UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | | |
|---|---|---|
| KSP INVESTMENTS, INC.<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | : | CASE NO. 1:07-CV-857<br><br><br><br>OPINION & ORDER<br>[Resolving Doc. No. 55] |

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

On March 22, 2007, Plaintiff KSP Investments, Inc. ("KSP"), as the Tax Matters Partner of AWG Leasing Trust, filed a complaint against the United States of America ("United States"). [Doc. 1.] The complaint challenges the Internal Revenue Service's proposed tax adjustments to the Plaintiff's 1999, 2000, 2001, 2002 and 2003 tax returns to disallow interest and depreciation deductions the Plaintiff had claimed regarding the sale and leaseback of a waste-to-energy facility in Germany (the "Facility"). *Id.* The case is set for trial on January 21, 2008.

On December 13, 2007, the Plaintiff filed a motion for an order to exclude the opinion testimony of the Defendant's expert witness Manfred Ernst ("Ernst"). [Doc. 55.] The Defendant opposed the motion on December 17, 2007. [Doc. 59.] On December 26, 2007, the Plaintiff replied in support of its motion to exclude Ernst's testimony. [Doc. 69.]

For the following reasons, this Court **DENIES** Plaintiff KSP's motion to exclude the opinion testimony of the Defendant's expert witness Manfred Ernst.

## I. Legal Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Fed. R. Evid. 702. Under Rule 702, testimony based on specialized knowledge is admissible if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* The Rule sets three additional prerequisites to admissibility:

(1) the testimony must be "based upon sufficient facts or data,"
(2) the testimony must be "the product of reliable principles and methods," and
(3) the witness must have "applied the principles and methods reliably to the facts of the case."

*Id.* As commentators have noted, Rule 702 evinces a liberal approach regarding admissibility of expert testimony. *See, e.g., Weinstein's Federal Evidence* § 702.02, at 702-6. Under this liberal approach, expert testimony is presumptively admissible. *Id.* Further, experts need not confine their testimony to matters upon which they have personal knowledge. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). *See also* Fed. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted.").

The Supreme Court in *Daubert* established the standard for admissibility of scientific expert testimony. *Id.* The requirement that "any and all scientific testimony or evidence admitted [be] not only relevant, but reliable," *id.* at 589, "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. This test has also been

applied to non-scientific expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). The Sixth Circuit has instructed, "Non-scientific expert testimony must be evaluated pre-trial with an equal degree of exactitude, ensuring not that the expert's testimony is 'known to a certainty,' but that the expert is basing the testimony on 'the same level of intellectual rigor that characterizes the practice in the relevant field.'" *Busch v. Dyno Nobel, Inc.*, 40 Fed. Appx. 947, 960 (6th Cir. 2002) (citing *Kumho,* 526 U.S. at 152).

In evaluating a motion to exclude expert testimony, the district court is charged with a "gatekeeper" function under Rule 702 of the Federal Rules of Evidence. Fed. R. Evid. 702. This "'gatekeeper inquiry' under Rule 702 is a flexible determination allowing the district court to exercise discretion, but 'there is no discretion regarding the actual performance of the gatekeeper function.'" *Busch,* 40 Fed. Appx. at 960-61 (internal citations omitted). The Sixth Circuit has held that, while the district court is not required to hold a *Daubert* hearing to determine the admissibility of expert testimony, the court must ensure that the disputed testimony is both relevant and reliable. *See Clay v. Ford Motor Co.,* 215 F.3d 663, 667 (6th Cir. 2000). Here, Plaintiff has filed the deposition of Ernst. [Doc. 64]. The parties have additionally provided the Court with Ernst's expert report, a report earlier provided to Plaintiff. The Court finds sufficient information to determine whether Ernst is qualified to testify under Rule 702.

**II. Discussion**

In this case, Plaintiff KSP argues generally that the opinion testimony proffered by the Defendant's expert witness Manfred Ernst is not relevant or reliable and that Ernst is not qualified to testify as an expert at trial. [Doc. 55.] This Court will analyze each question in turn.

*A. Relevance*

With its opening motion to exclude Ernst's testimony, Plaintiff made no argument that Ernst's testimony is not relevant. [Doc. 55]. Instead, Plaintiff only first attacks the relevance of Ernst's opinions in its reply. [Doc. 69 at 3-5.] Parties who fail to include an argument in an initial motion generally forfeit the argument. *American Trim, LLC v. Oracle Corp.*, 383 F.3d 462, 477 (6th Cir. 2004) ("This argument was raised for the first time in Oracle's reply brief, and this court has consistently held that we will not consider such arguments."); *United States v. Jerkins*, 871 F.2d 598, 602 n.3 (6th Cir.1989) ("It is impermissible to mention an issue for the first time in a reply brief because the appellee then has no opportunity to respond.") (internal citations omitted). Though the Plaintiff forfeited the argument that Ernst's testimony is irrelevant, the Court nevertheless examines this question.

To provide background, the Court briefly summarizes Ernst's expert report. The United States retained Ernst and seeks to offer his testimony. The Government assigned Ernst "to review and evaluate the opinions expressed by Deloitte & Touche in a written report dated December 7, 1999, as to the 'current fair market value' as of December 7, 1999 of a waste-to-energy facility owned and operated by [AWG]." Ernst Rep. at 1. In that December 7, 1999 report, Deloitte opined that "[t]he fair market value of the [AWG] Facility as of the Closing Date [December 7, 1999] is $423 million." Deloitte December 7, 1999 report at 3. In general, the United States offers Ernst to comment upon whether the Deloitte 1999 appraisal was so obviously deficient as to suggest that the Plaintiff never relied upon the report in deciding whether to set up the transaction but instead were motivated solely by tax considerations.

With his report, Expert Ernst generally finds that Deloitte used a generally appropriate methodology for valuing the AWG Facility. However, he say Deloitte then skewed the valuation

by selectively using incorrect inputs with huge effect upon Deloitte's valuation. Deloitte used three alternative valuation methods: market comparables, discounted cash flows, and cost analyses. While finding the general methodology appropriate, Ernst criticizes Deloitte's application of them.

Among the three methods of estimating the Facility's market value, Deloitte used a market approach. Market valuations look at two alternatives, either: 1) "examine sales or purchases of similar electric generating projects as a basis for determining value"; or 2) use a capital market approach "by comparing a subject company with companies which possess similar growth prospects and business risks." Deloitte Report at 55-56. As to the market value determination, Deloitte decided to rely upon the capital markets approach because "[t]he number of waste to energy facility transactions has been so small that a strong indication of value using the comparable transaction approach would be difficult considering the current depth of the transaction market." *Id.* To determine market valuation, Deloitte selected publicly traded companies and then compared their market valuation to their EBITDA.[1/] Claiming to have determined a representative EBITDA to market valuation relation, Deloitte then applied that relation to AWG's EBITDA.

While generally opining that this methodology is appropriate, U.S. Expert Ernst says Deloitte misapplied the market valuation procedure. Recall this market valuation method requires the appraiser identify <u>similarly situated</u> companies and then compare the market value of those companies to the EBITDA of those companies. Ernst criticizes Deloitte's failure to adjust earnings of comparable companies to reflect one-time events. For example, Deloitte used Allied Waste as a comparable but then failed to adjust the market multiple for the claimed fact that "the debt amount

[1/] Earnings Before (deductions of) Interest, Taxes, Depreciation and Amortization (EBITDA) measures net income before deducting costs associated with continuous business.

used to compute the market capitalization figure reflects the merger of Allied Waste with Browning Ferris that occurred in July 1999, while the 1998 EBITDA reflects the earnings of Allied Waste only, resulting in an overstatement of the market multiple." Ernst Rep. at 6. Using what Ernst says to be the proper EBITDA for Allied Waste, Ernst says its market multiplier falls from 20.3 used in the Deloitte report to 6.9 For another comparable company, Waste Management, Inc., Ernst says "Deloitte's estimate of 1998 EBITDA includes onetime expenses, which should not be included in the calculation of the market multiple; rather, only the EBITDA of the ongoing business should be included." Ernst Rep. at 6-7. After making adjustments to the EBITDA of Allied Waste Industries and Waste Management, Ernst says the EBITDA multiplier median falls from 11.4 to 6.1.

More important, Ernst criticizes Deloitte's use of an "adjusted 1998 EBITDA figure" when he says the actual reported 1998 EBITDA figure was available. Ernst says Deloitte used an "adjusted 1998 EBITDA" of DM 92.4 million rather than AWG's actual reported 1998 EBITDA of DM 41.12 million.

After adjusting for one-time earning events in comparable companies and using the actual 1998 EBITDA, Ernst says the AWG plant would be valued at $133 million under a market comparable valuation rather than the $557 million valuation found by Deloitte. In coming to this value, Ernst seemingly uses the same methodology used by Deloitte although using the actual 1998 EBITDA rather than the adjusted 1998 EBITDA and making the changes described above to the EBITDA of comparable companies to remove one-time events.

With regard to an alternative valuation based upon discounted cash flow, Ernst again finds Deloitte's use of this method appropriate although he again criticizes Deloitte's application of the approach. Using the cash flow approach, in 1999, Deloitte estimated the value of the facility at

approximately DM 870 million, or $460 million. Regarding the cash flow approach, Ernst says that Deloitte projected unreasonably high 1999 revenue by badly inflating tipping fees from the historical annual total of approximately DM 70 million to DM 127, a 70% increase from the 1998 actual tipping fee receipts, all without explanation. With a relatively stable measure of tons processed, to increase this tipping fee income, Deloitte apparently projected a price per ton of DM 330.97. It projected this, Ernst says, without explanation of how it would accomplish the significant increase in tipping fees, especially given the certain long-term contracts that AWG had extended to various municipalities, the principle purchaser of waste disposal. Using actual values of tipping costs and quantities, Ernst says the discounted cash flow should have resulted in a DM 370 million 1999 valuation, not Deloitte's DM 870 million valuation.

Finally, Ernst also agrees with Deloitte that a cost valuation can be appropriate. Once again however, Ernst criticizes Deloitte's method in applying the cost valuation. First, Ernst says Deloitte incorrectly double-counted capitalized interest and a turnkey premium. After withdrawing some of these costs, Ernst says the cost valuation should have been valued at DM 480 million or $254 million, substantially lower than Deloitte's 1999 cost valuation of DM 800 million or roughly $423 million.

The Plaintiff seeks to exclude the testimony of Manfred Ernst on the grounds that the testimony is irrelevant because Ernst "does not render any opinions that relate to the issues before this Court." [Doc. 69.] Specifically, Plaintiff KSP says that Ernst does not give an opinion as to the fair market value of the AWG Facility at the time of closing and merely substitutes different data into formulas that Deloitte uses. Further, the Plaintiff implausibly argues that Ernst never evaluates the propriety of Deloitte's techniques. The Court disagrees.

Rule 702 of the Federal Rules of Evidence enables a district court to admit expert testimony if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Here, the Court finds that Ernst's proposed testimony is highly relevant to several of the main issues involved in this litigation. The United States generally contends that the Plaintiff inflated the "purchase" price of the AWG facility to obtain greater depreciation and interest deductions. The Government argues that Deloitte knew this purpose and accommodated it by providing an unsupportable appraisal. Ernst will apparently attack that appraisal as evidence that Deloitte facilitated the improper deductions. Such testimony, if believed, seems highly relevant.

Ernst's testimony supports the Government's position that the sale and leaseback transaction lacks economic substance apart from its significant tax benefits. Ernst assesses the appraisal report conducted by Deloitte and finds it lacking in several ways that indicate that the fair market value of the Facility was not important to the parties in the transaction. Ernst utilizes the same methodology as Deloitte in appraising the Facility, but applies AWG's reported EBITDA as found in AWG's 1998 financial statements instead of using an "adjusted EBITDA" for 1998 as Deloitte did. Ernst gives the opinion that the "adjusted" EBITDA used by Deloitte resulted in a fair market valuation that was highly overstated.

Ernst concludes that Deloitte's appraisal of the Facility resulted in a significantly inflated value because the appraisal was based on future earnings assumptions that did not comport with AWG's actual reported financial information in the years leading up to the transaction. Further, Ernst testifies that the critical assumption used by Deloitte that waste processing "tipping" fees would increase in the future and consequently impact the value of the Facility was "inconsistent with reasonable economic expectations" and did not make sense in light of AWG's leveled financial

history. Ernst Rep. at 17-19.

Overall, Ernst's testimony, if believed, would raise significant doubt about Deloitte's appraised value of the Facility and, consequently, doubt about the participants' true motives for entering into the sale and leaseback transaction aside from the tax benefits.

The plausibility of the Deloitte 1999 appraisal has other relevance. The Plaintiff generally contends that a true sale occurred because it was highly unlikely that AWG would retake the facility during an option period occurring in 2024. The Plaintiffs contend that it is more likely that AWG will enter into a 12-year service contract rather than exercise a fixed purchase option. To enter the 12-year service contract, AWG would first need arrange for a non-recourse loan for the Plaintiff in the amount of $383 million with terms "acceptable" to the Plaintiff. Because the loan needs be non-recourse, the security represented by the value of the facility becomes extremely relevant to whether AWG could secure such loan even if it desired to enter the service contract. If the valuation of the facility is not significantly higher than $383 million, AWG will likely be unable to obtain a non-recourse loan, compelling them to purchase the Facility in 2024.

The Court finds that this testimony is relevant to the issue of whether the SILO transaction should be disregarded under the economic substance doctrine as lacking any financial incentive other than tax benefits. The Court further concludes that Ernst's testimony will be helpful in assisting the Court to understand the Deloitte report and in determining the true fair market value of the Facility.

*B. Reliability*

The Plaintiff also argues that Manfred Ernst's testimony is not reliable. Under Rule 702 of the Federal Rules of Evidence, expert opinions "must be reliable in an evidentiary sense--that is, trustworthy." *Weinstein's Federal Evidence* § 702.05. In *Daubert*, the Supreme Court created a

series of factors for courts to apply in determining reliability. *Daubert*, 509 U.S. at 592-94. Among these factors are:

- Whether the theory or technique that serves as the basis for the proposed expert testimony can be or has been tested.
- Whether the theory or technique has been published and subjected to peer review.
- The known or potential error rate experienced in the application of the particular technique.
- Whether the theory or technique is generally accepted in a definable relevant community.

*Id.* at 593-94.

In *Kumho*, the Supreme Court extended the gatekeeper function of district courts to cover non-scientific expert testimony. *Kumho*, 526 U.S. at 149. With regard to the *Daubert* factors, however, the *Kumho* Court stated:

> We also conclude that a trial court *may* consider one or more of the more specific factors that *Daubert* mentioned when doing so will help determine that testimony's reliability. But, as the Court stated in *Daubert*, the test of reliability is "flexible," and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.

*Id.* at 141-42.

Ernst is not a scientist; at least, not in the sense that the Supreme Court had in mind when it decided *Daubert*. Rather, he is an investment banker, and the methods and principles underlying the social sciences such as economics are less amenable to the factors listed in *Daubert*. The key questions with regard to the reliability of Ernst's testimony are (1) whether he applied a specific methodology to the facts before reaching his opinion; (2) whether that methodology is accepted within the relevant field of knowledge; and (3) whether that methodology has been subjected to peer review. Here, the answer to all three questions is affirmative.

Importantly, the appraisal methodology utilized by the Defense's expert witness Ernst is the same methodology used by the Plaintiff's own appraisal firm, Deloitte & Touche. As the Plaintiff itself points out, Ernst merely indicates problematic assumptions relied upon by Deloitte and substitutes different data into the same formulas and methodology as used by the Plaintiff's appraisers. In fact, both Ernst and Deloitte agree that Deloitte used the "well established and accepted methodology" of engaging in a three-part valuation analysis of Market Comparables, Discounted Cash Flows, and Cost Analyses. Ernst Rep. at 2. Neither party disputes the fact that this methodology is accepted within the field of property appraisal or that the specific methodology has been properly subjected to peer review.

The Plaintiff may challenge Ernst's belief that the Deloitte valuation made mistake such as using an estimated 1998 EBITDA rather than the actual 1998 EBITDA, but the Plaintiff does not question the legitimacy of Ernst's methodology. Issues regarding the data that Ernst used in criticizing the Deloitte report may be resolved through cross-examination, particularly in light of the fact that this is a bench trial. As the Supreme Court has noted, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. The Court thus concludes that the opinion testimony of Manfred Ernst is sufficiently reliable.

*C. Qualifications*

The main thrust of the Plaintiff's motion is that Ernst's testimony should be excluded because he is not a certified appraiser. The Plaintiff says he lacks the qualifications necessary to qualify as an expert in this case. [Doc. 55 at 1-5.] The Federal Rules of Evidence provide that a witness may be qualified as an expert "by knowledge, skill, experience, training, or education . . ." Fed. R. Evid.

702.

This Court finds that Manfred Ernst possesses sufficient knowledge, skill, experience, and education to meet the liberal standard for expert qualification as envisioned by the Federal Rules of Evidence. While it is true that Ernst's doctorate is not in the field of economics, he did receive training at the Wharton School and has worked in the field of corporate banking for over twenty-five years. Ernst Rep. at Appx. A. Ernst testified that he has significant experience in dealing with both domestic and international energy project finance transactions. Ernst Rep. at 1. In addition to his extensive experience over the past eighteen years in dealing with such transactions in his capacity as Managing Director of Fieldstone Private Capital Group, Inc., Ernst also served as Vice President of Corporate Finance for the Bankers Trust Co. *Id.* In this role, he gained experience working with European clients in the energy sector. Ernst further testified that, in his experience as an investment banker, he personally analyzed valuation reports of assets in the energy field. Ernst Rep. at 1-2.

The Court notes that Ernst is not a licensed appraiser. Although a certified appraiser might be able to provide a more authoritative expert opinion in this case, Ernst is still qualified as an expert on the proper valuation of assets like the Facility. Ernst does not claim to possess the credentials of a licensed appraiser, but rather, he testifies as an individual who has participated in numerous complex international transactions involving the transfer of assets similar to the those involved in the instant lawsuit. Ernst provides insight into the analysis and interests typically considered by parties with opposing interests entering into a "bona fide arms length transaction." [Doc. 59 at 4.] Because Ernst "has educational and experiential qualifications in a general field related to the subject matter of the issue in question," the Court would abuse its discretion if it found him unqualified merely because he potentially lacks expertise in the specialized area of waste-to-energy facility

appraisals or has failed to obtain formal certification as an appraiser. *Weinstein's Federal Evidence* § 702.04 (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 753-54 (3d Cir. 1994)).

The Court thus concludes that Ernst is qualified to testify as an expert witness for the Defense in this litigation.

**III. Conclusion**

For the reasons stated above, this Court **DENIES** the Plaintiff's motion to exclude the opinion testimony of the Defendant's expert witness Manfred Ernst.

IT IS SO ORDERED.

Dated: January 17, 2008

s/ *James S. Gwin*
JAMES S. GWIN
UNITED STATES DISTRICT JUDGE