**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **AWG LEASING TRUST,** | : | |
| **KSP INVESTMENTS, INC.,** | : | |
| **AS TAX MATTERS PARTNER** | : | |
| | : | |
| **Plaintiff,** | : | **Case 1:07-CV-857** |
| | : | |
| **v.** | : | **District Judge Gwin** |
| | : | |
| **UNITED STATES,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

**PLAINTIFF KSP INVESTMENTS, INC.'S POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

DAVID J. HOOKER  (0014531)
david.hooker@thompsonhine.com
JAMES D. ROBENALT (0022165)
james.robenalt@thompsonhine.com
BRIAN J. LAMB (0055447)
brian.lamb@thompsonhine.com
JEFFRY J. ERNEY (0040193)
jeffry.erney@thompsonhine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114-1291
Telephone: (216) 566-5500
Facsimile:  (216) 566-5800

COUNSEL FOR PLAINTIFF
KSP INVESTMENTS, INC.

## TABLE OF CONTENTS

Page

Table of Authorities ................................................................................................. iii
PROPOSED FINDINGS OF FACT ........................................................................... 1
I.    Nature of the Action ............................................................................................. 1
II.   Key's and PNC's Leasing Businesses ................................................................. 5
III.  The AWG Transaction ......................................................................................... 7
     A.     The Facility ................................................................................................ 7
     B.     The 1999 Bidding Process ...................................................................... 9
     C.     Due Diligence by Key and PNC .............................................................. 9
     D.     The Negotiations .................................................................................... 17
     E.     The Closing ............................................................................................ 18
     F.     The Sale .................................................................................................. 18
     G.    The Leaseback ....................................................................................... 22
     H.    The Service Contract .............................................................................. 28
     I.     Post-Closing Monitoring ........................................................................ 30
IV.  Non-Tax Benefits of the AWG Transaction ....................................................... 31
     A.     Business Purposes .................................................................................. 31
     B.     Pre-Tax Profit ........................................................................................ 31
     C.     Accounting and Book Earnings Benefits ............................................... 35
V.   The Two Purchase Options ................................................................................ 36
     A.     The FPO ................................................................................................. 36
     B.     Premium Option Price ............................................................................ 36
     C.     Attractive, Flexible Service Contract .................................................... 37
     D.    Other Factors Making Exercise of the FPO Uncertain ......................... 39
     E.     No German Tax Impact .......................................................................... 40
VI.  The Feasibility of Refinancing in 2024 ............................................................ 42
VII. Residual Value ................................................................................................... 46
PROPOSED CONCLUSIONS OF LAW .................................................................. 49
I.    Questions Presented .......................................................................................... 49
II.   The Court Has Jurisdiction and Venue is Proper .............................................. 50
III.  The AWG Transaction Has Practicable Economic Effects Aside From Tax
     Benefits ............................................................................................................. 52
     A.     Two-Prong Inquiry:  Business Purpose and Pre-Tax Profit ................... 52
     B.     Key and PNC Have Non-Tax Business Purposes for the AWG Transaction ....... 53
     C.     Key and PNC Have a Reasonable Possibility of Earning a Pre-Tax Profit .......... 58
IV.  The AWG Transaction's Substance Comports With its Form ........................... 64
     A.     The Sale-Leaseback-to-Service Contract is a Valid Transactional Form ........... 64
     B.     The Owner Trust Acquired the Benefits and Burdens of Ownership .................. 66
          (i)     Owner Trust Purchased the Facility for Fair Market Value ................... 69
          (ii)    The Trust Made and Maintained a Meaningful Equity Investment
                 in the Facility ......................................................................................... 72
          (iii)   The Trust Retained a Meaningful Residual Interest in the Facility ......... 73
          (iv)   AWG is Not Compelled to Exercise the FPO in 2024 ........................... 75

i

C.      The AWG Transaction Comports With Commonly Accepted Leasing
        Structures ........................................................................................... 82
D.      The Trust is the Owner of the Facility in Substance and Form ............................ 87
V.      The Loans Constitute Bona Fide Indebtedness For Federal Income Tax Purposes. ........ 88
VI.     Owner Trust is Entitled to the Benefit of the Partnership Items Reported on Its
        Returns for 1999-2003 ................................................................................. 91
VII.    Original Issue Discount................................................................................. 91
VIII.   Conclusion ................................................................................................ 93

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Alstores Realty Corp. v. Commissioner*, 46 T.C. 363 (1966) ........................................50

*American Electric Power Co. v. United States*, 326 F.3d 737 (6th Cir. 2003).......................50, 53

*American Realty Trust v. U.S.*, 498 F.2d 1194 (4th Cir. 1974)...............................................64, 77

*Arbor Tower Associate, Ltd. v. Commissioner*, 77 T.C.M. (CCH) 2348 (1999)...................69, 70

*BB&T Corp. v. United States*, 2007-1 U.S.T.C. (CCH) ¶¶ 50,130 (M.D. N.C. 2007) .................87

*Belz Investment Co. v. Commissioner*, 72 T.C. 1209 (1979), *aff'd on another issue by* 661
    F.2d 76 (6th Cir. 1981) ..................................................................68, 75, 76, 77

*Benton v. Commissioner*, 197 F.2d 745 (5th Cir. 1952) .........................................................76, 77

*Breece Veneer and Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956) ......................68, 80

*Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963) ...............................................................90

*Bryant v. Commissioner*, 928 F.2d 745 (6th Cir. 1991)....................................................49, 54, 55

*Burnet v. Harmel*, 287 U.S. 103 (1932).........................................................................................68

*Cal-Maine Foods v. Commissioner*, 36 T.C.M. (CCH) 383 (1977) ............................68, 75, 76, 77

*Calcasieu Paper Company, Inc. v. Commissioner*, 12 T.C.M. (CCH) 74 (1953) ........................77

*Casebeer v. Commissioner*, 54 T.C.M. (CCH) 432 (1987) ...........................................................60

*Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945)............................................................66

*Compaq Computer Corp. v. Commissioner*, 277 F.3d 778 (5th Cir. 2001)...................................84

*Coomes v. Commissioner*, 572 F.2d 554 (6th Cir. 1978).............................................................52

*Cooper v. Commissioner*, 88 T.C. 84 (1987)...............................................................50, 67, 84, 85

*Crane v. Commissioner*, 331 U.S. 1 (1947)...................................................................................88

*Crowley, Milner & Co. v. Commissioner*, 76 T.C. 1030 (1981), *aff'd*, 689 F.2d 635 (6th
    Cir. 1982) ................................................................................................................64

*Davis v. Commissioner*, 585 F.2d 807 (6th Cir. 1978) ..............................................56, 57

*Douglas v. Willcuts*, 296 U.S. 1 (1935) ...............................................................85, 90

*Dow Chemical Co. v. United States*, 435 F.3d 594 (6th Cir. 2006).......................................*passim*

*Emershaw v. Commissioner*, 59 T.C.M. 621 (1990) ...................................................72

*Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976) ...........................................88

*Estate of Kluener v. Commissioner*, 154 F.3d 630 (6th Cir. 1998)........................................66, 67

*Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985) ......................................... ...........*passim*

*First National Co. v. Commissioner*, 289 F.2d 861 (6th Cir. 1961) .............................................92

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) ........................................ *passim*

*Gefen v. Commissioner*, 87 T.C. 1471 (1986) ........................................ *passim*

*Gem, Inc. v. United States*, 192 F. Supp. 841 (N.D. Miss. 1961)....................................68, 76, 77

*Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981)........................................88

*Goldstein v. Commissioner*, 364 F.2d 734 (2d Cir. 1966) ............................................91

*Gregory v. Helvering*, 293 U.S. 465 (1935) ...............................................................52, 66

*Halle v. Commissioner*, 83 F.3d 649 (4th Cir. 1995)................................................88, 92

*Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252 (1939) ......................................65, 68

*Helvering v. Fuller*, 310 U.S. 69 (1940).................................................................85, 90

*Hilton v. Commissioner*, 671 F.2d 316 (9th Cir. 1982), *aff'g*, 74 T.C. 305 (1980) ......................60

*IES Industries v. United States*, 253 F.3d 350 (8th Cir. 2001) ......................................84

*Illinois Valley Paving Co. v. Commissioner*, 42 T.C.M. (CCH) 909 (1981)..........................75, 76

*Indmar Products Co., Inc. v. Commissioner*, 444 F.3d 771 (6th Cir. 2006)................................89

*Knetsch v. United States*, 364 U.S. 361 (1960)...........................................................90

*LTV Corp. v. Commissioner*, 63 T.C. 39 (1974)...........................................................77

iv

*Lemon v. United States*, 115 F. Supp. 573 (D. Va. 1953)............................................................79

*Levy v. Commissioner*, 91 T.C. 838 (1988) ................................................................ *passim*

*Lockhart Leasing Co. v. United States*, 446 F.2d 269 (10th Cir. 1971) .......................................77

*M&W Gear Co. v. Commissioner*, 54 T.C. 385 (1970), *rev'd on other grounds*, 446 F.2d
841 (7th Cir. 1971)..............................................................................................................78

*Martin v. Commissioner*, 379 F.2d 282 (6th Cir. 1967), *aff'g in part and rev'g in part*, 44
T.C. 731 (1965)....................................................................................................................79

*McShain v. Commissioner*, 71 T.C. 998 (1979)............................................................................70

*Miami Valley Broadcasting Corp. and Carolina Broadcasting Co. v. United States*, 204
Ct. Cl. 582, 588-90 (1974) ..................................................................................................71

*Mukerji v. Commissioner*, 87 T.C. 926 (1986) ................................................................ *passim*

*Negron v. United States*, 502 F. Supp. 2d 682 (N.D. Ohio 2007) .................................................70

*Northwest Acceptance Corp. v. Commissioner*, 58 T.C. 836 (1972)................................68, 75, 85

*Odend'hal v. Commissioner*, 748 F.2d 908 (4th Cir. 1984)...........................................................88

*Oesterreich v. Commissioner,* 226 F.2d 798 (9th Cir. 1955)........................................................77

*Old Colony Trust Co. v. Commissioner*, 279 U.S. 716 (1929) .....................................................83

*Packard v. Commissioner*, 85 T.C. 397 (1985) ...............................................................85, 89, 90

*Pearlstein*, 55 T.C.M. (CCH) 699.................................................................................................72

*Pearlstein v. Commissioner*, 58 T.C.M. (CCH) 669 (1989) .........................................................53

*Pleasant Summit Land Corporation v. Commissioner*, 863 F.2d 263 (3rd Cir. 1989) .................88

*Regents Park Partners v. Commissioner*, 63 T.C.M. (CCH) 3131 (1992) ....................................70

*Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184 (1983), *aff'd in part and rev'd in
part*, 752 F.2d 89 (4th Cir. 1985)........................................................................................60

*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985)...................50, 52, 53, 58

*Sanderson*, 50 T.C.M. (CCH) 1033 ......................................................................................82, 83

*Smith v. Commissioner*, 51 T.C. 429 (1968) ................................................................78

*Smith v. Commissioner*, 937 F.2d 1089 (6th Cir. 1991) ..............................................53

*Stanley Works and Subs. v. Commissioner*, 87 T.C. 389 (1986) ............................69, 70

*Toilet Room Accessories Co., Inc. v. United States*, 80-2 U.S.T.C. (CCH) 9563 (N.D. Ohio 1980) ................................................................................................................52

*Torres v. Commissioner*, 88 T.C. 702 (1987) ................................................... *passim*

*Transamerica Corp. v. United States*, 15 Cl. Ct. 420 (1988) ...........................68, 75, 76

*Tufts v. Commissioner*, 461 U.S. 300 (1983) ..............................................................88

*United States v. Cartwright*, 411 U.S. 546 (1973) ......................................................70

*Utilicorp United, Inc. & Subs. v. Commissioner*, 73 T.C.M. (CCH) 1835 (1997) ........71

*Van Valkenburgh v. Commissioner,* 26 T.C.M. (CCH) 753 (1967) ..............................77

*Welch v. Helvering*, 290 U.S. 111 (1933) ....................................................................52

## FEDERAL STATUTES

26 U.S.C. §§ 1271-1275 ..........................................................................................51, 92

26 U.S.C. § 1273(a) ......................................................................................................92

26 U.S.C. § 1273(b)(2) ..................................................................................................92

26 U.S.C. § 1273(c) .......................................................................................................92

26 U.S.C. § 163(a) ...........................................................................................51, 88, 91

26 U.S.C. § 168 ..................................................................................................51, 91

26 U.S.C. § 168(g)(3)(A) ...............................................................................................66

26 U.S.C. § 168(h)(2) ....................................................................................................66

26 U.S.C. § 385 ..............................................................................................................89

26 U.S.C. § 61 .......................................................................................................51, 91

26 U.S.C. § 6221 ............................................................................................................51

26 U.S.C. § 6226(a)(2) ....................................................................................................5

26 U.S.C. § 6226(c) ........................................................................................................3

26 U.S.C. § 6226(e)(1) ....................................................................................................4

26 U.S.C. § 6226(f) ........................................................................................................50

26 U.S.C. § 6231(a)(1)(B)(ii) ..........................................................................................2

26 U.S.C. § 6231(a)(3) ..................................................................................................51

26 U.S.C. § 6231(a)(7) ....................................................................................................2

26 U.S.C. § 6662(a) ......................................................................................................51

26 U.S.C. § 6662(b)(2) ..................................................................................................51

26 U.S.C. § 6662(d) ......................................................................................................51

26 U.S.C. § 6664 ..........................................................................................................51

26 U.S.C. § 7701(e) ................................................................................................65, 66

Priv. Ltr. Rul. 8144014 ............................................................................................59, 62

Priv. Ltr. Rul. 8507002 (November 6, 1984)................................................................61

Priv. Ltr. Rul. 8804020 (October 29, 1987)............................................................86, 90

Rev. Proc. 75-21 ....................................................................................................*passim*

Rev. Proc. 75-28 ..............................................................................................32, 59, 68

Rev. Proc. 2001-28, 2001-C.B. 1156............................................................................68

Rev. Proc. 2001-29, 2001-1 C.B. 1160..........................................................................68

Rev. Rul. 55-540 ................................................................................65, 68, 76, 77, 79

Rev. Rul. 59-60, 1959-1 C.B. 237 ................................................................................70

Rev. Rul. 68-590 ....................................................................................................65, 68

Rev. Rul. 77-110, 1977-1 C.B. 58 ...................................................................................88

Rev. Rul. 78-29, 1978-1 C.B. 62 ...................................................................................88

Rev. Rul. 85-42 ...................................................................................................86, 90

Tech. Adv. Mem. 9748005 (August 19, 1997) ....................................................67, 86, 90

Tech. Adv. Mem.  9802002 (September 18, 1997) ...............................................68, 86, 90

Treas. Reg. § 1.1001-3(d) ........................................................................................85

Treas. Reg. § 1.1001-3(e)(5)(ii)(A) .............................................................................85

Treas. Reg. § 1.1272-1(c)(5) .....................................................................................93

Treas. Reg. § 1.1273-1(b) .........................................................................................92

Treas. Reg. § 1.1275-1(d) .........................................................................................92

Treas. Reg. § 1.170A-1(c)(2) .....................................................................................70

Treas. Reg. § 1.61-13(b) .....................................................................................85, 90

Treas. Reg. § 20.2031-1(b) .......................................................................................70

Treas. Reg. § 301.6221-1(c) ......................................................................................51

Treas. Reg. § 301.6221-1(d) ......................................................................................51

Treas. Reg. § 301.6226(e)-1(a) ....................................................................................4

Treas. Reg. § 301.6231(a)(3)-1(a) and (b) ....................................................................51

Treas. Reg. § 301.6231(a)(5)-1(e) ...............................................................................51

Treas. Reg. § 301.7701-2 ............................................................................................2

Treas. Reg. § 301.7701-3 ............................................................................................2

## OTHER AUTHORITIES

Macan & Robinson, *Tax Aspects of Equipment Leasing*, EQUIPMENT LEASING –
    LEVERAGED LEASING, Ch. 4 (Ian Shrank & Arnold G. Gough, Jr., eds, Practicing
    Law Institute 2007) .................................................................................. 58, 59, 61, 65, 69, 73

Staff of Senate Committee on Finance, Explanation of Deficit Reduction Tax Bill of
    1984, 136-37 (April 2, 1984) ............................................................................................ 66, 67

Plaintiff KSP Investments, Inc. submits the following as its post-trial proposed findings of fact and conclusions of law.

The Court conducted a bench trial in this matter on January 21 through January 25, 2008. During the course of the trial, the Court received testimony, documentary evidence, and stipulations.  The Court now issues its findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.  These findings of fact and conclusions of law represent the Court's conclusions after consideration of all the evidence in light of the pertinent law, the Court's observation of the witnesses, and its evaluation of their demeanor, qualifications and credibility.

**PROPOSED FINDINGS OF FACT**

**I.      NATURE OF THE ACTION**

1.      This case concerns the proper federal income tax treatment of an international leasing transaction involving subsidiaries of KeyCorp and PNC Financial Services Group, Inc. (Stip. ¶ 1.)

2.      In 1999, KSP Investments, Inc., a subsidiary of KeyCorp (hereinafter collectively defined as "Key"), and PNC Capital Leasing LLC, a subsidiary of PNC Financial Services Group, Inc. (hereinafter collectively defined as "PNC") entered into a transaction with a German company owned by a consortium of German municipalities (the "AWG Transaction").  The asset involved in this case is a waste-to-energy facility in Wuppertal, Germany (the "Facility").  (Stip ¶ 2.)

3.      Key and PNC made their respective investments in the AWG Transaction through a Delaware business trust named the AWG Leasing Trust (Stip ¶ 3), which is sometimes referred to in the operative transaction documents and hereinafter as the "Owner Trust" or the "Trust."

4.      The Owner Trust is treated as a partnership for federal income tax purposes. (Treas. Reg. §§ 301.7701-2 and 301.7701-3.)  The Owner Trust's employer identification number for federal income tax purposes is 34-1934583, and its principal place of business is located at 127 Public Square, 13th Floor, Cleveland, Ohio  44114.  (Stip. ¶ 8.)

5.      The Owner Trust files an annual U.S. Return of Partnership Income (Form 1065), and is a pass-through entity with its two partners (Key and PNC) receiving annual schedule K-1s (Partner Share of Income, Deductions, Credits, Etc.) reporting their allocable shares of the Owner Trust's income and deductions.  (Stip. ¶ 9.)

6.      The Owner Trust timely elected under 26 U.S.C. § 6231(a)(1)(B)(ii) to have the tax treatment of any partnership item determined at the partnership level.  (Stip. ¶ 10.)

7.      Under the terms of the Trust Agreement dated December 6, 1999, Key and PNC are the grantors and beneficiaries of the Trust.  (Stip. ¶ 4.)  In general, Key and PNC each have a 50% allocable share of the Trust Estate, although there are schedules to the Trust Agreement that specify different marginal amounts to be distributed or allocated to each of Key and PNC in certain respects.  (Stip. ¶ 7.)

8.      Pursuant to the Trust Agreement, Key is the Tax Matters Partner of the Owner Trust within the meaning of 26 U.S.C. § 6231(a)(7).  Key, accordingly, brings this action on behalf of the partnership for a determination of the propriety of the IRS's proposed adjustments to certain "partnership items" in the Owner Trust's tax returns.  (Stip. ¶ 11.)

9.      KSP Investments, Inc. is indirectly owned by KeyCorp, a bank-based financial services company headquartered in Cleveland, Ohio.  KeyCorp owns KeyBank National Association, a national bank.  KSP Investments, Inc.'s address is 127 Public Square, 13th Floor, Cleveland, Ohio 44114.  (Stip. ¶ 12.)

2

10.     PNC Capital Leasing LLC is indirectly owned by PNC Financial Services Group, Inc., a bank-based financial services company headquartered in Pittsburgh, Pennsylvania.  PNC Financial Services Group, Inc. owns PNC Bank, a national bank.  PNC's address is 620 Liberty Avenue, Two PNC Plaza, 13th Floor, Pittsburgh, Pennsylvania 15222.  (Stip. ¶ 13.)

11.     PNC is deemed to be a party to this action by operation of statute.  (*See* 26 U.S.C. § 6226(c).)  (Stip. ¶ 14.)

12.     The defendant is the United States of America.  (Stip. ¶15.)

13.     The Owner Trust timely filed federal income tax returns (Forms 1065, U.S. Return of Partnership Income) for taxable years ending December 31, 1999, December 31, 2000, December 31, 2001, December 31, 2002, and December 31, 2003 (hereinafter, collectively referred to as the "Taxable Years").  (Stip. ¶ 16.)  On its tax returns for the Taxable Years, the Owner Trust reported income in the form of accrued rent payments under the Lease, and also reported deductions for depreciation expense on the Facility, interest expense on the Series A and Series B Loans, and amortization expense for the transaction costs (such as attorneys' fees and appraisal costs).  (Tax Returns, Joint Exs. XXX, XXXI, XXXII, XXXV, and XXXVIII.)

14.     The IRS challenged several tax positions taken in the Owner Trust's tax returns for each of the Taxable Years at issue, and asserted various adjustments in the Final Partnership Administrative Adjustment ("FPAA") issued to the Owner Trust on December 26, 2006.  (Stip. ¶ 18.)  Among other things, the IRS took the position that the Owner Trust did not become the owner of the Facility, for federal income tax purposes, and thus was not entitled to the tax benefits of ownership.  (Stip. ¶ 19; NOPA, Pl. Ex. 161.)  The IRS has asserted adjustments to the Owner Trust's tax returns to disallow deductions claimed by the Owner Trust and to re-

characterize the nature of the transaction in other ways that negatively affect the Owner Trust.

(Stip. ¶ 20; NOPA, Pl. Ex. 161.)

15.     The following chart depicts the asserted adjustments set forth by the IRS in the

FPAA.  (Stip. ¶ 21.)

| | | 1999 | 2000 | 2001 | 2002 | 2003 |
|---|---|---|---|---|---|---|
| Deemed Loan/Original Issue Discount | increase to income | $162,405 | $2,673,834 | $2,818,079 | $3,100,826 | $3,411,942 |
| Rent Accruals | decrease to income | | ($19,490,891) | ($23,866,424) | ($23,866,424) | ($23,866,424) |
| Sub-total | | $162,405 | ($16,817,057) | ($21,048,345) | ($20,765,598) | ($20,454,482) |
| Depreciation Expense | disallow deductions | $1,163,708 | $13,964,498 | $13,964,498 | $13,964,498 | $13,964,497 |
| Interest Expense | disallow deductions | $1,785,411 | $27,179,214 | $27,560,838 | $27,829,792 | $28,105,924 |
| Amortization of Transaction Costs | disallow deductions | $11,242 | $168,620 | $168,620 | $168,620 | $168,118 |
| Sub-total | | $2,960,361 | $41,312,332 | $41,693,956 | $41,962,910 | $42,238,539 |

16.     In order to challenge the adjustments asserted by the IRS, Key was required under

26 U.S.C. § 6226(e)(1) and Treas. Reg. § 301.6226(e)-1(a) to make a deposit with the Secretary

of the Treasury in an amount equal to the amount that its federal income tax liability would be

increased for the Taxable Years if the treatment of partnership items on its returns was made

consistent with the treatment of partnership items on the Owner Trust's partnership returns as

adjusted by the FPAA.  Key satisfied this obligation on March 19, 2007 by depositing with the

IRS in Cleveland, Ohio, the requisite amounts totaling $15,968,000, which were calculated in

good faith.  (Stip. ¶¶ 22, 23.)

17.     26 U.S.C. § 6226(e)(1) and Treas. Reg. § 301.6226(e)-1(a)) do not require any

partner other than the partner filing the petition to deposit its share of the potential tax liability

before instituting an action in district court.  (Stip. ¶ 24.)

4

18.     Key, as the Tax Matters Partner of the Owner Trust, and on behalf of the Owner

Trust, timely filed a Complaint in this Court on March 22, 2007, pursuant to 26 U.S.C. §

6226(a)(2).  The Complaint was filed within ninety (90) days of December 26, 2006, the date of

the Government's FPAA.  (Stip. ¶ 25.)

## II.     KEY'S AND PNC'S LEASING BUSINESSES

19.     Key and PNC invested in the AWG Transaction as part of their respective leasing

businesses.  (Larkins Tr. 281-82; Keener Tr. 311.)

20.     Key and PNC are large bank-based financial services companies offering a wide

range of products and services, including leasing services.  Key and PNC maintain multi-billion

dollar leasing portfolios, and they compete with each other and with many other leasing

companies in the leasing business, which in 1999 was a $200-300 billion industry.  (Larkins Tr.

266-69; Angel Tr. 54.)

21.     Key and PNC have been engaged in the leasing business for several decades.

(Stip. ¶ 29.)  In 1999, Key's leasing business had approximately 300-500 employees, and PNC's

leasing business had approximately 35-40 employees.  (Stip. ¶¶ 27, 28.)

22.     By the end of 1999, Key and PNC each had entered into multiple "domestic"

leveraged leasing transactions, in which the assets, the lessors and the lessees were all located in

the U.S.  (Leveraged Lease Portfolio, Joint Ex. LVII, KSP0207193-200; Keener Tr. 320.)  For

example, Key has owned nuclear power plants, a semi-conductor manufacturing facility, an

Oregon pulp processing plant, a New York de-inking facility and a chocolate factory in

Wisconsin.  (Angel Tr. 57-58; Shinderman Tr. 1100-01, 1126.)  The IRS does not challenge

Key's ownership of these domestic assets.

23.     By December 1999, Key and PNC had engaged in multiple cross-border leveraged leasing transactions.  (Larkins Tr. 272; Angel Tr. 60; Keener Tr. 320-21.)  Key also had an international leasing presence through a subsidiary called Leasetec, which it acquired in 1997.  Leasetec had (and has) leasing operations in 23 countries, including Germany.  (Angel Tr. 51-52.)  The AWG Transaction fit within Key's movement into the international leasing market. (Larkins Tr. 272.)

24.     The economics and accounting for leveraged leases are unique and are important reasons why bank-based lessors engage in leveraged lease transactions.  (Hurd Tr. 602-06; Angel Tr. 116-17.)

25.     In a "leveraged lease," there are at least three parties:  a lessor, who purchases an asset with partially borrowed funds; a third party lender, who loans part of the money to the lessor, on a non-recourse basis, to purchase the asset; and a lessee, who leases the asset from the lessor for a definite period.  (Angel Tr. 53; Rev. Proc. 75-21, Pl. Ex. 189, § 1.)

26.     Leveraged leasing is a well-established form of asset-based financing that delivers a front loaded pattern of after-tax cash by, among other things, allocating the risks and rewards of ownership to the lessor/investor instead of the user of property.  (Hurd Tr. 595-96.)

27.     As embodied in tax and accounting regulations, the concept of leveraged leasing involves an exchange of a rent obligation and meaningful residual value from the user of property to the lessor, as well as associated tax benefits that are available to an owner of property.  In return, the lessee receives a reduction in the cost of using the property.  (Hurd Tr. 599-600.)

28.     Leveraged lease accounting is a special method of accounting that was authorized by the Financial Accounting Standards Board in 1976 in recognition of the unique economics of

a leveraged lease. The standards for leveraged lease accounting are contained in Financial Accounting Standards Number 13 ("FAS-13"). (Hurd Tr. 602, 611.) FAS-13 is a comprehensive standard that addresses the accounting for leases from both the lessee and the lessor perspectives. It contains within it a section on leveraged lease accounting. (Hurd Tr. 612.)

29. Under leveraged lease accounting, the lessor's investment is reported net of non-recourse debt. This method of reporting only the lessor's equity investment is unique to leveraged lease accounting and enhances the investor's return on assets and return on equity relative to other non-leveraged lease investments. (Hurd Tr. 603-04, 610.)

30. The accounting for leveraged lease investments allows banks to increase and diversify their portfolio of financial assets while adhering to applicable bank regulations on leasing and capital investments. (Hurd Tr. 610.)

31. Leveraged leasing provides diversification within the leasing products offered by banks. (Angel Tr. 53; Hurd Tr. 604.)

### III.  THE AWG TRANSACTION

#### A.  The Facility

32. The Facility incinerates household and small business trash and uses the trash as fuel to generate electricity, steam heat, and certain by-products. (Stip. ¶ 30.) The Facility generates revenue by: (a) charging "tipping fees" to those who deliver their trash for incineration; and (b) selling electricity, steam heat, and by-products that are generated during the incineration process. (Stip. ¶ 31.)

33. The Facility became operational in 1976 and was refurbished and renovated from 1991 to 1997. (AWG Equity Memo, Pl. Ex. 52, IRS-ADM-000468, § III; Duke Report, Joint Ex.

XXIV, KSP0175811.)  The Facility is a fully integrated waste to energy facility and each component of the Facility is interrelated to the other components of the Facility in terms of useful life, function, structure and design, and it is anticipated that the basic components of the Facility will be retired contemporaneously with one another.  (Appraisal, Pl. Ex. 119, PNC0004918.)

34.     In 1999, the Facility was owned and operated by a German corporation called Abfallwirtschaftgesellschaft mbH Wuppertal ("AWG").  (Stip. ¶ 32.)  In 1999, AWG was owned, in essence, by the German cities of Wuppertal, Remscheid, and Velbert (the "Cities").  The largest shareholder in AWG is the Wuppertaler Stadtwerke WSWAG, the public utilities arm of the City of Wuppertal.  In particular, the shares of AWG were owned as follows:  Wuppertaler Stadtwerke WSWAG (Public Utilities) – 70.47%; Stadtwerke Remscheid GmbH – 24.97%; Stadtwerke Velbert – 4.5%; Stadt of Wuppertal – 0.03%; and Stadt of Remscheid - 0.03%.  (Stip. ¶ 34.)  The Cities are also customers of AWG in that they deliver their trash to the Facility and pay AWG tipping fees to incinerate their trash.  (Stip. ¶ 35.)

35.     The Cities of Wuppertal and Remscheid (the owners of AWG) had economic and political reasons for encouraging the transaction.  AWG's 1998 financial statements disclose its reasons for entering into the transaction.  AWG was concerned that a change in the Recycling Industry Act threatened to "shift the financial effects to private households and those who pay fees."  In order to reduce the negative impact of this change in the law, AWG planned to enter into a cross-border lease transaction for its facility.  AWG's auditors reported:  "The cash value advantage that will accrue to the Company through this transaction is to be used to reduce the incineration prices for the municipal deliverers.  If it proves impossible to successfully complete the planned transaction, then a substantial rise in the incineration prices can be expected

8

beginning in 2000."  (1998 AWG Audit Report, Joint Ex. XLIX, KSP0165907.)  As Wolfram

Reutlinger testified:  "[I]n the last decade, all major cities, with the possible exception of

Dusseldorf, had to combat major fiscal problems since the 1980s. Not only during the last decade.

Wuppertal and Duisberg faced the same problems."  Accordingly, the AWG Transaction was

viewed as a way to raise needed capital and to avoid making politically unfavorable choices.

(Reutlinger Tr. 674.)

### B.  The 1999 Bidding Process

36.    In April 1999, AWG sought investors by requesting proposals for a sale leaseback

of its Facility.  (Stip. ¶ 41; AWG Equity Memo, Pl. Ex. 52.)  AWG asked bidders to base their

proposals upon an estimated fair market value of the Facility of $440 million.  (AWG Equity

Memo, Pl. Ex. 52, IRS-ADM-000460.)

37.    AWG sought defeasance arrangements in its request for proposal.  (AWG Equity

Memo, Pl. Ex. 52, IRS-ADM-000461, § I(E) (stating that "lenders and defeasance providers"

were to be arranged by AWG's advisors, debis and PWC); AWG Equity Memo, Pl. Ex. 52, IRS-

ADM-000472, § IV (soliciting potential bidders to provide certain economic data, including

"debt and defeasance schedules"); Angel Tr. 123-25.)

38.    In August 1999, after the submission of proposals, PNC, Key and AWG signed a

conditional term sheet providing for further due diligence and negotiation.  (Stip. ¶¶ 42, 43, 44,

45, 46; Key Proposal, Pl. Ex. 73, BOSTON0004062-64; PNC Proposal, Pl. Ex. 83, PNC005663-

65.)

### C.  Due Diligence by Key and PNC

39.    Key and PNC each approached the proposed transaction in a prudent, businesslike

manner.  (Angel Tr. 104-119, 146, 148-61; Larkins Tr. 274; Keener Tr. 311-12, 328-29.)  Key

9

and PNC conducted extensive due diligence, relying on resources within their own companies, as well as hiring independent, well-qualified experts to advise them on engineering, appraisal, environmental, financial, and U.S. and foreign legal issues.  (Angel Tr. 104-119, 155; Keener Tr. 322-31.)

40.     Key and PNC engaged an engineering firm, Duke Engineering & Services, Inc. ("Duke") to perform an assessment of the Facility.  (Stip. ¶ 47.)  Duke, an established engineering firm, which at the time of the transaction had conducted formal due diligence reviews of between 10 to 20 waste-to-energy facilities, was asked to assess the design, construction, operation and expected useful life of the AWG Facility.  (Gonzalez Tr. 363-64.) To do this, Duke put together a highly knowledgeable team, with decades of experience in power and waste-to-energy plants, conducted an on-site investigation and prepared a comprehensive 186-page detailed report.  (Stip. ¶¶ 47, 48, 49, 50, 51; Gonzalez Tr. 365-69; Duke Report, Joint Ex. XXIV.)  For its work, Duke was paid $162,800. (Stip. ¶ 52.)  Key had engaged Duke on prior leasing transactions and was comfortable with Duke's reputation and qualifications.  (Angel Tr. 111.)  Duke opined that the Facility was state-of-the-art and had a remaining useful life of 46 years.  (Duke Report, Joint Ex. XXIV, KSP0175812; Gonzalez Tr. 372-73.)  (Stip. ¶¶ 50, 51.)

41.     Key and PNC engaged Deloitte & Touche LLP ("Deloitte") to prepare an appraisal of the Facility and a study of the economics of the proposed transaction (the "Deloitte Appraisal").  (Stip. ¶ 53.)  Key had engaged Deloitte to provide appraisal services in prior leasing transactions, including another waste-to-energy facility in Germany.  (Angel Tr. 77.)  Deloitte is a well-known, reputable firm with respect to appraising facilities.  (Angel Tr. 77, 80.)

42.     The final Deloitte Appraisal was dated December 7, 1999.  (Stip. ¶ 54.)  As part of its analysis, Deloitte performed a physical inspection of the Facility in April 1998.   Deloitte's

Appraisal includes a letter from AWG dated December 7, 1999, certifying that "The Facility is substantially in the same condition it was when it was inspected by Deloitte & Touche."  (Stip. ¶ 55.)  Deloitte's Appraisal concludes that the remaining economic useful life of the Facility is 46 years.  (Stip. ¶ 56.)

43.     The Deloitte Appraisal was conducted in accordance with generally accepted appraisal standards, as set forth by the American Society of Appraisers.  (Appraisal, Pl. Ex. 119, PNC0004918 and PNC0005020; Ellsworth Tr. 459-61; Ernst Tr. 950.)  Four appraisers from Deloitte signed the Appraisal.  (Appraisal, Pl. Ex. 119, PNC0005020.)  At the time of the AWG appraisal, Deloitte had already appraised half a dozen waste-to-energy ("WTE") facilities in the U.S., Germany, and elsewhere.  (Ellsworth Tr. 415.)

44.     Deloitte studied three aspects of the AWG Transaction.  First, Deloitte appraised the fair market value of the Facility as of the closing date of December 7, 1999 (the "Closing Date").  (Appraisal, Pl. Ex. 119, PNC0004918; Stip. ¶ 71.)  Second, Deloitte estimated the future fair market value of the Facility at the end of the Lease Term and the end of the Service Contract Term for purposes of assessing expected residual values.  (Appraisal, Pl. Ex. 119, PNC0004918-19.)  Third, Deloitte analyzed the economics of the Service Contract as part of a compulsion analysis with respect to the options facing AWG in 2024.  (Appraisal, Pl. Ex. 119, PNC0005003-04.)

45.     Deloitte concluded that the fair market value of the Facility as of the Closing Date was $423 million.  (Appraisal, Pl. Ex. 119, PNC0004918; Stip. ¶ 57.)

46.     As part of its standard appraisal process, Deloitte sought information from AWG regarding the Facility, the region and the waste-to-energy market.  (Due Diligence Information Request, Pl. Ex. 55, DT000025-28; Ellsworth Tr. 416-20.)  AWG, through its representatives,

11

provided written responses.  (AWG Response, Pl. Ex. 55, DT000029-44; Ellsworth Tr. 416-20.)

Deloitte also gathered information from other sources, as listed in the Appraisal (Appraisal, Pl.

Ex. 119, PNC0005028-32; Ellsworth Tr. 422-23) and as contained in Deloitte's work papers.

(Index of Deloitte Work Papers, Pl. Ex. 191.)  In reaching its opinion about fair market value,

Deloitte concluded that the cost approach provided the strongest indication of current fair market

value.  (Appraisal, Pl. Ex. 119, PNC0004996.)  The cost approach to valuation is based on the

concept that an informed purchaser measures an asset's value by the cost of substituting another

asset of comparable utility.  (Appraisal, Pl. Ex. 119, PNC0004972.)

47.     Deloitte was aware of construction costs and value indications of similar waste-

to-energy facilities in Germany and Western Europe from its work on other valuation projects.

(Appraisal, Pl. Ex. 119, PNC0004976 and 0004978; Ellsworth Tr. 456.)  Additionally, during

due diligence, AWG provided information of a comparable, recently constructed plant within the

region, a waste-to-energy facility in Cologne, Germany (Koln), that cost DM 900 million (a

450,000 tons/year plant), which closely tracked with Deloitte's DM 800 million ($423 million)

valuation for the AWG Facility (a 385,000 tons/year plant).  (Ellsworth Tr. 428-29; AWG

Response, Pl. Ex. 55,  DT000031.)  This is the best evidence of what it would cost to replace the

AWG Facility in 1999.

48.     This valuation was supported by the testimony of Werner Jacob, who represents a

client that built a 260,000 tons/year plant nearby for DM 700 million in 1998.  (Jacob Tr. 763.)

Further, Deloitte's cost analysis was buttressed at trial by an experienced appraisal expert, Rick

Meyer, who had appraised waste-to-energy facilities in the Netherlands and in Hamburg,

Germany.  The WTE facility in Hamburg, Germany was valued at $700 million (dollars). (Meyer

Tr. 1144, 1148-58.)

49.     Deloitte also considered information about what it cost to build a new WTE facility on a "cost per daily ton" basis.  Based on its experience, Deloitte concluded that there was a range in the U.S. and Western Europe of between $147,000 and $760,000 per daily ton of capacity.  Using the exchange rate, Deloitte estimated that the cost per daily ton for the AWG Facility would fall in the middle of this range, approximately $400,000 per daily ton (or $421 million in total).  (Appraisal, Pl. Ex. 119, PNC0004977-78.)

50.     AWG also provided Deloitte with asset registers listing the description, date of installation and "original purchase price" of each item of equipment that makes up the integrated Facility.  (Ellsworth Tr. 431; AWG Asset Register, Pl. Ex. 33.)  Using accepted appraisal techniques, Deloitte adjusted the "original purchase price" information for inflation using the Handy-Whitman index (a recognized inflation guide); added capitalized interest to include an estimate of financing costs during construction; added a turn-key premium of 7.5% (to reflect the value of the risk that AWG assumed in building a facility that would actually work and would pass regulatory hurdles in becoming operational, as well as the opportunity cost associated with waiting for a long construction period when the plant would not be generating income); and subtracted an estimated amount of physical depreciation based on the age of the particular asset. (Ellsworth Tr. 432-34; Appraisal, Pl. Ex. 119, PNC0005064-73.)

51.     Using these generally accepted appraisal techniques, Deloitte concluded that the total project costs to replace or reproduce the Facility would be approximately DM 800 million (or $423 million U.S., given the 1.89 to 1 exchange rate at the time).  (Appraisal, Pl. Ex. 119, PNC0004972-78.)

52.     Deloitte also performed a discounted cash flow ("DCF") analysis.  (Appraisal, Pl. Ex. 119, PNC0004985-96.)

13

53.     The largest single variable in Deloitte's DCF analysis is the projected tipping fees that the owner could collect from customers for waste incineration services.  (Appraisal, Pl. Ex. 119, PNC0004991.)

54.     In its projections of future revenues, Deloitte used market tipping fee information (AWG Response, Pl. Ex. 55, DT000030; Tipping Fees for Southern Germany, Pl. Ex. 30, DT-000712-14; Tipping Fees for North Rhine, Pl. Ex. 43, DT0000715; Appraisal, Pl. Ex. 119, PNC0004991; Ellsworth Tr. 421-26), rather than the below market, subsidized tipping fees that AWG historically charged its customers (who were also AWG's shareholders).  (AWG Response, Pl. Ex. 54, DT000023; AWG Response, Pl. Ex. 55, DT000043; Ellsworth Tr. 414-15, 427, 447, 480-81.)  AWG advised Deloitte that its tipping fees were not market based:  "Today the clearing prices for disposal of household waste are determined rather by political considerations than as a function of the market situation."  (AWG Response, Pl. Ex. 54, DT00023.)

55.     This was appropriate because AWG's waste disposal contracts with the Cities were not being conveyed to (or assumed by) the Owner Trust as part of the transaction; only the Facility was being conveyed.  (Ellsworth Tr. 447-48, 450-51; Meilman Tr. 521-25; P.A., Joint Ex. II, IRS-ADM-002224, definition of "Facility"; Head Lease, Joint Ex. IV, IRS-ADM-002737, description of leased property; P.A., Joint Ex. II, IRS-ADM-002114, § 7(m), definition of "Liens"; P.A., Joint Ex. II, IRS-ADM-002115, § 7(q), free and clear of liens; P.A., Joint Ex. II, IRS-ADM-002240-41, definition of "Permitted Liens"; Closing Memo, Joint Ex. I, IRS-ADM-002062, closing memorandum does not list any agreement in which the Trust assumes liability for the waste disposal contracts; Lease, Joint Ex. VI, IRS-ADM-002803, § 15(a)(vi), in the event of default Trust can retake the Facility "free and clear" of any rights of AWG.)  In other words,

14

the Owner Trust was purchasing the Facility unencumbered by the contracts between AWG and the Cities, and Deloitte relied on that premise in valuing the Facility.  (Ellsworth Tr. 450-51; Appraisal, Pl. Ex. 119, PNC0005018, #2.)   Deloitte defined fair market value "as the price at which property would change hands between a willing buyer and willing seller, neither being under any compulsion to buy or sell, with both having reasonable knowledge of the relevant facts." (Appraisal, Pl. Ex. 119, PNC0004924.)  Deloitte assumed that an independent operator of the Facility would be able to receive market tipping fees because it would not be encumbered by the contracts that were in place through the corporate entity AWG Wuppertal.  (Ellsworth Tr. 486.)   Richard Meyer, an appraiser who worked for a competitor of Deloitte during this time period, testified that in valuing a similar WTE facility in Hamburg, Germany in 2001, he too used actual market rates for tipping fees in his DCF analysis, rather than the historical below-market tipping rates the owner of that facility charged its municipal-customers/shareholders. (Meyer Tr. 1148-49.)

56.     Deloitte also considered the fact that in 1999 it was known that a new law banning most landfilling in Germany was scheduled to take effect in 2005.  This law, called TASI, was expected to depress tipping fee rates in the near term (while there was a run on landfilling), but was expected to increase market tipping fees (and thus the value of the Facility) after 2005.  As AWG explained, "[F]rom the year 2005 – the directive is suspended until this point in time – waste incineration plants were given a kind of monopoly status."  (AWG Response, Pl. Ex. 54, DT000021; Ellsworth Tr. 410-13, 426-27; Appraisal, Pl. Ex. 119, PNC0004940-41; AWG Response, Pl. Ex. 55, DT000043.)

57.     Using the DCF method, Deloitte calculated the value of the cash flows related to the Facility to be DM 870 million (or approximately $460 million U.S.).  (Appraisal, Pl. Ex. 119,

PNC0004985-96; Ellsworth Tr. 456.)  Deloitte found this to be consistent with values of other WTE facilities in Western Europe.  (Ellsworth Tr. 456.)

58.    Deloitte also performed a market comparable approach, but viewed it as the weakest of the three approaches because Deloitte was valuing a single facility, not a business comprised of a variety of interests, and thus gave it "little weight."  (Ellsworth Tr. 456-61; Appraisal, Pl. Ex. 119, PNC004996.)  Deloitte viewed the market approach more as a "broad sanity check."  (Ellsworth Tr. 459-61.)

59.    Deloitte followed standard appraisal methodology by considering all three approaches and arriving at a "conclusion of value."  In light of all the facts and circumstances, Deloitte concluded that the fair market value of the Facility as of the Closing Date was DM 800 million – or $423 million, using the applicable exchange rate.  (Ellsworth Tr. 461; Appraisal, Pl. Ex. 119, PNC0004996.)  This was a reasonable conclusion, supported by credible evidence and generally accepted appraisal standards.

60.    In reliance on the Deloitte Appraisal, the parties based the purchase price of the Facility on its appraised fair market value of $423 million.  (Angel Tr. 84-85; Head Lease, Joint Ex. IV, IRS-ADM-002730, §3(b); P.A., Joint Ex. II, IRS-ADM-002225, defining "Facility Value"; Lease, Joint Ex. VI, IRS-ADM-002835, Exhibit E.)

61.    Key and PNC hired the law firm of Chadbourne & Parke LLP ("Chadbourne") to advise them on the legal aspects of the transaction and to represent them in the deal negotiations.  (Stip. ¶¶ 66, 67.)  Chadbourne is a New York law firm whose lawyers had experience in the commercial and taxation aspects of leasing transactions.  (Meilman Tr. 511-14.)  Chadbourne spent a significant amount of time on this transaction over a period of four months.  (Meilman

Tr. 520.)  Key and PNC also hired Punder, Volhard, Weber & Axster ("Punder") of Germany to advise on German legal aspects of the proposed transaction.  (Stip. ¶ 68.)

62.    Key and PNC also performed environmental due diligence (Stip. ¶¶ 59, 60, 61) and financial due diligence (Stip. ¶¶ 62, 63, 64, 65) before closing on the AWG Transaction.

63.    Internally, Key's and PNC's own employees reviewed the expert reports of Duke and Deloitte, consulted with their financial advisor and legal advisors, and actively negotiated the terms and conditions of the transaction documents.  (Angel Tr. 103-18; Keener Tr. 322-30.) Key's and PNC's leveraged leasing personnel made detailed written presentations to their respective internal committees/management and ultimately obtained credit and other approvals for the AWG Transaction.  (AWG Profile, Pl. Ex. 78, IRS-ADM-001745-47; Key Credit Package, Pl. Ex. 80; Key Asset Management Report, Pl. Ex. 81; Angel Tr. 99-101; PNC Credit Reports, Joint Exs. XLV and XLVI; Keener Tr. 326-27.)  Asset management personnel conducted a review, as did the credit, risk and pricing committees. (Angel Tr. 105-118; Key Credit Package, Pl. Ex. 80; Key Asset Management Report, Pl. Ex. 81; and Pricing Analysis, Pl. Ex. 82; Keener Tr. 322-27.)  The proposed transaction was reviewed by top-level steering committees and the senior-most bank credit and risk officers. (Angel Tr. 118; Larkins Tr. 273-74; Keener Tr. 322-23.)

### D.    The Negotiations

64.    The parties engaged in extensive negotiations over the commercial and legal terms and conditions of the AWG Transaction.  (Angel Tr. 118-121, 148; Meilman Tr. 512-21.) The transaction documents were heavily negotiated and marked up by the parties and their lawyers with numerous back and forth negotiations on the terms and conditions.  (Angel Tr. 120; Meilman Tr. 517-18.)  Ultimately, there were ten to a dozen drafts of all the majors documents.

17

(Meilman Tr. 518.)  The document-intensive negotiations took place over four months with the corporate commercial lawyers spending the majority of the time negotiating terms and conditions.  (Meilman Tr. 515-20; *see, e.g.*, Open Issues Memo, Joint Ex. XXVII, BOSTON0003545-47.)

65.    Key and PNC bid on this deal in the open market and negotiated all of its terms and constituent agreements in the context of an arm's length business transaction.  (Key Proposal, Pl. Ex. 72, BOSTON0004065-67; PNC Proposal, Pl. Ex. 83, PNC0005667-69; Angel Tr. 103-105, 118-121; Keener Tr. 311.)  This was a substantial transaction, subject to market forces, competition and negotiation.  (Meilman Tr. 512-21; Angel Tr. 80, 91-92, 118-21, 128-29, 148.)

66.    Key and PNC pursue only a small percentage of the potential leveraged lease transactions that they learn about.  (Larkins Tr. 278; Keener Tr. 325-26; Angel Tr. 67.)  In considering whether to enter into the AWG Transaction, Key and PNC applied the same business considerations, due diligence procedures and investment criteria that they use for all "big ticket" leveraged leasing transactions (domestic or international).  (Angel Tr. 104-113; Keener Tr. 326.)

### E.    The Closing

67.    The Closing Memorandum identifies 22 agreements that form the AWG Transaction (the "Transaction Documents").  (*See* Closing Memo, Joint Ex. I, IRS-ADM-002063-64; Stip. ¶ 72 (listing the Transaction Documents.))

### F.    The Sale

68.    The transaction was structured as a sale-leaseback-to-service-contract transaction. (Angel Tr. 149.)  The Owner Trust purchased the economic and tax ownership of the Facility from AWG on the Closing Date pursuant to the Head Lease between AWG and the Owner Trust.

18

The Head Lease (§ 9(k)) states:  "Intent.  The Head Lessee [the Owner Trust] and the Head Lessor [AWG] intend this Head Lease to constitute an agreement for the sale of the Facility by the Head Lessor to the Head Lessee on the Closing Date for U.S. federal income tax purposes."  (Head Lease, Joint Ex. IV, IRS-ADM-002735; Angel Tr. 151; Macan Tr. 569-70.)

69.     Pursuant to the terms of the Head Lease, the initial term of the Head Lease is 75 years.  (Stip. ¶ 73.)  The 75-year initial term of the Head Lease is 29 years longer than the 46 year expected useful life of the Facility as determined by Duke (and Deloitte) in 1999.  (Stip. ¶ 74.)  The Head Lease contains a provision stating that if the actual economic useful life of the Facility is ever determined to be longer than the initial term of 75 years, then the term of the Head Lease is automatically extended to be 125% of the new expected useful life.  Because the length of the Head Lease is substantially longer than the Facility's expected economic useful life, the parties treated the Head Lease as a deemed sale of the Facility by AWG to the Trust on the Closing Date for U.S. federal income tax purposes.  (Stip. ¶ 75; Head Lease, Joint Ex. IV, IRS-ADM-002730, § 3(a).)

70.     The Head Lease provides that the Owner Trust "shall have the exclusive and unfettered right to possess, operate, maintain, improve, use, not use, or otherwise commercially exploit the Facility for its own account, as the Head Lessee [the Owner Trust] in its sole discretion shall determine, throughout the Head Lease Term."  (Head Lease, Joint Ex. IV, IRS-ADM-002730, §2.)

71.     The Owner Trust is entitled to any condemnation proceeds in the event of a taking of the Facility by eminent domain during the 75-year Head Lease Term.  (Head Lease, Joint Ex. IV, IRS-ADM-002733, §7(a).)

72.      The rent stated in the Head Lease for the entire Head Lease Term (the "Head Lease Rent") was $423 million.  (Stip. ¶ 76.)  Pursuant to the terms of the Head Lease, the Owner Trust paid AWG the entire Head Lease Rent ($423 million) in a non-refundable lump sum on the Closing Date, by wire transfer to AWG's bank account.  (Stip. ¶ 77.)

73.      To pay the Head Lease Rent of $423 million, the Owner Trust received equity contributions from Key (approximately $27.6 million) and PNC (approximately $27.6 million).  These equity contributions equaled 13% of the purchase price.  The Owner Trust borrowed the remaining 87% of the purchase price (approximately $367.8 million) on a non-recourse basis under the Loan Agreement.  (Stip. ¶ 78; Loan Agreement, Joint Ex. VIII, IRS-ADM-002903, 002962 and 002967; P.A., Joint Ex. II, IRS-ADM-002090, § 2(a)(ii).)  Thus, the loan-to-value ratio of these loans was 87%.

74.      The Loan Agreement sets forth the terms and conditions of two loans – a "Series A Loan" and a "Series B Loan."  (Loan Agreement, Joint Ex. VIII.)  Both the Series A Loan and the Series B Loan have a term of 34 years and bear interest at the rate of 7.28% per annum.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002912, § 2.02; P.A., Joint Ex. II, IRS-ADM-002233, defining "Loan Certificate Maturity Date," and IRS-ADM-002229, defining "Interest Rate.")  The Owner Trust is the borrower under each loan.  The Series A Lender is Nord LB.  The Series B Lender is LBW.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002907.)

75.      Both loans are secured by the Trust's interest in the Facility and by a collateral assignment of the Trust's rights under the Lease, Site Lease, Site Sublease, Assumption Agreement and Facility Support Agreement.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002907-09.)

20

76.     Both lenders required, as a precondition to making their loans, a letter from the appraiser indicating the fair market value and the estimated useful life of the Facility as of the Closing Date.  (P.A., Joint Ex. II, IRS-ADM-002101, § 4(b)(vi).)

77.     Debt service payments on both loans are required to be paid by wire transfer. (Loan Agreement, Joint Ex. VIII, IRS-ADM-002914, § 2.06.)

78.     The Series A Loan was equal to 90% of the total Loan proceeds.  The Series B Loan was equal to 10% of the total Loan proceeds.  The Loan Agreement amortizes principal ratably so that the Series A and Series B Loans remain at all times in a 90/10 ratio.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002962 and 002967.)

79.     In the event of a Loan default attributable to a Lease default, AWG will become the holder of the Series A Loan Certificates.  This is not true of the Series B Loan Certificates, which are, and always will be, held by an independent third party lender and not by AWG or an affiliate.  (P.A., Joint Ex. II, IRS-ADM-002148, §11(n)-(o).)  Upon becoming the holder of the Series A Loan Certificates, AWG may not set off rent payable by it under the Lease against debt service owed to it on the Series A Loan.  (P.A., Joint Ex. II, IRS-ADM-002148, § 11(n)(iii).)

80.     In the event of a default under the Loan Agreement, the exercise of remedies is controlled exclusively by the Series B Lender, and AWG, as the new Series A Lender, has no say as to the exercise of remedies and cannot prevent or impede the exercise of remedies in the event of its own default under the Lease.  (Lease Agreement, Joint Ex. VIII, IRS-ADM-002930-31; P.A., Joint Ex. II, IRS-ADM-002244-45, defining "Required Holders"; Angel Tr. 166-70.)

81.     The Series A Loan is not subordinated to the Series B Loan.  The Series A Loan and the Series B Loan are *pari passu*, meaning they are secured by the same collateral on a ratable 90/10 basis in the event of default, *e.g.*, for every dollar of available collateral, the Series

A Lender is entitled to recover 90 cents.  Therefore, the Nord LB PUA (which is described in more detail in ¶¶ 91-103) can pay, at most, 10 cents on the dollar of the Series B Loan in the event of default.  (Angel Tr. 166-69; Loan Agreement, Joint Ex. VIII, IRS-ADM-02922-23.) Thus, the Series B Lender, which loaned $38 million to the Trust, was effectively left looking to the Facility as its only security, and not to any PUAs.

### G.     The Leaseback

82.     The next step of the transaction was a lease from the Owner Trust to AWG.  (Stip. ¶ 82.)  Under the Lease, the Owner Trust is the "Lessor" and AWG is the "Lessee."  (Stip. ¶ 83.) The "Lease Term" is approximately 24.1 years, from December 7, 1999, through and including January 1, 2024.  (Stip. ¶ 84.)  The Lease is a "net" lease or "triple net" lease, which means that the lessee (AWG) bears the costs and expenses of operating the Facility during the Lease Term, including insurance, maintenance, and tax expenses.  (Stip. ¶ 85.)

83.     Under the Lease, AWG is entitled to sole possession of the Facility until the end of the Lease Term, subject to the Trust's right to an annual inspection of the Facility, so long as AWG satisfies all of its obligations under the Lease.  (Stip. ¶ 86.)  AWG is entitled to operate the Facility until the end of the Lease Term so long as it satisfies all of its obligations under the Lease.  (Stip. ¶ 87.)  AWG is responsible for all costs related to the use and maintenance of the Facility during the Lease Term, and is entitled to retain all profits generated from its use of the Facility under the Lease.  (Stip. ¶¶ 89, 90.)

84.     Contrary to the Government's contention that "nothing changed," there were material changes following the execution of the Lease.  For example, AWG is required to use, operate, maintain, service, repair, and overhaul the Facility in accordance with certain standards specified in the Lease.  (Stip. ¶ 88.)  AWG is also required to furnish annual compliance

22

certificates to the Owner Trust to confirm, among other things, that no lease default exists.  (Stip. ¶ 107.)  The yearly reporting requirements are extensive, and include certification of AWG's compliance with maintenance and repair obligations, environmental reporting obligations, financial reporting obligations, insurance obligations, and compliance with a checklist of Lease obligations (including liens, maintenance, modifications, replacement parts, operation and use, possession, subleasing, insurance and assignment obligations).  (P.A., Joint Ex. II, IRS-ADM-002300-05, Exhibit F.)  AWG has provided the Owner Trust with such compliance certificates for each year following the Closing Date.  (Angel Tr. 158-59; *see, e.g*., 2000 Compliance Certificate, Pl. Ex. 128.)

85.    Under the Lease, AWG is obligated to maintain and return the Facility in specified good condition.  The return conditions were carefully spelled out in the Lease, including fourteen highly defined engineering performance tests that must be passed at the end of the Lease as part of the protection of the Owner Trust's residual interest in the Facility.  (P.A., Joint Ex. II, IRS-ADM-002245-48; Angel Tr. 153-55.)

86.    There was expert testimony that the mandatory nature of repair and maintenance obligations under cross-border leases was a significant selling point from the perspective of a German lessee because it would assist the municipal government in the fight over scarce resources in the raising and spending of the needed money on critical maintenance and repair items for the leased infrastructure asset.  (Reutlinger Tr. 673-76.)

87.    There are conditions on AWG's ability to sublease the Facility during the Lease Term.  (Lease, Joint Ex. VI, IRS-ADM-002785–87, §8(b); Angel Tr. 160-61.)  In 2003, AWG asked for the Owner Trust's consent to sublease the Facility to another entity, EkoCity, for the remainder of the Lease Term.  After conducting due diligence, the Owner Trust gave its consent.

23

(Angel Tr. 161-64; EkoCity Documents, Pl. Exs. 140, 141, 142, 143, 144, 145, 146, 147, 148, 149.)  The Cities of  Wuppertal and Remscheid acknowledged and confirmed that their guarantees would continue in full force and effect under the EkoCity sublease.  (Confirmation of Guarantee, Pl. Exs. 142, 143.)

88.     The Lease states:  "True Lease.  It is the intent of the parties hereto that this Lease is a true lease, and that the Lessor [the Owner Trust] is the owner and lessor and the Lessee [AWG] is the lessee of the Facility for all U.S. federal, state and local income tax purposes." (Lease, Joint Ex. VI, IRS-ADM-002809, §20.)

89.     The rent payable to the Owner Trust is $1.2 million greater than the debt service on the Loans payable by the Owner Trust, *i.e.*, there is $1.2 million of "free cash" under the Lease.  (*Compare* Lease, Joint Ex. VI, IRS-ADM-002818, Ex. B1, *with* Loan Agreement, Joint Ex. VIII, IRS-ADM-002962 and 002967, Annex A to Loan Certificates Series A & B; Keener Tr. 331-32.)

90.     AWG's home currency was the Deutschmark (later, the Euro).  All amounts payable under the Lease, including rent, Termination Value, and the Fixed Purchase Option Price of  $521 million (if exercised), are required to be paid by wire transfer in U.S. dollars.  (Lease Agreement, Joint Ex. VI, IRS-ADM-002775-76, §3(d), and IRS-ADM-002808 and 002836, §19(b) and Ex. F.)

91.     AWG purchased, on the Closing Date, the Series A PUA, the Nord LB PUA and the AIG PUA (collectively, the "PUAs"), all of which are denominated in U.S. dollars.  (*See* Stip. ¶ 72(g), (h) and (i).)  These PUAs were used, among other things, to provide a hedge against AWG's currency exchange risk (since many of AWG's payment obligations in the transaction are in U.S. dollars but AWG's home currency is not in dollars), and to provide credit

24

support for a portion of AWG's obligations.  (Series A PUA, Joint Ex. IX, IRS-ADM-002972, whereas clause; Nord LB PUA, Joint Ex. X, IRS-ADM-002998, whereas clause; AIG PUA, Joint Ex. XV, IRS-ADM-003163, whereas clause; Angel Tr. 67-68, 182-83; Larkins Tr. 277; Macan Tr. 558-59.)

92.     Under the Series A PUA, AWG paid an amount equal to the Series A Loan proceeds to the Series A PUA Party on the Closing Date in consideration of the agreement of the Series A PUA Party to pay to the Series A Lender as assignee of the Lessor, for the benefit of AWG, amounts in U.S. dollars corresponding in timing and amount to the Series A Loan Portion of Lease Rent.  (Series A PUA, Joint Ex. IX, IRS-ADM-002973-74, § 2.02.)  Under the Nord LB PUA, AWG paid an amount equal to the Series B Loan proceeds to Nord LB on the Closing Date in consideration of the agreement of Nord LB to pay to the Lessor or its assignee or designee, for the benefit of AWG, amounts in U.S. dollars corresponding in timing and amount to the Series B Loan Portion of Lease Rent.  (Nord LB PUA, Joint Ex. X, IRS-ADM-002999–3000, § 2.02.)  Under the AIG PUA, AWG paid an amount to AIG Matched Funding ("AIG") on the Closing Date in consideration of the agreement of AIG to pay amounts in U.S. dollars corresponding in timing and amount to the Equity Portion of the Purchase Option Price and the Equity Portion of Rent.  (AIG PUA, Joint Ex. XV, IRS-ADM-003169, §3.1.)

93.     By entering into the PUAs, AWG controlled the risk that its home currency would become devalued in relation to its dollar obligations over the 24 year term of the Lease.  Rather than having to convert Euros each year at potentially disadvantageous exchange rates, AWG purchased the dollar denominated PUAs at the inception of the transaction.  (Angel Tr. 67-68, 182-83; Series A PUA, Joint Ex. IX, IRS-ADM-002972; Nord LB PUA, Joint Ex. X, IRS-ADM-002998; AIG PUA, Joint Ex. XV, IRS-ADM-003163.)  The PUAs provide AWG with the

25

liquidity, in U.S. dollars (the designated currency of AWG's annual rent obligations and the $521 million Purchase Option Price), so that AWG would be in a secure financial position to pay its rent and exercise the FPO in 2024, if it so desires.  (Graves Tr. 807.)

94.     The Euro was introduced around the same time this transaction closed.  It was generally expected that the dollar would likely strengthen against the Euro, which it did at first. Later, the dollar weakened against the Euro.  It is uncertain what the relationship will be in 2024, (Graves Tr. 810-11), but these kinds of fluctuations are precisely what AWG was hedging against in 1999.

95.     For its part, the Owner Trust desired credit support for a portion of AWG's rent obligations during this long-term international lease.  (Series A PUA, Joint Ex. IX, IRS-ADM-002972, whereas clause; Nord LB PUA, Joint Ex. X, IRS-ADM-002998, whereas clause; AIG PUA, Joint Ex. XV, IRS-ADM-003163, whereas clause.)  The PUAs mitigated, but did not eliminate, the credit risk borne by the Owner Trust.  (Angel Tr. 218-20; Shinderman Tr. 1115-16.)  PUAs are a form of "credit enhancement."  (Larkins Tr. 277.)

96.     By purchasing the PUAs, AWG did not legally discharge any of its payment obligations to the Trust.  By the terms of the Series A PUA, the Nord LB PUA, and the AIG PUA, AWG was not released from being the primary obligor in respect of all rent under the Lease.  (Series A PUA, Joint Ex. IX, IRS-ADM-002974-75, § 2.06; Nord LB PUA, Joint Ex. X, IRS-ADM-003000–01, § 2.06; AIG, Joint Ex. XV, IRS-ADM-003167-68, § 2.4.)  In other words, if the PUA parties for some reason do not timely pay AWG's rent obligations to the Trust, AWG would remain liable to the Trust for such amounts and would be in default under the Lease.

97.     The Series A Lender and the Series A PUA Party waived any rights of set off as between the Series A Loan and the Series A PUA.  (Series A PUA, Joint Ex. IX, IRS-ADM-002981, § 5.08.)  The Series B Lender and Nord LB waived any rights of set off as between the Series B Loan and the Nord LB PUA.  (Nord LB PUA, Joint Ex. X, IRS-ADM-003008, § 5.08.)  Thus, AWG's rental obligations and the Trust's debt obligations remained in full force and effect after AWG purchased the PUAs.

98.     The Series A PUA is pledged as collateral for repayment of the Loans (Loan Agreement, Joint Ex. VIII, IRS-ADM-002908), but not in the event of default.

99.     The Nord LB PUA, unlike the Series A PUA, is not pledged as security for the Loans under any circumstances.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002908-09.)

100.    Payments under the Series A PUA and the Nord LB PUA are used "for the benefit of" AWG during the Lease Term, that is, any payments made by the PUA issuers to the Trust or to the Lenders are made on behalf of AWG in order to satisfy AWG's payment obligations.  (Series A PUA, Joint Ex. IX, IRS-ADM-002973-74, § 2.02(a); Nord LB PUA, Joint Ex. X, IRS-ADM-002999-3000, § 2.02; AIG PUA, Joint Ex. XV, IRS-ADM-003166, § 2.1.)

101.    If AWG does not exercise the FPO in 2024, the final payments under the PUAs, totaling $521 million, are paid to AWG.  (P.A., Joint Ex. II, IRS-ADM-002146, § 11(m); AIG PUA, Joint Ex. XV, IRS-ADM-003169-71, § 3.2; Angel Tr. 178-85.)

102.    The monies in the PUAs belong to AWG during the Lease term, since they are used for the benefit of AWG during the Lease Term and, if the FPO is not exercised, they are paid out to AWG.  (Angel Tr. 182.)

103.    Moreover, even during the Lease Term, AWG is free under the Transaction Documents to arrange for a refinancing of the Series A and B Loans on an undefeased basis at

any time without the need for consent from the Owner Trust (or Key/PNC).  (P.A., Joint Ex. II, IRS-ADM-002156-60, § 13(b); Meilman Tr. 529-32.)  Any such refinancing results in a termination of the related PUA and release of the PUA funds for the benefit of AWG.  (Series A PUA, Joint Ex. IX, IRS-ADM-002972-74, §§ 1.01 and 2.02, defining "Final Payment Date"; Nord LB PUA, Joint Ex. X, IRS-ADM-02998-3000, §§ 1.01 and 2.02, defining "Final Payment Date".)  Although a "make-whole" provision can apply in certain circumstances (Loan Agreement, Joint Ex. VIII, IRS-ADM-002918, § 2.14), the "make-whole" provision in the AWG Transaction does not apply to a refinancing of the original Loans and a simultaneous termination of the PUAs – *i.e.*, if AWG moves to a non-defeased position.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002917-18, §§ 2.13(a) and 2.14.)

## H.     The Service Contract

104.    Unless AWG exercises the FPO, AWG and the Owner Trust or its designee are obligated to enter into a solid waste disposal service contract ("Service Contract") at the end of the Lease Term in substantially the form included in the Transaction Documents.  (Stip. ¶ 96; P.A., Joint Ex. II, IRS-ADM-002149, § 12.)  Under the Service Contract, AWG will engage the Owner Trust or its designee to render solid waste disposal services to it for a term of approximately 12.75 years (the "Service Contract Term"), from January 1, 2024, to September 23, 2036.  (Stip. ¶ 97; Service Contract, Joint Ex. XIII, IRS-ADM-003094-95 and 003100, §§ 3.1 and 5.)

105.    The Service Contract expressly states that it is intended by the parties to constitute a true service contract within the meaning of § 7701(e) of the Internal Revenue Code.  (Service Contract, Joint Ex. XIII, IRS-ADM-003126.)

106.    During the Service Contract Term, the Owner Trust or its designee is solely responsible for the Facility and the provision of services, including physical possession, custody and control of the Facility.  (Service Contract, Joint Ex. XIII, IRS-ADM-003093, §§ 2.1 and IRS-ADM-003108, § 8.3.)  The Owner Trust is permitted to hire a German operator to run the Facility during the Service Contract.  (P.A., Joint Ex. II, IRS-ADM-002149, § 12(a).)  There were many such operators available in 1999, and it was reasonable to expect that there would continue to be qualified operators in 2024.  (Appraisal, Pl. Ex. 119, PNC0005007-09; Heisse Tr. 1038-39; Reutlinger Tr. 673.)

107.    Under the Service Contract, AWG agrees to pay a periodic fee (the "Service Fee") to the Owner Trust or its designee.  The Service Fee consists of the sum of a "Capacity Charge"; an operations and maintenance charge ("O&M Charge"); and a charge in respect of solid waste delivered to the Facility in excess of a baseline amount (the "Excess Tonnage Charge"); minus credits to AWG in respect of service fees realized by the Owner Trust or its designee from the use of the Facility to serve third party customers.  (Stip. ¶ 103.)

108.    The Capacity Charge consists of a "Debt Portion" (in general, debt service on the new Non-Recourse Loans) and an "Equity Portion."  (Stip. ¶ 104.)  The Debt Portion is designed and defined to match the Trust's debt service obligations under the new Non-Recourse Loans (which are explained in more detail in ¶¶ 159-74).  (Service Contract, Joint Ex. XIII, IRS-ADM-003080-81, § 1.1, definition of "Capacity Charge," "Debt Portion" and "Debt Service.")

109.    The O&M Charge in general equals the costs reasonably incurred to operate and maintain the Facility and amounts needed to fund a reasonable reserve for working capital. (Stip. ¶ 105.)

29

110.     The Excess Tonnage Charge is $40 per ton of solid waste delivered by or on behalf of AWG to the Facility in excess of 200,000 tons of waste per year.  (Service Contract, Joint Ex. XIII, IRS-ADM-003085, §1.1; Angel Tr. 213.)  This $40 per ton Excess Tonnage Charge represents a significant cost savings per ton for AWG in the event it delivers more than 200,000 tons per year to the Facility.  (Graves Tr. 783.)

111.     The Service Fees are not to be paid on a "hell or high water" basis.  (Stip. ¶ 102.) Under the Service Contract, AWG must pay Service Fees to the Owner Trust or its designee only to the extent the Owner Trust or its designee actually performs the obligations required under the Service Contract.  If there is a disruption in service such that AWG's waste does not get incinerated, then AWG does not have to pay, and it may terminate the Service Contract or pursue any other remedy available under applicable law.  (Angel Tr. 208-09, 211-212, 214-216; Service Contract, Joint Ex. XIII, IRS-ADM-003105-06, 003114, §§ 6.7, 11.4.)

112.     Under the Service Contract, AWG would not bear operational risk or *force majeure* risk.  The new operator of the Facility (the Owner Trust or its designee) would assume those risks, including the risk of labor strikes and casualties.  (Service Contract, Joint Ex. XIII, IRS-ADM-003115, §12.)  The Owner Trust's equity is at risk during the Service Contract because of the assumption of operational and *force majeure* risk.  (Angel Tr. 212.)  Indeed, the Owner Trust could suffer a catastrophic loss well beyond loss of its equity investment in the event a major piece of equipment fails or is destroyed, as the Owner Trust is required to replace such equipment at its own cost, and cannot pass that cost on to AWG.  (Angel Tr. 216-17.)

## I.     Post-Closing Monitoring

113.     Key and PNC both continue to monitor their investments in the Facility after the Closing Date.  (Angel Tr. 157-60; Larkins Tr. 280-81; Keener Tr. 329.)

30

114.    In February 2000, two months after the transaction closed, Dave Keener and John McEnery of PNC traveled to Wuppertal, Germany, and physically inspected the Facility and met with management of AWG.  (Keener Tr. 332-33; Travel Receipts, Pl. Ex. 83, PNC005629-32.)

### IV.    NON-TAX BENEFITS OF THE AWG TRANSACTION

#### A.    Business Purposes

115.    Key's and PNC's non-tax business purposes for entering into the AWG Transaction included furthering their established leasing businesses (Larkins Tr. 272, 281-82; Keener Tr. 321; Angel Tr. 52); expanding their leasing footprints internationally, where there were higher returns and less competition (Angel Tr. 52); diversifying their investments on the credit side (AWG), on the geographical side (Germany), and on the asset side (waste-to-energy). (Angel Tr. 146; Hurd Tr. 610-11); earning a pre-tax profit on their investments (Angel Tr. 146-47; Keener Tr. 314-15); and achieving favorable accounting earnings and "return" metrics. (Angel Tr. 146; Hurd Tr. 622-25).  The pre-tax profit and accounting benefits are addressed in more detail below.

#### B.    Pre-Tax Profit

116.    The AWG Transaction provided substantial economic returns to Key and PNC. The pre-tax economic returns of a leveraged lease come from periodic cash flows, plus the residual value of the leased asset.  (Angel Tr. 87.)  Key and PNC (through the Trust) reasonably expect to earn significant pre-tax profits on their equity investments in the Facility, as shown below.

117.    Prior to making the decision to enter into the deal, Key and PNC each projected the profits they could expect to earn by participating in this transaction.  Each was satisfied that there were opportunities to earn substantial profits, measured either by the amount of cash

generated by the transaction or by the rate of return on their investments, on a pre-tax and after-tax basis.  (Angel Tr. 139; Keener Tr. 318.)

118.    Key and PNC performed projections of pre-tax profitability using leasing industry-standard computer software (Interet and ABC, respectively), which ran reports based on specific pre-tax profit and cash-flow guidelines issued by the IRS in Rev. Proc. 75-28.  (Angel Tr. 130-145; Keener Tr. 313-15; Key Interet Report, Pl. Ex. 112; PNC ABC Report, Pl. Ex. 79, PNC0005249.)  Both organizations used this software to ensure compliance with the IRS's requirements relating to leveraged leases.  Under these IRS Guidelines, a lessor has an expectation of pre-tax profit if the aggregate amounts collected from the lessee when combined with the residual value of the property (without taking into account the effects of inflation) are expected to exceed the lessor's equity investment and aggregate disbursements with respect to the property.  (Rev. Proc. 75-28, Pl. Ex. 190, at p. 4; Rev. Proc. 75-21, Pl. Ex. 189, at p. 2.)  The test set forth in Rev. Proc. 75-28 measures pre-tax profit on an aggregate cash-in-cash-out basis, requiring that the taxpayer demonstrate only $1 of pre-tax profit.  (Rev. Proc. 75-28, Pl. Ex. 190, at p. 4.)

119.    Key and PNC (individually and through the Trust) projected significant pre-tax profit under either scenario in this the transaction, i.e., if AWG exercises the FPO or if AWG chooses to enter into the Service Contract.  If AWG exercises the FPO in 2024, Key and PNC will earn a pre-tax profit of over $39 million each (or over $78 million together through the Owner Trust).  (Supp. Stip. ¶¶ 113, 114.)  If AWG chooses to forego the FPO and, instead, selects the Service Contract, Key and PNC expect to earn a pre-tax profit of $104 million (Key Interet Report, Pl. Ex. 112; Angel Tr. 135-139) and $102 million (PNC ABC Report, Pl. Ex. 79, PNC0005249; Keener Tr. 316-318), respectively.  Thus, the Trust expects a pre-tax profit of over

$200 million from the AWG Transaction through the Service Contract term.  The number would be substantially higher if one used the actual expected residual value of the Facility, including expected inflation.  (Angel Tr. 139-41.)

120.    In terms of pre-tax rate of return (Internal Rate of Return or "IRR"), if the FPO is exercised, the Trust, Key and PNC expect to achieve IRRs of 3.52% (Appraisal, Pl. Ex. 119, PNC0005170), 3.50% (Angel Tr. 91-92; Interet Summary, Pl. Ex. 113, KSP0211002), and 3.54% (Keener Tr. 314, 339; ABC Report, Pl. Ex. 79, PNC0005204), respectively.

121.    In terms of pre-tax IRRs through the Service Contract term, the Trust, Key and PNC expect to achieve IRRs of 3.43% (Appraisal, Pl. Ex. 119, PNC0005173), 3.39% (Angel Tr. 91-92) and 3.46% (Keener Tr. 313-16; PNC ABC Report, Pl. Ex. 79, PNC0005204), respectively – without taking into account the projected residual value of the Facility at the end of the Service Contract.  Taking into account the expected residual value of the Facility at the end of the Service Contract term, PNC's expected pre-tax IRR is over 5.92% (Keener Tr. 313-16; PNC ABC Report, Pl. Ex. 79, PNC0005204), while Key's expected pre-tax IRR is about 5.80% (Key Interet, Pl. Ex. 117, IRS-ADM-01229).

122.    The foregoing pre-tax IRR projections using Interet and ABC are based on conservative cash flows under the Service Contract (using minimum projected volumes of waste and excluding revenues from electricity, steam and other by-products generated by the Facility).  (Graves Tr. 800.)  In reality, there is a realistic range of additional cash flows under the Service Contract, which will vary depending on actual volumes of waste delivered (considering the Excess Tonnage Charge of $40 per ton) and revenues from electricity, steam and other by-products (which have traditionally been about 10% of the Facility's revenues).  (Graves Tr. 800.)  The Trust's expert economist, Frank Graves, performed a sensitivity analysis of these possible

33

future cash flows, and concluded that the Trust's pre-tax IRR could realistically grow to 6, 7, or even 8%.  He testified that those are very high pre-tax returns -- "far more than you would expect in most leases."  (Graves Tr. 795-96, 799-800.)

123.    Mr. Graves also testified that under his sensitivity analysis, in every instance the Trust's pre-tax IRRs are positive.  (Graves Tr. 795-96.)

124.    The Government does not challenge the reasonableness or reliability of the pre-tax profit projections performed by Key and PNC.  In fact, the Government's expert economist, Dr. Lys, acknowledged that the Trust can reasonably expect to earn a pre-tax profit of over 3% during the Lease Term (Lys Tr. 916, 939); that the Trust can expect to take in about $80 million more than it spends during the Lease Term (Lys Tr. 916); that the Trust can reasonably expect to earn a pre-tax profit of between 5% and 8% if AWG chooses the Service Contract (*id*); and that the Trust's pre-tax profit could be even greater than 5% to 8% (or significantly lower), depending on the business circumstances of 2024 to 2036.  (*Id.*)

125.    These pre-tax profit projections for the Trust, Key and PNC are based on their initial investments, and are not contingent upon future investments by the Trust, Key or PNC.  (PNC ABC Report, Pl. Ex. 79, PNC0005204; Key Interet Report, Pl. Ex. 117.)

126.    The Trust's realistic pre-tax returns of 6, 7 or 8 percent are equal to, or higher than, the Government bond rates that prevailed around 1999, which were about 6 to 7 percent.  (Graves Tr. 804.)

127.    Key's pre-tax IRRs in the AWG Transaction are "quite typical" in relation to the rest of Key's leveraged leasing transactions, even those that are not being challenged by the IRS, which typically range between 2.5 and 3.5 percent.  (Portfolio Interest Summaries, Pl. Ex. 171; Key Interet Report, Pl. Ex. 113; Angel Tr. 88-90; Graves Tr. 799-803; Pl. Graphic 38.)

34

128.    The following chart summarizes the foregoing pre-tax profit evidence:

| Service Contract or FPO | Method | KEY | PNC | Trust |
|---|---|---|---|---|
| SC | 75-28 Test:  Pre-tax profit | $104 million | $102 million | $206 million |
| SC | Pre-tax IRR, assuming no residual value | 3.39% | 3.46% | 3.43% |
| SC | Pre-tax IRR, assuming expected residual value | 5.80% | 5.92% | 5.86% |
| SC | Pre-tax IRR, assuming expected residual value plus additional expected revenues | calculated at trust level | calculated at trust level | 6% to 8% |
| FPO | 75-28 Test:  Pre-tax profit | $39 million | $39 million | $78 million |
| FPO | Pre-tax IRR | 3.50% | 3.54% | 3.52% |

129.    In sum, the Trust and its partners reasonably and realistically expect to earn substantial profit under the AWG Transaction, apart from any tax benefits.

### C.    Accounting and Book Earnings Benefits

130.    As explained earlier, there are significant accounting and book earnings benefits to all leveraged lease transactions.  Those benefits apply to the AWG Transaction.

131.    The AWG Transaction qualified for leveraged lease accounting treatment pursuant to FAS-13, and Key and PNC thereby realized very favorable financial reporting benefits.  (Hurd Tr. 619.)

132.    The AWG Transaction provided to Key and PNC a high book rate of return, including a net after-tax yield of close to 9%.  (Hurd Tr. 619-20.)  The AWG Transaction also provided a substantial increase in the recorded book revenue generated by the transaction, particularly during the first five years.  (Hurd Tr. 620-21.)

133.    The AWG Transaction provided Key and PNC a return on assets substantially in excess of the companies' average return on assets.  (Hurd Tr. 622-24.)  Key and PNC entered into the AWG Transaction for a profit driven business purpose, namely to generate superior incremental financial accounting earnings with an accretive affect (meaning a "positive beneficial effect") on their performance measures (net interest margin and return on investment). (Hurd Tr. 623-25.)

134.    In sum, Key and PNC were not motivated solely by tax benefits to make this investment.

## V.    THE TWO PURCHASE OPTIONS

### A.    The FPO

135.    At the end of the Lease Term, AWG has an option to purchase the Facility for a fixed price (the "Fixed Purchase Option" or "FPO").  (Stip. ¶ 91.)  If AWG does not exercise the FPO, then the parties must enter the Service Contract.  (Stip. ¶ 96.)

136.    The AWG Transaction is structured to incentivize AWG to choose the Service Contract, not the FPO, in a number of ways, as shown below.  (Angel Tr. 94-95, 177-78.)

### B.    Premium Option Price

137.    If the FPO is exercised, the "Purchase Option Price" is payable in five installments over the course of the year 2024, totaling $521 million.  (The present value of those five payments, as of January 1, 2024, is $515 million.)  (Stip. ¶ 93.)   If AWG exercises the FPO, AWG is required to pay the Owner Trust $521 million -- regardless of the actual value of the Facility in 2024.  (Lease, Joint Ex. VI, IRS-ADM-002807-08.)

138.    The Purchase Option Price of $521 million is substantially higher than the expected fair market value of the Facility in 2024, which is $390 million under the cost

36

approach.  (Appraisal, Pl. Ex. 119, PNC0005001; Angel Tr. 177-78; Stip. ¶¶ 94, 95; Ellsworth Tr. 473.)  This is a significant premium of  $131 million over the expected fair market value of the Facility.  Thus, AWG is likely to choose the Service Contract over the FPO.  (Appraisal, Pl. Ex. 119, PNC0004920; Ellsworth Tr. 474; Graves Tr. 791; Angel Tr. 177-78.)

139.    There is no evidence to suggest that the fair market value of the Facility is likely to be greater than the Purchase Option Price.  Thus, there is no "bargain option" or "nominal price option" in this transaction.

### C.    Attractive, Flexible Service Contract

140.    If the parties enter the Service Contract, the Owner Trust (in conjunction with a German operator) would accept and incinerate AWG's trash at the Facility, thus ensuring that AWG would have an uninterrupted means of incinerating its trash, without having to overpay to buy back the Facility.  (Service Agreement, Joint Ex. XIII, IRS-ADM-003074-144; Angel Tr. 177.)

141.    AWG would receive the $521 million from the PUA issuers, free and clear, if it enters the Service Contract.  (Angel Tr. 178-80; P.A., Joint Ex. II, IRS-ADM-002146-47, § 11(m).)

142.    Under the Service Contract, AWG would pay Service Fees that are at or below fair market value for such fees.  (Appraisal, Pl. Ex. 119, PNC0004919-20; Ellsworth Tr. 463.) Under the FPO, AWG would pay above fair market value to purchase the Facility.   Thus, the projected economics of the transaction have a built-in financial bias in favor of the Service Contract.  (Appraisal, Pl. Ex. 119, PNC0004919-20; Graves Tr. 774-75, 791; Ellsworth Tr. 464; Appraisal, Pl. Ex. 119, PNC0005175.)  In fact, the Service Contract is so valuable to AWG that

AWG would still prefer to enter into the Service Contract even if the value of the Facility exceeds the Purchase Option Price by around $50 million.  (Pl. Graphic 34; Graves Tr. 786.)

143.    During the Service Contract AWG also has the added benefit of shedding both operational and *force majeure* risk.  Additionally, the Owner Trust or its designee, not AWG, is responsible for repairing and replacing equipment, which could result in significant costs savings to AWG.  (Service Contract, Joint Ex. XIII, IRS-ADM-003105-06, 003115; Angel Tr. 208-09, 211-12, 214-16.)

144.    AWG has flexibility under the Service Contract in that it can assign its rights and obligations under the Service Contract to a qualified third party.  (Service Contract, Joint Ex. XIII, IRS-ADM-003118, §15.)

145.    AWG also has a second purchase option, which gives AWG the contractual right to purchase the Facility in 2036 at the end of the Service Contract at the then-appraised fair market value, with no premium.  (Service Contract, Joint Ex. XIII, IRS-ADM-003122; Angel Tr. 150, 218.)

146.    AWG could pay for the second purchase option with any financing technique it wants to.  If it wished to do so, AWG could set aside $151 million dollars from the $521 million it receives from the PUA issuers in 2024, invest it at seven percent, and have enough funds to purchase the Facility at its expected fair market value in 2036.  (Graves Tr. 811-12.)

147.    Accordingly, the Service Contract itself provides AWG with a flexible and attractive alternative to exercising the FPO by ensuring that AWG (a) could obtain a means to incinerate trash delivered by its customers without interruption after the Lease Term expires; (b) would pay Service Fees at or below fair market value; (c) would not bear operational risk or *force majeure* risk (including risk of labor strikes and governmental regulation) during the term

of the Service Contract; and (d) would have a second opportunity to purchase the Facility back at the end of the Service Contract at fair market value – if and only if AWG so desires.

### D.    Other Factors Making Exercise of the FPO Uncertain

148.    AWG may only exercise the FPO by giving written notice to the Owner Trust during the last two years of the Lease Term.  (Stip. ¶ 92.)  The notice will be valid only if it is authorized by a resolution of AWG's supervisory board adopted within the last two years of the Lease Term.  Thus, only the management of AWG in place in 2022-23 can make the decision of whether to exercise the FPO.  (Lease, Joint Ex. VI, IRS-ADM-002807; Angel Tr. 170-72.)

149.    AWG also confirmed at the time of the Closing it saw no reason it would be compelled to exercise the FPO.  In its application for a binding tax ruling, AWG certified to the German taxing authority as follows:  "The Applicant [AWG] has not made any decision whether or not it will exercise the FPO at the end of the sublease [i.e., Lease] term and will make that decision at the end of the sublease term.  The Applicant is not under any compulsion to exercise the FPO.  By the same token, nothing prevents the Applicant from exercising the FPO at the end of the sublease Term.  As of the inception of the transaction, it is uncertain whether the FPO will be exercised or not."  (Application for Ruling, Joint Ex. XXVIII, CLIF-005509; Angel Tr. 174-76; Stip. ¶ 69.)

150.    AWG also made representations and warranties to the Owner Trust that there are no agreements between AWG, the Cities or any other person pertaining to the exercise or non-exercise by AWG of the FPO; that AWG had taken no official corporate action authorizing the exercise of the FPO; and that none of the organizational or governing documents or rules, regulations or written policies of AWG economically compels or legally requires AWG to

exercise the FPO.  (Tax Indemnity Agreement, Joint Ex. XI, IRS-ADM-003027-29; Angel Tr. 173-74.)

151.    In Germany there is a law that prohibits the waste of public funds.  If AWG were to exercise the FPO and overpay for the Facility, this could be considered a waste of public funds in violation of German law.  (Reutlinger Tr. 671-72.)

### E.    No German Tax Impact

152.    The German tax issue that was set forth in Government expert reports never materialized in trial.  Instead, the Owner Trust put on expert testimony of a German lawyer and accountant, Werner Jacob, who heads up the 650-person German tax department of a worldwide accounting firm, who comes from the area where Wuppertal is located, and who represents municipal clients with waste-to-energy facilities. (Jacob Tr. 706-710.)

153.    Jacob testified that there is good reason to believe that the transition to the Service Contract would not be viewed as a "sale" under German tax law and, at most, would give rise to an immaterial tax that would be spread out over fifty years. (Jacob Tr. 726-728.)

154.    Further, he opined that even if there were a taxable event in 2024, it was reasonable in 1999 to assume it would be at a low corporate tax rate.  In 1999, the German corporate tax rate was falling precipitously and could be expected to continue to fall in light of the intense "tax competition" in Europe.  The corporate rate was 56% in 1988, and declined in consecutive steps until 1999 when it was announced it would be lowered to 25%.  The corporate tax rate has continued to fall and is 15% today.  (Jacob Tr. 731-33.)

155.    Moreover, the local trade tax component of any tax would not be a factor in AWG's decision because the trade tax ultimately is assessed and collected by AWG's 70%

shareholder, the City of Wuppertal.  Wuppertal would receive the money in any event as either a profit distribution or a collection of trade tax.  (Jacob Tr. 729-31.)

156.    In any event, there were and are important tax planning devices, like the group tax structure, available to the municipal shareholders of AWG to reduce or mitigate any such potential tax (especially when it was known in 1999 that the Wuppertal transit division was losing $50 million a year, and that loss carry-forwards under German tax law were unlimited). (Jacob Tr. 728-740; WSW Group Tax Regime, Pl. Ex. 183.)

157.    The Government's German tax law expert backed away from providing any testimony to support the allegation in his expert report that a 40% German tax would apply in 2024 if the FPO is not exercised.  At trial, Schweiss acknowledged that there was no precedential authority to support his unproven opinion that there would be a taxable event in 2024 (indeed, he conceded he had never been asked by a client to render such an opinion).  (Schweiss Tr. 1072-74.)  Tellingly, he gave no opinion about the size or magnitude of any such tax, should there be one, nor did he address or rebut Werner Jacob's conclusions, including the neutrality of the local tax and the availability to AWG of well-known tax planning techniques, such as the group tax regime.  (Schweiss Tr. 1067.)

158.    According to Werner Jacob, there would be a good chance to prevail in German court on the proposition that the non-exercise of the FPO is not a deemed sale under German law.  (Jacob Tr. 719-20.)  His conclusion was that AWG would not be compelled to exercise the FPO based on any potential German tax.  (Jacob Tr. 738-39.)  In sum, the arguments raised by the Government concerning a possible German tax in 2024 do not render exercise of the FPO by AWG a certainty as of 1999.

## VI.      THE FEASIBILITY OF REFINANCING IN 2024

159.    In connection with the commencement of the Service Contract Term, AWG is obligated to arrange for a refinancing (on behalf of the Owner Trust) in an amount sufficient to pay off the then outstanding balance of the Series A and B Loans with new non-recourse loans from a Lender or Lenders unrelated to AWG and the Cities (the "new Non-Recourse Loans"). (Stip. ¶ 99.)

160.    The new Non-Recourse Loans are to be payable in Euros or Deutsch Marks. (Stip. ¶ 101.)

161.    On January 1, 2024, the projected balance of the original Series A and B Loans is expected to be approximately $383 million.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002962-67.)  Under the Service Contract, AWG is required to make a payment of 50,035,590 Euros on January 1, 2024, which will reduce the balance of the Series A and B Loans simultaneously with the new lender making its loan to approximately $332.5 million.  (In December 1999, the exchange rate was one Euro to 0.991 dollars.)  Thus, effectively, the new Non-Recourse Loans need to be sufficient to pay off a $332.5 million balance.  (Service Contract, Joint Ex. XIII, IRS-ADM-003129; Graves Tr. 841-42.)

162.    There will be more than adequate collateral to secure the replacement financing. The Participation Agreement provides that the new Non-Recourse Loans are to be secured by the Facility, the Site Lease, the Facility Support Agreement, the Assumption Agreement or City guarantees, the Debt Portion of the Capacity Charge component of the Service Fees, Excess Capacity Charges, business interruption and casualty insurance, service fees from third party customers, and all revenues received by the Service Provider from the sale of electricity, steam, heat and recovered materials.  (Stip. ¶ 100; P.A., Joint Ex. II, IRS-ADM-002149, § 12(b)(ii).)

163.    The refinancing could be accomplished even if the *only* collateral were the Trust's interest in the Service Fees to be paid by AWG.  In particular, the Debt Portion of the Capacity Charge is defined and designed to match the debt service on the new loans.  (Service Contract, Joint Ex. XIII, IRS-ADM-003080-81, § 1.1, definition of "Capacity Charge," "Debt Portion" and "Debt Service.")

164.    AWG is projected to be able to cover its Service Fee obligations with the revenue it can generate by charging its own customers market tipping rates for collecting their trash. (Appraisal, Pl. Ex. 119, PNC0005176; Angel Tr. 190-91, 194-97; Graves Tr. 828-29.) Moreover, "AWG just put half a billion dollars in its pocket, and will have that as a big piece of economic proof of their strength and ability to make the service payments over the next twelve years."  (Graves Tr. 812-13.)  While the new Non-Recourse Loans are to be non-recourse *to the Owner Trust*, nothing prohibits AWG from lending its creditworthiness to help in the refinancing.  (P.A., Joint Ex. II, IRS-ADM-002149-50, § 12(b)(ii)(2).)

165.    AWG's obligation to pay the Debt Portion of the Capacity Charge is guaranteed by the German Cities, which themselves are bankruptcy remote.  (Key Credit Package, Pl. Ex. 80, KSP0169535.)  In particular, the Cities guaranteed the present and future obligations of AWG under the December 7, 1999 Assumption Agreement.  (Assumption Agreement, Joint Ex. XXII, IRS-ADM-003779-92; Angel Tr. 164.)  "A guarantee of a municipality is obviously good security."  (Heisse Tr. 1048-49.)

166.    Under the Assumption Agreement, the Cities agreed to stand behind "all present *and future* obligations of AWG under the Operative Documents and all other contracts related to the transactions contemplated by the Operative Documents."  (Assumption Agreement, Joint Ex. XXII, IRS-ADM-003780, §§1(a)(iii), 1(c)) (emphasis added).  The Service Contract is defined as

43

an Operative Document and thus, under the terms of the Assumption Agreement, the Cities already agreed in 1999 to stand behind AWG's obligations under the Service Contract.  (P.A., Joint Ex. II, IRS-ADM-002236-37.)  Because the Assumption Agreement has no specified end date, there is no reason to assume that new guarantees of the Service Contract will be required in 2024 as security for the new Non-Recourse Loans.  (Assumption Agreement, Joint Ex. XXII, IRS-ADM-003782, § 4.)

167.    If for some unknown reason a new Assumption Agreement were necessary, AWG is contractually required to cause the Cities to guarantee AWG's obligations under the Service Contract.  (P.A., Joint Ex. II, IRS-ADM-002151, § 12(b)(v).)  The Cities would have the same interest as AWG in providing such guarantees so AWG could receive all the benefits of the Service Contract and avoid all the downside of a premium FPO.  Reutlinger did not see any reason why AWG could not further guarantee the obligations of AWG under the Service Contract.  (Reutlinger Tr. 679.)  Indeed, the Cities confirmed their original guarantees in 2003 as part of the EkoCity transaction.  (Confirmation of Guarantees, Pl. Exs. 142 and 143.)

168.    If for some reason, AWG is temporarily relieved of its obligations to pay Service Fees (for example, due to an event of *force majeure*), then the proceeds of casualty and business interruption insurance would be available to the lender of the new Non-Recourse Loans, thus enhancing the available collateral.  (Service Contract, Joint Ex. XIII, IRS-ADM-003117, § 14; Stip. ¶ 100.)

169.    The collateral package also includes the revenues received by the Owner Trust from the sale of electricity, steam, heat and byproducts.  This is about 10% of the Facility's revenues each year (Appraisal, Pl. Ex. 119, PNC0004991) and in 2024 is projected to be worth about DM 21 million per year.  (Appraisal, Pl. Ex. 119, PNC0005115.)

44

170.     The Facility itself is also part of the collateral package.  It may be that the Facility alone would be sufficient collateral for securing the new Non-Recourse Loans.  (Graves Tr. 812.) Loan-to-value ratio ("LTV ratio") is calculated by comparing the amount of debt secured by an asset to the asset's value.  The debt to be secured in 2024 is effectively $332.5 million.  The value of the Facility is expected to be $390 million.  (Deloitte also projected the value of the Facility in 2024 to be $472 million (or DM 870 million) under the DCF approach.)  (Appraisal, Pl. Ex. 119, PNC0004996.)  Assuming for the sake of argument the Facility is the only source of repayment on the new Non-Recourse Loans, the LTV on the new Loans would be approximately 70% to 85%.  Either one is lower than the LTV ratio of 87% on the original Series A and Series B loans.  In fact, the Government's own expert conceded that German banks typically lend against an asset value between 60 and 80 percent. (Heisse Tr. 1045.)  However, as explained herein, the collateral package includes more than just the Facility.

171.     The collateral package also includes the "Control Documents," which are defined as the Site Lease and the Facility Support Agreement.  (P.A., Joint Ex. II, IRS-ADM-002216.)

172.     PwC opined to Key and PNC at the Closing Date that the new Non-Recourse Loans should be placeable with new lenders at the end of the Lease Term, taking into account the collateral package, the average life and other relevant factors.  The original Loans have an average life of 24 years.  The new Non-Recourse Loans have an average life of under 5 years meaning that the principal is being paid off in a much shorter time period than the original Series A and B Loans.  (PwC Opinion, Joint Ex. XXII, IRS-ADM-004676-79.)  A loan with a shorter average life is easier to obtain because it is less risky than one with a longer average life.  (Angel Tr. 209-10.)

173.    The Government's expert acknowledged that there is a "substantial collateral package" available to help arrange for the new Non-Recourse Loans.  (Heisse Tr. 1048.)  The Government's other expert stated that he does not know what the entire collateral package is. (Lys. Tr. 934.)  He was then asked:  "Did you think it was important to understand what the collateral package is before you give an opinion on whether or not refinancing would be feasible in 2024?"  He answered:  "Not from my analysis, no."  (Lys Tr. 934.)  His cavalier comments defy common sense.

174.    The foregoing collateral and other factors make it likely that AWG would have no problem in arranging for new Non-Recourse Loans in 2024 for the Trust in order to enter the Service Contract.  (Angel Tr. 188; Jacob Tr. 724-26; Graves Tr. 812-14.)

175.    There are no legal impediments to entering into the Service Contract.  (Reutlinger Tr. 668-71.)

## VII.    RESIDUAL VALUE

176.    Residual value is the remaining economic value of an asset at a point in time where the owner has a possibility of receiving the asset back.  (Keener Tr. 344; Appraisal, Pl. Ex. 119, PNC0004997; Angel Tr. 147, 149-150.)

177.    In all events, the Facility would have greater than 20% of its 1999 value left in 2024 and 2036 (at the end of the Lease and the end of the Service Contract), with or without including the effects of inflation.  (Appraisal, Pl. Ex. 119, PNC0004918-19; Angel Tr. 145; Keener Tr. 344.)

178.    For example, taking into account inflation, Deloitte projected the fair market value of the Facility on January 1, 2024 to be $390 million.  (Ellsworth Tr. 466-67, 474;

Appraisal, Pl. Ex. 119, PNC0005004.)  This is substantially more than 20% of the original cost of $423 million.

179.     In the Appraisal, Deloitte opined that the expected fair market value of the Facility as of the end of the Lease Term is in excess of 50% of the fair market value of the Facility as of the Closing Date, if inflation is not taken into account.  (Appraisal, Pl. Ex. 119, PNC0004918, #5.)

180.     Deloitte also opined that, if reasonably expected inflation is taken into account, the expected fair market value of the Facility as of the end of the Lease Term is in excess of 90% of the Closing Date fair market value of the Facility.  (Appraisal, Pl. Ex. 119, PNC0004918-19, #6.)

181.     Deloitte also opined that the Facility's expected fair market value as of the end of the Service Contract Term equals approximately 25% of the fair market value of the Facility as of the Closing Date, if inflation is not taken into account.  (Appraisal, Pl. Ex. 119, PNC0004919, #7.)

182.     Deloitte opined that, if reasonably expected inflation is taken into account, the expected fair market value of the Facility as of the end of the Service Contract Term is expected to be in excess of 60% of the fair market value of the Facility as of the Closing Date. (Appraisal, Pl. Ex. 119, PNC0004919, #8.)

183.     Residual value can also be measured in terms of percentage of remaining economic useful life at the point of return.  At the end of the Service Contract in 2036, there will be approximately 10 years of remaining useful life in the Facility.  This is more than 20% of the original 46 year expected useful life projected by Duke and Deloitte.  (Appraisal, Pl. Ex. 119, PNC0004918; Angel Tr. 145; Keener Tr. 344.)

47

184.    The Government put on no evidence of the future fair market value of the Facility at the end of the Lease Term or the end of the Service Contract Term.  (Ernst Tr. 975, (expressing no opinion about the future fair market value of the AWG Facility).)

185.    In 2036, after the Service Contract Term, there is no guarantee or protection on the Trust's residual risk.  (Angel Tr. 147.)  The Trust has full exposure to all the upside potential and the downside risk in 2036.  (Graves Tr. 798; Lys Tr. 917; Shinderman Tr. 1134.)

186.    The Owner Trust has a meaningful residual interest in the Facility as a result of the AWG Transaction.

## PROPOSED CONCLUSIONS OF LAW

### I.     QUESTIONS PRESENTED

1.     There are two overarching questions as a matter of tax law:

   a.     Whether the Owner Trust is the owner of the Facility for federal income tax purposes, effective December 7, 1999, such that it is entitled to the depreciation and amortization deductions, as well as the rental income, reported on its tax returns for the Taxable Years?

   b.     Whether the 1999 Series A and Series B Loans constitute bona fide indebtedness for federal income tax purposes, such that the Owner Trust is entitled to the interest expense deductions claimed on its tax returns for the Taxable Years?

2.     In order to answer these questions, the Court will need to determine if the transaction was "real," *i.e.*, did it have real substance aside from tax benefits and, if so, was the substance of the transaction consistent with its form (a sale-leaseback).

3.     In the Sixth Circuit, the answer to the first inquiry (*i.e.*, was it a "real" transaction) is answered by the following test:  whether the AWG Transaction has "any practicable economic effects" beyond the tax deductions claimed by the Owner Trust. *Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006).  In other words, did the Owner Trust make a "*bona fide* investment"? *Bryant v. Commissioner*, 928 F.2d 745, 749 (6th Cir. 1991).  This inquiry focuses on an examination of the objective facts and circumstances to determine whether Key and PNC had non-tax business purposes for entering into the AWG Transaction and whether Key and PNC had a "reasonable possibility" of earning a pre-tax profit.  *See Frank Lyon Co. v. United States*, 435 U.S. 561, 582-84 (1978); *Estate of Thomas v. Commissioner*, 84 T.C. 412,

49

431-40 (1985); *Levy v. Commissioner*, 91 T.C. 838, 853-59 (1988); *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91-95 (4th Cir. 1985); *Dow Chemical*, 435 F.3d at 599-603; *American Electric Power Co. v. United States*, 326 F.3d 737, 741-44 (6th Cir. 2003).

4.      The second inquiry (*i.e.*, whether the transaction's substance comports with its form) is determined by whether the Owner Trust acquired the "benefits and burdens" of ownership of the Facility on December 7, 1999.  *See Frank Lyon*, 435 U.S. at 582-84; *Levy*, 91 T.C. at 859-62 (1988); *Torres v. Commissioner*, 88 T.C. 702, 720-727 (1987); *Cooper v. Commissioner*, 88 T.C. 84, 104-108 (1987); *Estate of Thomas*, 84 T.C. at 431-36.  If the Owner Trust possesses the "benefits and burdens" of ownership, the AWG Transaction must be respected as structured, and cannot be recharacterized as a financing arrangement or the purchase of a "future interest."  *See Frank Lyon*, 435 U.S. at 569, 583-84; *Cooper*, 88 T.C. at 102-07; *Alstores Realty Corp. v. Commissioner*, 46 T.C. 363, 371-72 (1966).

5.      Because the AWG Transaction has "practicable economic effects," and the Owner Trust acquired the "benefits and burdens" of ownership, the Court concludes that the Owner Trust is entitled to the deductions reported on its returns for the Taxable Years.

## II.      THE COURT HAS JURISDICTION AND VENUE IS PROPER

6.      The Court has jurisdiction of this case under 28 U.S.C. § 1346(e) and 28 U.S.C. § 1331.  (Stip. ¶ 26.)  Venue in this Court is appropriate pursuant to 26 U.S.C. § 6226(a)(2).  (Stip ¶ 26.)  Key satisfied all jurisdictional prerequisites for filing this action.  (Stip. ¶ 26.)  (See also Proposed Findings of Fact ¶¶ 4, 16, 17, 18) (hereinafter "PFF ¶ _").

7.      The Court's jurisdiction is limited to a determination of the "partnership items" of the Owner Trust for the partnership Taxable Years to which the FPAA relates.  26 U.S.C. § 6226(f).  "Partnership items" are only those items required to be taken into account by the

partnership (Owner Trust) for the partnership Taxable Years at issue, and which are more appropriately determined at the partnership level rather than at the partner level.  26 U.S.C. § 6231(a)(3); Treas. Reg. §§ 301.6231(a)(3)-1(a) and (b).

8.     The partnership items shown on the Owner Trust's returns for the Taxable Years, and which are to be determined by the Court in this case, are as follows:  depreciation deductions under 26 U.S.C. § 168; rental income under 26 U.S.C. § 61; interest expense deductions under 26 U.S.C. § 163(a); and deductions for amortization of transaction costs.  (PFF ¶ 15.)

9.     The FPAA in this case asserts a "substantial understatement" penalty against the Owner Trust under 26 U.S.C. §§ 6662(a), (b)(2) and (d).  (FPAA, Joint Ex. LVIII.)  Although 26 U.S.C. § 6221 provides that the applicability of any penalty shall be determined at the partnership level, the computation of any "substantial understatement" of tax for purposes of the accuracy-related penalty under 26 U.S.C. §§ 6662(a), (b)(2) and (d) must be done at the partner level.  *See* Treas. Reg. §§ 301.6221-1(d) and 301.6231(a)(5)-1(e).  The determination of the amount of a "substantial understatement" is not a partnership item and, therefore, this Court does not have jurisdiction to determine such an amount.  Additionally, any other defenses to penalties which depend upon the actions of the individual partners, such as the reasonable cause defense under 26 U.S.C. § 6664, are not partnership items for purposes of this case.  Such partner-level defenses can only be asserted in a separate refund action.  *See* Treas. Reg. §§ 301.6221-1(c) and (d).

10.     The FPAA in this case asserts that the transaction should be recharacterized as a deemed loan and as such the Owner Trust must recognize original issue discount income under 26 U.S.C. §§ 1271-1275.  (FPAA, Joint Ex. LVIII.)  Both of these issues are partnership items which are to be determined by the Court.

51

11.     Key has the burden of proving by a preponderance of the evidence that the Owner Trust is entitled to the deductions as reported on its returns for the Taxable Years.  *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Coomes v. Commissioner*, 572 F.2d 554 (6th Cir. 1978); *Toilet Room Accessories Co., Inc. v. United States*, 80-2 U.S.T.C. (CCH) 9563 (N.D. Ohio 1980).

### III.     THE AWG TRANSACTION HAS PRACTICABLE ECONOMIC EFFECTS ASIDE FROM TAX BENEFITS

#### A.     Two-Prong Inquiry:  Business Purpose and Pre-Tax Profit

12.     A transaction must be respected for federal income tax purposes if it has "any practicable economic effects other than the creation of income tax losses."  *Dow Chemical*, 435 F.3d at 599.

13.     In assessing whether the AWG Transaction has "practicable economic effects," the Court "cannot ignore the reality that the tax laws affect the shape of nearly every business transaction."  *Frank Lyon*, 435 U.S. at 580.  In fact, "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."  *Gregory v. Helvering*, 293 U.S. 465, 469 (1935) (citations omitted).  "[T]he existence of tax benefits accruing to an investor does not necessarily deprive a transaction of economic substance."  *Mukerji v. Commissioner*, 87 T.C. 926, 958 (1986) (citations omitted).  Only if a transaction has been undertaken *solely* for tax avoidance purposes can it be disregarded.  *See Rice's Toyota World*, 752 F.2d at 91-92; *Estate of Thomas*, 84 T.C. at 432-33; *Gefen v. Commissioner*, 87 T.C. 1471, 1490 (1986).

14.     In the seminal sale-leaseback case of *Frank Lyon Co. v. United States*, the Supreme Court of the United States held that the Government must "honor the allocation of rights and duties effectuated by the parties" in a sale-leaseback transaction when it is "a genuine

multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." *Frank Lyon,* 435 U.S. at 583-84.

15.    The *Frank Lyon* standard is consistent with the Sixth Circuit's examination of "practicable economic effects," as both tests invite a broad two-pronged inquiry:  whether Key and PNC have a non-tax business purpose for entering into the transaction, and whether Key and PNC have a "reasonable possibility" of earning a profit independent of the tax benefits achieved in the transaction.  *See Frank Lyon*, 435 U.S. at 582-84; *Estate of Thomas*, 84 T.C. at 431-40; *Levy*, 91 T.C. at 853-59; *Rice's Toyota World*, 752 F.2d at 91-95; *Dow Chemical*, 435 F.3d at 599-603; *American Electric Power*, 326 F.3d at 741-44.

16.    Examinations into the business purpose and economic substance of transactions are inherently factual, *Levy*, 91 T.C. at 854, and must be conducted from the vantage point of the taxpayer at the beginning of the transaction, not with the benefit of hindsight.  *Smith v. Commissioner*, 937 F.2d 1089, 1096 (6th Cir. 1991).

**B.**    **Key and PNC Have Non-Tax Business Purposes for the AWG Transaction**

17.    "In the sale-leaseback context, the owner-investors who accrue tax benefits must show that they entered into the transactions motivated by a business purpose sufficient to justify the form of the transactions."  *Levy*, 91 T.C. at 854.

18.    Experience with, or a good faith intent to engage in, the equipment leasing business is indicative of a non-tax business purpose.  *Pearlstein v. Commissioner*, 58 T.C.M. (CCH) 669, 706 (1989); *Levy*, 91 T.C. at 855-56, 871-72.  Both Key and PNC had large, well-established equipment leasing businesses before entering into this transaction.  Key and PNC

53

employed personnel who were experienced in the leasing business; both engaged in other leasing transactions (before and after this one) that have not been challenged by the IRS on audit; both viewed cross-border leveraged leasing as an extension of their domestic leasing businesses; and both hired lawyers, appraisers, financial advisors, environmental experts, and engineers to assist them in evaluating this transaction.  (PFF ¶¶ 19-31, 39-63.)

19.    A desire to diversify investments is indicative of a non-tax business reason for entering into a sale-leaseback transaction.  *See Frank Lyon,* 435 U.S. at 582; *Levy,* 91 T.C. at 855.  Both Key and PNC achieved diversification of their leasing portfolios by entering into cross-border leveraged leasing transactions.  Investment diversification is particularly important to banks who are in the business of originating financial assets.  (PFF ¶ 31.)  Banks essentially "are large portfolio managers that are seeking to diversify their portfolio and earn a return." (Hurd Tr. 604.)  The accounting for leveraged lease investments allows banks to increase and diversify their portfolio of financial assets while adhering to bank regulations.  (PFF ¶ 30.)  In this case specifically, Key and PNC diversified their leasing portfolios by lessee, geography and asset type by entering into a cross-border leveraged leasing transaction with AWG involving a waste-to-energy facility in Germany.  (PFF ¶ 115.)

20.    A non-tax business purpose clearly exists if the taxpayer has a profit motive for entering into the transaction.  *See Estate of Thomas,* 84 T.C. at 437; *Mukerji,* 87 T.C. at 968; *Bryant*, 928 F.2d at 749.  Key and PNC clearly possessed a profit motive for entering into the AWG Transaction.  Key and PNC were motivated by a reasonable expectation of pre-tax profit of at least 3.5% on their investments, with the possibility of earning even higher pre-tax profits (between 6% and 8%) depending on performance under the Service Contract and the actual residual value of the Facility in 2036.  Key and PNC reasonably expect to earn a pre-tax profit,

54

regardless of whether AWG exercises the FPO or the parties enter the Service Contract.  (PFF ¶¶ 115-29.)

21.     It is irrelevant whether Key or PNC could have earned an equal or higher pre-tax profit by entering into an alternate form of investment.  The possibility that a taxpayer may have earned more money (on a pre-tax basis) by choosing an alternative investment does not demonstrate that a taxpayer invested in the transaction solely for tax benefits.  The Government cannot supplant the taxpayer's business judgment.  *See Gefen*, 87 T.C. at 1499; *Estate of Thomas*, 84 T.C. at 440 n.52; *Bryant*, 928 F.2d at 749-50.  In fact, even a small chance of making a large profit can support a profit motive.  *See Bryant*, 928 F.2d at 750.  Here, the Trust's expected pre-tax IRRs are in all events positive.  (PFF ¶ 123.)

22.     The Trust's possible pre-tax returns of 6, 7 or 8 percent through the Service Contract term are equal to or higher than the Government bond rates that prevailed around 1999, which were about 6 to 7 percent.  (PFF ¶ 126.)

23.     Moreover, Key and PNC had good business reasons for choosing a leveraged lease investment over other forms of investment.  Because leveraged lease accounting (FAS-13) permits the reporting of the lease investment net of the non-recourse debt, a bank uses less of its regulatory capital.  (Hurd Tr. 609-10; PFF ¶¶ 130-34.)

24.     Key and PNC also were motivated by significant after-tax book earnings pursuant to leveraged lease accounting standards for financial reporting purposes.  (PFF ¶¶ 24-31, 130-134.)  Although accounting descriptions alone do not imbue a transaction with substance, both the Supreme Court and the Sixth Circuit have recognized the "meaningful character" of the leveraged lease accounting for sale-leaseback transactions.  *See Frank Lyon,* 435 U.S. at 577-78, 578 n.14 (acknowledging that the sale-leaseback transaction was influenced by financial

accounting rules for leveraged leasing contained in Accounting Principles Bd. Opinion No. 5, which was the predecessor to FAS-13, and stating that: "Accounting methods or descriptions, without more, do not lend substance to that which has no substance.  But in this case accepted accounting methods, as understood by the several parties to the respective agreements and as applied to the transaction by others, gave the transaction a meaningful character consonant with the form it was given."); *Davis v. Commissioner*, 585 F.2d 807, 815 (6th Cir. 1978) (distinguishing case from *Frank Lyon*, in part, because accounting treatment did not support sale-leaseback form, and explaining that the Supreme Court " . . . pointed out that the use of accepted accounting methods in accordance with the form of the agreement gave the transaction a meaningful character because the parties understood the accounting treatment to be appropriate for a sale-and-leaseback").

25. Both Key and PNC reported the AWG Transaction in accordance with FAS-13. Leveraged lease accounting recognizes revenue based on the pattern of after-tax cash flow generated by the lease.  This favorable method of accounting enhances an investor's return on equity relative to other non-leveraged leasing investments.  (PFF ¶¶ 24-31, 130-134.)

26. Pursuant to leveraged lease accounting, the AWG Transaction provided to Key and PNC a high book rate of return, including a net after-tax yield of close to 9%.  (PFF ¶ 132.) Leveraged lease accounting also allowed Key and PNC to realize a net interest margin which was two to three times the average benchmark performance.  This margin is used to evaluate bank performance and, in this case, demonstrates that the AWG Transaction had an accretive affect on Key's and PNC's return on their portfolios.  Moreover, the AWG Transaction provided Key and PNC a return on assets substantially in excess of the companies' average return on assets.  (PFF ¶ 133.)

56

27.     Based on their use of leveraged lease accounting, Key and PNC (as publicly-traded companies) reported substantial book earnings on the AWG Transaction, giving the AWG Transaction a "meaningful character consonant with the form." *Frank Lyon*, 435 U.S. at 577-78 and 578 n.14; *Davis*, 585 F.2d at 815.  (*See also* PFF ¶ 131.)

28.     Key and PNC also entered into this transaction in a "business-like manner," which is evidence of a purpose beyond simply tax benefits. *Levy*, 91 T.C. at 855.  The terms of the transaction were heavily negotiated with the assistance of reputable lawyers having experience in leasing transactions.  (PFF ¶¶ 61, 64-65.)  AWG, with the assistance of its advisors, solicited bids for the transaction, and Key and PNC submitted conditional proposals.  (PFF ¶¶ 36-38.)  Key and PNC thoroughly investigated all aspects of the transaction pre-closing, including credit risk, asset risk, pricing, fair market value, residual value, profit projections, and other legal issues such as potential environmental liability associated with the Facility.  (PFF ¶¶ 39-63.)  Key and PNC hired Deloitte to conduct an independent appraisal of the Facility (PFF ¶ 41) and Duke Engineering to issue a report concerning the technical aspects of the Facility.  (PFF ¶ 40)  The Trust paid fair market value for the Facility as supported by the Deloitte appraisal.  (PFF ¶ 60.) The parties have adhered to the terms of the Operative Documents, as evidenced by (among other things) AWG's provision of annual compliance certificates to the Owner Trust, and AWG's requesting permission to sublease the Facility to EkoCity in 2003.  (PFF ¶¶ 84, 87.)  Finally, AWG, Key, PNC, and the Lenders are all unrelated parties.  All of these factors are indicative of the non-tax substance of the AWG Transaction.  *See Frank Lyon*, 435 U.S. at 575-76, 582-84; *Levy*, 91 T.C. at 855-56.

29.     Based on the totality of the facts and circumstances discussed above, Key and PNC had non-tax business purposes for entering into the AWG Transaction.

### C.    Key and PNC Have a Reasonable Possibility of Earning a Pre-Tax Profit

30.    A sale-leaseback transaction will have economic substance if an objective analysis of the facts and circumstances at the beginning of the transaction demonstrates that the taxpayer has a *reasonable possibility* of earning a pre-tax profit.  *See Torres*, 88 T.C. at 718-19 ("reasonable possibility"); *Rice's Toyota World*, 752 F.2d at 94 ("reasonable possibility"); *Levy*, 91 T.C. at 854 ("reasonable opportunity"); *Mukerji*, 87 T.C. at 964 ("realistic opportunity"); *Estate of Thomas*, 84 T.C. at 437, 439 ("reasonable potential" and "reasonably likely"); *see also* Macan & Robinson, *Tax Aspects of Equipment Leasing*, EQUIPMENT LEASING – LEVERAGED LEASING, 4-108 (Ian Shrank & Arnold G. Gough, Jr., eds, Practicing Law Institute 2007) (stating that, "[S]o far, in no leasing case that has presented the reasonable prospect of a pre-tax profit has the taxpayer been denied its anticipated tax treatment based on a lack of economic substance or business purpose").

31.    The determination of whether a taxpayer has a reasonable possibility of earning a pre-tax profit is a future-oriented analysis based on financial projections.  *See e.g., Dow Chemical*, 435 U.S. at 601-02 (stating that, "[I]t was proper for the district court to consider whether Dow's plans would be profitable in the future; indeed, in each prior COLI-plan case, the court looked to future cash flows").  In leasing transactions specifically, the determination of whether an owner-lessor has a reasonable possibility of making a pre-tax profit is based on two projected revenue sources: (i) the income producing potential of the property, and (ii) the property's projected residual value.  *See Levy*, 91 T.C. at 860; *Torres*, 88 T.C. at 726-27.  (*See also* Rev. Proc. 75-21, § 4(6), Pl. Ex. 189.)

32.     It only matters that the projections of cash flow and residual value are reasonable at the time they are made, not that those projections ultimately prove true.  *Gefen*, 87 T.C. at 1492; *see also Levy*, 91 T.C. at 858; *Torres*, 88 T.C. at 719.

33.     Both Key and PNC performed projections of pre-tax profitability using leasing industry-standard computer software (Interet and ABC, respectively), which ran reports based on specific pre-tax profit and cash-flow guidelines issued by the IRS in Rev. Proc. 75-28.  (PFF ¶¶ 118, 119.)  Under these IRS Guidelines for leveraged leasing, a lessor has an expectation of pre-tax profit if the aggregate amounts collected from the lessee when combined with the residual value of the property (without taking into account the effects of inflation) are expected to exceed the lessor's equity investment and aggregate disbursements with respect to the property.  (Rev. Proc. 75-28, Pl. Ex. 190, at 4; PFF ¶ 118.)  The IRS Guidelines do not require a taxpayer to demonstrate pre-tax profit based on net present value principles.  (*Id.*)  Rather, the test set forth in Rev. Proc. 75-28 measures pre-tax profit on an aggregate cash-in-cash-out basis, requiring that the taxpayer demonstrate only $1 of pre-tax profit.  (*Id.*); Macan & Robinson, *Tax Aspects of Equipment Leasing*, EQUIPMENT LEASING – LEVERAGED LEASING, 4-116 (Ian Shrank & Arnold G. Gough, Jr., eds, Practicing Law Institute 2007).

34.     Indeed, the IRS has long been on record that risk free rates of return and present values should not be used to determine if taxpayers entered into leveraged lease transactions with the expectation of a profit, exclusive of tax benefits.  Priv. Ltr. Rul. 8144014.

35.     Like the IRS, courts upholding sale-leaseback transactions have not required net present value techniques in the calculation of pre-tax profit.  *See Estate of Thomas*, 84 T.C. at 440 n.52 (specifically refusing to apply net present value concepts in calculating profit); *Gefen*, 87 T.C. at 1492 (calculating pre-tax profit on an aggregate basis, not a net present value basis,

using projected residual value and projected rental cash flow less investment); *Mukerji*, 87 T.C. at 967 (measuring pre-tax profit based on projected residual values and cash flows, not present values).

36.     Additionally, like the IRS, courts have required only a showing of a minimal pre-tax profit in sale-leaseback transactions and have not looked to alternative investment returns or present values.  *See Rice's Toyota World, Inc. v. Commissioner*, 81 T.C. 184, 203 n.17 (1983) (stating that, "The transaction will still be valid if it possesses some modicum of economic substance"), *aff'd in part and rev'd in part*, 752 F.2d 89 (4th Cir. 1985); *Estate of Thomas*, 84 T.C. at 440 n.52 (stating that, "[W]e do not feel competent, in the absence of legislative guidance, to require that a particular return must be expected before a 'profit' is recognizable. . . .Our sole task here is to determine whether a profit was reasonably likely on these facts in order to find that tax avoidance was not the sole motivation for the transaction.  Since the potential for profit here was more than *de minimis*, we are satisfied that petitioners should prevail"); *Hilton v. Commissioner*, 671 F.2d 316, 317 (9th Cir. 1982), *aff'g*, 74 T.C. 305 (1980) (specifically rejecting the idea that any particular level of pre-tax return is needed to demonstrate economic substance, stating: "[I]n its discussion of the economic value of the transaction, the court [below] looked at the future income potential available to the taxpayers. . . .  Using a six percent rate of return, the court calculated that the taxpayers were facing a net loss from the transaction.  We deem the six percent rate to be for illustrative purposes only.  No suggestion of a minimum required rate of return is made.  Taxpayers are allowed to make speculative investments without forfeiting the normal tax applications to their actions."); *Casebeer v. Commissioner*, 54 T.C.M. 1432 (1987) ("Our analysis does not account for the time value of money concept…As noted in *Estate of Thomas*…, we decline to do so absent statutory guidance in this [leasing] context.").

60

37.     Key and PNC (individually and through the Trust) have demonstrated a reasonable possibility of earning significant pre-tax profit whether AWG exercises the FPO or chooses to enter into the Service Contract.  If AWG exercises the FPO in 2024, Key and PNC will earn a pre-tax profit of over $39 million each (or over $78 million together through the Owner Trust).  (PFF ¶ 119.)  If AWG chooses to forego the FPO and, instead, selects the Service Contract, Key and PNC expect to earn a pre-tax profit of $104 million and $102 million, respectively.  (PFF ¶ 119.)  Thus, the Trust expects a pre-tax profit of over $200 million through the Service Contract term.  (PFF ¶ 119.)  This is based on the methodology established in the IRS Guidelines and thus does not include what could be expected if inflation were added into the calculation.  It is reasonable to include inflation and, if so included, the expected profit would rise significantly.  Macan & Robinson, *Tax Aspects of Equipment Leasing*, EQUIPMENT LEASING – LEVERAGED LEASING, 4-44 through 4-47 (Ian Shrank & Arnold G. Gough, Jr., eds, Practicing Law Institute 2007).

38.     In terms of pre-tax IRRs if the FPO is exercised, the Trust, Key and PNC expect to achieve pre-tax IRRs of 3.52%, 3.50%, and 3.54%, respectively.  (PFF ¶ 120.)

39.     In terms of pre-tax IRRs through the Service Contract term, the Trust, Key and PNC expect to achieve IRRs of 3.43%, 3.39%, and 3.46%, respectively – without taking into account the projected residual value of the Facility at the end of the Service Contract.  (PFF ¶ 121.)  To be conservative, Key often books its leveraged lease transactions by assuming a zero residual value for accounting purposes, despite the fact that it knows from its appraisal that the asset is actually expected to have substantially more than a 20% residual value left at the end of the transaction.   (Angel Tr. 92.)  *See e.g.*, Priv. Ltr. Rul. 8507002 (November 6, 1984) ("The use of a particular assumed residual value for investment analysis purposes should carry no

implication with respect to the reasonability of anticipated residual value.  In addition, it is normally prudent for financial statement purposes to use a more conservative residual value assumption"); Priv. Ltr. Rul. 8144014 ("In determining whether Taxpayer will realize a profit on the transaction, exclusive of the tax benefits, the projected residual value of the property is not limited to or governed by the value that was used for financial reporting purposes.").  Taking into account the expected residual value of the Facility at the end of the Service Contract term, PNC's expected pre-tax IRR is over 5.92%, while Key's expected pre-tax IRR is about 5.80%.  (PFF ¶ 121.)  If other sources of revenue are added (such as Excess Tonnage Charges and electricity revenues), the expected IRRs are in the 6-8% range.  (PFF ¶ 122.)

40.    The Government does not challenge the reasonableness or reliability of the pre-tax profit projections performed by Key and PNC.  In fact, the Government's expert economist, Dr. Lys, acknowledges that the Trust can reasonably expect to earn a pre-tax profit of over 3% during the Lease Term; that the Trust can expect to take in about $80 million more than it spends during the Lease Term; that the Trust can reasonably expect to earn a pre-tax profit of between 5% and 8% if AWG chooses the Service Contract; and that the Trust's pre-tax profit could be even greater than 5% to 8% (or significantly lower), depending on the business circumstances of 2024 to 2036.  (PFF ¶ 124.)

41.    The pre-tax profits projected for the Trust, Key and PNC are not contingent upon future investments by the Trust, Key or PNC or actions that are inconsistent with past conduct – a concern that the Sixth Circuit Court of Appeals had in the case of *Dow Chemical Co.*  In *Dow Chemical*, the Sixth Circuit held that the district court erred in concluding that Dow's COLI plan could yield a pre-tax profit because the plan's profitability depended upon the taxpayer's future investment of cash, which would have been a "drastic departure from the taxpayer's past

62

conduct." 435 F.3d. at 602.  The Sixth Circuit in *Dow Chemical* also emphasized that, "there was no contractual provision requiring Dow to make substantial cash infusions in the future."  *Id.*

42.     The AWG Transaction is fundamentally different from *Dow Chemical* for several reasons.  First, the *Dow Chemical* case is not a leveraged sale-leaseback case.  This is a significant distinction because the reasonable expectation of pre-tax profit in sale-leaseback cases always has been subject to future conditions that may affect projected residual values and projected cash flows (*e.g.*, changes in the economy, a lessee's decision to exercise or not exercise a purchase option, a lessee's performance under a lease, etc.).  Such conditions have not prevented courts from concluding that lessors had reasonable expectations of pre-tax profit.  *See e.g., Frank Lyon*, 435 U.S. 561; *Gefen*, 87 T.C. 1471; *Estate of Thomas*, 84 T.C. 412; *Levy*, 91 T.C. 838.  The AWG Transaction has these normal conditions and does not involve the kind of future cash infusion present in the *Dow Chemical* case.

43.     Second, unlike the situation in *Dow Chemical*, the future direction of the AWG Transaction will be determined by the other contracting party, not the taxpayer.  Specifically, whether the FPO is exercised or the Service Contract is selected in 2024 is entirely within the control of AWG, not the Trust.  (PFF ¶ 135.)  If the FPO is selected, the Trust will earn a pre-tax profit of over $78 million without any further action.  (PFF ¶ 119.)

44.     Third, although the Trust's profitability under the Service Contract alternative depends on the Trust's performance of waste disposal services (*i.e.*, AWG does not pay Service Fees on a "hell-or-high-water" basis), the Trust's future performance will not deviate from past conduct because the Trust has always been *contractually obligated* to enter into the Service Contract and perform as a service provider if AWG chooses not to exercise the FPO.  (PFF ¶¶

104, 119.)  The Sixth Circuit emphasized that such a contractual obligation established consistency between past action and future conduct.  *Dow Chemical*, 435 F.3d at 602 n.14.

45.     Based on the foregoing, the Trust, Key and PNC have demonstrated a reasonable expectation of pre-tax profit that is consistent with IRS guidelines, sale-leaseback case law, and the Sixth Circuit's view of economic substance.  The pre-tax profits projected for the Trust, Key and PNC are of significant amounts in light of both IRS Guidelines and case law standards.

46.     In conclusion, the totality of the facts and circumstances demonstrates that the AWG Transaction has "practicable economic effects" aside from tax benefits.  The Trust, Key and PNC have a reasonable possibility of earning a substantial profit in the transaction independent of tax benefits.  Key and PNC had non-tax business purposes for entering into the transaction and conducted thorough due diligence before closing.

## IV.     THE AWG TRANSACTION'S SUBSTANCE COMPORTS WITH ITS FORM

### A.     The Sale-Leaseback-to-Service Contract is a Valid Transactional Form

47.     The fact that a party sells property to another "only with some kind of leaseback arrangement included does not of itself detract from the reality of the sale."  *Crowley, Milner & Co. v. Commissioner*, 76 T.C. 1030, 1038 (1981) (citations omitted), *aff'd*, 689 F.2d 635 (6th Cir. 1982).

48.     In fact, for decades, the courts and the IRS have respected the sale-leaseback structure as a legitimate transactional form, recognizing that, "[t]here is nothing inherently suspect in a purchase and leaseback.,"  *American Realty Trust v. U.S.*, 498 F.2d 1194, 1197 (4th Cir. 1974) (citing jury instructions of trial court), and "[a] sale-and-leaseback, in and of itself, does not necessarily operate to deny a taxpayer's claim for deductions."  *Frank Lyon*, 435 U.S. at 584.

49.     Ownership of an asset for federal income tax purposes is not dependent upon the possession of legal title.  *See Helvering v. F. & R. Lazarus & Co.*, 308 U.S. 252 (1939). Therefore, a sale can be accomplished through a lease when the term of the lease exceeds the remaining economic useful life of the asset, and when the lessee pays up front a lump sum amount equal to the asset's fair market value.  *See Lazarus*, 308 U.S. 252; Rev. Rul. 55-540, § 4.06, 1955-2 C.B. 39; Rev. Rul. 68-590, 1968-2 C.B. 66; William A. Macan IV & Michael G. Robinson, *Tax Aspects of Equipment Leasing*, EQUIPMENT LEASING-LEVERAGED LEASING 4-16 (Ian Shrank & Arnold G. Gough, Jr. eds., Practicing Law Institute 2007).

50.     The Head Lease effectuated a sale of the Facility by AWG to the Owner Trust for federal income tax purposes.  *Lazarus,* 308 U.S. 252; Rev. Rul. 68-590; Rev. Rul. 55-540.  The Head Lease was substantially longer than the expected useful life of the Facility.  (PFF ¶ 69.) The Owner Trust paid in a lump sum at Closing an amount that equaled the appraised fair market value of the Facility, $423 million.  (PFF ¶ 72.)  AWG and Owner Trust intended that the Head Lease would effect a sale of the Facility as expressly stated in the Head Lease.  (PFF ¶ 68.)

51.     Ownership for federal income tax purposes does not depend upon current possession of the asset.  Federal income tax law recognizes that a lease separates one party's desire for ownership (the lessor) from another party's need for possession (the lessee).  *See Torres*, 88 T.C. at 721; Rev. Rul. 55-540, §2.01.  The Owner Trust and AWG intended that the Lease would constitute a true lease for federal income tax purposes.  (PFF ¶ 88.)

52.     The Service Contract component of the AWG Transaction is authorized under 26 U.S.C. § 7701(e).  Congress enacted 26 U.S.C. § 7701(e) as part of the Deficit Reduction Act of 1984 (the "1984 Act"), at the same time it enacted the "Pickle rule," which requires U.S. lessors to depreciate "tax-exempt use property" (defined as certain property leased to a tax-exempt

entity, including a foreign entity, 26 U.S.C. § 168(h)(2)) on an extended straight-line basis over a period of not less than 125% of the lease term, rather than on an accelerated basis.  26 U.S.C. § 168(g)(3)(A).  Congress specified that property used by a U.S. taxpayer to provide services to a tax-exempt entity pursuant to a service contract would not be subject to the extended depreciation period required by the Pickle rule.  STAFF OF SENATE COMMITTEE ON FINANCE, EXPLANATION OF DEFICIT REDUCTION TAX BILL OF 1984, 136-37 (April 2, 1984).  (Hereinafter, the "Senate Committee Report at ___").

53.    The Service Contract qualifies as a "service contract" under the factors listed in 26 U.S.C. § 7701(e)(1).  (PFF ¶¶ 105, 106, 107, 111, 112, 122, 143, 145.  S*ee also* Service Contract, Joint Ex. XIII, §§ 2.1, 6.1.6, 6.2.2, 6.7, 8.3, 12, 13, 17.2; Appraisal, Pl. Ex. 119, PNC0004919-20. )  The Government is not challenging this point.

### B.    The Owner Trust Acquired the Benefits and Burdens of Ownership

54.    The sale accomplished by the Head Lease, followed by the leaseback and service contract, must be respected so long as the substance of the transaction matches its form.  *See Gregory v. Helvering*, 293 U.S. 465, 469 (1935) ("But the question for determination is whether what was done, apart from the tax motive, was the thing which the statute intended"); *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334 (1945) ("The incidence of taxation depends upon the substance of a transaction.").  Under the "substance-over-form doctrine," courts view a transaction as a whole.  *Estate of Kluener v. Commissioner*, 154 F.3d 630, 634 (6th Cir. 1998).  Each step, from the commencement of negotiations to the consummation of the transaction is relevant.  *Id.*  (*citing Court Holding*, 324 U.S. at 334.)

55.    In *Frank Lyon*, the Supreme Court held that a taxpayer must be respected as the owner of the asset under the sale-leaseback form when the facts and circumstances demonstrate

that the taxpayer has acquired "significant and genuine attributes" of a traditional owner-lessor. 435 U.S. at 583-84.  As the Court noted, "What those attributes are in any particular case will necessarily depend upon its facts."  *Id.*

56.     Using the facts-and-circumstances analysis set forth in *Frank Lyon*, courts have upheld numerous sale-leaseback transactions by concluding that the taxpayer acquired the "benefits and burdens" of ownership.  *See Levy*, 91 T.C. at 859-862; *Torres*, 88 T.C. at 720-27; *Cooper*, 88 T.C. at 104-08; *Estate of Thomas*, 84 T.C. at 431-36.

57.     Whether a taxpayer has acquired the benefits and burdens of ownership is "a question of fact that must be ascertained from the intentions of the parties as evidenced by the written agreements read in light of all of the relevant facts and circumstances."  *Levy*, 91 T.C. at 860.

58.     A taxpayer need only acquire "sufficient," *Levy*, 91 T.C. at 860, or "significant," *Frank Lyon*, 435 U.S. at 584, benefits and burdens to be considered an owner for federal tax purposes.  Thus, whether the Owner Trust acquired sufficient benefits and burdens of ownership is determined by examining the substance of the rights and duties allocated by the parties in all of the Operative Documents, which contemplate a 36-year business relationship under a sale-leaseback to service contract structure. *See Frank Lyon*, 435 U.S. at 572-73, 583-84; *Estate of Kluener*, 154 F.3d at 634; *Levy*, 91 T.C. at 853-62.

59.     The benefits and burdens of ownership analysis is unaffected by the service contract rules of 26 U.S.C. § 7701(e).  *See* Senate Committee Report at 127.

60.     Moreover, U.S. tax ownership is a question of U.S. federal income tax law only, and is independent of the characterization of the transaction under the laws of other countries or jurisdictions.  *See, e.g.*, Tech. Adv. Mem.  9748005 (August 19, 1997) and Tech. Adv. Mem.

9802002 (September 18, 1997) (both explaining that: "[D]ual tax ownership will not be a

concern in the United States when it is solely the result of differing U.S. and foreign legal

standards of tax ownership being applied to the same facts because tax ownership is determined

under U.S. legal standards without regard to the tax ownership treatment obtained under foreign

law"); *see also Burnet v. Harmel*, 287 U.S. 103 (1932) (standing for the proposition that the

characterization of a transaction for federal income tax purposes is ultimately a question of

federal law, not local law).  Dual tax ownership, in which two parties from different countries

both claim tax ownership of the same asset under the distinct laws of their respective countries,

is a common feature in international transactions.  (Jacob Tr. 716-18; Schweiss Tr. 1071-72.)

The opposite can also occur, where both parties in an international transaction may suffer a tax

disadvantage, referred to as a "double-gouge."  (Jacob Tr. 716-18.)

      61.    The benefits and burdens of ownership have been addressed by judicial decisions

and IRS pronouncements over the course of many decades.  *See e.g.*, *Lazarus*, 308 U.S. 252;

*Frank Lyon*, 435 U.S. 561; *Estate of Thomas*, 84 T.C. 412; *Levy*, 91 T.C. 838; *Gefen*, 87 T.C.

1471; *Mukerji*, 87 T.C. 926; *Belz Investment Co. v. Commissioner*, 72 T.C. 1209 (1979), *aff'd on

another issue by* 661 F.2d 76 (6th Cir. 1981); *Northwest Acceptance Corp. v. Commissioner*, 58

T.C. 836 (1972); *Breece Veneer and Panel Co. v. Commissioner*, 232 F.2d 319 (7th Cir. 1956);

*Gem, Inc. v. United States*, 192 F. Supp. 841 (N.D. Miss. 1961); *Cal-Maine Foods v.

Commissioner*, 36 T.C.M. (CCH) 383 (1977); *Transamerica Corp. v. United States*, 15 Cl. Ct.

420 (1988); Rev. Rul. 55-540; Rev. Rul. 68-590; Rev. Proc. 75-21, 1975-1 C.B. 715; Rev. Proc.

75-28, 1975-1 C.B. 752; Rev. Proc. 2001-28, 2001-C.B. 1156; Rev. Proc. 2001-29, 2001-1 C.B.

1160.

62.     Based on the authorities noted above, a taxpayer must be respected as the owner of an asset under a sale-leaseback structure if the following criteria are satisfied:  (a) *Fair Market Value Purchase* -- the taxpayer pays fair market value for the property; (b) *Meaningful Equity Investment*-- the taxpayer made and maintained a meaningful equity investment in the property; (c) *Meaningful Residual Interest Retained* -- the taxpayer has a meaningful interest in the property's residual value; and (d) *Lessee Option Is Not Compelled* -- there is no certainty, based on the facts and circumstances at the beginning of the transaction, that the lessee will exercise any fixed purchase option (either during or at the end of the transaction) that it has been granted. *See generally*  Macan & Robinson, *supra* at 4-15 ("the principal aspects of a true lease [are] the availability to the lessor of a substantial anticipated residual value in property in which it has made a substantial equity investment, the enjoyment of which is subject to market forces and conditions, and the opportunity of the lessor, by realizing such residual value, to achieve a substantial economic profit from the lease transaction apart from tax benefits").

63.     It should be noted that the economic substance and business purpose analysis sometimes overlaps with what courts characterize as the benefits and burdens of ownership.  *See e.g. Levy*, 91 T.C. at 860; *Estate of Thomas*, 84 T.C. at 437.  As demonstrated above, Key and PNC have non-tax business purposes for the AWG Transaction and have a reasonable possibility of earning a pre-tax profit from the transaction.  Thus, this analysis need not be repeated here.

### (i)      Owner Trust Purchased the Facility for Fair Market Value

64.     The determination of a property's "fair market value" is a question of fact that must be ascertained based on all of the facts and circumstances known or reasonably foreseeable on the valuation date.  *See Stanley Works and Subs. v. Commissioner*, 87 T.C. 389, 408-11 (1986); *Arbor Tower Assoc., Ltd. v. Commissioner*, 77 T.C.M. (CCH) 2348, 2350-51 (1999).

69

65.     For federal income tax purposes, "fair market value" is considered to be the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.  *See, e.g.*, *United States v. Cartwright*, 411 U.S. 546, 551 (1973); *Negron v. United States*, 502 F. Supp. 2d. 682, 685 (N.D. Ohio 2007); *McShain v. Commissioner*, 71 T.C. 998, 1004 (1979); *Stanley Works*, 87 T.C. at 399 n.7; *Arbor Towers*, 77 T.C.M. (CCH) at 2350; *Regents Park Partners v. Commissioner*, 63 T.C.M. (CCH) 3131, 3131-12 (1992); Treas. Reg. § 1.170A-1(c)(2); Treas. Reg. § 20.2031-1(b); Rev. Rul. 59-60, 1959-1 C.B. 237.   The willing buyer and willing seller are hypothetical persons.  Thus, the specific characteristics of a particular buyer or seller should not be considered.  *See Arbor Towers*, 77 T.C.M. (CCH) at 2351.

66.     Fair market value equals the highest and best use to which the property could be put.  Fair market value is not affected by whether the owner has actually put the property to its highest and best use.  The reasonable, realistic, and objective possible uses for the property in the near future control the valuation.  *See Stanley Works*, 87 T.C. at 400; *Arbor Towers,* 77 T.C.M. (CCH) at 2351; *Regents Park Partners*, 63 T.C.M. (CCH) at 3131-12.  Fair market value is not represented by the property's "value in use" by a specific buyer or seller.  *See Arbor Towers,* 77 T.C.M. (CCH) at 2351.

67.     Deloitte appropriately valued the Facility using a hypothetical willing buyer / hypothetical willing seller standard required by federal tax law and generally accepted appraisal standards.  (PFF ¶ 55.)  Deloitte used the three accepted valuation approaches:  the cost approach, the discounted cash flow ("DCF") approach, and the market approach.   Deloitte followed standard appraisal methodology by considering all three approaches and arriving at a "conclusion of value."  (PFF ¶¶ 46, 52, 58.)

68.     Deloitte opined that the cost approach provided the strongest indication of fair market value.  Using the cost approach, Deloitte concluded that the total project costs to reproduce or replace the Facility would be approximately DM 800 million, or $423 million U.S. (PFF ¶¶ 47, 51.)  This was a reasonable estimate of the Facility's fair market value on December 7, 1999, especially in light of the fact Deloitte had substantial experience and knowledge of costs of similar facilities in Western Europe from other projects and, specifically, because it had information that a comparable WTE facility in nearby Koln, Germany had recently been constructed for an estimated cost of DM 900 million.  (PFF ¶ 47.)  There was additional evidence at trial supporting this conclusion.  (PFF ¶¶ 48, 49.)

69.     Deloitte also supported its cost valuation with a specific review of the AWG Facility's costs.  It was reasonable for Deloitte to include construction interest ("capitalized interest") and a turnkey premium as part of the reproduction cost method.  Courts have recognized the reproduction cost method as an appropriate method for determining a property's fair market value, and have accepted the incorporation of capitalized interest and turnkey fees into the cost method.  *See Miami Valley Broadcasting Corp. and Carolina Broadcasting Co. v. United States*, 204 Ct. Cl. 582, 588-90 (1974); *Utilicorp United, Inc. & Subs. v. Commissioner*, 73 T.C.M. (CCH) 1835 (1997).

70.     Deloitte's conclusion of fair market value was further supported by the DCF approach.  (PFF ¶¶ 52-57.)

71.     It was reasonable for Key and PNC to rely on Deloitte's expertise in appraising the fair market value of the Facility.  (PFF ¶¶ 41, 43.)

72.     Key's and PNC's reasonable reliance on Deloitte is not diminished by the fact that Deloitte conducted a preliminary analysis of the Facility's value for purposes of AWG's request

71

for proposals.  *See Mukerji*, 87 T.C. 926 (taxpayer relied on appraisal of equipment's current fair market value and projected residual value that was included in private placement memorandum); *Estate of Thomas*, 84 T.C. 412 (taxpayer performed due diligence based on appraisal provided in private placement memorandum).  The evidence established that this is a standard practice in the leveraged leasing industry where the lessor is comfortable with the appraiser.  (Angel Tr. 76.)

73.  The amount of $423 million was a reasonable estimate of the Facility's fair market value on December 7, 1999.  Accordingly, the Trust paid fair market value to acquire the Facility.

**(ii)**  **The Trust Made and Maintained a Meaningful Equity Investment in the Facility**

74.  To be respected as an owner in a leasing transaction, a taxpayer must make and maintain a meaningful equity investment in the property throughout the term of the transaction. In other words, while the vast majority of the funds used to purchase the asset can be borrowed on a non-recourse basis, some of the funds must consist of cash invested by the taxpayer.  *See, e.g., Estate of Thomas*, 84 T.C. 412.

75.  The IRS Guidelines state that the taxpayer must invest equity equal to at least 20% of the cost of the property for purposes of obtaining an advance letter ruling.  (Rev. Proc. 75-21, Pl. Ex. 189, § 4(1)(A).)  The courts, however, have not adopted the IRS's 20% benchmark as a matter of substantive tax law.  For example, courts have held that an equity investment equal to 13% or less of the purchase price of the property is a meaningful equity investment indicative of ownership status.  *See e.g., Estate of Thomas,* 84 T.C. 412 (equity investment of approximately 13%); *Frank Lyon*, 435 U.S. 561 (equity investment of approximately 6%); *Emershaw v. Commissioner*, 59 T.C.M. 621 (1990) (6% equity), *aff'd* 949 F.2d 841 (6th Cir. 1991); *Pearlstein*, 58 T.C.M. (CCH) 699 (equity investment of between 8% and 9%);

(Shinderman Tr. 1107 (equity investment of "somewhere between 10-40%").)  Thus, there is no

particular percentage requirement in the substantive case law for determining what is a

meaningful equity investment.

76.    The Owner Trust made and maintained an equity investment of $55 million,

which is equal to 13% of the purchase price of the Facility ($55 million / $423 million).  (PFF ¶

73.)   Thus, the Owner Trust made a meaningful equity investment in the Facility consistent with

applicable case law.  *See Estate of Thomas*, 84 T.C. 412.  Also, Key and PNC both complied

with the IRS Guidelines' test regarding maintenance of the meaningful equity investment

throughout the term of the transaction.  (Interet Report, Pl. Ex. 112, KSP0204891; ABC, Pl. Ex.

79, PNC0005249.)

### (iii)    The Trust Retained a Meaningful Residual Interest in the Facility

77.    A lessor must retain a meaningful residual interest in the property at the end of the

lease term.  Case law does not set forth bright line requirements for what constitutes a

meaningful residual interest.  However, case law generally requires that the useful life of the

property exceed the lease term and that the projected residual value be meaningful.  *See Estate of

Thomas*, 84 T.C. at 433; *Torres*, 88 T.C. at 724-25; *Levy*, 91 T.C. at 858-61; *Mukerji,* 87 T.C. at

967.

78.    In analyzing whether the taxpayer has retained a meaningful residual interest, it is

appropriate to consider the effects of inflation on the property's residual value.  *Estate of

Thomas,* 88 T.C. at 429 (explaining that certain predictions of residual values in the case "were

made in part in reliance upon continued high anticipated levels of inflation. . . "); Macan &

Robinson, *Tax Aspects of Equipment Leasing, supra*, at 4-45 and 4-47 (stating that: "The cases

73

are unanimous, however, in their implicit rejection of the [IRS Guidelines] notion that residual value must be determined without regard to inflation. . . ").

79.     A taxpayer is entitled to rely on an appraisal setting forth projected residual values for an asset as long as the appraisal reflects what was reasonable to believe about the property's future value at the time the transaction was entered into.  Unexpected events and changes in the economy after the appraisal has been performed do not affect the reasonableness of the appraisal's conclusions based on the facts and circumstances in existence at the beginning of the transaction.  *See Levy*, 91 T.C. at 858; *Gefen*, 87 T.C. at 1491-92; *Mukerji*, 87 T.C. at 965.

80.     The IRS Guidelines condition the receipt of an advance ruling on:  (1)  the lease term not exceeding 80% of the anticipated remaining economic useful life of the leased property, and (2) on the anticipated residual value of the property at the end of the lease term (without taking inflation into account), as estimated at the beginning of the transaction, equaling at least 20% of the cost of the property.  (Rev. Proc. 75-21, § 4(1)(C), Pl. Ex. 189.)

81.     Here, the residual value of the Facility satisfies both substantive tax law as developed by the courts, as well as the more conservative IRS Guidelines.

82.     First, the Owner Trust retained a residual interest of more than 20% of the Facility's expected useful life.  The estimated remaining economic useful life of the Facility, as of December 7, 1999, was approximately 46 years, as determined in writing by an appraiser (Deloitte) and an independent engineering firm (Duke).  (PFF ¶¶ 40, 42.)  The Government has not challenged this 46-year estimate of remaining economic useful life.  As of the Closing Date, neither the Lease Term (24 years) nor the combined Lease Term and Service Contract Term (36 years) exceeds 80% of the remaining economic useful life of the Facility.  (PFF ¶ 183.)

74

83.     Second, the Owner Trust retained a residual interest of more than 20% of the purchase price of the Facility.  In all events, the Facility is expected to have greater than 20% of its 1999 value remaining in 2024 and 2036 (at the end of the Lease Term and the Service Contract Term) with or without including the effects of inflation.  (PFF ¶ 177.)

84.     In all respects, the Owner Trust has retained a meaningful residual interest in the Facility consistent with applicable case law and the IRS Guidelines.  *See, e.g., Estate of Thomas*, 84 T.C. 412; Rev. Proc. 75-21, Pl. Ex. 189.

### (iv)     AWG is Not Compelled to Exercise the FPO in 2024

85.     It is common for leasing transactions to feature fixed price options for the lessee to purchase the property.  (Angel Tr. 89, 93-94.)

86.     A taxpayer should be respected as an owner-lessor of property under a true lease provided that, at the beginning of the transaction, there is no "certainty" that the lessee will exercise any purchase option that it has been granted.  *See e.g.*, *Transamerica Corp.* 15 Cl. Ct. at 442 (concluding that, "It was not a *certainty* in 1961 [the inception of the lease] that the options ever would be exercised. . . ."); *Northwest Acceptance Corp.,* 58 T.C. at 848 (concluding that: "[W]e cannot find that the purpose of the options was to give the lessee an equity in the equipment or to make the ultimate purchase of the machine by the lessee an *absolute certainty*"); *Cal-Maine Foods*, 36 T.C.M. (CCH) at 389 (stating that: "[W]e likewise cannot conclude that the ultimate purchase of the property was an *absolute certainty*"); *Illinois Valley Paving Co. v. Commissioner,* 42 T.C.M. (CCH) 909, 914 (1981) (concluding that: "Although it was clear that [the lessee] hoped to exercise the options when it entered the agreements herein, it was not *certain* then that [the lessee] would in fact do so at the end of the rental periods"); *Belz*

*Investment Co.,* 72 T.C. at 1228 (concluding that:  "[W]e cannot agree with [the Commissioner] that exercise of the option was a '*foregone' conclusion*") (all emphases added).

87.     The determination of whether a lessee is "certain" to exercise a purchase option must be made based on the facts and circumstances, including the parties' intent, existing at the time the parties entered into the transaction.  *See Illinois Valley Paving Co.,* 42 T.C.M. (CCH) at 914; *Cal-Maine Foods*, 36 T.C.M. (CCH) at 389; *Belz Investment Co.,* 72 T.C. at 1228; *Benton v. Commissioner*, 197 F.2d 745, 752 (5th Cir. 1952); Rev. Rul. 55-540, § 4.01.

88.     The mere possibility, expectation, or speculation that a lessee may exercise an option is not sufficient to conclude that the exercise is "certain."  *See Transamerica Corp*., 15 Cl. Ct. at 442; *Gem, Inc*., 192 F. Supp. at 848.  No one fact or circumstance is solely determinative of whether, as of the beginning of the transaction, it is "certain" that the lessee will exercise its purchase option.  *See, e.g.*, *Gem, Inc.*, 192 F. Supp. at 847-48 (refusing to engage in an "unwarranted overweighing of but one factor" at the expense of a "minimization of other factors").

89.     Here, based on all of the facts and circumstances, one cannot reasonably conclude that as of December 7, 1999, it was certain that AWG would exercise the FPO 24 years later on January 1, 2024.

90.     *First*, and perhaps most significantly, there is no "bargain option" or "nominal price option" in the AWG Transaction.  Courts give great weight to how the option price compares to the property's expected fair market value ("FMV") at the time of exercise.  Absent other facts to the contrary, an option is not certain to be exercised, and true lease status should prevail, if the option price equals or exceeds what the parties expected (as of the beginning of the transaction) the property's fair market value would be on the exercise date.  *See Frank Lyon,* 435

76

U.S. at 569-70 (options based on FMV); *Estate of Thomas*, 84 T.C. at 434-35 (option based on

FMV); *LTV Corp. v. Commissioner*, 63 T.C. 39, 50 (1974) (option based on expected FMV);

*Lockhart Leasing Co. v. United States*, 446 F.2d 269, 271 (10th Cir. 1971) (options based on

expected FMV); *Cal-Maine Foods*, 36 T.C.M. (CCH) at 389 (option based on expected FMV);

*Calcasieu Paper Company, Inc. v. Commissioner*, 12 T.C.M. (CCH) 74 (1953) (premium

option); *But See Oesterreich v. Commissioner,* 226 F.2d 798 (9th Cir. 1955) (nominal option

price of $10); *Van Valkenburgh v. Commissioner,* 26 T.C.M. (CCH) 753 (1967) (nominal option

price of $1); Rev. Rul. 55-540, § 4.01(e) (nominal option price indicative of conditional sale).

91. The purchase price of the FPO is fixed at $521 million per Section 19 and Exhibit

F of the Lease. (PFF ¶ 137.) Deloitte estimated in the Appraisal that the future fair market value

of the Facility as of January 1, 2024 is expected to be approximately $390 million. Thus, the

purchase price of the FPO was set to be approximately 132% of the Facility's value as of the

exercise date. (PFF ¶ 138.) It is far from certain that AWG, or any lessee, would purchase an

asset for $131 million more than what it is expected to be worth. In fact, Key put on evidence

that German law may prohibit a municipally-owned entity such as AWG from paying more than

fair market value for an asset. (PFF ¶ 151.)

92. *Second*, the significant span of time between the Closing Date and the FPO date --

24 years -- renders any attempt to predict what would happen in the intervening years all the

more speculative. All business, economic, political, and legal factors, whose future impact

cannot be predicted, create uncertainty as to a lessee's future decision regarding the exercise of

an option. *See Gem, Inc*., 192 F. Supp. at 847-48; *Belz Investment Co.*, 72 T.C. at 1228; *Benton*,

197 F.2d at 752; *American Realty Trust*, 498 F.2d at 1199. Much can change in 24 years,

including numerous business, economic, political and legal factors that could not be definitively

predicted at the closing of the transaction on December 7, 1999, such as the value of the Facility; market prices for tipping fees; the volume of waste processed; the value of electricity, heat, steam and other byproducts; and interest and currency exchange rates.  (Graves Tr. 775-95, 806-09; Pl. Graphics 34, 35.)  Additionally, there will be unpredictable political factors associated with the decision of public officials concerning which alternative (the FPO or the Service Contract) will be a better use of public funds at the time.  (Reutlinger Tr. 699.)  AWG's decision will be based on the facts and circumstances in 2024.  (Reutlinger Tr. 703.)

93.     *Third*, AWG made express written representations to the effect that, as of 1999, it was uncertain whether it would exercise the FPO in 2024.  (PFF ¶¶ 149, 150.)  The absence of any understanding between the parties as to the lessee's intentions with respect to the exercise or non-exercise of a purchase option also supports a finding that the lessee's future decision is uncertain.  *See Frank Lyon*, 435 U.S. at 583; *Smith v. Commissioner*, 51 T.C. 429, 439 (1968); *Estate of Thomas*, 84 T.C. at 425. *Cf. M&W Gear Co. v. Commissioner*, 54 T.C. 385 (1970), *rev'd on other grounds*, 446 F.2d 841 (7th Cir. 1971) (concluding that arrangement was a sale rather than a lease because separate memorandum expressed lessee's intention to exercise the option from the outset).

94.     AWG's written statements to the German taxing authorities shortly before Closing demonstrate the uncertainty surrounding the FPO.  (PFF ¶ 149.)  It is reasonable to believe that AWG would not misrepresent its intentions to the German taxing authorities for fear of jeopardizing the binding nature of the requested ruling.  Moreover, AWG also gave representations and warranties directly to the Owner Trust to the effect that there are no agreements between AWG, the Cities or any other person pertaining to the exercise or non-exercise by AWG of the Fixed Purchase Option; that AWG had taken no official corporate

78

action authorizing the exercise of the Fixed Purchase Option; and that none of the organizational or governing documents or rules, regulations or written policies of AWG economically compels or legally requires AWG to exercise the Fixed Purchase Option.  (PFF ¶¶ 149-50.)

95.    *Fourth*, even if AWG wanted to decide earlier, the transaction documents provide that AWG can exercise the FPO only by a vote of its *then-governing body* in the year 2022 or later.  (PFF ¶ 148.)  Thus, it is likely that the decision to be made by AWG in 2022-23 regarding whether to exercise the FPO in 2024 will be made by individuals that took no part in the 1999 decision to enter into the transaction.

96.    *Fifth*, Deloitte concluded that AWG was paying no more than fair rental value under the Lease.  (Appraisal, Pl. Ex. 119, PNC0004919-20.)  Nor is rent credited against the FPO price.  Thus, AWG is not building up "equity" by paying more than fair market rents during the Lease Term.  An option generally is not certain to be exercised if the lessee is paying fair market rent, the option price exceeds total rental value, and rent payments are not being credited toward the option exercise.  This ensures that the lessee is not building up substantial equity in the property during the lease term.  *See, e.g.*, *Estate of Thomas*, 84 T.C. at 434; Rev. Rul. 55-540, § 4.01; *Cf. Martin v. Commissioner*, 379 F.2d 282 (6th Cir. 1967), *aff'g in part and rev'g in part*, 44 T.C. 731 (1965); *Lemon v. United States*, 115 F. Supp. 573 (D. Va. 1953).

97.    *Sixth*, the alternatives to exercise of the FPO are attractive to AWG, as spelled out below.  AWG would be assured of an uninterrupted means of incinerating the waste it collects from its customers, if it decides not to exercise the FPO.  (PFF ¶ 140.)

98.    The Service Fees that AWG would be required to pay to the Owner Trust (or its designee) under the Service Contract do not exceed fair market value for such services.  (PFF ¶ 142.)  This stands in contrast to the premium AWG would have to pay to exercise the FPO.

79

99.     During the Service Contract Term, AWG sheds operational risk and *force majeure* risk.  The Owner Trust (or its designee) bears those risks.  AWG will pay only for those services it actually receives under the Service Contract.  (PFF ¶ 143.)

100.     AWG has a measure of flexibility under the Service Contract because AWG has the right to assign its interest as the Customer under the Service Contract to some other person.  (PFF ¶ 144.)  AWG, therefore, need not exercise the FPO in order to avoid being the Customer under the Service Contract.

101.     AWG has a second purchase option, which gives it the right to purchase the Facility in 2036 at the then-appraised fair market value.  (PFF ¶¶ 145, 146.)  The ability of AWG to purchase the Facility in 2036 at actual fair market value provides AWG with flexibility, and ensures that AWG will not be compelled to purchase the Facility for a premium at the first option point in 2024.

102.     Ultimately, AWG's exercise of the FPO in 2024 is *not* a "certainty."  Indeed, as demonstrated by all of the facts and circumstances above, the transaction economics have a built-in financial bias in favor of non-exercise of the FPO.

103.     The existence (from the inception of the transaction) of the PUAs does not make it certain that AWG will exercise the FPO in 2024.   The setting of money aside at the beginning of a transaction to potentially exercise an option is not evidence that the lessee was "certain" from the outset to exercise the option.  *See Breece Veneer and Panel Co.*, 232 F.2d at 323.

104.     The money owing under the PUAs provides AWG with the *liquidity* (in U.S. dollars, the currency in which the Purchase Option Price is payable) to be in a position to exercise the FPO, if it wants to, in 2024.  However, the money owing under the PUAs does not provide AWG the *motivation* to exercise the FPO.  One is not compelled to buy a shirt in a

department store simply because one has the necessary money in one's pocket.  Especially if the shirt is overpriced.  One might rather keep the money for another purpose.  If AWG exercises the FPO, then funds sufficient to pay the $521 million Purchase Price are paid on behalf of AWG by the PUA issuers.  If AWG does not exercise the FPO, then the $521 million is paid by the PUA issuers to AWG for AWG to save, spend or use as it sees fit, without any restrictions or conditions.

105.    There are no legal impediments to AWG entering into the Service Contract.  (PFF ¶ 175.)

106.    First, it is reasonable to expect that there will be qualified German operators available in 2024 to run the Facility for the Owner Trust.  (PFF ¶ 106.)

107.    Second, it is reasonable to expect that the Loans will be able to be refinanced in 2024 based on the expected value of the Facility, the substantial collateral package available at that time, and the short average life of the refinanced debt.  (PFF ¶¶ 159-175.)  The collateral package includes the Trust's interest in the Service Fees, which alone will be sufficient to service the debt on the new loans.  (PFF ¶ 163.)  The collateral package also includes guarantees by the bankruptcy-remote German Cities.  The Assumption Agreement is already in place for that purpose, but even if it were no longer in place, AWG is required to obtain them and there is no reason to believe that the Cities would not provide them.  (Reutlinger Tr. 678-80.)

108.    Finally, AWG would not be compelled to exercise the FPO based on any potential German tax.  In sum, the possible German tax arguments raised by the Government do not render exercise of the FPO by AWG a certainty as of 1999.  (PFF ¶¶ 152-58.)

### C.  The AWG Transaction Comports With Commonly Accepted Leasing Structures

109.    The Trust's use of non-recourse financing to fund part of its purchase price of the Facility is in line with common commercial practice.  *See Estate of Thomas*, 84 T.C. at 436 (stating that, ". . .we do not believe that the nonrecourse nature of notes is necessarily more than a 'neutral factor,' since nonrecourse liabilities are commonly used in modern transactions"); *see also Torres*, 88 T.C. 708, and *Sanderson*, 50 T.C.M. (CCH) 1033 (both holding that taxpayer was owner under sale-leaseback transactions in which nonrecourse debt was used to acquire property).  In fact, the debt in all leveraged leases is non-recourse.  (Angel Tr. 85; Macan Tr. 547.)

110.    The Lease in the AWG Transaction is a "net lease" or "triple net lease" in which the lessee is responsible for all taxes, insurance and maintenance expenses that arise from the use of the property.  (PFF ¶ 82.)  Net leases are commonly and extensively used in leveraged leasing transactions and constitute a neutral factor in the benefits and burdens analysis.  *See Frank Lyon*, 435 U.S. at 567; *Estate of Thomas*, 84 T.C. at 424, 433; *Gefen,* 87 T.C. at 1493; *Levy*, 91 T.C. at 860.

111.    A prudent lessor always will seek a financially stable lessee to enter into the lease transaction.  *See Gefen*, 87 T.C. at 1494 n.15; *Levy*, 91 T.C. at 846, 857.  It is generally expected in leasing that the lessee's rental payment to the lessor will be used by the lessor to pay the lessor's debt service on the non-recourse loan it incurred to make the initial purchase of the property.  *See, e.g., Frank Lyon,* 435 U.S. at 566-68, 581-84; *Levy*, 91 T.C. at 860; *Estate of Thomas*, 84 T.C. at 433-34, 436.  The Owner Trust received $1.2 million of positive excess cash flow during the first year of the Lease.  (PFF ¶ 89.)  However, the fact that the rent payments

were largely geared to paying debt service for most of the Lease Term is in line with common commercial practice.

112.    The fact that the issuers of the Series A PUA and the Nord LB PUA pay AWG's rent directly to the Lenders, instead of to the Owner Trust, is commercially reasonable.  Since lenders have a security interest in the lease rent (as well as the leased property), lenders universally insist that the lessor direct the lessee to pay the rent directly to the lessor's bank for the benefit of the lessor.  *See Estate of Thomas*, 84 T.C. at 423; *Sanderson*, 50 T.C.M. (CCH) at 1038-39.  It a bedrock principle of federal income tax law that a payment by one party to the creditor of another party in discharge of the legal obligation of that party to its creditor, are treated as a payment by the actual payor to the debtor, coupled with a simultaneous second payment by the debtor to its creditor.  *See Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929).

113.    Payments by the PUA issuers to the Lenders satisfy the Lessee's legal obligation to pay Basic Rent, Termination Value, if due, or FPO Price, if AWG ultimately elects to exercise the FPO.  (P.A., Joint Ex. II, IRS-ADM-002147, §11(m)(iv).)

114.    Payments by the PUA issuers to the Lenders further satisfy the Owner Trust's legal obligation to pay debt service on the Loans to the Lenders.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002921-24, §§3.01, 3.02, 3.03.)  Accordingly, payments by the PUA issuers are properly characterized for tax purposes as further payments by the Lessor of debt service on the Loans to the Lenders.

115.    All payments under the PUAs, the Lease and the Loan Agreement are required to be made by wire transfer.  (PFF ¶¶ 77, 90.)  Payments are not made by mere bookkeeping entries.

83

116.    The cash-flow patterns in the AWG Transaction are typical of other sale-leaseback transactions, and they create meaningful and enforceable obligations among the parties.  Sale-leaseback transactions always have featured efficient and interdependent payment structures between and among lenders, lessors, and lessees.  Lenders know that their primary source of repayment may come from the underlying lease rentals, and it is standard for lenders to look through the lessor to the financial strength of the prospective lessee as security for repayment of the loan.  *See Gefen*, 87 T.C. at 1494 n.15.  Moreover, it is commonly accepted in sale-leaseback transactions that the money will flow over the long-term transaction period from the financing source (either a third party bank or the seller-lessee), to the buyer-lessor in the form of loan proceeds; from the buyer-lessor to the seller-lessee in the form of purchase price; from the seller-lessee to the buyer-lessor in the form of rent; and from the buyer-lessor back to the financing source in the form of debt service.  *See, e.g., Frank Lyon*, 435 U.S. at 565-68; *Estate of Thomas*, 84 T.C. at 436; *Mukerji*, 87 T.C. at 928-29; *Cooper*, 88 T.C. at 86-88, 107; *Torres*, 88 T.C. at 709-12.

117.    The PUA arrangements in the AWG Transaction (in addition to serving as a hedge for AWG against foreign currency fluctuation) are a form of credit enhancement which mitigates both AWG's and the Owner Trust's risk of default.  Mitigating risk is an exercise in good business judgment and does not mean that a transaction lacks economic substance.  *See IES Industries v. United States*, 253 F.3d 350, 355 (8th Cir. 2001); *Compaq Computer Corp. v. Commissioner*, 277 F.3d 778, 787 (5th Cir. 2001).

118.    The PUA arrangements do not adversely affect the Trust's status as an owner.  Credit risk is not a requisite characteristic of tax ownership.  Lessors have been respected as owners for federal income tax purposes where they have mitigated their own risk of default, as

84

well as the risk of lessee default, through a variety of protective measures.  For example, lessors have been respected as owners in transactions in which the lessee's rental obligation has been guaranteed by another party.  *See Torres,* 88 T.C. at 712; *Cooper*, 88 T.C. at 87; *Northwest Acceptance Corp.*, 58 T.C. at 840-41, 844-48.  A lessor's status as an owner for federal income tax purposes is not impacted by the lessee's establishment of an escrow account as a means of setting aside money to satisfy its rental obligation.  *See Gefen*, 87 T.C. at 1484.  The lessee's purchase of insurance as security for its rental obligation does not impact the lessor's status as an owner for federal income tax purposes.  *Id.*  Finally, a lessor's tax ownership is not disturbed where it negotiates entitlement to a termination payment, if the lessee defaults under the lease, which will enable the lessor to repay indebtedness.  *See Estate of Thomas*, 84 T.C. at 424-25.

119.    Furthermore, decades of settled law (including U.S. Supreme Court decisions, Treasury Regulations, and IRS rulings) have drawn a clear distinction between "legal" defeasance and "economic" defeasance.  An obligation is "legally" defeased if the collateral arrangement extinguishes the taxpayer's legal obligation to pay.  An obligation is "economically" defeased if the collateral arrangement merely establishes a means by which to satisfy an obligation, but does not legally release the taxpayer from that obligation, no matter how remote it may be that the taxpayer will ultimately make payment out of its own pocket.  *See, e.g., Douglas v. Willcuts*, 296 U.S. 1 (1935) (income from trust created pursuant to divorce decree taxed to husband where used to discharge husband's continuing legal obligation to support wife); *Helvering v. Fuller*, 310 U.S. 69 (1940) (*contra*:  where creation of the trust discharged the husband's legal obligation to support his former wife); *Packard v. Commissioner*, 85 T.C. 397 (1985); Treas. Reg. § 1.61-13(b) (illustrating economic defeasance); Treas. Reg. §§ 1.1001-3(d), Ex. 5, and 1.1001-3(e)(5)(ii)(A) (illustrating the difference between economic and legal

85

defeasance); Rev. Rul. 85-42; 1985-1 C.B. 36.  The IRS previously has applied these defeasance

authorities in the context of private letter rulings on leveraged leasing transactions.  *See* Priv. Ltr.

Rul. 8804020 (October 29, 1987); Tech. Adv. Mem. 9748005 (August 19, 1997); Tech. Adv.

Mem. 9802002 (September 18, 1997).

120.    The import of these various authorities is that economic defeasance arrangements

do not legally release a lessee of its obligation to pay rent, whereas legal defeasance

arrangements do.  Accordingly, if the lessee is not legally released of its obligation to pay, there

still is a risk of lessee default should the PUA issuer go bankrupt or default.

121.    The PUA arrangements in the AWG Transaction do not constitute "legal"

defeasance.  Specifically, the PUA arrangements do not legally release AWG from the obligation

to pay rent under the Lease.  (PFF ¶¶ 96, 97.)  Thus, if the PUA issuers go bankrupt, or otherwise

fail to pay the rent on AWG's behalf, AWG still will be obligated to pay the rent; a failure to do

so will constitute a default by AWG under the Lease.  Likewise, the PUA arrangements do not

legally release the Owner Trust from the obligation of making payments of debt service to the

lenders.  If the PUA issuers fail to pay AWG's rent directly to the Lenders, as directed by the

Owner Trust, in satisfaction of the Owner Trust's debt service obligations, the Owner Trust still

will be legally obligated to pay the Lenders; a failure to do so will constitute a default by the

Owner Trust.  (Loan Agreement, Joint Ex. VIII, IRS-ADM-002926-27, § 4.02.)  There are no

PUAs during the Service Contract Term.  (P.A., Joint Ex. II, IRS-ADM-002150, § 12(b)(ii).)

122.    Because the Payment Undertaking Agreements do not constitute legal defeasance,

neither AWG's rent obligation nor Owner Trust's debt obligation have been legally satisfied at

Closing.  The PUA arrangements do not eliminate risk of default from the AWG Transaction –

the PUA arrangements are only as strong as the creditworthiness of the PUA issuers.  The PUA

86

arrangements do not deprive the Owner Trust of its status as an owner of the Facility for federal income tax purposes, nor do they strip this transaction of economic substance.

123.    The risk that is the touchstone of the true lease/tax ownership analysis is residual risk, not credit risk.  If credit risk were important, one could never enter into a lease with a top-notch credit like the U.S. Government.

124.    In 2007, the District Court for the Middle District of North Carolina decided the LILO case of *BB&T Corp. v. United States*, 2007-1 U.S.T.C (CCH) ¶¶ 50,130, 87,074 – 87,082 (M.D. N.C. 2007), in which it held that, in substance, BB&T acquired only a future interest in an asset, rather than a current leasehold interest.  The *BB&T* case does not control the outcome of this case.  First, each transaction must be analyzed on its own facts and circumstances.  *Frank Lyon*, 435 U.S. at 583-84.  Second, BB&T did not involve a sale-leaseback, a service contract, or the question of ownership of an asset, and the investor there was not claiming depreciation deductions.

### D.      The Trust is the Owner of the Facility in Substance and Form

125.    In sum, the AWG Transaction must be respected as a true leveraged sale-leaseback-to-service contract transaction, both in substance and in form.  The transaction is firmly rooted in a substantial body of law, including Supreme Court cases, lower court decisions, and IRS Revenue Rulings and Procedures.  Key has presented strong proof that, under the totality of the facts and circumstances, the Trust was allocated "significant and genuine attributes" of a traditional owner-lessor, including the "benefits and burdens" of an owner of the Facility under the Operative Documents.  The Trust made a substantial ($55 million) equity investment in the ownership of the Facility; the Trust has a reasonable possibility of earning a substantial pre-tax profit from that investment; the Facility is expected to have a substantial

87

remaining life and value at the end of the Lease Term and at the end of the Service Contract Term; and the exercise of the Purchase Option is uncertain.  In negotiating a transaction that mitigated some of their risk of loss, Key and PNC exercised good business judgment and followed applicable tax law principles.

## V.  THE LOANS CONSTITUTE BONA FIDE INDEBTEDNESS FOR FEDERAL INCOME TAX PURPOSES

126.  Because the AWG Transaction is a valid sale-leaseback in form and substance, the indebtedness incurred by the Trust to effectuate the sale is bona fide indebtedness for federal income tax purposes.

127.  A loan is an advance of funds against an unconditional obligation to repay the principal amount along with interest thereon by a fixed maturity date (or upon demand).  *See Halle v. Commissioner*, 83 F.3d 649 (4th Cir. 1995).  Taxpayers may deduct interest paid or accrued within the taxable year on indebtedness.  26 U.S.C. § 163(a).

128.  It is well-established that non-recourse debt constitutes genuine indebtedness for federal income tax purposes.  *See Crane v. Commissioner*, 331 U.S. 1 (1947); *Tufts v. Commissioner*, 461 U.S. 300 (1983).  Nonrecourse debt will be respected as genuine indebtedness if, at the time the loan is made, the fair market value of the property securing the debt exceeds the amount of the debt.  *Odend'hal v. Commissioner*, 748 F.2d 908 (4th Cir. 1984); *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976); *Pleasant Summit Land Corporation v. Commissioner*, 863 F.2d 263 (3rd Cir. 1989); *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981); *Halle*, 83 F.3d 649; Rev. Rul. 77-110, 1977-1 C.B. 58; Rev. Rul. 78-29, 1978-1 C.B. 62.

129.  The appraised fair market value of the Facility, which is part of the collateral for the Loans, exceeded the total amount of the debt at the time the AWG Transaction was entered

into.  (PFF ¶ 73.)  Additionally, the projected fair market value of the Facility will exceed the total amount of the debt at all times throughout the life of the Loans.  (Appraisal, Pl. Ex. 119, PNC005167.)  Accordingly, the Loans should be respected as genuine indebtedness for federal income tax purposes.

130.    The Loans advanced by the Lenders to the Trust on the Closing Date are true debt because they meet all of the substantive criteria of true indebtedness: the Loans have a fixed maturity date, a specified principal amortization schedule, a stated interest rate, are secured by the property of the Owner Trust as the Borrower (including its interest in the Facility and the Lease), are not subordinated, do not participate in net or gross income or asset appreciation, are not convertible into equity, and are evidenced by debt instruments (the Loan Certificates) issued in registered form.  (Loan Agreement, Joint Ex. VIII.)  *See Indmar Products Co., Inc. v. Commissioner*, 444 F.3d 771 (6th Cir. 2006); *see also* 26 U.S.C. § 385.

131.    Credit enhancement techniques do not transform valid debts into shams.  A lender's mitigation of credit risk does not cause a loan to fail to be genuine indebtedness for federal income tax purposes.  *See Gefen*, 87 T.C. at 1494 n.15 (describing that lessor's loans were secured by insurance that lessee had obtained to guarantee up to 80% of its rental obligation to the lessor, as well as the cash flow from a sublease that the lessee had arranged, and concluding that: "Respondent would apparently have us hold that the indebtedness incurred by a lessor in a leasing transaction is genuine only if the lessee is financially weak and the lender does not have a security interest in the property that is acquired with the lender's funds.  We decline to do so.");  *Packard v. Commissioner*, 85 T.C. 397 (1985) (bank loan secured in part by certificate of deposit issued by the lender-bank respected as true debt).

132.    Additionally, the courts and the IRS have consistently drawn a bright line distinction between an "economic" defeasance (in which an obligor remains liable for payment of the underlying obligation notwithstanding the posting of collateral) and a "legal" defeasance (in which the obligor is legally released from liability).  *See Douglas v. Willcuts*, 296 U.S. 1 (1935); *Helvering v. Fuller*, 310 U.S. 69 (1940); *Packard v. Commissioner*, 85 T.C. 397 (1985); Treas. Reg. § 1.61-13(b); Rev. Rul. 85-42; Tech. Adv. Mem. 9802002; Tech. Adv. Mem. 9748005; Priv. Ltr. Rul. 8804020.

133.    The Participation Agreement §11(m)(v) and each of the PUAs expressly states that nothing in the PUAs or elsewhere constitutes a legal release of, or legally releases, the Lessee from being the primary obligor in respect of all Lease Rent.  There are no rights of set off as between the Loans and the PUAs.  (PFF ¶ 97.)  And the amounts remaining to be paid on the PUAs upon entry into the Service Contract at the end of the Lease Term revert to AWG.  (PFF ¶ 101.)  Thus, the Loans would not be extinguished in a tax sense, but would be valid and subsisting debt even if they were viewed as defeased debt, because any such defeasance would be an economic defeasance and not a legal defeasance.

134.    Moreover, the AWG Transaction is distinguishable from cases frequently cited as examples of "sham" debts.  *See Knetsch v. United States*, 364 U.S. 361 (1960) (holding that interest was not deductible under section 163(a) because the loan transactions were shams, and concluding that, "there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction"); *Bridges v. Commissioner*, 325 F.2d 180, 185 (4th Cir. 1963) (holding that interest was not deductible under section 163(a) because the transaction by design generated a built-in pre-tax loss: "[The taxpayer] agreed to and did pay out substantially more money than he could ever hope to recover. . .[T]here was no prospect whatever of any financial profit"; the

90

taxpayer himself testified that, "the only objective consideration involved in the transactions was the tax consideration"); *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966) (holding that interest was not deductible under section 163(a) because transaction had no "realistic expectation of economic profit").

135.    The AWG Transaction is distinguishable from these cases because the transaction has created real "practicable economic effects" aside from tax benefits – specifically, the reasonable possibility of significant pre-tax profits for the Trust, Key and PNC.  Moreover, both Key and PNC entered into the transaction as part of long-standing equipment leasing businesses – a motive beyond simply tax advantage.

136.    For all of the foregoing reasons, the Loans constitute genuine indebtedness for federal income tax purposes.

## VI.    OWNER TRUST IS ENTITLED TO THE BENEFIT OF THE PARTNERSHIP ITEMS REPORTED ON ITS RETURNS FOR 1999-2003

137.    Because the AWG Transaction has economic substance and is supported by non-tax business purposes, and because the Owner Trust acquired the benefits and burdens of ownership of the Facility, the Trust is entitled to the following tax attributes claimed on its 1999-2003 returns: depreciation deductions under 26 U.S.C. § 168; gross rental income under 26 U.S.C. § 61; interest expense deductions under 26 U.S.C. § 163(a); and deductions for the amortization of transaction costs.

138.    There has been no substantial understatement of taxes by the Trust and, therefore, the Trust is not subject to penalties for engaging in the AWG Transaction.

## VII.    ORIGINAL ISSUE DISCOUNT

139.    Because this transaction is a valid sale-leaseback-to-service contract transaction, the Trust is not subject to any original issue discount ("OID") income as suggested by the IRS in

the FPAA.  (FPAA, Joint Ex. LVIII)  *Only if* the transaction were recharacterized as a "loan" from the Trust to AWG would this Court need to address the OID issue.

140.    However, even if this transaction were not respected as a valid sale-leaseback-to-service contract transaction, the Owner Trust cannot recognize OID income.  The OID provisions only apply to "debt instruments."  *See* 26 U.S.C. §§ 1271-1275 and Treas. Reg. § 1.1275-1(d).  To have a "debt" for federal income tax purposes, there must be an *unconditional obligation* to repay a sum certain.  *See First Nat'l Co. v. Commissioner*, 289 F.2d 861, 864-65 (6th Cir. 1961); *Halle*, 83 F.3d 649.  AWG does not have an *unconditional obligation* to repay for two reasons.  First, AWG has a choice in 2024: it can exercise the FPO or it can choose the Service Contract.  Even if AWG intended from the start to exercise the FPO, it still would not have an unconditional obligation to do so.  Second, AWG only pays Service Fees under the Service Contract if Owner Trust actually performs the waste-disposal services.  AWG cannot be said to have an unconditional obligation to pay.  Therefore, OID is not applicable.

141.    Even if the transaction could be recharacterized as a "debt" owed by AWG to the Trust, the IRS miscalculated the OID reflected in the FPAA.  If the AWG Transaction were recharacterized, Owner Trust only should have to recognize $8,341,814 of OID income for the years 1999-2003 – not the $12,167,086 asserted by the Government.  The aggregate amount of OID possible in this transaction would be $126,481,655, which is the difference between the "debt's" original "issue price" of $55,126,965 and the debt's "stated redemption price at maturity" ("SRPM"), which is $181,608,620 – the total amount payable by AWG under the Service Contract.  *See* 26 U.S.C. §§ 1273(a), (b)(2) and (c); Treas. Reg. § 1.1273-1(b).  The SRPM would have to be based on the transaction running through the Service Contract period (2036) because, under the OID rules, the FPO point in 2024 would have to be treated as an option given

92

to AWG to "extend the payment schedule" on the "debt."  Calculating OID over 36 years produces a lower yield (3.61%) than calculating OID over 24 years (3.88%).  Treasury Regulation § 1.1272-1(c)(5) requires that the alternative with the lower yield be used.

142.    The Government inexplicably calculated the aggregate amount of OID to be $236,639,144.  The Government also incorrectly allocated the OID over 24 years, and used a random 10% interest rate without explaining the rationale for so doing.  (*See* IRS 60-Day Letter, Pl. Exs. 161, 163.)

143.    Taking aggregate OID of $126,481,655, and allocating it over 36 years, the correct constant yield should be approximately 3.61%, which produces total OID for 1999-2003 of approximately $8,341,814, allocated as follows: $58,509 (1999); $1,994,778 (2000); $2,022,199 (2001); $2,095,295 (2002); $2,171,033 (2003).

## VIII.  CONCLUSION

144.    Based on the Court's findings of fact and conclusions of law, the Court finds that that (1) the tax treatment of the AWG Transaction reported on the Owner Trust's federal income tax returns for the Taxable Years (1999-2003) was correct; (2) the IRS's adjustments as set forth in the FPAA are without merit; and (3) the assertion of accuracy-related penalties by the IRS under 26 U.S.C. § 6662 is without merit.  Accordingly, Plaintiff is entitled to judgment.  The Court ORDERS that the United States return and refund all amounts deposited with the Secretary of the Treasury with respect to this action, together with interest thereon as allowed by law, and pay all other amounts that may be legally due.

Respectfully, submitted,

/s/ Brian J. Lamb
DAVID J. HOOKER  (0014531)
david.hooker@thompsonhine.com
JAMES D. ROBENALT (0022165)
james.robenalt@thompsonhine.com
BRIAN J. LAMB (0055447)
brian.lamb@thompsonhine.com
JEFFRY J. ERNEY (0040193)
jeffry.erney@thompsonhine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114-1291
Telephone: (216) 566-5500
Facsimile:  (216) 566-5800

COUNSEL FOR PLAINTIFF
KSP INVESTMENTS, INC.

**<u>CERTIFICATE OF SERVICE</u>**

A copy of the foregoing *Plaintiff KSP Investments, Inc.'s Post-Trial Proposed Findings of Fact and Conclusions of Law* was filed electronically on February 25, 2008.  Notice of such filing will be made electronically by way of the Court's electronic notification system and parties may access the filing through the Court's system.

/s/ Brian J. Lamb
*One of the Attorneys for Plaintiff*
*KSP Investments, Inc.*

11352929.10

95