IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AWG LEASING TRUST, | : | |
| KSP INVESTMENTS, INC., | : | Case 1:07-CV-857 |
| AS TAX MATTERS PARTNER | : | |
| | : | |
| Plaintiff, | : | District Judge Gwin |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, | : | |
| | : | |
| Defendant. | : | |
| _____ | : | |

## PLAINTIFF'S POST-TRIAL BRIEF

DAVID J. HOOKER  (0014531)
david.hooker@thompsonhine.com
JAMES D. ROBENALT (0022165)
james.robenalt@thompsonhine.com
BRIAN J. LAMB (0055447)
brian.lamb@thompsonhine.com
JEFFRY J. ERNEY (0040193)
jeffry.erney@thompsonhine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114-1291
Telephone: (216) 566-5500
Facsimile:  (216) 566-5800

COUNSEL FOR PLAINTIFF
 KSP INVESTMENTS, INC.

## TABLE OF CONTENTS

I.      Introduction ................................................................................................................1

II.     The AWG Transaction .................................................................................................1

III.    The Owner Trust Had Business Purposes Other Than Solely Tax Benefits.....................18

IV.     Economic Substance:  Reasonable Anticipation By The Owner Trust Of Profit, Apart
        From Tax Benefits ........................................................................................................19

V.      Form And Substance:  Owner Trust Acquired The Benefits And Burdens
        Of Ownership................................................................................................................20

## TABLE OF AUTHORITIES

*American Electric Power Co. v. United States*, 326 F.3d 737, 741 (6th Cir. 2003).......................18

*Dow Chemical Company v. United States*, 435 F.3d 594 (6th Cir. 2006)....................................19

*Estate of Thomas v. Commissioner*, 84 T.C. 412, 433-34 (1985)..............................................5,19

*Frank Lyon Co. v. United States*, 435 U.S. 561, 565 (1978)...................................................17, 18

*Geffen v. Commissioner*, 87 T.C. 1471, 1493 (1986) ..................................................................6, 17

*Levy v. Commissioner*, 91 T.C. 838, 859-860 (1988)....................................................................18

*Old Colony Trust co. v. Commissioner*, 279 U.S. 716, 729 (1929) ...............................................16

*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985) .............................18

## I.  Introduction

This Court heard evidence which establishes that the Owner Trust became the owner of the AWG facility (the "Facility") in 1999 and is entitled to the depreciation and interest deductions challenged in this proceeding by the IRS.  First, the evidence proved that the transaction has non-tax business purposes.  Second, the transaction has economic substance-- there exists a reasonable opportunity for pre-tax profit.  Third, the Owner Trust took on the traditional attributes of an owner and lessor by assuming the economic benefits and burdens of ownership.  Under the established law for sale-leasebacks and the relevant Sixth Circuit law, this was a real transaction, with lasting consequences in a real world, economic substance, and the substance of the transaction matched its form (a sale-leaseback-service contract transaction).

## II.  The AWG Transaction

The Owner Participants, as the grantors and beneficiaries of the Owner Trust (sometimes the "Banks"), had long-established leasing arms whose business purposes were to enter into leveraged lease transactions for all sorts of assets, including the sale-leaseback of major facilities like a nuclear power plant in Ohio, a coal-fired plant in Pennsylvania, and a semi-conductor manufacturing facility in Oregon. (Angel Tr. 57-58; Joint Trial Ex. LVII; Keener Tr. 320-22.) The Owner Participants sought diversification, both in the types of assets in their respective portfolios and in terms of global investment of funds. (Angel Tr. 146; Larkins Tr. 274-76.)  At the time of the AWG transaction, for example, Key had over $1 billion in equity invested in leveraged leases of so-called "big ticket" items like airplanes, facilities and railcars. (Angel Tr. 61; Joint Trial Ex. LVII.)  Moreover, Key had expanded into the international arena in 1997 through the purchase of a worldwide leasing company, Leasetec, which had offices in 23 countries around the world, including Germany. (Angel Tr. 51-52.)  In 1999, Key had over 600 employees in the leasing area and was considered one of the top 20 bank-based leasing

1

companies across the United States. (Larkins Tr. 267.)  As a result of growth, Key now employs 950 professionals, is in the top five bank-based leasing companies in this country, and has become one of the top lessors capable of operating in a number of jurisdictions around the world. (Larkins Tr. 267-68.) "We are recognized as a leader," per Paul Larkins of Key. (*Id.*)

The AWG Facility fit within established business plans of Key and PNC.  With a domestic market that had become intensely competitive, the Banks could look for greater profits and returns in the international market. (Larkins Tr. 272; Angel Tr. 52, 80, 92; Keener Tr. 321.)  As Larkins of Key testified, "the net, net, net of it is we want to make money." (Larkins Tr. 274, 281-82; *see also* Angel Tr. 146: "On the AWG transaction specifically, we were interested primarily in earning a profit on our investment.")  Because of the competitive nature of the industry, the Banks carefully reviewed investment opportunities to determine where they could profitably and prudently place their resources. (Larkins Tr. 274-75.)  Not every deal was attractive, even deals that were so-called "fully defeased." (Angel Tr. 67-73; *see* Amtrak Offering, Pl. Ex. 69; Larkins Tr. 267-77.)  It was critical to have the right asset and the right credit risk profile.  As Larkins noted, "there are assets we liked, assets we didn't like at all, and assets we didn't have." (Larkins Tr. 275.)  The Banks did not want to have too much concentration in any type of asset (e.g., airplanes), and wanted assets that would diversify the portfolio and mitigate credit exposures. (Larkins Tr. 275-77.)  The AWG Facility was a unique asset that the Banks were interested in adding to their portfolios.  "It was a waste-to-energy asset, which we didn't have a lot of," according to Larkins. "So that was attractive to us." (Larkins Tr. 281-82.)  Indeed, Key had one other German waste-to-energy facility (TAD) in its portfolio at the time of the AWG deal. (Angel Tr. 59.)

2

The Banks put the AWG opportunity through the same process and scrutiny as any of their other "big ticket" leveraged lease deals.  Asset management conducted a review, as did credit, risk and pricing committees. (Angel Tr. 105-118; Pl. Exs. 80, 81 and 82; Keener Tr. 322-27.)  The proposed transaction was reviewed by top-level steering committees and the senior-most bank credit and risk officers. (Angel Tr. 118; Larkins Tr. 273-74; Keener Tr. 322-23.)  The Banks relied upon first class and high reputation consultants to conduct extensive due diligence. (Angel Tr. 110-12.)  Duke Engineering, an established engineering firm, which at the time of the transaction in question had conducted formal due diligence reviews of between 10 to 20 waste-to-energy facilities, was asked to assess the design, construction, operation and expected useful life of the AWG Facility. (Gonzalez Tr. 363-64.)  To do this, Duke put together a highly knowledgeable team, with decades of experience in power and waste-to-energy plants, conducted an on-site investigation and prepared a comprehensive 186-page detailed report. (Stip. ¶¶ 47-51; Gonzalez Tr. 365-69; Joint Trial Ex. XXIV.)  For its work, Duke was paid $162,000. (Stip. ¶ 52.)  Deloitte was hired to conduct an appraisal and was paid $225,000 for its work. (Stip. ¶¶ 53-58.)  Deloitte had conducted appraisals of half a dozen waste-to-energy facilities in Europe and the United States at the time of the AWG transaction. (Ellsworth Tr. 415.)  Deloitte collected extensive information on market tipping fees and cost comparables of waste-to-energy facilities recently constructed in Germany. (Tipping fees, Pl. Exs. 30 and 43; Ellsworth Tr. 424-426; waste-to-energy facility construction costs, Pl. Ex. 26; Ellsworth Tr. 428-29.)

Both Banks used industry developed software programs that had "baked into them" the requirements of the IRS Guidelines for granting advance rulings on leveraged leases and the special GAAP accounting rules for leveraged leasing, known as FAS-13.  Key used the Interet program and PNC used the ABC program. (Angel Tr. 130-45; Pl. Ex. 112; Keener Tr. 312.)

3

These programs assured that the transaction had the right "substance" to be considered a true lease under IRS requirements and FAS-13 accounting rules.[1]  For example, the programs tested if sufficient equity was invested in the deal, and maintained in the deal. (Pl. Ex. 112, KSP0204891, "Maintenance of Minimum Investment – Rev. Proc. 75-28, § 4.025;" Angel Tr. 143-44.)  In addition, the programs tested if there was pre-tax profit in the transaction, as "profit" has been defined, measured and calculated per the IRS Guidelines. (Pl. Ex. 112, KSP0204889, "Analysis of Profit and Cash Flow According to Rev. Proc. 75-28;" Angel Tr. 135-143; for the FPO case, *see* Supp. Stip.)  If the transaction did not meet the IRS Guidelines, the software programs would provide a warning, and the transaction would not be completed. (Angel Tr. 138.)  The AWG transaction passed all these requirements.

The AWG transaction had each of the typical characteristics of all "big ticket" leveraged leases, including transactions that are not being challenged by the IRS. (Angel Tr. 74.)  In each case, as in the AWG case, arrangers bring the deals to market with typical terms and conditions.  Usually, a provisional value has been determined by an appraiser and included in the offering memorandum. (Angel Tr. 75-76.)  Here, the preliminary value for the AWG Facility was set at $440 million. (Pl. Ex. 52; Angel Tr. 121-22.)  Appraisers are well-known for specialty areas (like airplanes, railcars or facilities) and generally accepted by lessors after they perform a preliminary analysis of fair market value.  Because lessors compete for deals based on terms in the offering memo, it is understood as an industry practice that the successful lessor in a bidding competition will pay fair market value for the facility. (Angel Tr. 77-80.)  Here, after Deloitte was hired by the Owner Trust it made adjustments to its preliminary valuation through the completion of its

---

[1]  Per the Purpose Clause of Rev. Proc. 75-21: "The purpose of this Revenue Procedure is to set forth guidelines that the Internal Revenue Service will use for advance ruling purposes in determining whether such transactions are, in fact, leases for Federal income tax purposes." (Pl. Ex. 189.) These Guidelines were adopted after many years of leasing transactions and a wealth of case law.  They set forth standards that are consciously more conservative than substantive tax law.  In this brief reference will be made to the Revenue Procedures in place in 1999.

4

appraisal, arriving at a fair market value of $423 million. (Angel Tr. 84-85, 122.)  The Owner Trust also hired an experienced German environmental consultant, IGA, who conducted an extensive environmental review of the Facility. (Stip. ¶¶ 58-61; Joint Trial Ex. XXI.)

In every non-challenged leveraged lease, and in the AWG transaction, the amount of equity invested is generally in the 10 to 20% range, with non-recourse debt being used to finance the balance of the purchase price. (Angel Tr. 81, 85, 131; Hurd Tr. 595-96.)  Here the Owner Trust paid by wire transfer on the closing date 13% of the fair market value, or $55 million (Stip. ¶¶ 77, 78), an amount consistent with leveraged lease case law (Angel Tr. 131; *see Conclusions of Law*).  In every leveraged lease, the non-recourse loans are paid from the rents under the lease, and it is common for the rents to match debt payments, with little or no "free cash" or return of equity during the lease term. (Angel Tr. 86; Hurd Tr. 596.)[2]  The same is true in the AWG transaction. (Angel Tr. 86.)  The matching of rent and debt payments is a part of leveraged leasing economics that allows maximum optimization of the lowest rental payments and upfront benefit for the lessee in return for pre-tax profits, use of tax benefits and residual value for the lessor. (Angel Tr. 86; Hurd Tr. 598-601.)

The AWG lease is a standard "net" lease (Joint Trial Ex. VI, IRS-ADM-002806-07, §18), meaning the lessee pays for maintenance, insurance and taxes. (Stip. ¶¶ 85-90.)  While the Government argues that "nothing happens" during the leaseback to AWG, leveraged leases are invariably so-called "triple net" leases, leaving expenses, operating revenues, possession and control in the hands of the lessee. (Angel Tr. 133.)  The IRS Guidelines recognize "net" leases as a common feature of leveraged leases.  As Dave Angel pointed out, Revenue Procedure 75-21 states in its Purpose Clause: "[I]n general, these leases are *net leases*…." (Pl. Ex. 189; Angel Tr.

---

[2]  "[T]he absence of significant positive net cash-flow during the lease terms is a neutral factor." *Estate of Thomas v. Commissioner*, 84 T.C. 412, 433-34 (1985).

132-33)(emphasis added).  The Tax Court has also recognized this commercial reality:

"Moreover, we have long rejected any notion that a net lease . . . shifts the burden of ownership

from the lessor to the lessee." *Geffen v. Commissioner*, 87 T.C. 1471, 1493 (1986).

Just as importantly, things <u>did</u> change in material ways after the sale-leaseback.  AWG

was now required, by contract, to maintain and repair the Facility to certain industry standards,

both as a part of its regular obligations and its duty to deliver the plant in good working order at

the end of the lease to the Owner Trust. (Angel Tr. 153-58.)[3]  All condemnation proceeds, if the

Facility is taken by expropriation, go to the Owner Trust, not AWG. (Angel Tr. 152; Joint Trial

Ex. IV, IRS-ADM-002733, § 7).  Extensive yearly reporting on maintenance, repair and other

financial matters is required and followed. (Angel Tr. 156-60; Joint Trial Ex. II, IRS-ADM-

002300-01, Exhibit F; Pl. Ex. 128.)  The return conditions were carefully and fully spelled out,

including fourteen highly defined engineering performance tests that must be passed at the end of

the Lease as part of the protection of the Owner Trust's residual interest in the Facility. (Joint

Trial Ex. II, IRS-ADM-002245-48; Angel Tr. 154-56.)  Subleasing was permitted only under

defined and controlled circumstances. (Joint Trial Ex. VI, IRS-ADM-002785-87, § 8.)

Assignment was prohibited without consent. (Joint Trial Ex. VI, IRS-ADM-002797, § 13.)

AWG's actions, seeking the Owner Trust's sign-off on the 2003 sublease to EKO City, show that

AWG understood it no longer had unfettered control over the property and that it must follow the

Lease requirements with respect to any usage of the property under pain of the lessor

---

[3] The mandatory nature of repair and maintenance obligations under a cross-border lease was a significant selling
point from the perspective of the German lessee.  As expert witness Wolfram Reutlinger testified, he recommended
a similar cross-border lease to his client, Duisburg, Germany, mainly because it would assist the municipal
government in the fight over scarce resources in raising and spending the needed money on critical maintenance and
repair items for the leased infrastructure asset.  (Reutlinger Tr. 673-676.)  "Why? Then you are obligated by
contracts . . . and no treasurer of the city will be able to say no, I don't want to put money in that system.  He has to."
(Reutlinger Tr. 675.)

6

repossessing the Facility upon a payment or non-payment default by the lessee. (Angel Tr. 160-164; Pl. Exs. 141-149.)

Like all leverage leases, the AWG transaction presented pre-tax and after-tax returns that take into account the trade between the lessor and lessee inherent in a leveraged lease. As Rod Hurd explained to the Court: "[T]here is a trade inherent in a leveraged lease transaction from a lessor's point of view. They have given up pre-tax cash in the form of reduced rents in exchange for getting tax benefits of ownership and the residual value." (Hurd Tr. 604-05.) As Hurd pointed out, the pre-tax returns are lower due to unique leveraged lease accounting rules, and the returns found in the AWG transaction are consistent with all non-controversial leveraged lease transactions, like those for United Airlines, American Airlines and Union Pacific. (Hurd Tr. 599.) One measure of pre-tax profit is the internal rate of return, or IRR. This method does not take into account what Hurd described as the "meaningful interest in residual value," (Hurd Tr. 599), but is an industry standard for looking at pre-tax returns. The Court heard testimony that these pre-tax returns are fairly consistent across the industry, and also within the Banks' portfolios of leveraged leases. The IRRs for Key's leveraged leases, for example, are in the 2.5 to 3.5% range. (Pl. Ex. 171; Angel Tr. 87-93.) AWG's return was squarely within this norm. (Pl. Ex. 113; Angel Tr. 90-91; Plaintiff Graphic 38; Graves Tr. 801-04.) These IRRs, which do not take into account residual values or other profit expectations, rise substantially in the AWG transaction when the residual and other profits (sale of electricity under the Service Contract, for example) are considered. (Angel Tr. 93; Graves Tr. 798-801.) In short, the AWG deal fit -- indeed exceeded -- the classic pre-tax profit profile that is found in every leveraged lease.

Like virtually every leveraged lease, the AWG Lease included a fixed price purchase option ("FPO") for the lessee. While the IRS would not issue an advance letter ruling under the

7

Guidelines if the lease included a fixed price option, case law and IRS rulings on substantive law have consistently permitted them as long as—tested at the inception of the transaction-- they are not set at a projected bargain price and exercise by the lessee is not legally required or economically compelled. (*See Conclusions of Law*; Angel Tr. 93-96.)  Here, there were multiple "anti-compulsion" features built into the Operative Documents and the terms of the fixed purchase option itself at the end of the Lease.  First, the option price was set at a substantial premium, 32% or approximately $130 million above the Facility's then-expected fair market value. (Stip. ¶¶ 91-95; Angel Tr. 178.)  Second, AWG was required to represent that it had entered into no side agreements concerning the exercise of the option and that none of AWG's governing documents, rules or policies "economically compels or legally requires" exercise of the option. (Joint Trial Ex. XI, IRS-ADM-003028-29, § 3(d), (f)  and (g); Angel Tr. 172-74.) Third, AWG was prohibited from making a binding decision of whether to exercise the option until two years prior to the lease expiration date in 2024, and then only by an authorized resolution of the then-existing governing board of AWG. (Joint Trial Ex. VI, IRS-ADM-002807, § 19(a); Angel Tr. 170-172.)  "We wanted to make sure that they were going to look at the facts and circumstances surrounding the option at the appropriate time," according to Dave Angel. Fourth, AWG would pocket over half a billion dollars ($521 million) from the payment undertaking agreements if it decided not to exercise the option.  These were unfettered funds, which AWG and its municipal shareholders could use as they wanted. (Angel Tr. 178-182.) Fifth, Deloitte opined that the service fees due under the Service Contract, including the portion of the fee to pay down new non-recourse loans, would be covered, at market rates, by the tipping fees that AWG could charge at the time. (Angel Tr. 190-97; Interim Argument Tr. 574-75.) Sixth, AWG will shed operational and *force majeure* risks of the aging plant, including the risk

8

of labor strikes or boiler explosions, during the Service Contract. (Angel Tr. 213-18.)  Seventh, and significantly, AWG has a second option to purchase the Facility at the end of the Service Contract, this time not at a 32% premium but at the then-existing fair market value of the Facility. (Angel Tr. 177-78.)

Given these structural impediments to the exercise of the FPO, the Banks concluded it would be "very unlikely" that the option would be exercised. (Angel Tr. 177-78.)  Moreover, Deloitte so opined in its appraisal (Pl. Ex. 119, PNC0005010-11; Angel Tr. 176; Ellsworth Tr. 462-465), and AWG's request for a German tax ruling included a representation that AWG was "not under any compulsion to exercise the FPO," and that, as of the "inception of the transaction, it is uncertain whether the FPO will be exercised or not." (Joint Trial Ex. XXVIII, CLIF-005509; Angel Tr. 174-76.)  The conclusion that the FPO was a true option was supported by the expert testimony of Wolfram Reutlinger, who noted that, especially in light of the overall movement towards privatization of public utilities in Germany and the European Union and concerns about increasing environmental regulation, AWG was given significant flexibility in managing its asset by having the option in 2024 to return the Facility to the Owner Trust and take in half a billion dollars. (Reutlinger Tr. 660-75.)  The decision of whether to exercise was placed entirely in AWG's hands; the Owner Trust is required by contract to live with AWG's decision.  The Owner Trust cannot deny the use of the Facility to AWG if AWG chooses the Service Contract.

The Government posited several reasons why AWG will be compelled to exercise the FPO, including (1) supposed flaws in the initial appraisal that resulted in an overstatement of the value of the Facility in 1999 (hence, it is argued, the Facility, in reality, would not be worth enough in 2024 to support new non-recourse loans); (2) an alleged German tax; and (3) other alleged impediments to obtaining non-recourse loans in 2024.  All these reasons are faulty.

9

Moreover, as shown in the *Conclusions of Law*, the legal standard applicable to this question overall is that there has to have been "<u>certainty</u>" in 1999, at the time the transaction was entered into, that the FPO would be exercised, in every event (that is, it was not a true option, but instead was going to be compulsory and therefore <u>certain</u> to be exercised in 2024).  None of the Government's theories begin to give rise to this level of "<u>certainty</u>" required by the law.  Indeed, one of the Government's attorneys emphasized the point in her concluding questioning of Wolfram Reutlinger:

> BY MS. HERBERT:
>
> Q.    Now, just to close up, we all agree – you do agree that you don't know what is going to happen in 2024.  Right?
>
> A.    Yes.
>
> Q.    And whether the purchase option or the service contract option is exercised today is *uncertain* which would be chosen.
>
> A.    Yes.

(Reutlinger Tr. 703-04) (emphasis added).

The Government was wrong that the appraisal of the Facility was overstated by Deloitte, as suggested by the Government's expert, Manfred Ernst.  Deloitte had a solid basis for arriving at a value of $423 million.  Deloitte was aware of construction costs and value indications of similar waste-to-energy facilities in Germany and Western Europe from its work on other valuation projects. (Pl. Ex. 119, PNC0004976 and 0004978; Ellsworth Tr. 456.)  Additionally, during due diligence, AWG provided information of a comparable, recently constructed plant within the region, a waste-to-energy facility in Cologne, Germany (Koln), that cost DM 900 million (a 450,000 tons/year plant), which closely tracked with Deloitte's DM 800 million ($423 million) valuation for the AWG Facility (a 385,000 tons/year plant). (Ellsworth Tr. 428-29; Pl.

10

Ex. 26,  DT000860.)  This valuation was supported at trial by the testimony of Werner Jacob, who represents a client that built a 260,000 ton/year nearby plant built for DM 700 million in 1998. (Jacob Tr. 763.)  Further, Deloitte's cost analysis was buttressed at trial by an experienced appraisal expert, Rick Meyer, who had appraised waste-to-energy facilities in the Netherlands and two in Hamburg, Germany. (Meyer Tr. 1144, 1148-58.)[4]

The German tax issue that was set forth in Government expert reports never materialized in trial.  Instead, the Owner Trust put on expert testimony of a German lawyer and accountant, Werner Jacob, who heads up the 650-person German tax department of a worldwide accounting firm, who comes from the area where Wuppertal is located, and who represents municipal clients with waste-to-energy facilities. (Jacob Tr. 706-10.)  Jacob testified that there is good reason to believe that the transition to the Service Contract would not be viewed as a "sale" under German tax law and, at most, would give rise to an immaterial tax that would be spread out over fifty years. (Jacob Tr. 726-28.)  Further, he opined that even if there is a taxable event in 2024, it was reasonable in 1999 to assume it would be at a low corporate tax rate, that the local tax component of any such tax would be "neutral" in any compulsion analysis by AWG, and that, in any event, there were and are important tax planning devices, like the group tax structure, available to the municipal shareholders of AWG to shield any such potential tax (especially when it was known in 1999 that the Wuppertal transit division was losing $50 million a year, and that loss carryforwards under German tax law were unlimited). (Jacob Tr. 728-740; Pl. Ex. 183.) His conclusion was that AWG would not be compelled to exercise the FPO based on any potential German tax. (Jacob Tr. 738-39.)

---

[4] Similarly, the discounted cash flow analysis was supported by sound research in the market and the application of proper appraisal standards.  (Ellsworth Tr. 424, 443-456; Meyer Tr. 1148-49.)  The market comparable approach, because of shortcomings in available data, was questioned by Deloitte and given "little weight" (indeed, no weight) in its analysis. (Ellsworth Tr. 458-59; Pl. Ex. 119, PNC0004996.)

The Government's German tax law expert backed away from providing any testimony to support the allegation in his expert report that a 40% German tax would apply in 2024 if the FPO is not exercised.  At trial, Schweiss acknowledged that there was no precedential authority to support his unproven opinion that there would be a taxable event in 2024 (indeed, he conceded he had never been asked by a client to render such an opinion). (Schweiss Tr. 1072-74.)  But tellingly, he gave no opinion about the size or magnitude of any such tax, should there be one, nor did he address or rebut Werner Jacob's conclusions, including the neutrality of the local tax and the availability to AWG of well-known tax planning techniques, such as the group tax regime. (Schweiss Tr. 1067.)  Professor Lys, who had relied on Schweiss in his expert analysis before trial, changed his theory about the German tax at the time of trial.  He presented an entirely new analysis, given to plaintiff two days earlier (and objected to by plaintiff as untimely), which was indecipherable but appeared to agree that the German tax in fact could be zero as to AWG as a result of all the factors considered by Werner Jacob. (Lys Tr. 891-900.)  In the end, Lys' analysis was so muddled and unsupported as to be meaningless.

Finally, the Government's position that the value of the Facility would not support new non-recourse loans – remembering that the legal standard is that it would have to have been certain in 1999 that the loans would not be available in 2024 – is likewise seriously flawed.  The Government's experts couldn't agree on what was reasonable to assume about the ability to refinance the loans in 2024.  Professor Lys, a Chicago professor, claimed to be certain that no German bank would loan more than 60-67% against the value of the Facility. (Lys Tr. 902-03.)  Yet, Doctor Heisse, a German corporate lawyer hired by the Government, disagreed, saying even in a garden variety real estate loan a German bank would loan on a non-recourse basis up to

12

80%, assuming the only collateral was the facility itself. (Heisse Tr. 1045-46.)  Heisse, though, acknowledged that the guarantees of the Cities would be very important to a German bank.

In fact, the collateral package to support the refinancing in this transaction was much more extensive than simple reliance on the value of the facility.  It included: (1) the Owner Trust's interest in the Facility, a Site Lease and a Support Agreement; (2) municipal guarantees under the Assumption Agreement; (3) the Debt Portion of the Capacity Charge under the Service Contract, which covers debt service; (4) Excess Tonnage Charges and all revenues received by the Service Provider from the sale of electricity, steam, heat and recovered materials, which create a large "cushion" of cash flow available if need be for debt service. (Joint Trial Ex. II, IRS-ADM-002149-50, § 12(b)(ii); Angel Tr. 187-88; Graves Tr. 812- 15; Heisse Tr. 1046-48; Jacob Tr. 722-26, 739-40; Reutlinger Tr. 678-80.)  The German experts all agreed this collateral package is "substantial," and the most experienced lawyer and accountant among them, Werner Jacob, who has multiple clients with waste-to-energy facilities in Germany, felt that given all the circumstances there would be "no problem" obtaining the new loans. (Jacob Tr. 722-26, under Court-initiated inquiry, 739-40.)

The availability of the Cities' guarantees (backed by the German Federal Government), the "new-found" creditworthiness of AWG with the $521 million in proceeds in its pocket, and the existence of substantial business interruption and casualty insurance during the Service Contract all provide significant reasons for a German bank to lend money against this Facility and its business. (Joint Trial Ex. XIII, § 14 and Ex. F; Graves Tr. 812-814; Jacobs Tr. 722-26.) The Assumption Agreement of the Cities of Wuppertal and Remscheid, by its terms, remains in place after the Lease ends (the Assumption Agreement has no termination date and expressly states that the Cities will stand behind all present *and future obligations of AWG* under, among

13

other things, the *Operative Documents*, which include the Service Contract).[5]   However, if for any reason the Assumption Agreement is not still in place, AWG will be obligated to cause the Cities to  guarantee AWG's performance under the Service Contract. (Joint Trial Ex. II, IRS-ADM-002151, § 12(b)(v).)  The German legal expert and city administrator who represents a nearby municipality with a similar waste-to-energy facility saw no impediments, legally or otherwise, to the Cities' continuing to guarantee AWG's performance during the Service Contract. (Reutlinger Tr. 678-80.)  The evidence shows that the Cities have twice extended guarantees to support this deal (the original guarantees and the confirmations of the guarantees to support the EKO City transaction — *see* Pl. Exs. 143 and 144).  There is no reason to think they would not do so again, especially when it means that AWG will receive over half a billion dollars in return and the Cities would be indirect beneficiaries. (Jacob Tr. 722-26; Graves Tr. 812-13.)

Moreover, logic shows that even if, hypothetically, the Facility were the only collateral, and if there is a "shortfall" in the loan-to-value ratio for the Facility, AWG would only be required to use a small portion of its PUA proceeds of $521 to provide the necessary credit support.  Say, for example, the lenders wanted to loan only 80% against the Facility's value of $390 million.  Given the first day payment of $50 million as an advance on Service Fees on the $383 million non-recourse loans (Joint Trial Ex. XIII, IRS-ADM-003129, Ex. B), the lender would only be at risk for a loan of $333 million.[6]  This is 85% of the Facility value, and AWG would only be required to post $21 million of the $521 million it will receive (or more likely,

---

[5]Joint Trial Ex. XXII, IRS-ADM-003779-92, § 1(a)(iii) and (c).  The term "Operative Documents" is defined to include the Service Contract.  (Joint Trial Ex. II, IRS-ADM-002236-37, App. A.)
[6] There was inquiry at trial of whether AWG would be required to use some of the $521 million of PUA proceeds to pay the $50 million advance payment of its Service Fees.  Even if so, the advance would be quickly paid back out of tipping fees collected in the first year of the Service Contract, so it would be a very short term use of money.

14

purchase a $21 million letter of credit), to get the ratio to 80%, leaving AWG still with half a billion dollars.

An additional reason a lender would look favorably on the new loans is that they have a short "average life," a key metric for lenders.  (Angel Tr. 209-10.)  The loans have a maturity of 10 years and an average life of 4.9 years, per the amortization schedules, so a lender would not be at risk for very long in the transaction.  This is one of the reasons that PWC gave an opinion that non-recourse loans would be available in 2024.  (Joint Trial Ex. XXII, IRS-ADM-004676-79; Angel Tr. 209-10.)

Since the AWG transaction has all the elements of a true leveraged sale-leaseback, the Government's attack really comes down to two things.  First, the Government does not like it that tax-exempt entities are "creating" tax benefits. (Angel Tr. 74.)  This, of course, has been decided by Congress, in the Deficit Reduction Act of 1984, through the "Pickle" depreciation rules. (Angel Tr. 62-63; IRC § 168(g)(3)(A).)  Congress expressly approved leasing with tax-exempt entities but provided that depreciation could not be taken on an accelerated basis, and instead had to be taken on a straight-line basis, over 125% of the lease term.  In the AWG transaction, for this reason, the depreciation deductions are taken over 30 years (or 125% of the lease term of 24 years). (Angel Tr. 63-66; Pl. Ex. 111.)

Secondly, the Government takes aim at the Payment Undertaking Agreements ("PUAs") during the Lease portion of the transaction.  The Government argues that these PUAs make the deal completely circular and meaningless outside of tax benefits.  But this is simply not the case. First, if it is conceded, as it must be, that exercise of the FPO is not a "foregone conclusion," then there is no doubt that the PUAs act simply as currency hedges and other protection for the lessee and credit supports for the lessor, as expressly recited in the Payment Undertaking Agreements.

15

(Joint Trial Exs. IX, X and XV.)  In the event the FPO is not exercised, the PUA issuer is required to pay money to AWG, having been its rightful money all along,[7] and no new PUAs or the like are required for the balance of the transaction. (Angel Tr. 182-85; 206-08; Joint Trial Ex. II, IRS-ADM-002149-50, § 12(b)(ii), "The Non-Recourse Loans . . . shall not be legally or economically defeased"). (Stip. ¶ 101.)  There is no "defeasance" during the Service Contract, since the bulk of the Service Fees are payable in Euros and thus there is no need for a currency hedge; nor is there "defeasance" for the second purchase option, also payable in Euros; nor is there "defeasance" to guarantee the residual value of the Facility at the end of the Service Contract. (Angel Tr. 206-208; Joint Trial Ex. XIII, IRS-ADM-003106, § 6.9, "All amounts due under this Service Contract shall be payable in Euros [with limited exceptions.]")  Thus, the "transaction" itself is not "fully defeased."  Risk abides.  Only the Lease portion has PUAs, which even the IRS agrees do not all constitute defeasance arrangements.  The Owner Trust's equity is fully at risk in the Service Contract (and then some), and its residual reward is going to be dictated by market forces. (Angel Tr. 212-17.)  The Government stipulated that the Service Contract in this transaction is not a "hell or high water" commitment (Stip. ¶ 102), which makes it materially different from the IRS published attacks on "SILOs."  (Notice 2005-13, 2005-1 C.B. 630.)

The Federal Government itself sponsored and encouraged leasing deals with tax-exempt entities (with full defeasance) in several areas, including transit authorities.  Key entered into fully defeased leasing deals with the Chicago and San Francisco transit authorities, overseen by

---

[7] There is no doubt that the money in the PUAs always is paid to or for the benefit of AWG.  (Angel Tr. 182.)  The PUA agreements all recite that the money is being paid "for the benefit of" AWG.  (*See, e.g.*, Series A PUA, Joint Trial Ex. IX, IRS-ADM-002973-74, § 2.02)  Under U.S. tax law, such payments are deemed to belong to the person for whose benefit the money is being paid.  *See Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929).  Moreover, the PUA money is AWG's for the asking at any time, since AWG can refinance the transaction debt and terminate the PUAs (with no "make whole" payment under the loans – see *Findings of Fact*).

the Federal Transit Authority, which required as a condition of approving the deals that money

be set aside to pay the rents in "defeasance" accounts. (Angel Tr. 72-74.)  Moreover, there is risk

associated with "defeased" transactions.  As noted, Key routinely walked away from defeased

transactions, where they did not like the lessee or the asset. (Angel Tr. 67-69; Larkins Tr. 276-

77.)  There are other defaults possible than simply the failure to make payments. (Angel Tr. 70-

71; Meilman Tr. 526.)  There was also evidence presented that credit support providers are

carefully watched and monitored, since the credit of these providers is anything but guaranteed.

(Angel Tr. 218-22.)  In the law, there has always been a difference between credit risk and

residual risk.  A true lease requires residual risk.  If credit risk were a requirement, no lease with

the U.S. government would be valid.  Besides, banks are supposed to mitigate risk.

     In sum, the transaction was real, the Owner Trust acquired the Facility and assumed the

benefits and burdens of ownership (that is, its form and substance were the same). A full

discussion of the applicable legal authorities is contained in the *Conclusions of Law*, filed

simultaneously with this brief.  But a few summary observations are important and are contained

in the following sections.  Looked at from a very high level, the cases establish the following

broad principles in review of a sale-leaseback-service contract case:

     1. "The fact that a transaction generates tax benefits for investors does not necessarily

mean that the transaction lacks economic substance."  *Gefen, supra*, at 1490.  "We cannot ignore

the reality that the tax laws affect the shape of nearly every business transaction." *Frank Lyon

Co. v. United States,* 435 U.S. 561, 580 (1978).

     2. The first question, therefore, is whether the transaction is a "real" transaction, not one

based <u>solely</u> on tax benefits.  In the Sixth Circuit, that question is broken down into two related

17

inquiries: a taxpayer's business purpose and the transaction's economic substance.  As noted in

*American Electric Power Co. v United States*, 326 F.3d 737, 741 (6th Cir. 2003):

> In this circuit, the proper standard in determining if a transaction is a sham is
> whether the transaction has any *practicable economic effects* other than the
> creation of income tax losses.  A taxpayer's subjective business purpose and the
> transaction's objective economic substance may be relevant to this inquiry.
> (emphasis added).

3.  Once it is determined that the transaction has "practicable economic effects," the

question then becomes, did the substance follow the form of the transaction.  In a sale-leaseback,

the form must be respected if the lessor retains significant and genuine attributes of the

traditional lessor status.  *Frank Lyon, supra,* at 583-84.  A lessor will be respected as the owner

of the leased property if the lessor bears the burdens and stands to reap the benefits of ownership

as an economic matter.  *Levy v. Commissioner*, 91 T.C. 838, 859-60 (1988). The critical factors

are whether the taxpayer made a meaningful investment of equity in the property, whether there

is expected to be a meaningful residual interest in the property available to the taxpayer, and the

potential for realizing a profit based on market conditions.  Here, the Owner Trust retained these

risks and rewards of ownership under the transaction documents.

**III. The Owner Trust Had Business Purposes Other Than Solely Tax Benefits**

The question is not whether tax factored into the transaction, but whether the transaction

was done solely for tax benefits, without any other business motivation.  *Frank Lyon, supra*;

*Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89, 91 (4th Cir. 1985).  Here, the

transaction had multiple business purposes other than tax benefits.  The unrebutted testimony

was that the Banks had established leveraged leasing arms, that they were heavily engaged in

leveraged leasing of "big ticket" assets, including power plants and manufacturing facilities, that

they sought diversification of lessees and assets, that they were able to compete on a world

18

platform and sought higher profits and returns as a result, that the motivation for the transaction was profit and obtaining the residual benefits from the Service Contract and the residual value of the property, and that the Banks benefited from leveraged leasing accounting rules set up by the accounting industry.  This was anything but a transaction motivated solely by tax benefits.

### IV.  Economic Substance: Reasonable Anticipation By The Owner Trust Of Profit, Apart From Tax Benefits

The inquiry here is objective: did the transaction create a reasonable expectation of pre-tax profit.  Unlike the Government's contentions, the issue is not whether the Owner Trust might have made more money by investing in Treasuries.  The issue is whether there was more than *de minimus* pre-tax profit potential.  *See, e.g., Estate of Thomas, supra*, 84 T.C. at 440, n. 52. The Owner Trust met this test in spades.  The pre-tax profit of the AWG transaction fell exactly within the expected returns for all leveraged leases of the Banks (which have been audited and not challenged by the IRS).  More, there was a reasonable expectation that this deal provided opportunities for even greater pre-tax returns, above "risk-free" returns, from the sale of electricity, steam and byproducts during the Service Contract and use or sale of the Facility thereafter.  And, importantly, the expectation of pre-tax profits was not dependent on the taxpayer's discretionary actions or "highly contingent events in the future," as in the *Dow* case.  *Dow Chemical Company v United States*, 435 F.3d 594 (6th Cir. 2006).  The Owner Trust reasonably expects over $200 million in pre-tax profits if the Service Contract is elected (without considering inflation, or the sale of electricity, etc.).  But even if the FPO is exercised, there is still an expectation of substantial pre-tax profits for the Owner Trust (almost $80 million).  Unlike the taxpayer in *Dow,* the Owner Trust was under contract to act in a certain way in the future: it was required to either accept the FPO proceeds or enter into the Service Contract.  The transaction's profits do not depend on discretionary future conduct of the Owner Trust.  And

those cash-on-cash profits far exceed the level of pre-tax profit required to obtain an advance ruling from the IRS.

**V.  Form And Substance: Owner Trust Acquired The Benefits And Burdens Of Ownership**

This leveraged lease functioned like others.  Rents matched debt payments, little free cash was generated during the Lease, returns depended heavily on residual value, pre-tax profit was expected under either the FPO exercise or the Service Contract option, and the final returns will depend on a market-driven second purchase option or the subsequent use of the Facility by the Owner Trust or its sale of the Facility to a third party.  Moreover, the transaction had all the critical features of a non-contested leveraged lease (equity invested and maintained, pre-tax profit, substantial expected residual value, and a non-compelled fixed price purchase option), which have long been approved by the case law and substantive administrative authorities issued by the IRS.  The Owner Trust took on the benefits and burdens of ownership.  The form of the transaction must be respected.

Respectfully submitted,

/s/ Brian J. Lamb
DAVID J. HOOKER  (0014531)
david.hooker@thompsonhine.com
JAMES D. ROBENALT (0022165)
james.robenalt@thompsonhine.com
BRIAN J. LAMB (0055447)
brian.lamb@thompsonhine.com
THOMPSON HINE LLP
3900 Key Center
127 Public Square
Cleveland, Ohio  44114-1291
Telephone: (216) 566-5500
Facsimile:  (216) 566-5800

COUNSEL FOR PLAINTIFF
KSP INVESTMENTS, INC.

20

## CERTIFICATE OF SERVICE

A copy of the foregoing was filed electronically on February **25**, 2008.  Notice of such filing will be made electronically by way of the Court's electronic notification system and parties may access the filing through the Court's system.

/s/ Brian J. Lamb
*One of the Attorneys for Plaintiff*
*KSP Investments, Inc.*

21