*No. 1:07-CV-857*
*(District Judge Gwin)*
*(Magistrate Judge Hemann)*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

_____

AWG LEASING TRUST,
KSP INVESTMENTS, INC.
AS TAX MATTERS PARTNER,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

_____

*POST-TRIAL BRIEF FOR THE*
*UNITED STATES*

_____

GREGORY A. WHITE
  United States Attorney

ANGELO FRATTARELLI
STUART J. BASSIN
ROBERT J. KOVACEV
MATTHEW VON SCHUCH
NANCY B. HERBERT
  Attorneys
  U.S. Justice Department
  Tax Division
  P.O. Box 55
  Ben Franklin Post Office
  Washington, D.C.  20044

Page

**TABLE OF CONTENTS**

**Introduction** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Argument:**

    **I.**     **Jurisdiction and Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    **II.**    **Looking at the Substance of the Transaction, Plaintiffs Have Not Acquired a Current Depreciable Interest in the Facility** . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    **III.**   **The "Loop Debt" Arrangement with the German Banks Does Not Constitute Genuine Indebtedness** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    **IV.**   **The SILO Transaction Lacks Economic Substance and Should Be Disregarded** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    **V.**    **The Penalties Imposed on Plaintiffs Are Proper** . . . . . . . . . . . . . . . . . . . . . . . 18

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

**TABLE OF AUTHORITIES**

**Cases:**

    *ACM Partnership v. Commissioner*, 157 F.3d 231 (3d Cir. 1998), *cert. denied* 526 U.S. 1017 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    *Alderholt Speciality Co. v. Commissioner*, 50 T.C.M. 1101 (1985) . . . . . . . . . . . . . . . . 11

    *American Electric Power Co. v. United States*, 326 F.3d 737 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    *American Electric Power, Inc. v. United States*, 136 F. Supp. 2d 762 (S.D. Ohio), *aff'd* 326 F. 3d 737 (6th Cir. 2003), *cert. denied* 540 U.S. 1104 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    *Barnett v. Commissioner*, 364 F.2d 734 (2d Cir. 1966), *cert. denied sub nom Goldstein v. Commissioner,* 385 U.S. 1005 (1967) . . . . . . . . . . . . . . . . . . . . . . . 13

**Page**

**Cases (Continuation):**

*BB&T Corp. v. United States*, 2007 WL. 37798, 99 A.F.T.R.2d 2007-376,
2007-1 USTC ¶ 50,130 (M.D.N.C. 2007), *appeal docketed,* No. 07-1177
(4th Cir. March 19, 2007, argued Feb. 1, 2008) . . . . . . . . . . . . . . . . . . . . . *passim*

*Bridges v. Commissioner*, 325 F.2d 180 (4th Cir. 1963) . . . . . . . . . . . . . . . . . . . . . . . . 13

*In re CM Holdings*, 301 F.3d 96 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cemco Investors, LLC v. United States*, __ F.3d __, 2008 WL. 321270 (7th
Cir. Feb. 7, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Coleman v. Commissioner*, 16 F.3d 821 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006)
*cert. denied* 127 S.Ct. 1261 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Commissioner v. Culbertson*, 337 U.S. 733 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Commissioner v. Duberstein*, 363 U.S. 278 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Commissioner v. Tower*, 327 U.S. 280 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Dow Chemical Co. v. United States*, 435 F.3d 594 (6th Cir. 2006), *cert.
denied*, 127 S. Ct. 1251 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Deputy v. DuPont*, 308 U.S. 488 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) . . . . . . . . . . . . . . . . . . . . . . *passim*

*Gregory v. Helvering*, 293 U.S. 465 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6,15

*Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221 (1981) . . . . . . . . . . . . . . . 7

*INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 84 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Jade Trading, LLC v. United States*, 80 Fed. Cl. 11, 2007 WL. 4553043 (Fed.
Cl. Dec. 21, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Knetsch v. United States*, 364 U.S. 361 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,15

**Page**

3084217.1

**Cases (Continuation):**

*Kwiat v. Commisioner*, 64 T.C.M. (CCH) 327 (1992)  . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Long-Term Capital Holdings, LP v. United States*, 330 F. Supp. 2d 122
    (D. Conn. 2004), *aff'd* 150 Fed. Appx. 40 (2d Cir. 2005)  . . . . . . . . . . . . . . . . . 18, 19

*Nebraska Department of Revenue v. Loewenstein*, 513 U.S. 123 (1994)  . . . . . . . . . . . . 6

*Old Colony Trust Co. v. Commissioner*, 284 U.S. 552 (1932)  . . . . . . . . . . . . . . . . . . . 13

*Pahl v. Commissioner*, 150 F.3d 1124 (9th Cir. 1998)  . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Santa Monica Pictures*, 89 T.C.M. (CCH) at 1229-30  . . . . . . . . . . . . . . . . . . . . . . . . . 19

*TIFD III-E, Inc. v. United States*, 459 F.3d 220 (2d Cir. 2006)  . . . . . . . . . . . . . . . . . 7, 11

**Statutes:**

American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 848, 118 Stat. 1418  . . . . . 5

Internal Revenue Code of 1986 (26 U.S.C.):

§ 6221 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

§ 6226 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5,18

§ 6662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

§ 6664 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

§ 7491 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3084217.1

**Page**

**Miscellaneous:**

    Treasury Regulations (26 C.F.R.):

        § 1.6662-4(d)(3)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        § 1.6664-4(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        Rev. Proc. 75-21, 1975-1 C.B. 715 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        Rev. Proc. 2001-28, 2001-1 C.B. 1156 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        Rev. Rul. 99-14, 1999-1 C.B. 335 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 19

        Shvedov, *CRS Report for Congress: Tax Implications of SILOs, QTEs, and
        Other Leasing Transactions with Tax-Exempt Entities* (Nov. 30, 2004)
        http://digital.library.unt.edu/govdocs/crs/permalink/meta-crs-6848:1) . . . . . . . . 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AWG LEASING TRUST, | : | |
| KSP INVESTMENTS, INC., | : | |
| AS TAX MATTERS PARTNER | : | |
| | : | |
| Plaintiff, | : | **Case 1:07-CV-857** |
| | : | |
| v. | : | **District Judge Gwin** |
| | : | |
| UNITED STATES, | : | **Magistrate Judge Hemann** |
| | : | |
| Defendant. | : | |
| _____ | : | |

_____

**POST-TRIAL BRIEF FOR THE UNITED STATES**
_____

The United States, by its undersigned counsel, hereby files this post-trial brief pursuant to

the Court's amended order dated January 28, 2008.  This brief presumes the Court has already

read the United States' proposed findings of fact and conclusions of law filed concurrently.[1]

**<u>Introduction</u>**

This case presents a claim by the Plaintiffs[2] for more than $100 million dollars in

depreciation deductions, interest deductions, and other tax benefits for the years in suit (and

much more in subsequent non-suit years) arising out of a purported sale-leaseback or sale

in/lease out (SILO) transaction involving the Plaintiffs (through a partnership and grantor trust,

_____

[1] The facts as adduced at trial are set forth in detail in the United States' Proposed Findings of Fact and are not repeated herein.  To the extent necessary, the proposed findings and conclusion are incorporated herein by reference.

[2] The real parties in interest here are Key Bank and PNC Bank.  Through subsidiaries, they each own a 50% interest in the AWG Leasing Trust.  KSP Investments Inc. is a subsidiary of Key Bank and serves primarily as a designee to receive notices on tax matters directed to the trust.  For convenience, we will refer to all of these entities collectively as Plaintiffs.

3084502.1

the AWG Leasing Trust), a German utility company (AWG), and a host of banks, financial service firms, and professional service firms.  On audit, the Internal Revenue Service ("Service") determined that Plaintiffs' claims for tax benefits from this transaction were contrary to law and that penalties applied to any deficiencies resulting from Plaintiffs' claims.

The evidence at trial confirms that the Service's determination was correct.  First, an examination of the reality of the SILO Transaction as a whole reveals that, notwithstanding the form, Plaintiffs did not enjoy the benefits or shoulder the burdens of owning a depreciable interest in the Facility.  The Transaction was designed to ensure that, in substance but not in form, AWG would operate and have responsibility for the Facility from the closing date in 1999 until 2024 (the "Initial Lease Period").  At the end of the Initial Lease Period, AWG can exercise a pre-funded "Fixed Purchase Option" that gives it a cashless opportunity to end the transaction without affecting its continuing operation and control of the Facility.  Alternatively, AWG may elect to use the Facility under a "Service Contract" with Plaintiffs (or their designee), a transaction that arguably allows the incidences of ownership to pass both in form and in substance to Plaintiffs, but only after the end of the Initial Lease Period.

Regardless which option is ultimately selected in 2024, however, Plaintiffs did not acquire any meaningful stake (i.e., a depreciable ownership interest) in the Facility on the closing date in 1999, which is the relevant date for purposes of Plaintiffs' claimed tax deductions.  Nor can they acquire any real interest in the Facility during the Initial Lease Period, a point AWG emphasized to the German taxing authorities when it sought an advance ruling regarding its entitlement to continued depreciation deductions for the Facility in Germany:

> The head lease and sublease are entered into simultaneously, so that possession, use, and the obligations will at no time – ***not even for one legal second*** – be transferred to the U.S. Trust, if [AWG] exercises the [fixed purchase option].  By entering into the sublease, the Applicant will – if the transaction is consummated

as agreed – obtain the incontestable right to use the [Facility] over the duration of the sublease term . . . .

Joint Ex. XXVIII, at CLIF-005512 (AWG's Request for Tax Ruling) (emphasis added).  And because Plaintiffs did not, in substance, acquire a current ownership interest in the Facility, they are not entitled to the depreciation deductions at issue.  *See BB&T Corp. v. United States*, 2007 WL 37798, 99 A.F.T.R.2d 2007-376, 2007-1 USTC ¶ 50,130 (M.D.N.C. 2007), *appeal docketed,* No. 07-1177 (4th Cir. March 19, 2007, argued Feb. 1, 2008) (denying deductions for rent and interest expense claimed on account of a comparable LILO transaction).

Second, Plaintiffs may not claim interest expense deductions for the self-described "loop debt" in connection with this transaction because Plaintiffs did not incur genuine debt, which is a legal prerequisite for deducting interest on a purported loan.   Plaintiffs did not engage in any purposeful borrowing in connection with the SILO Transaction.  Even under the form of the transaction, the so-called non-recourse loans Plaintiffs "received" from the German banks as part of the "purchase price" for the transaction were merely one component of a circular flow of funds that never left the German banks' umbrella.  *Id.*   Nor do the so-called loans serve the purpose of facilitating the acquisition of the Facility by Plaintiffs because Plaintiffs acquired no current interest in the Facility, as described above.  Accordingly, Plaintiffs may not deduct so-called interest payments related to what they themselves describe as "loop debt."  *See* Def. Ex. DDDDDD, at PNC0005839 (PNC Service Contract Presentation); Keener Tr. 349:1-350:3.

Third, the SILO Transaction should be disregarded because the tax law does not respect transactions lacking economic substance apart from the tax benefits at issue.  As recently applied by the Sixth Circuit, the economic substance doctrine requires the Court to disregard transactions which do not have "any practical economic effects other than the creation of income tax losses."  *Dow Chemical Co. v. United States*, 435 F.3d 594, 599 (6th Cir. 2006) (citations omitted), *cert.*

-3-

*denied*, 127 S. Ct. 1251 (2007).   In making this analysis, the Court may not consider projections

of contingent cash flows for future years.  *Id*. at 602.   In other words, the relevant inquiry is

whether the SILO Transaction had positive economic consequences for Plaintiffs after

transaction costs, setting aside the tax benefits they hoped to generate and projections of

contingent future cash flows.  Here, Plaintiffs paid almost $60 million to enter a transaction that

creates no economic benefits for Plaintiffs (apart from tax deductions) for the first 24 years of

the transaction.  Even at the end of the Initial Lease Period in 2024, putting aside contingent

future cash flows, Plaintiffs will only receive a fraction of the funds they put into the transaction,

on a net present value basis.  The transaction therefore generates a pretax **loss** for Plaintiffs,

when adjusted for net present value.  *See* Lys Tr. 908:13-912:3; Def. Graphic 3**.**  Thus, the SILO

Transaction does not have any practical economic effects other than tax deductions, and the

Court should disregard the transaction and deny those deductions for lack of economic

substance.

     Not only are the tax deductions claimed by Plaintiffs improper, but penalties are

applicable to underpayments of tax liability attributable to the improper reporting of the SILO

Transaction.  Plaintiffs have sought to dramatically reduce Key's and PNC's federal income tax

liability by engaging in a complex scheme designed to generate tax deductions without other

economic consequences.  Indeed, the SILO Transaction is little more than a poorly-disguised

LILO transaction–a tax-avoidance scheme the Service specifically ruled was not acceptable less

than a year earlier.[3]  Rev. Rul. 99-14, 1999-1 C.B. 335.  Plaintiffs have presented no defenses to

---

[3]   *See generally* Shvedov, *CRS Report for Congress: Tax Implications of SILOs, QTEs, and Other Leasing Transactions with Tax-Exempt Entities* (Nov. 30, 2004) ("CRS Report")(available at http://digital.library.unt.edu/govdocs/crs/permalink/meta-crs-6848:1) (describing the evolution of the "service contract" SILO as a restructured version of the Lease-In/Lease-Out ("LILO") transactions) . SILOs evolved after the IRS effectively eliminated (in May 1999) the tax benefits related to LILOs when it promulgated the final version of the regulations under section 467.

3084502.1

the asserted penalties in this action at the partnership level.  The Court, accordingly, should

uphold the Service's determination regarding the applicability of penalties.

## Argument

### I.        JURISDICTION AND STANDARD OF REVIEW

The governing statute, Section 6226(f) of the Internal Revenue Code of 1986, as

amended to the period in issue (the "Code"), requires the Court to–

> determine all partnership items of the partnership for the partnership taxable year
> to which the notice of final partnership administrative adjustment relates, the
> proper allocation of such items among the partners, and the applicability of any
> penalty, addition to tax, or additional amount which relates to an adjustment to a
> partnership item.

The Court makes a de novo determination in resolving this case and may sustain the Service's

determinations based upon any applicable legal theory or authority.  *Jade Trading, LLC v.*

*United States*, 80 Fed. Cl. 11, 2007 WL 4553043, * 32 (Fed. Cl. Dec. 21, 2007).  Plaintiffs bear

the burden of proving that the Service's determinations were incorrect.  *Dow Chem. Co. v.*

*United States,* 435 F.3d at 599, *quoting INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 84 (1992)

("'[A]n income tax deduction is a matter of legislative grace and . . . the burden of clearly

showing the right to the claimed deduction is on the taxpayer.'")

---

The similarity between LILOs and SILOs is borne out by the history of the particular transaction at issue in this case.  Initially, the AWG transaction was marketed by Key Global Finance (an affiliate of Plaintiff KeyCorp) as a LILO transaction.  Stipulation of Facts ¶¶37-38; Joint Ex. LIII.  Once the Service issued the regulations depriving the LILO structure of its tax benefits, the AWG transaction morphed from a LILO to a SILO.  Stipulation of Facts ¶41.  Indeed, the substance of the AWG SILO Transaction is identical to that of a LILO, and the main features of the AWG structure are taken from the "standard structure" used by law firms for LILOs.  Meilman Tr. 538-40.  The only significant differences in form–the length of the Head Lease and the possibility of entering a Service Contract after the Initial Lease Period–are largely irrelevant for the reasons set forth herein.

In the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 848, 118 Stat. 1418, Congress effectively eliminated the tax benefits derived from SILO transactions (even if respected under a substance over form analysis).  Despite their current protestations that they entered into cross-border lease-to-service-contract transactions like the AWG SILO transaction for business purposes having nothing to do with tax effects, Plaintiffs stopped engaging in any such transactions once the remedial legislation became effective.  *See* Angel Tr. 224:19-225:9; Keener Tr. 336:11-14.

3084502.1

## II.  LOOKING AT THE SUBSTANCE OF THE TRANSACTION, PLAINTIFFS HAVE NOT ACQUIRED A CURRENT DEPRECIABLE INTEREST IN THE FACILITY

The fact that the contract documents in this case describe the SILO Transaction as a sale-leaseback of the Facility is irrelevant because a transaction's substance, not its form, determines its treatment for federal income tax purposes.[4]  *Gregory v. Helvering*, 293 U.S. 465 (1935).  For this reason, courts have never regarded "the simple expedient of drawing up papers" as controlling for tax purposes where, as here, a transaction's objective economic realities do not comport with the form in which the deal has been cast.  *Frank Lyon Co. v. United States*, 435 U.S. 561, 572-73 (1978) quoting *Commissioner v. Tower*, 327 U.S. 280, 291 (1946) .  Where the form of a transaction presents an accurate reflection of the substantive rights and responsibilities allocated by the parties, the form of the transaction should be respected.  When it does not, however, and the substance of a transaction differs from its form, the transaction's substance controls.  *Nebraska Dep't of Revenue v. Loewenstein*, 513 U.S. 123 (1994) (distinguishing *Frank Lyon* and recharacterizing a transaction structured as a "sale" and "repurchase" of municipal bonds as a secured lending transaction).  It is this principle, and not a taxpayer's desire to achieve particular tax results, that determines a transaction's effects for federal income tax purposes. *Commissioner v. Duberstein*, 363 U.S. 278, 286 (1960).[5]

---

[4]  Indeed, Plaintiffs seek to apply this principle to characterize the Head Lease as a "sale" even though the document itself is drafted as a lease.  Otherwise, Plaintiffs could never claim depreciation deductions as a purported "tax owner" of the Facility based on a document that calls itself a "head lease" and is not accompanied with a transfer of title.

[5]  At bottom, Plaintiffs' entire case rests on their contention that the "leaseback" portion of the transaction meets certain "tests" that appear in revenue procedures issued by the Service (Rev. Proc. 75-21, 1975-1 C B. 715, *reissued as* Rev. Proc. 2001-28, 2001-1 C.B. 1156, also known as the "Guidelines"), as allegedly reflected in Plaintiffs' computer-generated number runs.  Even assuming that to be true, Plaintiffs' argument is irrelevant because it merely shows that Plaintiffs, and the advisors and lawyers to whom they paid millions to engineer this deal, successfully mimicked the "form" of a leveraged lease.  Courts have long recognized that it is all too easy for parties to use the guise of a legitimate transaction to conceal the underlying reality.  *See Frank Lyon,* 435 U.S. at 577.  This is

3084502.1

When the structure of a transaction raises questions regarding the proper characterization of a purported transfer of ownership, this Court must examine all the relevant facts and circumstances, considering the transaction as a whole (not pieces of the transaction in isolation). *See TIFD III-E, Inc. v. United States,* 459 F.3d 220, 231 (2d Cir. 2006), citing *Commissioner v. Culbertson,* 337 U.S. 733, 742 (1949) (The nature of an interest must be determined "based on a realistic appraisal of the totality of the circumstances.")   *See also Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981).  This analysis requires an examination of the substantive rights and duties actually involved in the SILO Transaction to determine whether, in substance, as well as in form, AWG transferred an ownership interest in the Facility to Plaintiffs. To prevail, Plaintiffs must show that they both obtained and retained "significant and genuine attributes" of ownership of the Facility in 1999, when they purportedly became the "owners" of the Facility for tax purposes.  *See Frank Lyon*, 435 U.S. at 584.  Those attributes are present only when the person purporting to own property enjoys the benefits and bears the burdens normally incident to possession of ownership.  *Coleman v. Commissioner*, 16 F.3d 821, 826 (7th Cir. 1994) (distinguishing *Frank Lyon* and concluding that taxpayer did not own computer equipment it sought to depreciate).

Application of these principles is demonstrated by a recent decision addressing a LILO transaction.[6]  *BB&T Corp. v. United States*, *supra*.  That case involved a purported transfer of a leasehold interest in paper mill equipment from a Swedish wood pulp company (Sodra) to a

---

precisely why this Court is compelled to look beyond Plaintiffs' arguments about the form and evaluate the substance behind the transaction as a whole.

[6]   The salient features of the SILO Transaction, such as the defeasance structure, the loop debt, the pre-funded option to "reacquire" the Facility, and the offsetting obligations that leave economic control of the asset unchanged, are present in LILOs such as *BB&T*.  Meilman Tr. 538-40; Shinderman Tr.1106, 1115-17.

domestic financial services company (BB&T).  As here, the equipment was simultaneously leased back to Sodra on a long-term basis, the lease was secured through payment undertaking agreements, and Sodra held an option (pre-funded by BB&T) to reacquire the equipment at a predetermined price at the end of the lease term.  Rejecting BB&T's claims for tax benefits based upon its acquisition of a leasehold interest in the equipment, the court stated–

> In sum, because Sodra retained, in substance, all of the rights it possessed in the Equipment, at least for the term of the Lease, BB&T could acquire only a future interest in the Equipment that will mature at the end of the Lease term and then only in the event Sodra elects not to exercise its option (funded in full by the Equity PUA and the Debt PUA) to buyout BB&T's interest in the Head Lease.

2007 WL 37798 at *8.  Accordingly, the form of the transaction was not respected and the taxpayer was denied the tax benefits it claimed from the transaction.

Likewise, Plaintiffs have not shown that they acquired a current property interest in the Facility through the SILO Transaction.  The SILO Transaction left the benefits and burdens of ownership of the Facility exactly where they had been since the Facility was built in 1976 - with AWG.  AWG continues to possess and operate the Facility, it remains responsible for all costs and capital improvements associated with the Facility's use and maintenance; and it retains all the profits from the operation of the Facility.

Indeed, AWG treated itself as the owner of the Facility on its financial statements and claimed depreciation deductions on the Facility on its German tax returns.  In fact, AWG indicated to the German tax authorities that it, not Plaintiffs, retained economic ownership, dominion and control of the Facility throughout the Initial Lease Period.  *See* Joint Ex. XXVIII, at CLIF-005512.  Just like in *BB&T*, the fact that AWG did not lose its rights in the Facility establishes that Plaintiffs did not acquire any rights in the Facility on the closing date.  *See BB&T*, 2007 WL 37798 at *10 (disregarding offsetting reciprocal obligations in head lease and leaseback).

-8-

The cash flows in the SILO Transaction also demonstrate that Plaintiffs received no current interest in the Facility.  While the form of the SILO Transaction is dizzying in its complexity, the money trail makes the substance of the transaction quite clear: Plaintiffs paid AWG an accommodation fee to execute meaningless papers which Plaintiffs hoped would provide the predicate for claims to massive tax benefits.[7]  The remainder of the SILO Transaction cancels itself out, and no money ever truly changes hands throughout the Initial Lease Period (except for the fees Plaintiffs paid to the lawyers and other professionals who engineered the deal).

Plaintiffs' executives nonetheless testified that they acquired depreciable rights in the property at the closing, because they expected AWG to elect the Service Contract at the end of the Initial Lease Period, which would potentially give Plaintiffs possession and control over the Facility at that time (i.e., in 2024).  To support this contention, Plaintiffs relied upon calculations made by Deloitte & Touche, presented by their witness Richard Ellsworth and replicated by one of their expert witnesses, Frank Graves, to the effect that AWG would be economically better off if it entered the Service Contract because it would also receive the $521 million in the Payment Undertaking Agreements directly (rather than use them to exercise the Fixed Purchase Option), even though AWG would have to pay that amount (and more) in "Capacity Charges" under the Service Contract.

The evidence at trial demonstrated that the calculations supporting Plaintiffs' contention were based on two assumptions that even Plaintiffs' own experts now acknowledge are false:

---

[7]  Plaintiffs also funded an Equity Payment Undertaking Agreement with AIG on the closing date in the amount of $26.5 million.  But like other parts of the SILO Transaction, the Equity Payment Undertaking Agreement is not what its label suggests.  The Equity Payment Undertaking Agreement  is designed to provide a guaranteed return on those funds in 2024.  Thus, the purported "equity" undertaking it is more like a debt security for Plaintiffs, under which the funds are to be repaid effectively with interest.

3084502.1

(1) AWG would be somehow exempt from paying tax on the $521 million it would receive in 2024 (while being able to fully deduct the Capacity Charges under the Service Contract), and (2) the German tax rate in 2024 would precisely equal the *United States'* combined federal and state corporate tax rate in 1999 (40.85%).  Correcting either or both of these false assumptions reveals that the Service Contract would be more costly to AWG than exercising the Fixed Purchase Option.  Thus, the Fixed Purchase Option is the economically dominant choice for AWG.  *See* Lys Tr.888-900, 933 & Def. Graphic 5.

Even if Plaintiffs could show that AWG was likely to enter the Service Contract, all that Plaintiffs established is that they **might** acquire some interest in the Facility at the end of the Initial Lease Period in **2024**.  That contingent interest – which cannot be realized for at least 24 years, if at all – does not mean that Plaintiffs bear the benefits and burdens of ownership starting in 1999, which is what they must show in order to legitimately claim depreciation deductions as the "owners" of the Facility for the 1999-2003 tax years at issue.  *See BB & T Corp.*, *supra* at 6 (concluding that only a potential future interest was conveyed).

Further, as the United States' expert in the leasing industry Morris Shinderman testified, the SILO Transaction insulates Plaintiffs from the risks and rewards that lessors in legitimate leveraged leases experience.  Shinderman Tr. 1115-17.  That fact undermines any claim that Plaintiffs acquired a depreciable interest in the Facility on the closing date.  *See, e.g., Kwiat v. Commisioner,* 64 T.C.M. (CCH) 327, 333-334 (1992) (a structure that  effectively collars the upside benefits and downside risks of the parties to a putative leasing transaction indicates that the benefits and burdens of ownership remain with the lessee).[8]  Indeed, the Second Circuit in

---

[8]  The SILO Transaction deserves particularly intense scrutiny because it employs reciprocal and offsetting obligations, such as the Payment Undertaking Agreements and so-called nonrecourse loans, that

*TIFD III-E, Inc. v. United States*, concluded that a bank lacked an equity investment in a

partnership for that very reason:

> The banks had essentially bargained for and received a secure guaranty of the
> reimbursement of their investment at the agreed Applicable Rate of return. Their
> apparent 98% share of partnership income was largely defeasible by the taxpayer,
> and was more in the nature of window dressing designed to give ostensible support
> to the characterization of equity participation, which was essential to the dominant
> tax objective, rather than a meaningful stake in the profits of the venture. The
> possibility of a small share in extraordinary profits was not a significant feature of
> their investment. While the amount owed to the banks was not exactly a "sum
> certain," it was not significantly different; it was more akin to the characteristic
> repayment of debt than to a real equity stake in the venture.

459 F.3d at 236-37.

Nor does the evidence support Plaintiffs' contention that the SILO Transaction is

comparable to the sale-leaseback transaction recognized by the Supreme Court in *Frank

Lyon*.  In *Frank Lyon*, the Court relied on the fact that the transaction at issue was "a

genuine multiple-party transaction with economic substance which is compelled or

encouraged by business or regulatory realities, is imbued with tax-independent

considerations, and is not shaped solely by tax-avoidance features that have meaningless

labels attached."  *Frank Lyon*, 435 U.S. at 583-84.  The facts established at trial show that

this case is distinguishable from *Frank Lyon* in at least the following ways.

•       The SILO Transaction includes a pre-funded Fixed Purchase Option and Service
        Contract Option that "collar" their potential upside benefits and downside risks.
        Plaintiffs' own witnesses admitted as much, acknowledging both that the Fixed
        Purchase Option eliminates the risk from the transaction if selected, and that the
        equity payments required as part of the Capacity Charges under the Service

---

serve no substantive purpose.  *See, e.g., Cemco Investors, LLC v. United States*, __ F.3d __, 2008 WL
321270, at *1-2 (7th Cir. Feb. 7, 2008) (holding that offsetting long and short currency options used to
generate tax losses far exceeding actual at-risk investment lack economic substance); *see also Kwiat*, 64
T.C.M. at 333-334 (offsetting put and call options "insulated" taxpayers from risk); *Alderholt Speciality
Co. v. Commissioner*, 50 T.C.M. 1101, 1107 (1985) ("reciprocal options" eliminated risk).

Contract effectively do the same if the Service Contract is selected.  Keener Tr.
350:10-353:18; Def. Ex. DDDDDD, at PNC0005852.  *Frank Lyon* had no such
artificial risk-avoidance mechanisms, instead leaving the lessor to face the upside
reward and downside risk normally borne by the owner of property.[9]  435 U.S. at
576-77.

- The SILO Transaction supposedly permits Plaintiffs to claim ownership of the
  Facility and take depreciation deductions for the Facility that otherwise would not
  have been available to any other U.S. taxpayer.  By contrast, in *Frank Lyon* the
  Supreme Court specifically relied on the fact that while tax benefits were
  transferred from one U.S. taxpayer to another, no new tax benefits were created.
  435 U.S. at 583 n.18 (noting that the transaction in *Frank Lyon* did not "actually
  create[] tax advantages that, for one reason or another, could not have been enjoyed
  had the transaction taken another form").

- The SILO Transaction supposedly permits both Plaintiffs and AWG to claim
  ownership of the Facility and take depreciation deductions for the Facility.  By
  contrast*, Frank Lyon* did not involve any potential of double dipping of deductions,
  but merely shifted existing tax benefits from one U.S. taxpayer to another.[10]  435
  U.S. at 580.

- The SILO Transaction purports to pay AWG $423 million as the "purchase price"
  for the Facility, but AWG only retains less than 8% of that amount.  The rest is
  instantaneously disbursed into the Payment Undertaking Agreements referenced
  above, where they are beyond AWG's control.  In *Frank Lyon*, as in the typical
  sale-leaseback between two U.S. taxpayers, the lessee received 100% of the
  proceeds of the sale to use as it saw fit.  435 U.S. at 566; *see also* Shinderman Tr.
  1106.

- The SILO Transaction used a defeasance structure (the Payment Undertaking
  Agreements) to virtually eliminate any risk to Plaintiffs and to guarantee their
  predetermined return on equity.  *Frank Lyon* involved no comparable defeasance

---

[9]   Although the lessee in *Frank Lyon* had the option to purchase the building from the taxpayer at
various points in time at a predetermined price, there were no funds set aside and dedicated to that
purpose as in this case.

[10]   While such "double dipping" does not automatically deprive a foreign leasing transaction of its tax
benefits, since it is possible that the other country's tax laws permit reliance on form over substance, the
fact that the parties all understood and contemplated that AWG would continue to be treated as the owner
for purposes of claiming depreciation in Germany for German tax purposes is both a reason to scrutinize
the claim of ownership for U.S. tax purposes and serves to distinguish the case from *Frank Lyon*, which
did not contemplate a transaction in which both lessor and lessee could claim the same tax benefits.  This
is particularly true in light of AWG's representation (approved by Plaintiffs) to the German tax authorities
that economic control over the Facility would not pass to Plaintiffs even "for one legal second" if the
Fixed Purchase Option were exercised.

scheme and left the lessor to bear the risks of losing its equity investment.  435 U.S. at 581.

In sum, Plaintiffs' claim that the tax deductions at issue here are supported by the Supreme Court's decision in *Frank Lyon* is specious.  While both cases involve documents called "leases," the similarity ends there, and Plaintiffs cannot rely upon *Frank Lyon* to provide even a patina of respectability to the SILO Transaction.

## III.   THE "LOOP DEBT" ARRANGEMENT WITH THE GERMAN BANKS DOES NOT CONSTITUTE GENUINE INDEBTEDNESS

Section 163(a) of the Internal Revenue Code generally allows taxpayers a deduction for all interest paid or accrued within the taxable year on indebtedness.  For purposes of this section, interest refers to compensation for the use or forbearance of money.  *Bridges v. Commissioner*, 325 F.2d 180, 184 (4th Cir. 1963), *citing Deputy v. DuPont*, 308 U.S. 488, 498 (1940); *Old Colony Trust Co. v. Commissioner*, 284 U.S. 552, 560 (1932).  In order to claim a deduction, however, the debt on which the interest is paid must be genuine. *Bridges v. Commissioner*, 325 F.2d at 184-85, citing *Knetsch v. United States*, 364 U.S. 361 (1960); *Barnett v. Commissioner*, 364 F. 2d 734, 740-42 (2d Cir. 1966), *cert. denied sub nom Goldstein v. Commissioner,* 385 U.S. 1005 (1967)  ("We here decide that Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction.**")**

Applying those principles in a comparable fact pattern, the court in *BB&T* denied interest deductions attributable to loans secured with a defeasance arrangement similar to the arrangements surrounding the "loans" from the German Banks in the AWG SILO Transaction.  That court looked past the form of the transaction selected by the parties and found–

-13-

> When the intermediate payment steps are disregarded, which must be done in order to consider the substance of the loan transaction and not the form selected by the parties, it becomes clear that the loan transaction is only a circular transfer of funds in which the . . . ***loan is paid from the proceeds of the loan itself***.  There was no money lent . . . in a substantive sense, and the . . . ***loan does not reflect genuine indebtedness***.

*BB&T*, 2007 WL 37798 at *11 (emphasis added).  Accordingly, the court concluded that the "purported interest payments cannot be what Congress intended to allow as an income tax deduction" and rejected the taxpayer's claims for interest deductions.  *Id.*

Here, Plaintiffs themselves characterize the "loans" obtained from the German banks as "loop debt," reflecting the reality that the cash flows are circular and no funds ever truly leave the German banks' umbrella.  *See* Def. Ex. DDDDDD, at PNC0005839 (PNC Service Contract Presentation); Keener Tr. 349:1-350:3.  The funds were "loaned" by the German banks to Plaintiffs on a non-recourse basis; the same funds were "paid" by Plaintiffs to AWG at the closing as the price of the Head Lease; and the same funds were "paid" to an affiliate of one of the German banks as consideration for their assumption of AWG's "rent" obligations under the Payment Undertaking Agreements.  Plaintiffs never actually pay the "interest" on those so-called loans, because the "interest" payments are made out of the proceeds of the "loans" themselves, held by an affiliate of one of the lenders.  Most important, no portion of this purported borrowing was ever invested in the Facility or put to any other purposeful use by either Plaintiffs or AWG.  This lack of economic purpose to the loans indicates that they are not genuine debt.  Accordingly, the claimed interest deductions must be denied.

IV.     **THE SILO TRANSACTION LACKS ECONOMIC SUBSTANCE AND
        SHOULD BE DISREGARDED**

The tax law is concerned with the economic substance of transactions, not just the form or labels chosen by the taxpayer to describe a transaction.  Thus, it is a well-established principle that tax benefits claimed from a transaction contrived to create tax benefits will not be recognized for federal tax purposes if the transaction lacks independent economic substance.  *American Electric Power Co. v. United States*, 326 F.3d 737, 741 (6th Cir. 2003) (tax benefits denied because corporate owned life insurance program lacked economic substance); *Knetsch v. United States*, *supra* (denying interest deductions on offsetting loans and annuity contracts); *Gregory v. Helvering*, *supra* (tax motivated corporate reorganization disregarded as a sham).

The analysis focuses upon evaluation of the pre-tax profitability of the disputed transaction.  Stated more succinctly, the Sixth Circuit explained that "the point of the analysis is to remove from consideration the challenged deduction, and to evaluate the transaction . . . to see if it makes sense economically or is mere tax arbitrage."  *American Electric Power*, 326 F.3d at 743-44, quoting *In re CM Holdings,* 301 F.3d 96, 101 (3d Cir. 2002).  The analysis disregards economic profits attributable to projected future tax benefits, *id.,* and does not allow a taxpayer to "save" a transaction by including "highly-contingent positive cash flows projected for later years" in the analysis.[11]  *Dow Chemical*

_____

[11]  As the Court stated in *Dow Chemical Co. v. United States,* 435 F.3d at 599 (internal citations omitted):

> "The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses." If the transaction has economic substance, "the question becomes whether the taxpayer was motivated by profit to participate in the transaction." "If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes, and the [subjective] inquiry is never made."

3084502.1

*Co. v. United States*, 435 F.3d at 602.   The analysis is almost exclusively objective and a

taxpayer's assertion of a subjective belief in a transaction's profit potential will not satisfy

the test if the objective evidence demonstrates that a reasonable expectation of profit is

lacking.  *Coltec Industries, Inc. v. United States*, 454 F.3d 1340 (Fed. Cir. 2006) *cert.*

*denied* 127 S.Ct. 1261 (2007); *Dow*, 435 F.3d at 605 (concluding that transaction lacked

economic substance without considering evidence of subjective intent).   The relevant

inquiry is whether the transaction that generated the disputed tax deductions has economic

substance.  *Coltec*, 454 F. 3d at 1356-57.

Such an analysis mandates a conclusion that the SILO Transaction lacks economic

substance.  It is uncontested that, during the Initial Lease Period, Plaintiffs will only

recover a de minimis $1.2 million on their initial outlay of $55 million (not including

transaction costs).  The only significant cash flows during the 24 years of the Initial Lease

Period are the meaningless circular flows of funds between and among the German banks.

Neither the $1.2 million recovery nor the "loop financing" constitutes a profit for Plaintiffs

on a pre-tax basis.  For that reason, even Plaintiffs' economics expert acknowledged that

there is no non-tax benefit to Plaintiffs during the Initial Lease Period.[12]  Graves Tr. 823-

24.

Likewise, Plaintiffs cannot economically benefit from the exercise of AWG's Fixed

Purchase Option or the alternative Service Contract route at the end of that period.  In the

---

[12]    Plaintiffs contend that  the accounting "profits" they recognized for financial statement purposes
are an important non-tax business purpose for engaging in the SILO Transaction.  Of course, those
accounting profits derive largely from the tax benefits Plaintiffs claim, not pretax economic gains.  Hurd
Tr. 603:24-604:13, 640:24-641:20.  An accounting benefit resulting from tax savings generated by a
transaction that lacks economic substance at its inception cannot imbue the transaction with economic
substance once the tax savings are challenged.  *American Electric Power, Inc. v. United States*, 136 F.
Supp. 2d 762, 791-92 (S.D. Ohio), *aff'd* 326 F. 3d 737 (6th Cir. 2003), *cert. denied* 540 U.S. 1104 (2004).

3084502.1

likely event AWG elects its pre-funded Fixed Purchase Option, Plaintiffs will only receive

a payment equal to the $26.5 million it deposited with AIG, plus interest.  That payment

(due in 2024), however, merely represents a risk- free return of Plaintiffs' AIG deposit (not

the fruits of a legitimate leasing deal).  Considering Plaintiffs' total equity investment of

$55 million, the return Plaintiffs will receive from the AIG deposit is less than they could

have earned had they invested the same funds in risk-free Treasury obligations, or in their

own lending business.  Instead, in the SILO Transaction, Plaintiffs paid in $55 million in

1999 dollars only to receive, in net present value terms, $26.5 million in 1999 dollars 24

years later.  This is a loss in net present value terms.  *See ACM Partnership v. Commissioner*, 157 F.3d 231, 259 (3d Cir. 1998), *cert. denied* 526 U.S. 1017 (1999) (making

present value adjustments in evaluating "profits" from future payments).  Even in the

unlikely event that AWG elects the Service Contract, Plaintiffs' receipt of any pretax

profits hinge upon the hypothesis that AWG will depart from its past practices and

historical behavior, and stop operating the Facility that it has operated continuously since

1976.  Further, those hypothetical pretax returns to Plaintiffs will not be received for many

years.  Those speculative future cash flows are precisely the type of contingent future

benefit the Sixth Circuit excluded from the economic substance analysis in *Dow*.[13]

Accordingly, the Court should conclude that the SILO Transaction lacks economic

---

[13]   While the economic dominance of the Fixed Purchase Option over the Service Contract, as
demonstrated by Dr. Lys, underscores the speculative nature of any cash flows that Plaintiffs might
receive under the Service Contract, it is irrelevant for the purposes of the economic substance test whether
or not AWG is likely to exercise the Fixed Purchase Option or not.  What matters is that, even if the
Service Contract is elected, it will not commence—and Plaintiffs would not earn the purported returns
that they project will flow from the Service Contract--but for the contingency that, years into the future,
AWG rejects the Fixed Purchase Option and otherwise meets the many preconditions to the Service
Contract.  That is precisely the sort of future contingency that the Sixth Circuit teaches cannot be taken
into account as part of the economic substance analysis.  *See Dow Chemical,* 435 F.3d at 602.

3084502.1

substance and that Plaintiffs may not claim tax benefits from the transaction.

## V.      THE PENALTIES IMPOSED ON PLAINTIFFS ARE PROPER

The Court in this TEFRA partnership proceeding must also resolve the applicability

of any penalty that has been asserted by the IRS.  26 U.S.C. §§6221, 6226(f).  While the

United States bears the burden of production on penalty issues, 26 U.S.C. §7491(c),

Plaintiffs bear the ultimate burden of proof on issues related to penalties.  *Pahl v.*

*Commissioner*, 150 F.3d 1124, 1131 (9th Cir. 1998).  *See generally Long-Term Capital*

*Holdings, LP v. United States*, 330 F. Supp.2d 122, 196-99 (D. Conn. 2004), *aff'd* 150 Fed.

Appx. 40  (2d Cir. 2005).  Here, the Service determined that a penalty for a substantial

understatement of tax attributable to plaintiffs' treatment of the SILO Transaction was

applicable under Section 6662 of the Internal Revenue Code.  Section 6662(a), provides

that there "shall be added to the tax an amount equal to 20 percent of the portion of the

underpayment to which this section applies."[14]  An understatement of income tax is

substantial if it exceeds the greater of (1) 10 percent of the tax required to be shown on the

return, or (2) $5,000 ($10,000 for corporations).  26 U.S.C. §6662(d)(1).  For these

purposes, the amount of an understatement is reduced by the portion thereof that is

attributable to the tax treatment of any item by the taxpayer if there is or was substantial

authority for such treatment.  26 U.S.C. §6662(d)(2)(B).

The United States has met its burden of production with respect to the penalty.

Determination of whether an understatement exists is strictly computational; therefore,

Plaintiffs cannot dispute that if their reporting of the SILO Transaction was improper, a

---

[14]   At its simplest, an "underpayment" is the difference between the amount of tax reported on a return and the correct amount of tax due, as determined after an audit or judicial review.  *See* 26 U.S.C. §6664(a).

-18-

substantial understatement occurred.[15]

Plaintiffs challenge the penalty in their Complaint based on the "reasonable cause" exception. *See* 26 U.S.C. §6664(c) & 26 C.F.R. §1.6664-4(b)(1). But plaintiffs offered nothing at trial to support any reasonable cause defense. Instead, they appear to take the all-or-nothing position that reasonable cause is exclusively a partner-level determination, beyond the jurisdiction of this Court. Plaintiffs have consistently refused to respond to discovery requests, and instructed witnesses not to answer questions in depositions, related to their "reasonable cause" defense based on their contention that such arguments can only properly be litigated at the partner level. Reasonable cause may be asserted in some circumstances at the partnership level. *See Long Term Capital*, 330 F.Supp.2d at 205; *Santa Monica Pictures*, 89 T.C.M. (CCH) at 1229-30. Whether those circumstances are present in this case need not be resolved here, as Plaintiffs have waived any partnership-level reasonable cause defense, and this Court should uphold the penalty determination.

To the extent Plaintiffs might request that this Court determine that their reasonable cause defense is a partner-level issue, that is more properly a matter to be decided in a subsequent partner-level proceeding. All that this Court need do is determine that no partnership-level

---

[15] The substantial authority and adequate disclosure exceptions to the penalty are not applicable for corporate taxpayers in the case of a tax shelter, which is the case here. 26 U.S.C. § 6662(d)(2)(B), (C). At all events, plaintiffs can show no substantial authority, which would exist only if the weight of the authorities supporting taxpayer's position is substantial in relation to the weight of authorities supporting contrary treatment. 26 C.F.R. §1.6662-4(d)(3)(i). Because this is an objective standard, the taxpayer's belief that there is substantial authority for the tax treatment of an item is not relevant to the analysis. *Id.* Plaintiffs filed returns which treated the SILO Transaction as a legitimate economic transaction even though it clearly lacked economic substance. In addition, the SILO Transaction cannot reasonably be distinguished from a LILO, which the Service had ruled less than a year earlier – in Revenue Ruling 99-14 – was improper. *See* 26 C.F.R. §1.6662-4(d)(3)(i) (a revenue ruling is a type of authority for purposes of substantial understatement penalty).

reasonable cause exists, thus making it clear that any alleged reasonable cause that could have been raised in this proceeding will be barred.

## CONCLUSION

For the foregoing reasons, the Court should sustain the Service's determinations that Plaintiffs' claims for tax benefits from the SILO Transaction are improper and that penalties are applicable to underpayments attributable to improper reporting of the SILO Transaction.

Respectfully submitted,

GREGORY A. WHITE
United States Attorney

s/ Robert J. Kovacev
Robert J. Kovacev
Trial Attorney, Tax Division
U.S. Department of Justice
555 Fourth Street, NW, Suite 7826
Washington, DC 20001
(202) 307-6541
Robert.J.Kovacev@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/ Robert J. Kovacev
Robert J. Kovacev
Trial Attorney, Tax Division

3084502.1