*No. 1:07-CV-857*
*(District Judge Gwin)*
*(Magistrate Judge Hemann)*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

————————

AWG LEASING TRUST,
KSP INVESTMENTS, INC.
AS TAX MATTERS PARTNER,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

————————

### *PROPOSED FINDINGS OF FACT AND PROPOSED CONCLUSIONS OF LAW FOR THE UNITED STATES*

————————

GREGORY A. WHITE
  United States Attorney

ANGELO FRATTARELLI
STUART J. BASSIN
ROBERT KOVACEV
MATTHEW VON SCHUCH
NANCY HERBERT
  Attorneys
  U.S. Justice Department
  Tax Division
  P.O. Box 55
  Ben Franklin Post Office
  Washington, D.C.  20044

Page

# TABLE OF CONTENTS

***PROPOSED FINDINGS OF FACT AND PROPOSED CONCLUSIONS OF LAW
FOR THE UNITED STATES.*** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**Proposed Findings of Fact** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.  **THE PRINCIPALS IN THE AWG SILO TRANSACTION.** . . . . . . . . . . . . . 2

Background of Key's and PNC's Leasing Businesses . . . . . . . . . . . . . . . . . . . . . 4

II.  **THE AWG SILO TRANSACTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

History of the AWG SILO Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

The Form of the AWG SILO Transaction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.  **THE REALITY BEHIND THE FORM OF THE AWG SILO
TRANSACTION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

The Cash Flows At Closing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

The Circular Money Flows During the Initial Lease Period. . . . . . . . . . . . . . . . 14

The Benefits and Burdens of Ownership of the Facility Remain with AWG. . . . 16

The Fixed Purchase Option is the Only Economically Rational
Choice for AWG. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Plaintiffs' Guaranteed Pretax Return under the Fixed Purchase Option is
Negative on a Net Present Value Basis. . . . . . . . . . . . . . . . . . . . . . . . . . 32

**Proposed Conclusions of Law** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

I.  **THE SILO TRANSACTION IS NOT PROPERLY CHARACTERIZED
AS A TRANSFER OF A DEPRECIABLE OWNERSHIP INTEREST
IN THE FACILITY TO PLAINTIFFS.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

II.  **PLAINTIFFS ARE NOT ENTITLED TO DEDUCT "INTEREST"
THEY CLAIM TO HAVE PAID ON THE "LOANS" FROM THE
GERMAN BANKS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

- i -

3084344.1

**III.**     **THE SILO TRANSACTION MUST BE DISREGARDED FOR TAX PURPOSES BECAUSE IT LACKS ECONOMIC SUBSTANCE**. . . . . . . . 44

**IV.**     **THE SERVICE PROPERLY DETERMINED THE APPLICABILITY OF PENALTIES AGAINST PLAINTIFFS**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

3084344.1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AWG LEASING TRUST, | : | |
| KSP INVESTMENTS, INC., | : | |
| AS TAX MATTERS PARTNER | : | |
| | : | |
| Plaintiff, | : | Case 1:07-CV-857 |
| | : | |
| v. | : | District Judge Gwin |
| | : | |
| UNITED STATES, | : | Magistrate Judge Hemann |
| | : | |
| Defendant. | : | |
| _____ | : | |

**DEFENDANT UNITED STATES'**
**PROPOSED FINDINGS OF FACT AND PROPOSED CONCLUSIONS OF LAW**

Pursuant to the Court's post-trial briefing order of January 30, 2008, the defendant United

States of America submits its Proposed Findings of Fact and Proposed Conclusions of Law.  An

electronic "e-brief" will be filed promptly.

**PROPOSED FINDINGS OF FACT**

The Court should find the following facts based on the evidence introduced at trial and

the stipulations of fact filed by the parties.  Parenthetical references at the end of each paragraph

cite the exhibits supporting each finding or cite the transcript of a witness' testimony supporting

each finding.

1.      This case involves a transaction commonly referred to by the government as a sale-in/lease-out ("SILO").  In a typical SILO transaction, a U.S. taxpayer purports to acquire assets from a tax-indifferent owner under a so-called "head lease" and simultaneously leases that property back to the owner under a so-called "sublease" or "leaseback." (Revock Dep. 16:9-17:17).

2.      The asset involved in the AWG SILO Transaction at issue is a waste disposal and electricity generating facility located in Wuppertal, Germany (the "Facility").  The Facility is a large, technologically-sophisticated complex designed to incinerate solid waste and to employ heat from burning waste to generate electricity.  The Facility was built in and has been in operation since 1976.  Like similar facilities in Europe, the Facility was designed and built as a "monument to posterity."  (Ellsworth Tr. 415:19 – 416:8; Gonzalez Tr. 370:21 – 371:21; Joint Ex. XXIV, at KSP0175821-24 (Duke Engineering Report); Plt. Ex. 119, at PNC0004930-34 (D&T Appraisal Report)).

## I.      THE PRINCIPALS IN THE AWG SILO TRANSACTION

3.      The participants in the SILO transaction at issue in this case (the "AWG SILO Transaction") are KSP Investments Inc. ("KSP") and PNC Capital Leasing LLC ("PNC Leasing"), each of which owns a 50% interest in the AWG Leasing Trust.  KSP and PNC Leasing are subsidiaries of the real parties in interest here, respectively KeyCorp ("Key") and PNC Financial Services Group, Inc. ("PNC").  Collectively, these parties are referred to as "Plaintiffs" herein. (Joint Stip. ¶¶ 1-3, 7, Joint Ex. VII, §4.01(e), at IRS-ADM-002849 (Trust Agreement)).

4.      The AWG Leasing Trust is a Delaware trust which is treated as a partnership for federal income tax purposes.  Ownership of the AWG Leasing Trust is divided on a 50/50 basis

between KSP, a wholly-owned subsidiary of Key, and PNC Leasing, a wholly-owned

subsidiary of PNC.  (Joint Stip.  ¶¶ 2-7; Joint Ex. VII, (Trust Agreement)).

5.     KSP was designated as the "Tax Matters Partner" for the trust under 26 U.S.C. Section

6231(a)(7) and, in that role, represented the AWG Leasing Trust during the audit  and

filed suit here on behalf of the AWG Leasing Trust.  (Joint Stip. ¶ 11).

6.     AWG Abfallwirtschaftgesellschaft mbH Wuppertal ("AWG") is a German corporation

owned and operated by a group of municipalities located in western Germany – the

largest of which is the city of Wuppertal.  AWG was founded in 1971 for the purpose of

converting household refuse and similar waste materials to energy by incineration.  AWG

has owned and operated the Facility since it became operational in 1976.  (Joint Stip. ¶¶

32, 33; Joint Ex. XXIV, at KSP0175821 (Duke Engineering Report); Plt. Ex. 80, at

KSP0169527 (Final Key Credit Package for AWG Trans.).

7.     AWG is treated as an independent corporation under German law, produces its own

financial statements, and pays German income taxes (both trade income taxes and

corporate income taxes) like any privately-held corporation.  (Schweiss Tr. 1060:12-22;

Joint Ex. XLIX (1998 AWG Annual Report)).

8.     In the mid-1990s AWG refurbished the Facility replacing the boilers, which are the "heart

of the Facility," the grates that load the waste into the boilers, and various ancillary

equipment, so that the after the refurbishment the Facility was "as good as brand new."

In fact in 1999, when Duke Engineering Services ("Duke") performed its engineering

assessment of the Facility, Duke concluded that the Facility was as good as a four year

old facility and estimated its useful life to be 46 years.  (Joint Stip. ¶¶ 50-51, 56;

Gonzalez Tr. 371:13 – 374:7, 393:25; Joint Ex. XXIV, at KSP0175816-16, 48 (Duke

Engineering Report)).

9.  AWG's revenue comes entirely from the Facility.  Dumping or "tipping" fees charged to

customers for disposal of their solid waste at the Facility constitutes 90.8% of the

revenues produced through operation of the Facility.  The Facility also produces revenues

through the sale of electricity and steam for heat to AWG's shareholder municipalities.

Significantly, the most important customers of the Facility are the municipalities which

own and control AWG and which, thereby, indirectly control the Facility, its operations,

and the fees they charge themselves.  (Joint Stip. ¶¶ 34-35; Plt. Ex. 119, at PNC0004991-

92 (D&T Appraisal Report); Joint Ex. XLIX (1998 AWG Annual Report)).

**Background of Key's and PNC's Leasing Businesses**

10.  Both Key and PNC have a long history of engaging in a range of domestic leasing

transactions as a means to maximize after-tax profits.  Those types of transactions include

small and mid-size ticket direct leases, and are far different in both form and substance

from cross-border transactions like the AWG SILO Transaction.  (Joint Stip. ¶¶ 27-29;

Shinderman Tr. 1106:1 – 1115-17).

11.  Prior to 1996 neither Key nor PNC engaged in any cross-border leveraged leasing

transactions.  However, after being approached by various arrangers in the mid-1990s,

both Key and PNC began to expand their leasing business to "big ticket" cross-border

transactions, specifically lease-in/lease-out ("LILO") transactions, and subsequently SILO

transactions like that involved here.  (Angel Tr. 223:19-21; Keener Tr. 321:5-6; 335:23 –

336:2; Dep. 28:4-15; Meighen Dep. 41:19 – 42:5; Joint Ex. LVI, at KSP0197639-42

(Leverage Lease Monthly Portfolio Reconciliation Report)).

12.  From 1996 through 1999, Key entered into approximately 37 LILO transactions, all of

3065030.1

which involved assets not subject to U.S. tax, located outside the United States, and owned by foreign entities.   One such LILO transaction, referred to as TAD, involved a waste-to-energy facility in Germany similar to the AWG Facility at issue in the AWG SILO Transaction. (Angel Tr. 59:13-25, 253:6-22; Joint Ex. LVI, at KSP0197639-42 (Leverage Lease Monthly Portfolio Reconciliation Report)).

13.   Similarly, PNC entered into a number of cross-border LILO transactions in 1998 and 1999.   In fact, PNC's first cross-border leverage lease was a LILO transaction that closed in 1998.  (Joint Stip. ¶ 28; Keener Tr. 335:11 – 336:2).

14.   Effective May 18, 1999, the Internal Revenue Service adopted final regulations under Section 467 of the Internal Revenue Code that reduced the tax benefits of LILO transactions, even if the form of such transactions were to be respected.  As a result of these regulations neither Key nor PNC participated in a LILO transaction after April 1, 1999.  (Angel Tr. 224:8-13; Joint Ex. LVI, at KSP0197639-42 (Leverage Lease Monthly Portfolio Reconciliation Report); 64 Fed. Reg. 26863 (May 18, 1999)).

15.   The closing date of Key's last LILO transaction was December 17, 1998. (Joint Ex. LVI, at KSP0197639-42 (Leverage Lease Monthly Portfolio Reconciliation Report)).

16.    After the adoption of the regulations under Section 467, both Key and PNC began entering into SILO transactions, which were a variant of sale-leaseback to service contract transactions that were used before the advent of LILO transactions.  The structure of SILO transactions, including the use of reciprocal loan and defeasance arrangements, was based on the standard LILO transaction structure developed by several law firms, including Chadbourne & Parke LLP.  (Angel Tr. 224:14-18; Meighen Dep. 48:17 – 49:2; Meilman Tr. 536-38; Joint Ex. LVI, at KSP0197639-42 (Leverage Lease Monthly

Portfolio Reconciliation Report); Gov't Ex. Z, at IRS-ADM-001623-24 (Key Asset Management Report); Gov't Ex. DDDDDD, at PNC0005841, 5853 (PNC Leasing Corp Presentation on Cross Border Lease Products).

17. From 1999 through 2004 Key entered into 31 SILO transactions, which are reported as service contracts in Key's internal leverage lease database. Like its LILOs, all of these SILO transactions involved assets owned by foreign entities not subject to U.S. tax. (Joint Ex. LVI, at KSP0197639-42 (Leverage Lease Monthly Portfolio Reconciliation Report))

18. Similarly, PNC, which had not entered into any leverage leases with service contracts prior to the issuance of the regulations under Section 467, entered into several SILO transactions. All of PNC's lease transactions in Europe and Asia are either LILO or SILO transactions. (McEnery Dep. 29:13-24; Meighen Dep. 48:17 – 49:2; Keener Tr. 336:3-18).

19. In 2004 the United States Congress enacted the American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 848, 118 Stat. 1418 (2004), which eliminated the tax benefits derived from SILO transactions executed after March 12, 2004. As a result, neither Key nor PNC participated in any SILO transactions (including cross-border lease to service contract transactions like the AWG SILO Transaction) after March 12, 2004. (Angel Tr. 224:19 – 225:9; Keener Tr. 336:11-14; Larkins Tr. 291:5-10).

20. The last SILO transaction involving Key closed on January 7, 2004. (Joint Ex. LVI, at KSP0197639-42 (Leverage Lease Monthly Portfolio Reconciliation Report).

## II.     THE AWG SILO TRANSACTION

### History of the AWG SILO Transaction

21. In early 1998, Macquarie Corporate Finance (USA), Inc., and Deutsche Anlagen-Leasing

GmBH ("DAL") began the process of arranging a U.S. leasing transaction involving the Facility. At this time, Macquarie contacted Deloitte & Touche LLP ("D&T") to provide appraisal services for the potential transaction. The only appraisal ever obtained by the Plaintiffs was prepared by D&T. (Joint Stip. ¶ 36; Angel Tr. 79:21 – 80:6; Ellsworth Tr. 407:2 – 409:3).

22. In April, 1998, Key Global Finance, an affiliate of Key that advises leasing companies, prepared an Offering Memorandum seeking one or more U.S. investors to invest in a LILO transaction involving the Facility totaling $250 million. (Joint Stip. ¶ 37; Bell Dep. 52:13 – 53:1; Def. Ex. E, at BOSTON0004087 (Letter Discussing FMV of Facility)).

23. Shortly after this Offering Memorandum was prepared, D&T indicated to Key that it believed it could appraise the value of the Facility at an amount considerably higher than $250 million. Def. Ex. E, at BOSTON0004087 (Letter Discussing FMV of Facility).

24. In June 1998, Key Global Finance prepared another Offering Memorandum seeking an equity investor to invest in a LILO transaction involving the Facility, this time totaling $450 million. (Joint Stip. ¶ 38; Joint Ex. LIII).

25. AWG was unable to come to terms with any potential lessor in 1998, and, at that point, D&T and Duke stopped their work on the proposed deal. (Joint Stip. ¶ 39; Gonzalez Tr. 368:10-17).

26. At the end of 1998, AWG retained new arrangers, PricewaterhouseCoopers Global Structure Finance Group ("PWC") and debis Financial Engineering GmbH, to again explore a cross-border lease transaction involving the Facility. (Joint Stip. ¶ 40).

27. In April 1999, PWC circulated an Equity Information Memorandum to prospective investors proposing a potential leasing transaction for the Facility to be structured as a

LILO or a lease to service contract transaction.  (Joint Stip. ¶ 41; Plt. Ex. 52, at IRS-ADM-000461 (AWG Equity Information Memorandum).

28.  On August 23, 1999, in response to the Equity Information Memorandum circulated by PWC, both Key and PNC issued conditional proposals to AWG to participate in a lease/service contract financing transaction valued at $425 million.  PNC proposed an aggregate equity investment of $27.625 million. Key issued a conditional proposal to AWG similar to PNC's proposal.  (Joint Stip. ¶¶ 42, 43; Joint Ex. XLI, at IRS-ADM-E0016 (PNC Leasing Proposal)).

29.  On August 26, 1999, Key and PNC issued a joint proposal to AWG, which AWG signed that same day.  There is no evidence that any competing bids existed at the time Plaintiffs made their conditional proposals.  (Angel Tr. 80:22-24; Joint Stip. ¶¶ 43, 45, 46).

## The Form Of The AWG SILO Transaction

30.  The AWG SILO Transaction, engineered to appear in form as a leveraged sale-leaseback, closed on December 7, 1999.  Plaintiffs and their lawyers and advisors generated over 2,000 pages of contracts and related closing documents among the parties, a complete list of which is contained in the Closing Memorandum (Joint Ex. I, pg. IRS-ADM-002063-64) that was drafted and executed as part of this transaction.  The transaction is memorialized in a series of interrelated agreements, governed by a Participation Agreement executed by all the parties to the AWG SILO Transaction.  (Joint Ex. I – XXV (transaction documents)).

31.  Under the so-called "Head Lease Agreement," Plaintiffs purported to lease the Facility from AWG for 75 years in exchange for what was called a "head lease rent" payment of $423 million payable in one lump sum payment at closing.  The Head Lease term of 75

years was designed to exceed the Facility's estimated useful life of 46 years so that

Plaintiffs could claim to "own" the Facility for U.S. tax purposes without actually

acquiring title to the Facility.  (Joint Stip. ¶ 75, Joint Ex. IV, §§ 3, 9(k), at IRS-ADM-

02730, 02735 (Head Lease Agreement); Joint Ex. XI, § 4, at IRS-ADM-003029-30 (Tax

Indeminity Agreement)).

32.    The $423 million price was based on an appraisal prepared by D&T.  (Joint Ex. XXIII

       (D&T Appraisal)).

33.    Of the $423 million head lease "rent" payment, only $55.1 million was actually paid in

       cash by Plaintiffs at the closing.  The remaining $368 million was obtained from the

       proceeds of purported long-term non-recourse loans from two German banks,

       Norddeutsche Landesbank ($331.1 million) and Landesbank Baden-Wurttenburg ($36.8

       million).  (Joint Ex. VIII (Loan and Security Agreement); Joint Ex. XXV, at IRS-ADM-

       000510 (Closing Funding Memorandum); Def. Graphic 1).

34.    Having purportedly conveyed a leasehold interest in the Facility to Plaintiffs, AWG

       purportedly executed a simultaneous Lease Agreement that "leased" the Facility right

       back to AWG for 25 years (the "Initial Lease Period") in exchange for a specified series

       of annual "rent" payments.  These so-called rent payments precisely match, in amount

       and timing, the principal and interest payments due on the so-called non-recourse loans.

       (Lys Tr. 880:1-17;  Meilman Tr. 535:2 – 536:1; Def. Graphic 2; compare Joint Ex. VI,

       Ex. B1, at IRS-ADM-002818 (Lease Agreement) to Joint Ex. VIII, Annex A to Loan

       Certificate – Series A, Annex to Loan Certificate - Series B, at IRS-ADM-002962, 2967

       (Loan and Security Agreement)).

35.    At the end of the Initial Lease Period in 2024, AWG can exercise a so-called "Fixed

Purchase Option" to reacquire Plaintiffs' interest in the Facility for a series of payments equal to approximately $521 million. Of that amount, $383 million would pay off the balances of the loans to the German banks, while the remainder—$138 million (or $26.5 million in 1999 dollars)—would go to Plaintiffs. (Lys Tr. 884:14 – 885:7; Def. Graphics 2, 3; Joint Ex. VI, §19, at IRS-ADM-002807-09, 2838 (Lease Agreement)).

36.  If AWG chooses not to exercise the Fixed Purchase Option—assuming that certain pre-conditions are met—it must enter into a 12-year Service Contract to buy waste disposal services from an entity to be selected by the Plaintiffs for amounts determined under a formula (the "Service Contract"). Under the Service Contract, AWG must guarantee that it will pay specified "capacity charges" over the term of the Service Contract for waste disposal services to the service provider. AWG will retain the right to charge its customers—ostensibly its municipal shareholders—tipping fees for disposing of their waste. However, the service provider will retain the right to any revenue earned from the sale of electricity and steam generated by the Facility. (Joint Stip. ¶¶ 103-05; Joint Ex. II, § 12, at IRS-ADM-002148-53 (Participation Agreement); Joint Ex. XIII, "Capacity Charge," "Direct Costs," § 6.7.1, IRS-ADM-003050, 3082, 3105 (January 1, 2024 Solid Waste Disposal Service Contract)).

37.  At the end of the 12-year Service Contract, AWG may terminate the Head Lease by paying Plaintiffs an amount equal to the fair market value of the Facility at that time. If AWG does not terminate the Head Lease at the end of the 12-year Service Contract, Plaintiffs will have control of the Facility for the duration of the Head Lease, leaving only bare title with AWG. (Joint Ex. XIII, § 17.2 at IRS-ADM-003102 (January 1, 2024 Solid Waste Disposal Service Contract)).

3065030.1

III.    **THE REALITY BEHIND THE FORM OF THE AWG SILO TRANSACTION**

38.    While the documents used to structure the AWG SILO Transaction are presented in a

form that contains elements of a typical leveraged lease, the reality behind the AWG

SILO transaction presents a different picture.  In fact, many of the key elements of the

AWG SILO transaction derive from a standard structure used by Plaintiffs' law firm

Chadbourne & Parke in the discredited LILO transactions (deals challenged by the IRS).

The only differences in the two transactions are the longer head lease term and service

contract alternative in the AWG SILO transaction, neither of which have any significance

if the Fixed Purchase Option is exercised.  (Meilman Tr. 536:11 – 538:18).

<u>**The Cash Flows At Closing**</u>

39.    In form, AWG receives the entire $423 million "head lease payment."  In reality AWG

does not receive or retain that amount.  Instead, almost all of the money (approximately

$383 million) is automatically and instantaneously transferred to other parties in the

AWG SILO Transaction.  AWG keeps only a $28.5 million fee (about 7% of the

purported head lease payment) for its own use. (Joint Ex. II (Participation Agreement);

Joint Ex. IX, § 2.01, at IRS-ADM-002973 (Series A Payment Undertaking Agreement);

Joint Ex. X § 2.01, at IRS-ADM-002999 (Nord LB Payment Undertaking Agreement);

Joint Ex. XV, "Strip PUA Fee," § 2.1, at IRS-ADM-003166 (Payment Undertaking

Agreement); Joint Ex. XXV, at IRS-ADM-00503-10 (Closing Funding Memorandum)).

40.    Under the form of the transaction, through a series of simultaneous book keeping entries

between accounts at the Wilmington Trust Company, approximately $368 million of the

$423 million "head lease payment" (i.e., the debt portion of that payment) was placed in

two Payment Undertaking Accounts (the "Debt PUAs").  The Debt PUAs are

3065030.1

"defeasance" accounts, meaning they are designed to prepay Plaintiffs' debt obligations under the AWG SILO transaction. These prearranged payments are made automatically regardless of whether the German cities use the Facility, and neither AWG nor its creditors can access these funds for any purpose until 2024. Rather, the money is held by an affiliate of Norddeutsche Landesbank, and dedicated to paying AWG's "rent" under the Lease, and Plaintiffs' debt service under the so-called loans, which precisely match in amount and timing. Indeed, the amounts placed in the Debt PUAs precisely match the amounts borrowed by Plaintiffs on the two loans placed through the Loan and Security Agreement. (Keener Tr. 342:2-8; Lys Tr. 880:1-17; Def. Graphic 2; Joint Ex. IX, § 2.01, at IRS-ADM-002973 (Series A Payment Undertaking Agreement); Joint Ex. XXV, at IRS-ADM-00503-10 (Closing Funding Memorandum); compare Joint Ex. VI, Ex. B1, at IRS-ADM-002818 (Lease Agreement) to Joint Ex. VIII, Annex A to Loan Certificate – Series A, Annex to Loan Certificate - Series B, at IRS-ADM-002962, 2967 (Loan and Security Agreement)).

41.    In addition, through a series of simultaneous book keeping entries between accounts at the Wilmington Trust Company, $26.5 million of the $423 million head lease payment is paid to AIG Matched Funding (a subsidiary of American International Group) ("AIG"), in the form of a "Payment Undertaking Agreement Fee" ("Equity PUA"), in exchange for a Payment Undertaking Agreement under which AIG must make payments of approximately $138 million (the "Equity PUA") in 2024. (Keener 341:7 – 342:19; Joint Ex. XV, "Strip PUA Fee," § 2.1, at IRS-ADM-003166 (Payment Undertaking Agreement); Joint Ex. XXV, at IRS-ADM-00503-10 (Closing Funding Memorandum)).

42.    This instantaneous disbursement of the so-called head lease payment to defeasance

3065030.1

accounts is inconsistent with typical leverage leases in the United States, where the lessee receives free use of 100% of the proceeds to spend as it sees fit, rather than locking the proceeds up in defeasance accounts that are beyond the lessee's control. (Shinderman Tr. 1106:20 – 1107:13).

43.     Besides the $55 million equity investment, Plaintiffs paid an additional $4.8 million to the arrangers, consultants, and lawyers who structured the deal. (Def. Ex. VVVVV (AWG Transaction Expense Detail)).

44.     The economic results of the form of the transaction on the closing date – setting aside intermediate payments – can be summarized as follows:

| Source of Funds | | Receivers of Funds | |
|---|---|---|---|
| German Banks | $367.9 million | German Banks (for Debt PUAs) | $367.9 million |
| Plaintiffs | 59.9 million | AIG (for Equity PUA) | 26.5 million |
| | | AWG | 28.6 million |
| | | Professional Service Fees | 4.8 million |
| | $427.8 million | | $427.8 million |

(Joint Ex. XXV, at IRS-ADM-00503-10 (Closing Funding Memorandum); Def. Ex. VVVVV (AWG Transaction Expense Detail)).

In substance, the only money that changed hands between Plaintiffs and AWG on the closing date was the $28.6 million paid by Plaintiffs to AWG. The so-called non-recourse loans and Debt PUAs constituted nothing more than a series of debts and credits to accounts maintained under the German banks' control. The amount paid to AIG for the Equity PUA will be returned to the Plaintiffs' either upon AWG's exercise of the Fixed Purchase Option or as capacity charges under the so-called Service Contract. (Angel Tr. 212:3-8; 240:9 – 241:8; Lys Tr. 880:1-17; Joint Ex. XXV, at IRS-ADM-00503-10 (Closing Funding Memorandum)).

## The Circular Money Flows During The Initial Lease Term

45.     In form, AWG is nominally responsible for the "rent" payments under the Lease

Agreement; in substance, those payments are made by the German banks under the PUAs,

not by AWG out of its own operating funds.  In form, the "rent" is purportedly owed to

Plaintiffs as lessor under the Lease Agreement, but in fact it goes directly to the two

lenders (one of whom is an affliate of the PUA bank).  Thus, in both form and substance,

Plaintiffs' debt service payments and AWG's rent—identical in timing and amount—are

both satisfied under the Debt PUAs, and there is no cash flowing between AWG and

Plaintiffs throughout the Initial Lease Period.  The payment of "rent" and offsetting

payment of the "loans" are merely accounting entries on the Plaintiffs' books.  (Angel Tr.

228:24 – 230:13; Keener Tr. 349:8 – 350:4; Lys Tr. 879:7 – 881:25; Gov't Graphic 2;

Joint Ex. VIII, Annex A to Loan Certificates A & B, at IRS-ADM-002962, 67 (Loan and

Security Agreement); (Joint Ex. IX, Schedule A, at IRS-ADM-002985 (Series A Payment

Undertaking Agreement); Joint Ex. X, Schedule A, at IRS-ADM-003012 (Nord LB

Payment Undertaking Agreement)).

46.     As result of these off-setting payment schedules the Plaintiffs receive no cash in this

transaction at anytime during the term of the Lease, with one immaterial exception.[1]

Thus, PNC's internal documents aptly described the loans from the German banks in

internal documents as "loop debt."  (Angel Tr. 228:24 – 230:13; Keener Tr. 349:18 –

---

[1] There is a de minimus fully defeased $1.2 million payment under the Lease and Equity PUA scheduled to be made to PNC from the Equity PUA on March 7, 2000. (Joint Ex. XLVI, at IRS-ADM-E0206 (PNC Purpose/Transaction Summary); Joint Ex. XV, Schedule A, at IRS-ADM-003183 (Payment Undertaking Agreement)).  This is the only payment to be made to the Plaintiffs during 24 year Lease term and is an insignificant amount compared to Plaintiffs' initial cash layout of $55.1 million.  Thus this payment is immaterial to the substance of the transaction. (Lys Tr. 919: 16-20).

350:4; Lys Tr. 879:7 – 880:17; Def. Ex. DDDDDD, at PNC0005840 (PNC Leasing Corp

Presentation on Cross Border Lease Products)).

47.     Furthermore, at the end of the Initial Lease Period, if AWG exercises the Fixed Purchase

Option, the Debt PUAs automatically release their funds to the lenders.  Not surprisingly,

the proceeds in the Debt PUAs in 2024 precisely match the outstanding loan balances as

of that date.  Thus, the entire proceeds of the loans will return directly to the lenders, and

neither Plaintiffs nor AWG will pay a single penny from their own funds toward

repayment of those loans.  (Angel Tr. 244:17 – 245:13; Joint Ex. VI, § 19(b), at IRS-

ADM-002808 (Lease Agreement); Joint Ex. VIII, at IRS-ADM-002910 (Loan and

Security Agreement)).

48.     At the end of the Initial Lease Period, if AWG exercises the Fixed Purchase Option, the

proceeds of the Equity PUA (approximately $138 million or $26.5 million in 1999

dollars) automatically release to Plaintiffs.  This represents Plaintiffs' "return" on its

equity "investment" in the transaction.  Thus, the $55.1 million "equity" investment is

returned to Plaintiffs with a guaranteed rate of return, albeit a low pre-tax rate of return,

worth far less than the original $55.1 million equity contribution by Plaintiffs.  (Lys Tr.

883:12-22; Joint Ex. XV, §3.2(a)(I), at IRS-ADM-003170; Def. Graphics 2, 3).

49.     The following charts summarizes the circular nature of these payments:



(Def. Graphic 3).

**The Benefits And Burdens Of Ownership Of The Facility Remain With AWG**

50.     In  form, the transaction is that of a sale of the Facility to Plaintiffs and a leaseback to

AWG.  In substance, the transaction does not give Plaintiffs current ownership of the

Facility for any purpose other than harvesting U.S. depreciation deductions. (Lys Tr.

885:8 – 886:1).

51.     The AWG SILO was structured to ensure that it would not be treated as a sale of

ownership of the Facility under German law.  For instance, Plaintiffs did not take legal

title of the Facility.  (Angel 257:8-23, Heisse Tr. 1023:5 – 1024:1; Joint. XXVIII, at

CLIF-005512 (Due Finance German Tax Ruling Request)).

52.     During the Initial Lease Period, AWG continues to run the Facility in precisely the same

way it has run the Facility since 1976—as if the AWG SILO Transaction never occurred.

Indeed, AWG is guaranteed the right to "quiet enjoyment" of the Facility (§ 4c) and

Plaintiffs are only allowed to inspect the Facility on one calendar day each year (§ 12). (Joint Ex. VI, at IRS-ADM-002778, IRS-ADM-002796 (Lease Agreement)).

53.   AWG is required to maintain insurance on the Facility (§ 11), required to maintain the Facility at its own expense (§ 7a), required operate the Facility in compliance with applicable German law (§ 8), required to make capital improvements to the Facility at its own expense (§ 7c), and takes depreciation on the Facility for German tax purposes. Plaintiffs' engineering expert candidly acknowledged that, under the Lease, AWG will not have to make any changes to the manner in which it previously operated and maintained the Facility.  (Gonzalez Tr. 385:17 – 387:14, 390:16-22; Joint Ex. VI, at IRS-ADM-002781-002782, 2785, 2792 (Lease Agreement)).

54.   AWG  remains solely responsible for environmental liabilities related to the Facility. Plaintiffs purposely insulated themselves from any German environmental liability by making sure that they did not, for German law purposes, become the owner of the Facility. (Angel Tr. 227:6-14; Heisse 1024:2-16; Plt. Ex. 87, at KSP0169558-169559 (Asset Management Evaluation Report); Joint Ex. XLVI, at IRS-ADM-E0213 PNC Purpose/Transaction Summary)).

55.   If the AWG SILO Transaction constituted a sale under German real estate, environmental, and regulatory law, there would have been substantial legal, regulatory, and German tax implications.  Plaintiffs would have been required to undertake (and, in fact, did not undertake) substantial regulatory burdens and potential liability if the AWG SILO Transaction were treated as a sale of the Facility.   (Heisse Tr. 1024:2-18; Jacob Tr. 713:5-20; Schweiss Tr. 1059:3 – 1060:11).

56.   AWG has not treated the AWG SILO Transaction as a "sale" of its interest in the Facility.

3065030.1

Indeed, AWG holds title to the Facility and continues to account for the Facility as an asset on its audited financial statements and on its tax balance sheet. In fact, AWG continues to depreciate the Facility for corporate and trade income tax purposes. Key is aware of AWG's treatment of the Facility on its books and for tax purposes. (Angel Tr. 252:20-25; Jacob Tr. 741:8 – 742:1; Schweiss Tr. 1061:2-22; Plt. Ex. 106, at 1-2; Plt. Ex. 107, at 1-2).

57.   Due to the offsetting "rent" and "loan" payments between the German banks, AWG will not have to use its own funds to pay rent during the Initial Lease Period. As Plaintiffs' economic expert acknowledged, the AWG SILO transaction does not produce any economic benefit for either AWG or Plaintiffs, except tax deductions, during the initial lease period. The only part of the AWG SILO transaction which could generate any pre-tax economic benefits is the Service Contract that would not begin until 2024. (Graves Tr. 823-24; Lys Tr. 874; Joint Ex. XLVI, at IRS-ADM-E0211 (PNC Purpose/Transaction Summary)).

58.   The representations AWG made (with the participation and approval of Plaintiffs) to the German tax authorities before closing the AWG SILO transaction confirm no change of ownership. In a request for a binding tax ruling on the tax consequences of the AWG SILO Transaction for AWG, AWG asserted that it would retain "economic ownership" of the Facility throughout the duration of the AWG SILO transaction, so long as the Fixed Purchase Option was exercised.[2] In this regard, AWG advised the German taxing authorities that:

---

[2] Even if the Fixed Purchase Option is not exercised, AWG has all economic rights in the Facility for the entire Initial Lease Term.

3065030.1

> the head lease and sublease are entered into simultaneously,
> so that possession, use, and the obligations will at no time –
> not even for one legal second – be transferred to the U.S.
> Trust, if [AWG] exercises the [Fixed Purchase Option].

(Joint. XXVIII, at CLIF-005512 (Due Finance German Tax Ruling Request)).

59.    In substance, the AWG transaction is fundamentally different from a typical leveraged

       lease between two U.S. taxpayers in which the benefits and burdens of ownership would

       pass to the lessor.  (Shinderman Tr. 1106:15-17).

60.    In a typical leveraged lease, the lessor bears three kinds of risk: credit risk (the risk of a

       default by the lessee on its payments during the lease term), residual risk (the risk that at

       the end of the lease term the asset will have lost value), and remarketing risk (the risk that

       at the end of the lease term, the lessee will return the asset to the lessor, who would then

       be forced to find a new purchaser or lessee for that asset). (Shinderman Tr. 1107:19-24,

       1109:5-15, 1115:4-20).

61.    The AWG transaction carries no meaningful credit risk.  AWG's "rent" obligations under

       the Lease were pre-funded by the German Banks through the Debt PUAs, making

       payment default "quite unlikely."  In addition, the Fixed Purchase Option guarantees

       Plaintiffs a predetermined return on their equity "investment" in the transaction, albeit a

       low return.   Key is unaware of any PUA providers going bankrupt. (Angel Tr. 221:18-

       21; Meilman Tr. 526:9-17; Shinderman Tr. 1115:4 – 1116:16).

62.    In a typical leverage lease, the lessor takes on the credit risk of the lessee who is the

       primary source for paying rent in the transaction out of its own funds.  (Shinderman

       1108:1-15).

63.    Plaintiffs' return is guaranteed through additional mechanisms in the structure of the

AWG SILO transaction.  The AWG SILO Transaction includes a guaranty from the municipal shareholders of AWG, backed by the full faith and credit of the German federal government.  There is also a letter of credit that provides credit protection for a prescribed "termination value," that even if AWG goes bankrupt Plaintiffs are guaranteed a positive rate of return. Key expected the letter of credit to supplement the defeasance accounts to ensure that the Plaintiffs would be made whole in the event of  an early termination and regarded the termination values as investment protection.  Even if the AWG SILO Transaction ended prematurely due to a termination event such as expropriation, the Plaintiffs made sure they would receive any compensation paid.  Also, in the case of a default which triggered a termination payment, the Plaintiffs would demand payment from AWG and liquidate the collateral in the PUAs to meet their debt payment obligations.  (Angel Tr. 152:1-11; 166:4-11; 234:7-25; 225:24-25; Shinderman Tr. 1115:4 – 1116:16; Joint Ex. IV, § 7, at IRS-ADM-002733 (Head Lease); Joint Ex. XVI (Irrevocable Transferable Standby Letter of Credit); Joint Ex. XII (Guaranty Agreement); Joint Ex. XLVI, at IRS-ADM-E0208, 214 (PNC Purpose/Transaction Summary); Plt. Ex. 80, at KSP0169525-169532 (Final Key Credit Package for AWG Transaction)).

64.     As part of its evaluation of the AWG SILO Transaction Key prepared a memorandum evaluating the credit risk Key was exposed to in the transaction.  In evaluating the credit risk of the SILO Transaction, Key focused its analysis on the Equity PUA, letter of credit, guarantee from AWG's municipalities, and the Debt PUAs as material strengths in the SILO Transaction.  It noted that AWG's poor financial performance as a weakness in the transaction, but concluded that it was mitigated by the guarantee from AWG's municipal

3065030.1

shareholders.   (Plt. Ex. 80, at KSP0169528 – KSP169535 (Final Key Credit Package for AWG Transaction)).

65.   PNC also prepared a credit memorandum as part of its evaluation of the AWG SILO Transaction, which was approved by various executives in PNC's leasing business.  In this memorandum, PNC documented its understanding that the primary source of payment in the AWG SILO Transaction was the PUAs and the letter of credit.  It was on the strength of the PUAs and the letter of credit that PNC rated the credit risk of the AWG SILO Transaction as a "1,"  on a scale of 1 to 6, signifying that the AWG SILO Transaction had the lowest possible credit risk.  (Keener Tr. 355:9 – 357:7, 358:22 – 359:19; Joint Ex. XLVI, at IRS-ADM-E0214 (PNC Purpose/Transaction Summary); Joint Ex. XLIV, at IRS-ADM-E0140 (PNC General Industries Risk Rating Grid)).

66.   Also unlike a typical leveraged lease, Plaintiffs likewise do not bear any remarketing risk at end of the Initial Lease Term, because there is nothing to remarket. Under no circumstances will Plaintiffs be left holding the Facility in 2024 at the end of the lease term. AWG will retain the Facility either by virtue of exercising the Fixed Purchase Option, or as a customer in the Service Contract. (Shinderman Tr. 1116:17 – 1117:3).

67.   In addition, in contrast with a typical leveraged lease, the AWG SILO transaction was purposely structured to effectively eliminate any residual risk.  Plaintiffs will assume no residual risk in the event that the Fixed Purchase Option is exercised. Even in the event that the Fixed Purchase Option is not exercised (which is unlikely, as explained below), any residual risk is mitigated by the Service Contract, which will provide Plaintiffs with a virtually guaranteed return on their investment through the capacity charges.  Indeed,

- 21 -

PNC's own documents acknowledged that the capacity charges effectively mitigate any residual risk in the Service Contract.  (Keener 351:6 – 353:19; Shinderman Tr. 1115:16-20, 1117:4-11; Def. Ex. DDDDDD, at PNC0005857 (PNC Leasing Corp Presentation on Cross Border Lease Products)).

68.    While the AWG transaction differs in these key respects from a typical leveraged lease, its structure is strikingly similar to the LILO transaction structure Plaintiffs had abandoned (due to changes in the tax laws) just before the AWG transaction closed. Indeed, the main features of the AWG transaction (such as the use of two separate loans instead of one and the use of Payment Undertaking Agreements to defease those loans) were part of the standard structure used by Plaintiffs' tax lawyers at Chadbourne and Parke for LILO transactions.  (Meilman Tr. 536:5 – 538:25).

69.    Thus, while the form of the AWG SILO transaction purports to effect a "deemed sale" through a leveraged lease that gives Plaintiffs a current ownership interest in the Facility, the substance of that transaction does not convey any benefits and burdens of ownership from AWG to Plaintiffs at any time during the Initial Lease Term.  At best, even assuming that the benefits and burdens of ownership would shift to Plaintiffs under the Service Contract, the benefits and burdens of ownership would not shift to Plaintiffs until 2024 – and then only if AWG does not exercise the Fixed Purchase Option.

**The Fixed Purchase Option Is The Only Economically Rational Choice For AWG**

70.    It is unlikely that Plaintiffs would ever enjoy that future ownership interest in the Facility, because AWG will likely exercise the Fixed Purchase Option.  (Lys Tr. 885:8 – 886:1).

71.    The Fixed Purchase Option is a "cashless option" for AWG because the amount of the

- 22 -                                           3065030.1

Fixed Purchase Option, $521 million, is precisely equal to the total funds scheduled to be held by the German banks and AIG under the respective PUAs on the Fixed Purchase Option Date.  Thus, AWG is not required to supply any of the funds necessary to exercise the Fixed Purchase Option.  Upon exercise of the Fixed Purchase Option, the money credited to the Debt and Equity PUAs would be released – but not to AWG.  Instead, the funds credited to the Debt PUAs held by Norddeutsche Landesbank would be used to satisfy the amounts supposedly owed by Plaintiffs to the German banks and the balance of the Equity PUA will be returned to Plaintiffs as a return on equity.  At that point, on paper, AWG will regain unfettered ownership of the Facility and the AWG SILO Transaction will end.  (Angel Tr. 244:17 – 245:13; Lys Tr. 882:19 – 884:13; Def. Graphic 3; Joint Ex. VI §§ 18, 19(b), and Exhibit F, at IRS-ADM-002807–2808, 2836 (Lease Agreement); Joint Ex. VIII, at IRS-ADM-002910 (Loan and Security Agreement); Joint Ex. XV, §3.2(a)(I), at IRS-ADM-003170 (Payment Undertaking Agreement; Def. Graphics 2, 3).

72.     While the cashless nature of the Fixed Purchase Option strongly suggests that AWG will exercise this option in 2024, the adverse consequences to AWG under the Service Contract alternative ensures that result.  To review, if AWG does not elect the cashless Fixed Purchase Option, AWG is required to enter the Service Contract in 2024.  Under that scenario, Plaintiffs must designate a previously unidentified service provider to replace AWG as the operator of the Facility.  AWG would become the mere "customer" and must guarantee that it will pay specified "capacity charges" over the next 12 years (until 2036) for waste disposal services (although the service provider will retain the right

- 23 -                                          3065030.1

to resell electricity and steam generated at the Facility).  (Joint Ex. II, § 12 at IRS-ADM-002149–2153 (Participation Agreement); Joint Ex. XIII §§ 2, 3, 5, at IRS-ADM-003093–3094, 3100 (January 1, 2024 Solid Waste Disposal Service Contract)).

73.  Although under the form of the agreements, AWG is entitled (assuming it does not exercise the Fixed Purchase Option) to receive the proceeds of the three PUAs, or approximately $521 million, the value of those funds to AWG will be largely offset by the capacity charges it must pay under the Service Contract.  (Lys Tr. 884:14 – 885:13).

74.  In its analysis D&T concluded that AWG will incur an additional DM 1.610 billion (or $851.9 million in U.S. dollars) of capacity charges over and above the operating and maintenance expenses it will incur under both the Fixed Purchase Option and Service Contract alternatives.[3]  This amount will have to be paid out of AWG's operating funds under the Service Contract, but will not be incurred by AWG under the Fixed Purchase Option.  (Plt. Ex. 119, Exhibit XI and XV, at PNC0005159-5165, 5175-5177 (D&T Appraisal Report).

75.  The capacity charge under the Service Contract consists of three components: (i) a debt component that is equal to the debt service on the so-called non-recourse loans AWG must obtain on behalf of the Plaintiffs as a pre-condition for entering into the Service Contract; (ii) an equity component; and (iii) the actual operating and maintenance

---

[3] This amount is calculated using D&T's discounted cash flow analysis of the Service Contract, by summing the cash flows, for the years 2024 through 2036,  from the line items labeled "Capacity Charges (Base Amount)," "Capacity Charges (Excess Amount)," and "Management Fees."  (Plt. Ex. 119, at PNC0005175-5177 (D&T Appraisal Report).  These amounts represent the debt and equity portions of the capacity charges and the ten percent management fee that will be charged to AWG by the service provider.  This amount is converted to U.S. dollars using D&T's conversion rate of DM 1.89 to $1.00. (Plt. Ex. 119, at PNC0004996 (D&T Appraisal Report).

3065030.1

expense incurred by the service provider, plus a management fee equal to ten percent of actual operating and maintenance expenses. (Joint Ex. XIII, §§ 6.7.1 6.1.2, at IRS-ADM-003100-3101, 3105 (January 1, 2024 Solid Waste Disposal Service Contract)).

76.    At the end of the 12-year Service Contract, AWG may terminate the Head Lease by paying Plaintiffs the fair market value of the Facility at that time, although unlike the Fixed Purchase Option—which was pre-funded on the closing date—no funds have been dedicated to facilitate the exercise of this option.  Consequently, if AWG wished to exercise the purchase option at the end of the Service Contract it must do so using its own funds.  If AWG is unable (or unwilling) to do so, Plaintiffs will have control of the Facility for the duration of the Head Lease, leaving only bare title with AWG.  (Graves Tr. 840:25-841:16; Joint Ex. II (Participation Agreement); Joint Ex. XIII, § 17.2, at IRS-ADM-003122 (January 1, 2024 Solid Waste Disposal Service Contract)).

77.    As part of its argument that Plaintiffs have an "ownership" interest in the Facility, they rely on a so-called "compulsion analysis" performed by D&T to demonstrate that AWG is more likely than not to enter the Service Contract. (Angel 176:19 – 177:2;Plt. Ex. 119, Conclusion 12, at PNC0004919 (D&T Appraisal Report)).

78.    D&T's so-called "compulsion analysis" compares the present value (in 1999) of the economic consequences to AWG under the Service Contract and the Fixed Purchase Option.  D&T erroneously concluded that the present value of the projected economic benefits to AWG under the Service Contract is 2% of the Facility's fair market value as of 1999; while the present value of the economic benefits under the Fixed Purchase Option are negative 10% of the Facility's fair market value as of 1999.  Thus D&T

- 25 -

3065030.1

concluded that the Service Contract was more attractive to AWG.  (Plt. Ex. 119, §IX(C), at PNC0005004-5005 (D&T Appraisal Report)).

79.     As outlined below, the evidence at trial showed D&T's "compulsion analysis" to be wrong for four reasons: (1) D&T made erroneous assumptions under German tax law resulting in an asymmetrical treatment of the Service Contract's tax consequences to AWG; (2) D&T used the wrong German corporate tax rate; (3) AWG cannot satisfy the condition precedent to the Service Contract that it refinance Plaintiffs' so-called non-recourse loans; and (4) D&T did not analyze the impediments to the Service Contract under German law that are not accounted for in the transaction documents and not under AWG's control.

80.     All of the parties agree that D&T made crucial mistakes in their purported "compulsion analysis" concerning the effect of German tax law on AWG's options.[4]  First, D&T

---

[4] Both D&T's appraisal and its appraiser Richard Ellsworth lack credibility in several other respects as well.  For instance, in its discounted cash flow and market comparable methods for estimating the value of the Facility, D&T ignored AWG's actual financial history, as set forth in its audited financial statements, and instead based its calculations off an inflated "estimate" of AWG's past and future financial performance that ignored AWG's actual historical earnings from tipping fees.  D&T did no research as to whether its "market" tipping fees were reasonable given the political considerations that resulted in AWG's financial relationship with its municipal shareholders/customers.  (Ellsworth 481:10 – 485:12; Ernst Tr. 951:12 – 953:19; Def. Graphic 7; Plt. Ex. 45, at DT 000043)

In addition, in its cost analysis D&T inflated the cost of building the Facility in 1976 to 1999 dollars without conducting any research as to how changing technology in the waste-to-energy industry would affect the cost of constructing a new Facility 1999.  D&T's cost analysis is also inappropriately inflated by a turnkey premium and capitalized interest (at an arbitrarily high rate of 12.75%).  (Ellsworth Tr. 435:8 – 442:13)

This and other dubious assumptions caused D&T to inflate the value of the Facility in 1999 by as much as 100% over a calculation of the value of the Facility using assumptions based on AWG's actual historical financial performance.  This inflated valuation served primarily to increase the amount of the interest and depreciation deductions Plaintiffs would claim for Federal income tax purposes.  As the appraiser for approximately 100 LILO transactions and a number of SILO transactions – the magnitude

erroneously assumed that, under the Service Contract, AWG would receive a tax benefit

by deducting the capacity charges it will be required to pay, but it would not incur a tax

liability as result of receiving $521 million from the PUAs upon entering the Service

Contract.  Second, D&T erroneously assumed that the applicable German tax rate in 2024

would be identical to the United States' 1999 corporate income tax rate of 40.85%.

(Jacob Tr. 731:12 – 733:6, 754:9 – 761:6; Schweiss Tr. 1055:20 – 1056:11; Ellsworth Tr.

503:24 – 504:13; Plt. Ex. 119, Exhibit XV, at PNC0005175-5177 (D&T Appraisal

Report)).

81.     Similarly, Plaintiffs' economics expert Frank Graves relied on those same assumptions in

his analysis of the likelihood that AWG would exercise the FPO instead of taking the

Service Contract, without either making any independent verification of those

assumptions or performing further analysis to determine whether changing those

assumptions would change the result of his calculations.  D&T made no effort to verify

either of those assumptions, even though D&T itself had German tax lawyers and

advisors who could have reviewed those assumptions.  Ellsworth Tr. 502:19 – 506:23;

Graves Tr.  831:22 – 838:16).

82.     These assumptions are undisputedly false, as admitted by Plaintiffs' own expert in

German tax law (id.) and explained further by the United States' German tax law expert.

(Jacob Tr. 731:12 – 733:6, 754:9 – 758:23, 758:24 – 761:6; Schweiss Tr. 1055:20 –

1056:11, 1064:5 – 1067:24).

---

of which he could not recall at trial, Mr. Ellsworth is very familiar with the favorable tax consequences
that result from an inflated value of the Facility.  (Ellsworth 507:14 – 508:25; Manfred 968:25 – 969:8;
Def. Graphic 12).

83. First, D&T incorrectly assumed asymmetrical tax consequences to AWG under the Service Contract when it failed to account for the tax liability AWG would incur as result of receiving $521 million from the PUAs.  Even Plaintiffs' German tax expert agreed that AWG's receipt of the funds in the PUAs under the Service Contract would trigger a taxable event.  Plaintiffs' expert also agreed that should AWG be able to eliminate its tax burden under the Service Contract, that fact would eliminate AWG's ability to deduct the capacity charge. (Jacob Tr. 719:2 – 722:24, 726:9 – 727:24, 743:5-7, 754:9 – 761:6).

84. Second, D&T incorrectly assumed a German tax rate in its analysis of 40.85%, which was actually a U.S. tax rate.  According to Plaintiffs' German tax expert, it was widely known in 1999 that the German corporate tax rate was scheduled to be reduced to 15% in 2008.  Furthermore, according to Plaintiffs' German tax expert, the local trade income tax would be a wash for AWG since it would in essence be paying any such tax to its own municipal shareholders. In other words, that tax would not be viewed as a negative.  (Jacob Tr. 731:12 – 733:6).

85. Correcting either one of D&T's erroneous assumptions makes the Fixed Purchase Option the economically dominant alternative from AWG's perspective. AWG would rationally elect the Fixed Purchase Option rather than enter the Service Contract.   (Lys Tr. 888:4 – 900:15).

86. As explained by Dr. Tom Lys, the United States' economic expert, when correcting D&T's erroneous asymmetrical tax treatment of the Service Contract alternative – that is by treating the capacity charges under the Service Contract as deductible, but recognizing the receipt of $521 million from the PUAs as a taxable gain – while still using D&T's

- 28 -

inflated tax rate of 40.85%, the present value of the Service Contract alternative is reduced by roughly $205 million.  Since the present value of the Fixed Purchase Option alternative is not affected by those assumptions, it would not change, and the Fixed Purchase Option becomes economically advantageous by roughly $160 million.  In other words, the cashless Fixed Purchase Option is less expensive to AWG than the Service Contract.  (Lys Tr. 888:4-891:18).

87.  Dr. Lys' opinion holds true even using the German tax assumptions provided by Mr. Jacob, and the asymmetrical tax treatment assumed by D&T.  As Dr. Lys explained, when correcting for the tax rate used by D&T – that is using the 15% tax rate that Plaintiffs' German tax expert admits was appropriate, while maintaining D&T's asymmetrical tax treatment of the Service Contract – the Fixed Purchase Option becomes the economically dominant alternative for AWG.  In fact, for any German tax rate below 29%—a rate Mr. Jacob suggested was a virtual certainty to be overstated by 2024—the Fixed Purchase Option is less expensive than the  Service Contract, even under D&T's asymmetrical tax treatment of the Service Contract.  (Lys Tr. 891:19 – 900:15).

88.  Even if the Fixed Purchase Option were not the economically rational choice, AWG is still likely to select the Fixed Purchase Option because AWG probably could not satisfy the conditions precedent to the Service Contract in those situations in which AWG would want to do so.  (Lys Tr. 904:4 – 908:12).

89.  One of those conditions precedent is that AWG must arrange for a non-recourse refinancing of $383 million in non-recourse debt that will remain outstanding in 2024.  AWG is not permitted to defease the obligations under the refinanced loan.  (Joint Ex. II,

- 29 -

§ 12(x) at IRS-ADM-002149-50 (Participation Agreement)).

90. Non-recourse financing requires lenders to analyze the value of the collateral that will

secure the non-recourse loan.  This analysis is quantified as a loan-to-value ratio, which is

calculated by dividing the principal amount of the loan by the value of the collateral.

Loan-to-value ratios are calculated assuming default by the borrower.  In this case, that

would require a lender to disregard the the capacity charges under the Service Contract as

a source of collateral, since those funds will only exist if the Facility was operating,

which would not be the case if a default occurred.  In a default, the only asset of value the

lender could rely upon to satisfy its note is the Facility itself.  (Lys Tr. 901:3 – 907:12).

91. Dr. Lys testified that a study by Societe Generale, a very large French bank, found that the

loan-to-value ratios in Germany were generally less than 67 percent during 2005.   At that

level, the maximum amount that could be borrowed against the Facility in 2024 is $261.3

million, assuming D&T's projected value of the Facility in 2024 of $390 million.  This

amount is far less than the $383 million needed to refinance the so-called non-recourse

loans.  As a result, Dr. Lys concluded that AWG would not be able to obtain non-recourse

financing as required for it to enter the Service Contract.   (Lys Tr. 901:3 – 907:12; Angel

Tr. 255:1-9).

92. Dr. Lys' analysis further demonstrates that it is a virtual certainty that AWG will exercise

the Fixed Purchase Option.  To illustrate, if the value of the Facility appreciates

sufficiently so that the loan-to-value ratio in 2024 is such that AWG could obtain non-

recourse financing for the Plaintiffs, then AWG would not want to enter into the Service

Contract because it would prefer to keep the Facility for itself, because its value would be

- 30 -

so much higher.  If, on the other hand, the value of the Facility declines to the point that AWG would be tempted to accept the $521 million instead of retaining the Facility, AWG will be unable to obtain the necessary non-recourse financing as a required prerequisite to entering the Service Contract.  (Lys Tr. 907:13 – 908:10).

93.   Similarly, if the exchange rate between US dollars and Euros changes so that the dollar depreciates in value relative to the Euro (as has happened since 1999), then the Facility becomes even more valuable to AWG, while the value of the $521 million would be worth less in Euros, and AWG would rationally prefer to retain the Facility rather than enter the Service Contract.  On the other hand, if the dollar appreciates in value relative to the Euro, the Facility (located in a country that has adopted the Euro as its currency) would correspondingly decline in value, making the Facility inadequate as collateral for refinancing the (dollar-denominated) loans.  (Graves Tr. 807:20 – 810:8).

94.   AWG would have to meet other requirements as well before it could enter into the Service Contract.  For instance, AWG must certify that the Facility meets certain maintenance and operating tests and no "loss event" has occurred.  As such, AWG could not to enter the Service Contract if the Facility was damaged, out of repair, or subject to environmental liability.  (Joint Ex. II, § 12(b), at IRS-ADM-002149-2152).

95.   Finally, AWG must meet other requirements under German law outside of its control that were not addressed in the transaction documents.  For example, AWG's municipal shareholders must guarantee AWG's obligations under the Service Contract, these guarantees must be approved by the county of Dusseldorf (the county in which AWG's municipal shareholders are located), the service provider selected by Plaintiffs to run the

3065030.1

Facility would have to meet the necessary requirements to be certified for waste disposal

in Germany, AWG must obtain the consent of its current customers before entering the

Service Contract, and AWG must offer other employment or severance pay to any of its

employees who do not wish to work for the service provider.  (Heisse Tr. 1026:1 –

1035:24).

96.     In contrast to these burdensome preconditions to the Service Contract, AWG can freely

        elect the Fixed Purchase Option without preconditions and without bearing any of the

        costs listed above. (Angel Tr. 244:5 – 248:4; Heisse Tr. 1026:10-25).

97.     Thus, the Fixed Purchase Option is the only economically rational and commercially

        viable choice for AWG to make in 2024, and AWG is extremely unlikely to reject the

        Fixed Purchase Option and accept the Service Contract. (Lys Tr. 914:5 – 915:18).

**Plaintiffs' Guaranteed Pretax Return Under
The Fixed Purchase Option Is Negative On A Net Present Value Basis**

98.     In absolute terms, not corrected for inflation, the amount Plaintiffs would receive from

        the AIG PUA upon exercise of the Fixed Purchase Option in 2024 is greater than the

        $55.1 million they put in 24 years earlier (roughly $138 million).   (Lys Tr. 908:13 –

        912:4; Def. Graphic 4).

99.     However, putting aside the considerable tax benefits that Plaintiffs claim and even

        ignoring transaction costs, the AWG SILO Transaction has a net present value,

        accounting for inflation, of negative $28.6 million.  So Plaintiffs will actually lose money

        on the transaction.  Plaintiffs invested $55.1 million in 1999 dollars only to receive the

        net present value equivalent of $26.5 million (in 1999 dollars) 24 years later.  (Lys. Tr.

- 32 -

910:6-11; Def. Graphic 4).

100.   The $26.5 million (in 1999 dollars) that Plaintiffs receive from the Equity PUA over a 24

year period has an internal rate of return of approximately 3.2%, a return confirmed by

Plaintiffs' expert.  Key incurred a 4.63% borrowing rate Key on its interest-bearing

liabilities for 1999.  Thus  the internal rate of return Plaintiffs' expect to earn on the

Equity PUA represents a loss if viewed in terms of opportunity cost.  This internal rate of

return is also significantly less than the prime rate PNC charged its customers.  (Lys Tr.

910:21 – 912:4; Graves Tr. 804:13-17; Keener Tr. 334:8-15; Joint Ex. LXIV, Figure 5,

pg. 37 (KeyCorp's 1999 Form 10-K Annual Report).

101.   Had Plaintiffs invested their initial cash outlay of $55.1 million in the same manner as

AIG invested the $26.5 million it received under the Equity PUA, Plaintiffs' pre-tax

return would have been roughly $270 million – nearly double the payment under the

Equity PUA.  (Lys Tr. 910:21 – 912:4; Def. Graphic 4).

102.   Plaintiffs will only enjoy a positive return, on a net present value basis, by taking U.S. tax

deductions into account.  Plaintiffs' own expert testified that in connection with a

leveraged lease of the type in this case, during the initial lease term, all of the cash flows

are going to be generated from the tax benefits.  (Hurd Tr. 641:8-16; Keener Tr. 345:3-

14; Lys 910:12 – 911:5; Def. Graphic 4).

103.   Reflecting this fact, PNC internal documents indicate that the economics driving AWG

SILO Transactions using the service contract structure (like AWG) was the "accelerated

depreciation" that would result, not any expected pretax returns from the deal.  (Keener

Tr. 350:10 – 353:18;  Def. Ex. DDDDDD, at PNC0005852).

- 33 -

104.    To the extent that any proposed finding of fact is more properly characterized as a

conclusion of law, it should be deemed a conclusion of law.

### PROPOSED CONCLUSIONS OF LAW

A.      The governing statute, Section 6226(f) of the Internal Revenue Code of 1986, as amended

to the period in issue (the "Code"), requires the Court to –

> determine all partnership items of the partnership
> for the partnership taxable year to which the notice
> of final partnership administrative adjustment
> relates, the proper allocation of such items among
> the partners, and the applicability of any penalty,
> addition to tax, or additional amount which relates
> to an adjustment to a partnership item.

B.      This Court makes a de novo determination in resolving this case and may sustain the

Service's determinations based upon any applicable legal theory or authority.   Plaintiffs

bear the burden of proving the correct amount of their tax liability   *Jade Trading, LLC v.*

*United States*, 80 Fed. Cl. 11, 2007 WL 4553043, * 32-33 (Fed. Cl. Dec. 21, 2007); *Dow*

*Chem. Co. v. United States,* 435 F.3d at 599, *quoting INDOPCO, Inc. v. Comm'r,* 503

U.S. 79, 84 (1992) ("'[A]n income tax deduction is a matter of legislative grace and . . .

the burden of clearly showing the right to the claimed deduction is on the taxpayer.'");

*see generally Helvering v. Taylor*, 293 U.S. 507, 515 (1935).

**I.      THE AWG SILO TRANSACTION IS NOT PROPERLY CHARACTERIZED AS
A TRANSFER OF A DEPRECIABLE OWNERSHIP INTEREST IN THE
FACILITY TO PLAINTIFFS**

C.      The fact that the contract documents in this case describe the AWG SILO Transaction as

a sale of the Facility is irrelevant because a transaction's substance, not its form,

determines its treatment for federal income tax purposes.  *Gregory v. Helvering*, 293 U.S.

- 34 -

3065030.1

465 (1935).  For this reason, courts have never regarded "the simple expedient of drawing

up papers" as controlling for tax purposes where, as here, a transaction's objective

economic realities do not comport with the form in which the deal has been cast.  *See*

*Frank Lyon Co. v. United States*, 435 U.S. 561, 572-73 (1978) quoting *Commissioner v.*

*Tower*, 327 U.S. 280, 291 (1946) .  Where the form of a transaction presents an accurate

reflection of the substantive rights and responsibilities allocated by the parties, the form

of the transaction should be respected.  When it does not, however, and the substance of a

transaction differs from its form, the transaction's substance controls.  *Nebraska Dep't of*

*Revenue v. Loewenstein*, 513 U.S. 123 (1994) (distinguishing *Frank Lyon* and

recharacterizing a transaction structured as a "sale" and "repurchase" of municipal bonds

as a secured lending transaction).  It is this principle, and not a taxpayer's desire to

achieve particular tax results, that determines a transaction's effects for federal income

tax purposes. *Commissioner v. Duberstein*, 363 U.S. 278, 286 (1960).[5]

D.    Because the structure of the AWG SILO Transaction raises questions regarding the

proper characterization of a purported transfer of ownership, this Court must examine all

the relevant facts and circumstances (not pieces of the transaction in isolation).  *See TIFD*

---

[5] At bottom, Plaintiffs' entire case rests on their contention that the "leaseback" portion of the transaction otherwise had economic substance, which the AWG SILO Transaction does not.meets certain "tests" that appear in revenue procedures issued by the Service (Rev. Proc. 75-21, 1975-1 C B. 715, reissued as Rev. Proc. 2001-28, 2001-1 C.B. 1156, also known as the "Guidelines"), as allegedly reflected in Plaintiffs' computer-generated number runs.  Even assuming that to be true, Plaintiffs' argument is irrelevant because it merely shows that Plaintiffs, and the advisors and lawyers to whom they paid millions to engineer this deal, successfully mimicked the "form" of a leveraged lease.  Courts have long recognized that it is all too easy for parties to use the guise of a legitimate transaction to conceal the underlying reality.  *See Frank Lyon*, 435 U.S. at 577.  This is precisely why this Court is compelled to look beyond Plaintiffs' arguments about the form and evaluate the substance, or lack thereof here, behind the transaction as a whole.

3065030.1

*III-E, Inc. v. United States,* 459 F.3d 220, 231 (2d Cir. 2006) (*citing Commissioner v. Culbertson,* 337 US 733, 742 (1949)) (The nature of an interest must be determined "based on a realistic appraisal of the totality of the circumstances."); *see also Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). The analysis requires examination of the substantive rights and duties actually involved in the AWG SILO Transaction to determine whether, in substance, AWG transferred an interest in the Facility to Plaintiffs. To prevail, Plaintiffs must show that they both obtained and retained "significant and genuine attributes" of ownership of the Facility. *Frank Lyon*, 435 U.S. at 584. Those attributes are present only when the person purporting to own property enjoys the benefits and bears the burdens normally incident to possession of ownership. *Coleman v. Commissioner*, 16 F.3d 821, 826 (7th Cir. 1994) (distinguishing *Frank Lyon* and concluding that taxpayer did not own computer equipment it sought to depreciate).[6]

E.  Application of these principles is demonstrated by a recent decision addressing a LILO transaction.[7] *BB&T Corp. v. United States*, 2007 WL 37798, 99 A.F.T.R2d 2007-376, 2007-1 USTC ¶ 50, 130 (M.D.N.C. 2007). That case involved a purported transfer of a leasehold interest in paper mill equipment from a Swedish wood pulp company (Sodra) to

---

[6]  *See also Swift Dodge v. Commissioner*, 692 F.2d 651, 654 (9th Cir. 1982) (a "lease agreement" is not a genuine lease because the "lessee" assumed the risk of depreciation and remained responsible for expenses related to the property); *Estate of Thomas v. Commissioner,* 84 T.C. 412, 435 (1985) (respecting sale/leaseback where lessor "bore the risk at the end of the leases that the residual value would not be sufficient to recoup its cash outlay")

[7]  The salient features of the AWG SILO Transaction, such as the defeasance structure, the loop debt, the pre-funded option to "reacquire" the Facility, and the offsetting obligations that leave economic control of the asset unchanged, are present in LILOs such as BB&T as well. (Meilman Tr. 538-40; Shinderman Tr. 1106, 1115-17)

3065030.1

a domestic financial services company (BB&T).  As here, the equipment was leased back to Sodra on a long-term basis, the lease was secured through payment undertaking agreements, and Sodra held an option (pre-funded by BB&T) to reacquire the equipment at a predetermined price at the end of the lease term.  Rejecting as a matter of law BB&T's claims for tax benefits based upon its acquisition of a leasehold interest in the equipment, the court stated –

> In sum, because Sodra retained, in substance, all of the rights it possessed in the Equipment, at least for the term of the Lease, BB&T could acquire only a future interest in the Equipment that will mature at the end of the Lease term and then only in the event Sodra elects not to exercise its option (funded in full by the Equity PUA and the Debt PUA) to buyout BB&T's interest in the Head Lease.

2007 WL 37798 at *8.  Accordingly, the form of the transaction was not respected and the taxpayer was denied the tax benefits it claimed from the transaction.

F.      Plaintiffs here cannot make the required showing that they acquired a current property interest in the Facility through the AWG SILO Transaction.  As in the LILO transaction disregarded in *BB&T*, while the form of the AWG SILO Transaction is dizzying in its complexity, its substance is quite clear: Plaintiffs paid AWG an accommodation  fee to execute meaningless papers which Plaintiffs hoped would provide the predicate for claims to massive tax benefits.[8]

---

[8] The AWG SILO Transaction deserves particularly intense scrutiny because it employs reciprocal and offsetting obligations, such as the Payment Undertaking Agreements and so-called nonrecourse loans. The presence of such offsetting obligations strongly indicates that the transaction serves no substantive purpose other than generating tax benefits for Plaintiffs.  See, e.g., Cemco Investors, LLC v. United States, __ F.3d __, 2008 WL 321270, at *1-2 (7th Cir. Feb. 7, 2008) (holding that offsetting long and short currency options used to generate tax losses far exceeding actual at-risk investment lack economic substance).

G.    The remainder of the AWG SILO Transaction cancels itself out, and no money ever truly

changes hands (except for the fees paid by Plaintiffs).  The benefits and burdens of

ownership remain exactly where they have always been.  AWG will possess and operate

the Facility, it will remain responsible for all costs and capital improvements associated

with the Facility's use and maintenance, remain responsible for continuing its insurance

coverage, and retain all profits from its operation.  AWG did not dispose of its rights in

the Facility – and indicated to the German tax authorities that it has the unilateral right "to

exclude [Plaintiffs] from . . . use of the [Facility] – and Plaintiffs did not acquire any

rights in the Facility on the closing date."  *See* Joint Ex. XXVIII, at CLIF-00512.

H.    Nor does the possibility that Plaintiffs may acquire an ownership interest in the Facility in

2024, if AWG does not exercise the Fixed Purchase Option at the end of the Initial Lease

Period, give Plaintiffs a *current* ownership interest in the Facility.  Such a possible future

interest would not entitle Plaintiffs to depreciation deductions in 1999 under I.R.C.

Section 168 based upon this contingent future interest.  *See BB & T Corp.*, *supra* at 6

(concluding that only a potential future interest was conveyed).  *See also Williams v.

Commissioner*, 1 F.3d 502 (7th Cir. 1993), *aff'g* 63 T.C.M. (CCH) 2959 (1992)(holding

that where home buyers had neither possession of, nor the right to possess the home

before closing and the sales agreement explicitly denied the buyers the right to force

conveyance, sales of the homes did not occur until closing).[9]

---

[9]   *See McCulley Ashlock v. Commissioner*, 18 T.C. 405, 411-412 (1952), *acq.* 1952-2 C.B. 1 (taxpayer/
buyer acquired only a future interest in property where seller retained control and benefits of ownership);
*Kruesel v. United States*, 63-2 U.S. Tax Cas. (CCH) ¶ 9714, 12 A.F.T.R. 2d (RIA) ¶ 5701 (D. Minn.
1963); *Alstores Realty Co. v. Commissioner*, 46 T.C. 363, 370-372, *acq.* 1967-2 C.B. 1 (taxpayer/buyer
that assumed risk and burdens of ownership subject to a lease treated as property owner for tax

- 38 -                                              3065030.1

I.   As the United States' expert in the leasing industry Morris Shinderman testified, the

     AWG SILO Transaction insulates Plaintiffs from the risks and rewards that lessors in

     legitimate leveraged leases experience.  Shinderman Tr. 115-17.  That fact undermines

     any claim that Plaintiffs acquired a depreciable interest in the Facility on the closing date.

     *See, e.g., Kwiat v. Commisioner*, 64 T.C.M. (CCH) 327, 333-334 (1992) (a structure that

     effectively collars the upside and downside risks of the parties to a putative leasing

     transaction indicates that the benefits and burdens of ownership remain with the lessee).

     Indeed, the Second Circuit in *TIFD III-E, Inc. v. United States*, 459 F. 3d 220 (2d Cir.

     2006), concluded that a bank lacked an equity investment in a partnership for that very

     reason:

> The banks had essentially bargained for and received a secure guaranty of the
> reimbursement of their investment at the agreed Applicable Rate of return. Their
> apparent 98% share of partnership income was largely defeasible by the taxpayer,
> and was more in the nature of window dressing designed to give ostensible
> support to the characterization of equity participation, which was essential to the
> dominant tax objective, than a meaningful stake in the profits of the venture. The
> possibility of a small share in extraordinary profits was not a significant feature of
> their investment. While the amount owed to the banks was not exactly a "sum
> certain," it was not significantly different; it was more akin to the characteristic
> repayment of debt than to a real equity stake in the venture.

     459 F.3d at 236-37.

J.   Plaintiffs' attempt to defend the AWG SILO Transaction as comparable to the sale-

     leaseback transaction recognized by the Supreme Court in *Frank Lyon* fails because of

     important factual differences between the two transactions.

K.   The AWG SILO Transaction includes a pre-funded Fixed Purchase Option and Service

purposes.)

3065030.1

Contract Option that "collar" Plaintiffs potential upside and downside risk.  Plaintiffs'

own witnesses admitted as much, acknowledging both that the Fixed Purchase Option

eliminates the risk from the transaction if selected, and that the equity payments required

as part of the Capacity Charges under the Service Contract effectively do the same if the

Service Contract is selected.  Keener Tr. 350:10-353:18; Gov't Ex. DDDDDD, at

PNC0005852.  *Frank Lyon* had no such artificial risk-avoidance mechanisms, instead

leaving the lessor to face the upside reward and downside risk normally borne by the

owner of property. 435 U.S. at 576-77.[10]

L.    The AWG SILO Transaction supposedly permits both Plaintiffs and AWG to claim

      ownership of the Facility and take depreciation deductions for the Facility. By contrast,

      *Frank Lyon* did not involve any potential of double dipping of deductions, but merely

      shifted existing tax benefits from one U.S. taxpayer to another.[11] 435 U.S. at 580.

---

[10]   *See* Kwiat v. Commisioner, 64 T.C.M. (CCH) 327, 333-334 (1992) (lessor's put option and lessee's call option "insulated" taxpayer-lessor from both the risk that the property would decline in value and the benefit of appreciation in value; the "mere possibility that neither [option] will be exercised should not be determinative" of whether the lessor had a current property interest because the "mere presence of reciprocal puts and calls" indicates that the benefits and burdens of ownership remain with the lessee." (Emphasis in original)). Although the lessee in *Frank Lyon* had the option to purchase the building from the taxpayer at various points in time at a predetermined price, there were no funds set aside and dedicated to that purpose like there are in this case.

[11]  While such "double dipping" does not automatically deprive a  foreign leasing transaction of its tax benefits,  since it is possible that the other country's tax laws permit reliance on form over substance , the fact that the parties all understood and contemplated that AWG would continue to be treated as the owner for purposes of claiming depreciation in Germany for German tax purposes is both a reason to scrutinize the claim of ownership for U.S. tax purposes and serves to distinguish the case from *Frank Lyon*, which did not contemplate a transaction in which both lessor and lessee could claim  the same tax benefits. This is particularly true in light of AWG's representation (approved by Plaintiffs) to the German tax authorities that economic control over the Facility would not pass to Plaintiffs even "for one legal second" if the Fixed Purchase Option were exercised.

3065030.1

M.    The AWG SILO Transaction supposedly permits Plaintiffs to claim ownership of the
Facility and take depreciation deductions for the Facility that otherwise would not have
been available to any other U.S. taxpayer.  By contrast, in *Frank Lyon* the Supreme Court
specifically relied on the fact that while tax benefits were transferred from one U.S.
taxpayer to another, no new tax benefits were created.  435 U.S. at 583 n.18 (noting that
the transaction in Frank Lyon did not **"actually create[] tax advantages that, for one
reason or another, could not have been enjoyed had the transaction taken another form")**.

N.    The AWG SILO Transaction purports to pay AWG $423 million as the "purchase price"
for the Facility, but AWG only retains less than 8% of that amount.  The rest is
instantaneously disbursed into the Payment Undertaking Agreements referenced above,
where they are beyond AWG's control.  In *Frank Lyon*, as in the typical sale-leaseback
between two U.S. taxpayers, the lessee received 100% of the proceeds of the sale to use
as it saw fit.  435 U.S. at 566; *see also* Shinderman Tr. 1106.

O.    The AWG SILO Transaction used a defeasance structure (the Payment Undertaking
Agreements) to virtually eliminate any risk to Plaintiffs and to guarantee their
predetermined return on equity.  *Frank Lyon* involved no comparable defeasance scheme
and left the lessor to bear the risks of losing its equity investment.  435 U.S. at 581.

P.    In sum, the Supreme Court's decision in *Frank Lyon* does not support Plaintiffs' claim
that the AWG SILO Transaction gives them a depreciable ownership interest in the
Facility.  While both cases involve leasing transactions, the similarity ends there, and
Plaintiffs cannot rely upon *Frank Lyon* to provide even a patina of respectability to the
AWG SILO Transaction or any claim that they bear the benefits and burdens of

3065030.1

ownership.

## II.   PLAINTIFFS ARE NOT ENTITLED TO DEDUCT "INTEREST" THEY CLAIM TO HAVE PAID ON THE "LOANS" FROM THE GERMAN BANKS

Q.   Section 163(a) of the Internal Revenue Code generally allows taxpayers a deduction for

all interest paid or accrued within the taxable year on indebtedness.  For purposes of this

section, interest refers to compensation for the use or forbearance of money.  *Bridges v.*

*Commissioner*, 325 F.2d 180, 184 (4th Cir. 1963), *citing Deputy v. DuPont*, 308 U.S. 488,

498 (1940); *Old Colony Trust Co. v. Commissioner*, 284 U.S. 552, 560 (1932).  In order

to claim a deduction, however, the debt on which the interest is paid must be genuine.

*Bridges v. Commissioner*, *325 F.2d at 184-85* citing *Knetsch v. United States*, 364 U.S.

361 (1960); *Barnett v. Commissioner*, 364 F. 2d 742, 744 (2d Cir. 1966), cert. denied

*Goldstein v. Commissioner*, 385 U.S. 1005 (1967)  ("We here decide that Section 163(a)

does not 'intend' that taxpayers should be permitted deductions for interest paid on debts

that were entered into solely in order to obtain a deduction.")

R.   Applying those principles in a comparable fact pattern, the court in *BB&T* denied interest

deductions attributable to "loans" secured with a defeasance arrangement comparable to

the arrangements surrounding the loans from the German Banks in the AWG SILO

Transaction.  That court looked past the form of the transaction selected by the parties

and found –

> When the intermediate payment steps are disregarded, which must be done
> in order to consider the substance of the loan transaction and not the form
> selected by the parties, it becomes clear that the loan transaction is only a
> circular transfer of funds in which the . . . loan is paid from the proceeds of
> the loan itself.  There was no money lent . . . in a substantive sense, and
> the . . . loan does not reflect genuine indebtedness.

3065030.1

*BB&T*, 2007 WL 37798 at *11.  Accordingly, the court concluded that the "purported interest payments cannot be what Congress intended to allow as an income tax deduction" and rejected the taxpayer's claims for interest deductions.  *Id.*

S. The *BB&T* court also found that where, as in a LILO or SILO, parties have purported to enter into two separate transactions that result in similar and reciprocal obligations, the transaction should be collapsed to reflect its true substance. Id. at *8, *accord Rogers v. United States*, 281 F.3d 1108 (10th Cir. 2002) (loan and option to purchase shareholder's stock collapsed to reveal a redemption of stock). Based upon this principle, courts have not hesitated to collapse reciprocal obligations that are offset by some other arrangement between the putative obligors. *See Rickey v. Commissioner*, 502 F.2d 748 (9th Cir. 1974), *aff'g* 54 T.C. 680 (1970); *United States v. Ingalls*, 399 F.2d 143 (5th Cir. 1968), cert. *denied* 393 U.S. 1094, 89 S. Ct. 865, 21 L. Ed. 2d 784 (1969); *Blue Flame Gas Co. v. Commissioner*, 54 T.C. 584 (1970); *Greenfield v. Commissioner*, 44 T.C.M. (CCH) 1487, T.C. Memo. (P-H) 1982-617 (1982); *Big "D" Development Corp. v. Commissioner*, 30 T.C.M. (CCH) 646, T.C. Memo. (P-H) 1971-148 (1971), *aff'd per curiam*, 453 F.2d 1365 (5th Cir.), *cert. denied* 406 U.S. 945, 92 S. Ct. 2043, 32 L. Ed. 332 (1972).

T. Here, the undisputed facts demonstrate that the "loans" Plaintiffs obtained from the German banks lack substance, and should not be treated as a genuine debt.  In form the funds were "loaned" by the German Banks to Plaintiffs on a non-recourse basis; the same funds were paid by Plaintiffs to AWG at the closing as the price of the Head Lease; and the same funds were paid to the German Banks as consideration for their assumption of AWG's "rent" obligations under the Payment Undertaking Agreements.  Even in form,

- 43 -                                                        3065030.1

the cash flows are circular and no funds ever left the German Banks' umbrella.  *See* Gov't

Ex. DDDDDD, at PNC 0005839 (PNC Service Contract Presentation); Keener Tr. 349:1-

350:3.  Most important, no portion of this purported borrowing was ever invested in the

Facility, or put to any other purposeful use by either Plaintiffs or AWG.  In substance,

these purported loans were merely a series of debits and credits to various accounts under

the German Banks' umbrella, all designed to leave a zero balance in each account at the

end of the transaction.  In other words, in substance there was no loan.  Accordingly, the

claimed interest deductions must be denied.

## III.   THE AWG SILO TRANSACTION MUST BE DISREGARDED FOR TAX PURPOSES BECAUSE IT LACKS ECONOMIC SUBSTANCE

U.     The tax law is concerned with the economic substance of transactions, not just the form

or labels chosen by the taxpayer to describe a transaction.  Thus, it is a well-established

principle that tax benefits claimed from a transaction contrived to create tax benefits will

not be recognized for federal tax purposes if the transaction lacks independent economic

substance.  *Knetsch v. United States*, 364 U.S. 361 (1960) (denying interest deductions on

offsetting loans and annuity contracts); *Gregory v. Helvering*, 293 U.S. 465 (1935) (tax

motivated corporate reorganization disregarded as a sham); and *American Electric Power

Co. v. United States*, 326 F.3d 737. 741 (6th Cir. 2003)(tax benefits denied because

corporate owned life insurance program lacked economic substance).

V.     The analysis focuses upon evaluation of the pre-tax profitability of the disputed

transaction.[12]  Stated more succinctly, the Sixth Circuit explained that "the point of the

---

[12]   For this reason, Plaintiffs' expert misses the mark when he focuses on Plaintiffs' after-tax internal
rate of return, in contrast to Dr. Lys's pretax analysis.  Graves Tr. 805:5-806:13.  As the Sixth Circuit has

3065030.1

analysis is to remove from consideration the challenged deduction, and to evaluate the

transaction . . . to see if it makes sense economically or is mere tax arbitrage." *American*

*Electric Power*, 326 F.3d at 743-44, quoting *In re CM Holdings*, 301 F.3d 96, 101 (3d

Cir. 2002).  The analysis disregards economic profits attributable to projected future tax

benefits, *id.,* and does not allow a taxpayer to "save" a transaction by including "highly-

contingent positive cash flows projected for later years" in the analysis.  *Dow Chemical*

*Co. v. United States*, 435 F.3d 594, 602 (6th Cir. 2006), *cert. denied*  127 S. Ct. 1251

(2007) (concluding that an insurance program lacked economic substance).

W.    As the Court stated in *Dow Chemical Co. v. United States,* 435 F.3d at 599 (internal

citations omitted):

> "The proper standard in determining if a transaction is a sham is whether
> the transaction has any practicable economic effects other than the creation
> of income tax losses." If the transaction has economic substance, "the
> question becomes whether the taxpayer was motivated by profit to
> participate in the transaction." "If, however, the court determines that the
> transaction is a sham, the entire transaction is disallowed for federal tax
> purposes, and the [subjective] inquiry is never made."

X.    The analysis is almost exclusively objective and a taxpayer's assertion of a subjective

belief in a transaction's profit potential will not satisfy the test if the objective evidence

demonstrates that a reasonable expectation of profit is lacking.  *Coltec Industries, Inc. v.*

*United States*, 454 F.3d 1340 (Fed. Cir. 2006) *cert. denied* 127 S.Ct. 1261 (2007).  *See*

*Dow*, 435 F.3d at 605 (concluding that transaction lacked economic substance without

---

held, the entire point of an economic substance analysis is to determine "whether the transaction has any
practicable economic effects other than the creation of income tax losses." *Dow Chemical*, 435 F.3d at
599. Plaintiffs' focus on after-tax returns is therefore irrelevant to the pre-tax economic substance inquiry
this Court must conduct.

3065030.1

considering evidence of subjective intent).  The relevant inquiry is whether the

transaction that generated the disputed tax deductions has economic substance.  *Coltec*

454 F. 3d at 1356-57.

Y.    Plaintiffs contend that the accounting "profits" they recognized for financial statement

purposes is an important non-tax business purpose for engaging in the AWG SILO

Transaction.  An accounting benefit resulting from tax savings generated by a transaction

that lacks economic substance at its inception cannot imbue the transaction with

economic substance once the tax savings are challenged.  *American Electric Power, Inc.*

*v. United States*, 136 F. Supp. 2d 762, 791-92 (S.D. Ohio), *aff'd* 326 F. 3d 737 (6th Cir.

2003), *cert. denied* 540 U.S. 1104 (2004).   Because Plaintiffs' alleged accounting profits

derive almost entirely from the tax benefits Plaintiffs claim, not from any pretax

economic gains, those accounting benefits do not save the AWG SILO Transaction.

Z.    Such an analysis mandates a conclusion that the AWG SILO Transaction lacks economic

substance.  It is uncontested that, during the Initial Lease Period, Plaintiffs will only

recover a de minimis $1.2 million on their initial outlay of $55 million (plus transaction

costs) during the Initial Lease Period.  The only significant cash flows during the 24 years

of the Initial Lease Period are the circular flows of funds between and among the German

banks.  Neither the $1.2 million recovery nor the "loop financing" constitutes a profit for

Plaintiffs on a pre-tax basis.  For that reason, even Plaintiffs' economics expert

acknowledged that there is no economic benefit to Plaintiffs during the Initial Lease

3065030.1

Period.[13]

AA.    Likewise, Plaintiffs cannot economically benefit from AWG's exercise of its Fixed Purchase Option or the alternative Service Contract route at the end of that period. In the likely event AWG elects its prefunded Fixed Purchase Option, Plaintiffs will only receive a payment equal to the $26.5 million it deposited with AIG. That payment (due in 2024), however, merely represents a risk- free return of Plaintiffs' AIG deposit (not the fruits of a legitimate leasing deal). Considering Plaintiffs' total equity investment of $55.1 million, the return Plaintiffs' will receive on the AIG deposit will be less than they could have earned from investing in risk-free Treasury obligations, or even in their own lending business. Instead, in the AWG SILO Transaction Plaintiffs' paid in $55.1 million in 1999 dollars only to receive, in net present value terms, $26.5 million in 1999 dollars 24 years later. This is a loss in net present value terms. *See ACM Partnership v. Commissioner*, 157 F.3d 231, 259 (3d Cir. 1998), *cert. denied* 526 U.S. (1999) (making present value adjustments in evaluating "profits" from future payments).

BB.    Even in the unlikely event that AWG elects the Service Contract alternative Plaintiff's receipt of any pre-tax profits hinge upon the hypothesis that AWG will depart from its past practices and historical behavior and stop operating a Facility that they have

---

[13] Plaintiffs contend that the accounting "profits" they recognized for financial statement purposes as an important non-tax business purpose for engaging in the AWG SILO Transaction. Of course, those accounting profits derive almost entirely from the tax benefits Plaintiffs claim, not from any pretax economic gains. Hurd Tr. 603:24-604:13, 640:24-641:20. An accounting benefit resulting from tax savings generated by a transaction that lacks economic substance at its inception cannot imbue the transaction with economic substance once the tax savings are challenged. *American Electric Power, Inc. v. United States*, 136 F. Supp. 2d 762, 791-92 (S.D. Ohio), *aff'd* 326 F. 3d 737 (6th Cir. 2003), *cert. denied* 540 U.S. 1104 (2004).

3065030.1

continuously operated since 1976.  Further those hypothetical pre-tax returns to Plaintiffs

will not be received for many years.  Those speculative future cash flows are precisely the

type of contingent future benefit the Sixth Circuit excluded from the economic substance

analysis in *Dow*.[14]  Accordingly, the AWG SILO Transaction lacks economic substance

and Plaintiffs may not claim tax benefits from the transaction.

## IV.  THE SERVICE PROPERLY DETERMINED THE APPLICABILITY OF PENALTIES AGAINST PLAINTIFFS

CC.  The Court in this TEFRA partnership proceeding must also resolve the applicability of

any penalty that has been asserted by the IRS.  26 U.S.C. §§ 6221, 6226(f).

DD.  While the United States bears the burden of production on penalty issues, 26 U.S.C.

§ 7491(c), Plaintiffs bear the ultimate burden of proof on issues related to penalties.  *Pahl*

*v. Commissioner*, 150 F.3d 1124, 1131 (9th Cir. 1998).  *See generally Long-Term Capital*

*Holdings, LP v. United States*, 330 F. Supp.2d 122, 196-99 (D. Conn. 2004), aff'd 150

Fed. Appx. 40  (2d Cir. 2005).

EE.  The Service determined that a penalty for a substantial understatement of tax attributable

to plaintiffs' treatment of the AWG SILO Transaction was applicable under Section 6662

of the Internal Revenue Code.  Section 6662(a), provides that there "shall be added to the

---

[14]  While the economic dominance of the Fixed Purchase Option over the Service Contract, as demonstrated by Dr. Lys, underscores the speculative nature of any cash flows that Plaintiffs might receive under the Service Contract, for the purposes of the economic substance test it is irrelevant whether or not AWG is likely to exercise the Fixed Purchase Option or not.  What matters is that the Service Contract will not be commenced—and the purported returns that Plaintiffs project will derive from the Service Contract will not be earned—but for the contingency that, years into the future, AWG rejects the Fixed Purchase Option and otherwise meets the many preconditions to the Service Contract.  That is precisely the sort of future contingency that the Sixth Circuit teaches cannot be taken into account as part of the economic substance analysis.  *See Dow Chemical,* 435 F.3d at 602.  In addition, however, if the degree of likelihood is considered relevant, the Service Contract would represent an irrational choice by AWG.

- 48 -

tax an amount equal to 20 percent of the portion of the underpayment to which this section applies."[15]  An understatement of income tax is substantial if it exceeds the greater of (1) 10 percent of the tax required to be shown on the return, or (2) $5,000 ($10,000 for corporations.)  I.R.C. § 6662(d)(1).  For these purposes, the amount of an understatement is reduced by the portion thereof that is attributable to the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment.  I.R.C. § 6662(d)(2)(B).

FF.  The United States has met its burden of production with respect to the penalty. Determination of whether an understatement exists is strictly computational; therefore, Plaintiffs cannot dispute that if their reporting of the AWG SILO Transaction was improper, a substantial understatement occurred.

GG.  Plaintiffs primary defense to the penalty appears to be the "reasonable cause" exception. *See* 26 U.S.C. 6664(c) & 26 C.F.R. §1.6664-4(b)(1).  But plaintiffs offered nothing at trial to support any reasonable cause defense.  Instead, they appear to take the all-or-nothing position that reasonable cause is exclusively a partner-level determination, beyond the jurisdiction of this Court.

HH.  Plaintiffs have consistently refused to respond to discovery requests, and instructed witnesses not to answer questions in deposition, related to their "reasonable cause" defense based on their contention that such arguments can only properly be litigated at the partner level.

---

[15] At its simplest, an "underpayment"is the difference between the amount of tax reported on a return and the correct amount of tax due, as determined after and audit or judicial reveiw.  See 26 U.S.C. § 6664(a).

3065030.1

II.     Plaintiffs are wrong; reasonable cause may be asserted in some circumstances at the partnership level.  *See  Long Term Capital*, 330 F.Supp.2d at 205; Santa Monica Pictures, 89 T.C.M. (CCH) at 1229-30.  Whether those circumstances are present in this case need not be resolved here, as plaintiffs have waived any partnership-level reasonable cause defense, and this Court should uphold the penalty determination.

Respectfully submitted,

GREGORY A. WHITE
United States Attorney

/s Matthew Von Schuch
MATTHEW VON SCHUCH
ROBERT KOVACEV
ANGELO FRATTARELLI
NANCY HERBERT
Attorneys, Tax Division
U.S. Department of Justice
Post Office Box 55
Ben Franklin Station
Washington, D.C.  20044

3065030.1

CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2008, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s Matthew Von Schuch
Matthew Von Schuch
Trial Attorney, Tax Division
U.S. Department of Justice

3065030.1