UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                                :
AWG LEASING TRUST,                              :        CASE NO. 1:07-CV-857
KSP INVESTMENTS, INC.                           :
AS TAX MATTERS PARTNER,                         :
                                                :
              Plaintiff,                        :
                                                :
vs.                                             :        OPINION & ORDER
                                                :        [Resolving Doc. No. 1]
UNITED STATES OF AMERICA,                       :
                                                :
              Defendant.                        :
                                                :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

## I. Introduction[1/]

With this action, two large national banks dispute adjustments that the Internal Revenue

Service ("IRS") made to partnership federal income tax returns for the 1999, 2000, 2001, 2002, and

2003 tax years.  In those adjustments, the IRS found that the banks' partnership, the AWG Leasing

Trust, mis-characterized a 1999 transaction as a $423 million purchase of a German waste-to-energy

facility.  The IRS says the transaction was a thinly-veiled tax dodge that attempted to skirt IRS and

Congressional action directed to limiting transactions that had the purpose of transferring tax

deductions for rental payments, depreciation, amortization, and interest payments from tax neutral

entities.  As a result, the IRS claims that the Plaintiffs owe approximately $88 million in taxes for the

---

[1/] In this opinion and order, the Court uses hyperlinks to cite to briefs and exhibits on the electronic case docket.  This electronic filing system, known as CM/ECF, is accessible to any registered user through the U.S. District Court for the Northern District of Ohio website.

Case No. 1:07-CV-857
Gwin, J.

1999 - 2003 tax years and will owe much more for subsequent years.

As will be described below, the banks say that they paid $423 million on December 7, 1999 to buy a waste-to-energy facility in Wuppertal, Germany and should be allowed to depreciate the Wuppertal plant.  The banks argue that their contemporaneous lease of the facility back to the original owner under a very long-term triple-net lease and their  grant of an option to repurchase the facility does not defeat their claim of ownership rights to the facility.

The banks also say that they should be allowed to deduct interest on the $368 million long-term non-recourse loans that they obtained from two German banks to finance the transaction even though the loan proceeds went to escrow-type accounts that the German entity could not access and that were committed to paying the German company's lease payments and to providing sufficient funding to complete the option exercise.

In deciding this case, the Court makes two determinations.  First, the Court decides whether the 1999 transaction has economic substance apart from the tax benefits at issue.  Second, the Court considers whether the banks enjoyed the benefits and burdens of ownership of the Facility when the transaction pre-funded the repurchase of the facility and also required the original owner to repurchase the facility unless it met near-impossible conditions.  As will be described, the Court finds that the transaction had some minimal substance apart from the tax benefit.  However, the Court finds that the Plaintiffs never obtained an ownership interest sufficient to obtain a depreciable interest in the facility.  The Court further concludes that the Plaintiffs are not entitled to deductions for interest paid or accrued on the underlying transaction loans because such loans do not constitute genuine indebtedness.

For the reasons that follow, this Court **SUSTAINS** the IRS's determination that the Plaintiffs'

Case No. 1:07-CV-857
Gwin, J.

asserted tax benefits relating to the AWG transaction are improper.  The Court **DENIES** the Plaintiffs' claimed depreciation deductions under 26 U.S.C. § 168, interest expense deductions under § 163(a), and amortization of transaction costs deductions.  The Court also upholds the IRS's imposition of accuracy-related penalties at the partnership level for substantial understatement of tax liability under 26 U.S.C. § 6662(a).

## II. Background

This case revolves around a 1999 sale-in/lease-out ("SILO") transaction.  Under some SILO transactions, a party acquires assets from a tax-exempt party under a "head lease."  A SILO head lease typically involves a lease term sufficiently long to qualify as a sale under United States tax law. The acquiring party then simultaneously leases the assets back to the original owner under a long-term triple-net "sublease" with lease and option payments that exhaust almost all of the sale proceeds. The original owner also receives an option to repurchase the asset.  Depending upon the transaction provisions, the exercise of the repurchase option may be nearly certain.  In practical terms, the tax-exempt property owner continues to use the property as it did before the transaction and has no risk of losing control of the property.  Meanwhile, the taxpayer receives tax benefits, sometimes significant tax benefits, by depreciating the assets, amortizing certain transaction costs, and deducting interest payments.

Where the original owner seems extremely likely to repurchase the facility that it originally sold, the IRS argues that a true sale has not occurred and that the owner-lessor is not entitled to claim tax benefits associated with ownership, such as deductions for depreciation. The IRS also says that where a transaction has no economic substance apart from tax benefits, the taxpayer is not entitled to deduct interest on loans used to fund the transaction or expenses associated with the transaction.

-3-

Case No. 1:07-CV-857
Gwin, J.

### *A. Historic Tax Treatment of Leveraged Lease Transactions*

For some time, financial leasing has served as an important vehicle for commercial enterprise fund raising.  Leasing can mitigate the capital commitment that usually accompanies asset purchases.  Often, commercial leases also allow parties to transfer tax benefits in an efficient fashion.  Lessees who were unable to fully utilize tax benefits (usually because of a lack of profits) could obtain lower financial cost by entering a transaction that allowed them to transfer the tax benefits associated with depreciation and interest expense deductions to lessors who could more fully use these tax benefits.  In theory, the lessees obtained lower financing costs in recognition of their transfer of the tax benefit.  Accounting rules that apply to leveraged leases also make them significantly more attractive.[2]  Concerned that financial leases unfairly undercut the federal tax system, the IRS and Congress have adopted rules to ensure that the risks and indices of true ownership pass to the lessor before tax benefits can be claimed.

SILOs are a modified version of their tax-driven financial predecessors, lease-in/lease-out ("LILO") transactions.  Although each transaction is factually distinct, SILOs generally differ from LILOs by having a longer-term head lease that is sufficiently long to qualify for tax purposes as a sale.  In a typical LILO, the taxpayer leases property from a tax-exempt entity and simultaneously leases the same property back to the owner and gives the owner an option to repurchase the lease.  In practical terms, the tax-exempt property owner continues unfettered use of the property just as before

---

[2]  Leveraged leasing is a well-established type of asset-based financing. [Hurd Tr., Doc. 178-1 at 595-97.]  In 1976, the Financial Accounting Standards Board authorized leveraged lease accounting methodology.  Leveraged lease accounting standards are found in Financial Accounting Standards Number 13 ("FAS-13").  FAS-13 comprehensively addresses lease accounting for both lessors and lessees. [Hurd Tr., Doc. 178-1 at 602, 611.]  Under principles of leveraged lease accounting, a lessor's investment is reported net of non-recourse debt.  By reporting only the lessor's equity investment, therefore, this accounting method improves the investor's return on assets and equity compared to other non-leveraged lease transactions.  *Id.* at 603-04, 610.

Case No. 1:07-CV-857
Gwin, J.

the transaction, but the taxpayer claims tax benefits.  As the Fourth Circuit Court of Appeals recently

noted, "LILOs have been harshly criticized as abusive tax shelters that serve only to transfer tax

benefits associated with property ownership from tax-indifferent entities, which have no use for them,

to U.S. taxpayers." *BB&T Corp. v. United States,* 523 F.3d 461, 465 (4th Cir. 2008) (citing David

Hariton, *Response to "Old 'Brine' in New Bottles" (New Brine in Old Bottles)*, 55 Tax L. Rev. 397,

402 (2002)).

In 1996, the IRS issued proposed regulations that generally eliminated any favorable tax

treatment associated with LILOs.  These proposed regulations sought to reduce the tax benefits of

lease-leaseback transactions by treating prepaid rent as a loan.  Section 467 Rental Agreements, 61

Fed. Reg. 27,834 (June 3, 1996).  On May 19, 1999, the IRS issued a final ruling under I.R.C. § 467,

significantly reducing the tax benefits commonly associated with LILO structures.  *See* Rev. Rul. 99-

14, 1999-1 C.B. 835, *modified and superseded by* Rev. Rul. 2002-69, 2002-2 C.B. 760.  In its 1999

ruling, the IRS determined that LILOs were abusive and impermissible tax shelters and announced

that it would seek disallowance of rent and interest deductions on the grounds that these transactions

lack economic substance.  These regulations did not retroactively apply to any transactions created

before May 19, 1999, but "there remained a risk that the IRS would invoke generally applicable tax

law principles to disallow LILO-related deductions." *BB&T Corp. v. United States,* 523 F.3d 461,

465 (4th Cir. 2008).

KeyCorp ("Key") and PNC Financial Services Group, Inc. ("PNC Financial") previously

participated in a large number of LILO transactions.  As a result of the 1999 IRS regulations, Key

and PNC stopped taking part in new LILO transactions.  [Joint Ex. 56, Doc. 167-7 at

KSP0197639-42; Angel Tr., Doc. 178-1 at 224.]

-5-

Case No. 1:07-CV-857
Gwin, J.

Presumptively alerted that the IRS would challenge exotic efforts to transfer tax deductions from tax indifferent entities, one might have thought that banks would step away from similar transactions.  Instead, some United States banks began to enter into sale-leaseback transactions ("SILOs") that were designed to substantially replicate lease-leaseback transactions.  [Joint Ex. 56, Doc. 167-7 at KSP0197639-42; Angel Tr., Doc. 178-1 at 224.]

Having given notice that purposeless efforts to transfer tax benefits would be addressed, it was no surprise when in 2004, Congress passed the American Jobs Creation Act to explicitly eliminate all tax advantages of SILO transactions created after March 12, 2004. American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 848, 118 Stat. 1418 (2004). Consequently, neither Key nor PNC participated in any new cross-border lease to service contract transactions after that date. [Angel Tr., Doc. 178-1 at 224–25; Larkins Tr., Doc. 178-1 at 291; Keener Tr., Doc. 178-1 at 336.] The last SILO transaction to which Key was a party, for example, closed on January 7, 2004. [Joint Ex. 56 (Leveraged Lease Portfolio Rep.), Doc. 167-7 at KSP0197639-42.]

        In 2005, the IRS issued a notice about tax-exempt leasing involving defeasance in which it declared that it would contest claimed tax deductions for any SILO transactions that it suspected had no economic purpose apart from tax benefits. IRS Notice 2005-12, 2005-1 C.B. 630. Unsurprisingly, after the efforts of both Congress and the IRS to eliminate the tax benefits of lease-in/lease-out and sale-in/lease-out transactions, both LILOs and SILOs have become almost non-existent in the leveraged leasing industry today.

Many SILOs that were created before 2004, however, remain in effect and the tax implications of these economic structures present the dispositive issue for this Court today.

*B. Overview of the Instant Litigation*

-6-

Case No. 1:07-CV-857
Gwin, J.

The present case involves a SILO transaction entered into in 1999 for the "sale" and "leaseback" of a fully integrated waste-to-energy disposal and treatment plant located in Wuppertal, Germany (the "Facility"). Built in 1976, the Facility uses state-of-the-art technology to burn waste from households and small businesses. [Joint Stip., Doc. 83-1 at ¶ 30, 32; Ellsworth Tr., Doc. 178-1 at 415-16; Gonzalez Tr., Doc. 178-1 at 370-71; Joint Ex. 24 (Duke Rep.), Doc. 164-1 at KSP0175821-24; Pl. Ex. 119 (Appraisal), Doc. 142 at PNC0004930-34.] The Facility then converts the waste into fuel to generate electricity and steam heat, as well as other by-products.

Prior to the 1999 transaction at issue, Abfallwirtschaftgesellschaft mbH Wuppertal ("AWG") owned the Facility. [Joint Stip., Doc. 83-1 at ¶ 32.] Founded in 1971, AWG is a German corporation that is owned and maintained by a consortium of west German municipalities, including the cities of Wuppertal, Remscheid, and Velbert. The public utilities arm of the City of Wuppertal, Wuppertaler Stadtwerke WSWAG, is the largest shareholder in AWG.[3/] [Joint Stip., Doc. 83-1 at ¶ 34.] AWG has owned and operated the Facility since the plant became operational in 1976. [Joint Stip., Doc. 83-1 at ¶ 32; Pl. Ex. 80 (Final Key Credit Package), Doc. 137-1 at KSP0169527.] At the time of the 1999 transaction, AWG operated at a profit, having earned over $10 million in 1999. AWG also had relatively little debt despite having recently completed a major renovation. At the end of 1999, AWG had long-term debt of $177 million. [Pl. Ex. 128, Doc. 144-1 at KSP0165568.]

AWG receives all of its revenue from the operation of the Facility. 90.8% of the revenue from the Facility is generated through "tipping" fees that the Facility charges to its customers for the disposal of their solid waste. The Facility produces the remaining 9.2% of its revenue by selling

_____

[3/] In 1999, the shares of AWG were owned as follows: Wuppertaler Stadtwerke WSWAG (Public Utilities) (70.47%); Stadtwerke Remscheid GmbH (24.97%); Stadtwerke Velbert (4.50%); Stadt of Wuppertal (0.03%); and Stadt of Remscheid (0.03%). [Joint Stip., Doc. 83-1 at ¶ 34.]

Case No. 1:07-CV-857
Gwin, J.

electricity, steam heat, and other by-products created during the waste incineration process. [Joint Stip., Doc. 83-1 at ¶ 31, 34-35; Pl. Ex. 119 (Appraisal), Doc. 142 at PNC0004991-92; Joint Ex. 49 (1998 AWG Annual Rep.), Doc. 166-8.]

The municipalities that own and operate AWG are also important customers of the Facility. These German municipalities provide large amounts of the materials incinerated at the Facility and are responsible for much of the tipping fee income that AWG receives. [Joint Stip., Doc. 83-1 at ¶ 35.] The municipalities therefore control, at least indirectly, the tipping fees that they charge themselves. [Joint Stip., Doc. 83-1 at ¶¶ 34-35; Pl. Ex. 119 (Appraisal), Doc. 142 at PNC0004991-92; Joint Ex. 49 (1998 AWG Annual Rep.), Doc. 166-8.] German law generally treats AWG like a privately-held corporation and requires AWG to produce financial statements and to pay trade and corporate income taxes. [Schweiss Tr., Doc. 178-1 at 1060; Joint Ex. 49 (1998 AWG Annual Rep.), Doc. 166-8.]

Between 1991 and 1997, AWG refurbished and renovated the Facility. [Pl. Ex. 52 (AWG Equity Mem.), Doc. 133-39 at IRS-ADM-000468; Joint Ex. 24 (Duke Rep.), Doc. 164-1 at KSP0175811.] During this time period, AWG replaced the Facility's boilers, essential components to the waste-to-energy production process. AWG also replaced the grates that are used to load waste into the boilers and assorted other related pieces of equipment. After this renovation, in 1999, Duke Engineering Services ("Duke") conducted an engineering evaluation of the Facility and concluded the plant had a useful life of 46 years and was in as good a condition as that of a four year old facility. [Joint Stip., Doc. 83-1 at ¶¶ 50-51; Gonzalez Tr., Doc. 178-1 at 371-74, 393; Joint Ex. 24 (Duke Rep.), Doc. 164-1 at KSP0175816.]

Under German law, municipalities have a duty to dispose of domestic waste and waste

-8-

Case No. 1:07-CV-857
Gwin, J.

generated in their respective territories.  Germany had also passed a law forbidding the use of landfills
after 2005, making the AWG incinerating facilities more important to the AWG owners.  The
municipal owners of AWG had no known reason for selling the Facility and no apparent need for
capital. Yet, in early 1998, for unclear and unexplained reasons, a promoter sought investors on
behalf of AWG by requesting proposals for a sale-leaseback of the Facility.  Against this backdrop,
the Plaintiffs offer no explanation as to what purpose motivated AWG to enter the Transaction.
AWG's 1999 financial statements indicate that AWG was profitable as the sole owner and operator
of the Facility, earning a net income of DM 19,114,814.62 (or $10,113,658.53 in 1999 U.S. dollars).
[Pl. Ex. 128, Doc. 144-1 at KSP0165569.]

Although the Plaintiff Banks enjoy a contractual right to require testimony from responsible
AWG officers regarding what motivated the Transaction, they offered no evidence to explain why
AWG wanted, or needed, the Transaction. No representatives of AWG or its German municipality
shareholders testified at trial. As described, the Facility had just undergone a significant renovation
that placed it in a like-new condition in 1999.  AWG earned a profit, was able to pay its bills,
including the costs associated with the renovation, and nothing suggests it needed additional capital.
Against this background, the Court surmises that the promoters simply devised a scheme to allow
AWG to convey a tax-avoidance transaction for a fee.

Nothing suggests that AWG had ever had any financial relation with Key Global Finance or
with PNC Financial Services Group, Inc. ("PNC").  There is no evidence that AWG itself ever
approached Key Global Finance or PNC about putting together a financial transaction involving the
Facility.  Instead, facilitators put AWG in contact with the Plaintiffs.

Promoters Deutsche Anlagen-Leasing GmBH ("DAL") and Macquarie Corporate Finance

Case No. 1:07-CV-857
Gwin, J.

(USA), Inc. ("Macquarie") initiated the process of securing a U.S. leasing transaction involving the

Facility.  Macquarie contracted with the accounting firm of Deloitte & Touche LLP ("Deloitte") to

provide appraisals for the possible transaction.

After being solicited to participate by promoter Macquarie, in April 1998, Key Global

Finance, an affiliate of KeyCorp ("Key"), a financial services company with its headquarters in

Cleveland, Ohio, drafted an Offering Memorandum seeking American investors to take part in a $250

million LILO transaction involving the Facility. [Joint Stip., Doc. 83-1 at ¶ 37.] Apparently, in 1998,

Deloitte had valued the AWG facility at $250 million.  Shortly thereafter, Deloitte informed Key that

it believed the Facility could support a higher appraised value than $250 million. [Def. Ex. E, Doc.

151-17.] In a June 10, 1998 letter, Key stated that "Deloitte & Touche has valued the current FMV

[fair market value] of the facility at approximately $450 million, which is well beyond the preliminary

estimates we received in February . . ." *Id.*  That same month, Key Global Finance drafted another

Offering Memorandum attempting to find equity investors to participate with it in a $450 million

LILO transaction for the Facility. [Joint Stip., Doc. 83-1 at ¶ 38; Joint Ex. 53 (Offering Mem.), Doc.

167-4.]  These efforts, however, did not result in any contracts between AWG and potential lessors.

[Joint Stip., Doc. 83-1 at ¶ 39.]

In late 1998, PricewaterhouseCoopers Global Structured Finance Group ("PWC") and debis

Financial Engineering GmbH began promoting a cross-border leveraged leasing transaction for the

Facility on AWG's behalf. [Joint Stip., Doc. 83-1 at ¶ 40, 41.]  In April 1999, PWC sent an Equity

Information Memorandum to possible investors proposing a prospective LILO transaction for the

Facility.  [Joint Stip., Doc. 83-1 at ¶ 41; Pl. Ex. 52 (AWG Equity Mem.), Doc. 133-39.]  Both Key

and PNC, a financial services company headquartered in Pittsburgh, Pennsylvania, responded

-10-

Case No. 1:07-CV-857
Gwin, J.

favorably to this memorandum.

Key and PNC generally compete against each other in the leasing industry. [Joint Stip., Doc. 83-1 at ¶¶ 27-29.] As large bank-based institutions, Key and PNC offer a variety of financial products and services, including leasing services, and each company maintains leasing portfolios worth several billion dollars.  [Larkins Tr., Doc. 178-1 at 266-69; Angel Tr., Doc. 178-1 at 54.]  Both corporations have engaged in domestic leveraged leasing transactions for several decades, arguably in an attempt to increase after-tax profits.  Neither corporation, however, had participated in any cross-border leveraged leasing transactions prior to 1996. [Angel Tr., Doc. 178-1 at 223; Keener Tr., Doc. 178-1 at 320-21, 335-36.]

Beginning in 1996, however, Key and PNC both began engaging in significant cross-border lease-in/lease-out ("LILO"), and later sale-in/lease-out ("SILO"), transactions.[4/]  [Angel Tr., Doc. 178-1 at 223; Keener Tr., Doc. 178-1 at 320-21, 335-36.].  As previously discussed, many banks, including Key and PNC, stopped engaging in LILO transactions and began using SILO structures as the result of the IRS final regulations that took effect in May 1999. [Angel Tr., Doc. 178-1 at 224; Section 467 Rental Agreements, 64 Fed. Reg. 26863 (May 18, 1999).]

On August 23, 1999, Key and PNC sent AWG conditional and separate proposals to participate in a sale-in/lease-out transaction for the Facility for $425 million. [Joint Stip., Doc. 83-1 at ¶¶ 42, 43; Joint Ex. 41 (PNC Leasing Proposal), Doc. 165-13.]  On August 26, 1999, Key and PNC submitted a joint proposal to AWG.  AWG approved the proposal that same week.  [Joint Stip.,

---

[4/] For example, Key engaged in 37 LILO transactions between 1996 and 1999, many of which were cross-border.  One of these LILO transactions, called the "TAD" transaction, involved a German waste-to-energy facility. [Angel Tr., Doc. 178-1 at 59, 253; Joint Ex. 56 (Leveraged Lease Portfolio Rep.), Doc. 167-7 at KSP0197639-42.] Today, all of PNC's leases in Europe and Asia are structured as either LILOs or SILOs. [Keener Tr., Doc. 178-1 at 336.]

Case No. 1:07-CV-857
Gwin, J.

Doc. 83-1 at ¶¶ 45, 46.]  The parties signed a conditional term sheet allowing for further negotiation and due diligence. [Joint Stip., Doc. 83-1 at ¶¶ 42-46; Pl. Ex. 73 (Key Proposal), Doc. 135-2; Pl. Ex. 83, (PNC Proposal), Doc. 138 at PNC005663-65.]

Key and PNC subsequently hired independent experts to advise them about various legal, engineering, financial, and environmental issues associated with the possible AWG leveraged leasing transaction.  [Angel Tr., Doc. 178-1 at 104-119, 155;  Keener Tr., Doc. 178-1 at 322-31.]  Among these experts, Key and PNC hired Duke Engineering & Services, Inc. ("Duke") to do an engineering assessment of the Facility. [Joint Stip., Doc. 83-1 at ¶ 47.]  Duke, a qualified engineering firm, provided a comprehensive 186-page report that complimented the design, construction, and operation of the Facility, and predicted a 46 year useful life for the Facility. [Joint Stip., Doc. 83-1 at ¶¶ 47-51; Gonzalez Tr., Doc. 178-1 at 363-69; Joint Ex. 24 (Duke Rep.), Doc. 164-1.][5]

Key and PNC also retained the accounting and consulting firm of Deloitte & Touche LLP ("Deloitte") to provide an appraisal of the Facility and to conduct a financial analysis of the proposed SILO transaction (hereinafter, the "Deloitte Appraisal").  [Joint Stip., Doc. 83-1 at ¶ 53.] Apart from the Deloitte Appraisal, the Plaintiffs obtained no other appraisals of the Facility.  The Plaintiff banks acknowledge that they never engaged in any negotiations with AWG over the price for the Facility. In attempting to explain why they never attempted to test whether AWG would accept a lower price, the Plaintiffs say bargaining seldom occurred in such transactions.  Responding, the United States says that the Facility was not worth the suggested price and the Plaintiffs accepted the price without negotiations to increase their tax deductions.  The final Deloitte Appraisal for the Facility also concluded that the remaining economic useful life of the Facility was 46 years. Id. at ¶ 54-56.

_____

[5] Key and PNC paid Duke $162,800 for this review. [Joint Stip., Doc. 83-1 at ¶ 52.]

-12-

Case No. 1:07-CV-857
Gwin, J.

In its appraisal, Deloitte studied three different aspects of the proposed AWG transaction. First, Deloitte assessed the fair market value of the Facility at the closing date, December 7, 1999 (the "Closing Date"). Second, Deloitte predicted the future fair market value of the Facility both at the end of the Leaseback period and at the end of the Service Contract. Deloitte conducted this analysis to assess expected residual values of the Facility. Finally, Deloitte assessed the economics of the Service Contract option as part of its compulsion analysis regarding the options that AWG would face in 2024. [Pl. Ex. 119 (Appraisal), Doc. 142.]

Deloitte followed standard appraisal methodology by considering three different types of appraisal methods – the cost approach, the discounted cash flow approach, and a market comparable method – and reaching a "conclusion of value." Deloitte's application of the discounted cash flow approach and the market comparable approach, however, were flawed.[6/]

In its report, Deloitte concluded that the cost approach offered the best indication of the Facility's current fair market value. [Pl. Ex. 119 (Appraisal), Doc. 142 at PNC0004996.] The Court finds that this cost approach provides a reasonable estimate of the value of the Facility. The cost approach measures an asset's value by utilizing the cost of another asset of equal or comparable utility. *Id.* at PNC0004972. Deloitte was aware of construction costs and value indications of similar waste-to-energy plants in Germany and other Western European countries from its work on other valuation assignments. *Id.* at PNC0004976-78; Ellsworth Tr., Doc. 178-1 at 456. Deloitte believed the most comparable construction costs for a similar waste-to-energy plant was a plant in Cologne,

_____

[6/] With regard to the market comparable methodology, Deloitte improperly compared companies and failed to adjust those companies' Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for one-time events. Also, Deloitte failed to use readily available information on AWG's EBITDA. Deloitte's use of an estimated EBITDA instead of the actual EBITDA also causes the cash flow valuation to be unreliable.

-13-

Case No. 1:07-CV-857
Gwin, J.

Germany. [Ellsworth Tr., Doc. 178-1 at 428-29; Pl. Ex. 55 (AWG Resp.), Doc. 133-42 at DT000031.]  The Cologne facility cost DM 900 million to construct and was a 450,000 tons/year plant.  This was very similar to AWG's Facility, which Deloitte valued at DM 800 million and was a 385,000 tons/year plant.  This comparable cost evidence is the best evidence of what it would cost to replace the AWG Facility in 1999.  [Ellsworth Tr., Doc. 178-1 at 428-29; Pl. Ex. 55 (AWG Resp.), Doc. 133-42 at DT000031.]

Utilizing these generally accepted appraisal methods, Deloitte concluded that the total project costs to replace or reconstruct the Facility, as of December 7, 1999, would be approximately DM 800 million or $423 million U.S. dollars.[7]  [Joint Stip., Doc. 83-1 at ¶ 57; Pl. Ex. 119 (Appraisal),  Doc. 142 at PNC0004972-78.]  This appears to have been a reasonable conclusion, particularly in light of the credible evidence regarding the costs of replacing the Facility based on the similarly situated Cologne plant.

Deloitte also generally considered that, in 1999, it was known that a new German law that prohibited most forms of landfilling in Germany would take effect in 2005.  This law, commonly known as TASI, was anticipated to depress tipping fee rates in the short-term while customers tried to make use of their landfills' capacity, but was expected to lead to increased market tipping fees for incinerators after 2005.  Increased market tipping fees obviously increase the value of the Facility to its owners.  As AWG explained, "[F]rom the year 2005 – the directive is suspended until this point in time– waste incineration plants were given a kind of monopoly status." [Pl. Ex. 54 (AWG Resp.), Doc. 133-41 at DT000021; Pl. Ex. 55 (AWG Resp.), Doc. 133-42 at DT000043;  Pl. Ex. 119 (Appraisal),  Doc. 142 at PNC0004940-41; Ellsworth Tr., Doc. 178-1 at 410-13, 426-27.]

_____

[7] Deutschmark to U.S. dollar calculations based on the DM 1.89 to 1 USD exchange rate in 1999.

-14-

Case No. 1:07-CV-857
Gwin, J.

Without any apparent negotiation, the Plaintiffs agreed that the purchase price of the Facility should be $423 million. Joint Ex. 6, (Lease) Doc. 158-1 at IRS-ADM-002835.]

On December 7, 1999, KSP Investments, Inc. ("KSP"), a wholly-owned subsidiary of Key, and PNC Capital Leasing, LLC ("PNC Leasing"), a wholly-owned subsidiary of PNC, entered into the leveraged leasing transaction with AWG for the "sale" and "leaseback" of the German waste-to-energy Facility.  [Joint Stip., Doc. 83-1 at ¶ 2.]  The Plaintiffs finalized the transactions with a series of written agreements, including the Participation Agreement that was executed by all of the parties. *Id.* at ¶ 72; Joint Exs. 1-25.  In total, the Plaintiffs generated over 2,000 pages of closing documents to govern their relationship.

KSP and PNC Leasing made their respective investments in the AWG Transaction through a Delaware business trust called the AWG Leasing Trust (the "Trust"). [Joint Stip., Doc. 83-1 at ¶ 3.]  Both KSP and PNC Leasing each own a 50% interest in the Trust. *Id.* at ¶¶ 2-7.  KSP and PNC are the beneficiaries and the grantors of the AWG Leasing Trust.  *Id.* at ¶ 4.

The AWG Leasing Trust is treated as a partnership for federal income tax purposes. [Joint Stip., Doc. 83-1 at ¶ 8.]  The Trust annually files a U.S. Return of Partnership Income (Form 1065) and is treated as a pass-through entity whereby its partners, Key and PNC, receive annual K-1 schedules that report their allocable portions of the Trust's income and deductions.  [Joint Stip., Doc. 83-1 at ¶ 9.]  Pursuant to 26 U.S.C. § 6231(a)(1)(B)(ii), the AWG Leasing Trust chose to have the tax treatment of all partnership items determined at the partnership level.  *Id.* at ¶ 10.  KSP was designated as the "Tax Matters Partner" for the AWG Leasing Trust pursuant to 26 U.S.C. § 6231(a)(7).  [Joint Stip., Doc. 83-1 at ¶ 11.]  In this capacity, KSP represents the AWG Leasing Trust and brought the present action on the Trust's behalf against the United States to determine the

-15-

Case No. 1:07-CV-857
Gwin, J.

propriety of the IRS's proposed adjustments to several "partnership items" in the Trust's tax returns.
*Id.* at ¶ 11.

### C. Procedural History of the Present Case

The Trust filed timely federal income tax returns for the taxable years of 1999, 2000, 2001, 2002, and 2003. [Joint Stip., Doc. 83-1 at ¶ 16.] In its tax returns for these years, the Trust reported income in the form of accrued rent payments from AWG under the Leaseback. The Trust also reported deductions for depreciation on the Facility, interest expense on loans, and amortization expenses for the transaction costs (i.e. attorneys' fees and appraisal costs). [Joint Exs. 30, 31, 32, 35, and 38 (Tax Returns), Doc. 165.]

On December 26, 2006, the IRS challenged the tax positions asserted on the Trust's tax returns for these years and also imposed several adjustments in the Final Partnership Administrative Adjustment ("FPAA"). [Joint Stip., Doc. 83-1 at ¶ 18.] In the FPAA, the IRS claimed that the Trust did not become the owner of the Facility for purposes of United States federal tax law and therefore could not claim tax benefits associated with ownership. *Id.* at ¶ 19; Pl. Ex. 161 (IRS Notice), Doc. 147-1.] The IRS also made adjustments to the Trust's tax return for these years to disallow certain deductions claimed by the Trust and to restate the nature of the transaction in other ways that may reduce the Trust's claimed tax benefits. [Joint Stip., Doc. 83-1 at ¶ 20; Pl. Ex. 161 (IRS Notice), Doc. 147-1.]

KSP, as the Tax Matters Partner of the Trust, took an appeal through this present lawsuit under 26 U.S.C. § 6226(a)(2). [Joint Stip., Doc. 83-1 at ¶ 25.] On March 22, 2007, KSP filed a complaint against the United States in this Court to determine the propriety of the IRS's proposed adjustments to several "partnership items" in the Trust's 1999, 2000, 2001, 2002, and 2003 tax

-16-

Case No. 1:07-CV-857
Gwin, J.

returns. [Complaint, Doc. 1.]

After fully conducting discovery, the parties filed pre-trial briefs and proposed findings of fact and conclusions of law, as well as a joint stipulation of facts. [Docs. 81, 82, 83, 84, 85.] Beginning on January 21, 2008, this Court conducted a week-long bench trial in the case. [Docs. 100, 101, 102, 104, 106.] As remarked at the trial, counsel for both parties provided admirable representation of their respective positions. After the completion of the trial, the parties filed post-trial briefs and reply briefs, along with final proposed findings of fact and conclusions of law. [Docs. 105, 118, 119, 120, 121, 122, 123.]

Before analyzing whether the 1999 SILO should receive favorable tax treatment, this Court provides a detailed discussion of the structure of the 1999 transaction.

### III. The Structure of the AWG Transaction

The AWG deal was structured as a "sale-leaseback-to-service-contract" transaction regarding the waste-to-energy plant in Wuppertal, Germany (the "Facility"). [Angel Tr., Doc. 178-1 at 149-50.]

In summary, the transaction seemingly called for the Plaintiffs to pay $423 million to lease the Facility from AWG and called for AWG to lease the facility back. The transaction also gave AWG an option in 2024 to repurchase the balance of the Plaintiffs' lease. Of the $423 million, all of the payment excepting $28.6 million was committed to escrow-type accounts to guarantee AWG's sublease of the facility and to fund the exercise of the 2024 purchase option. Unless AWG rejects that purchase option, the 1999 transaction results a simple circular flow of money.

As with most SILOs, the AWG transaction had two significant components: a head lease under which the Plaintiffs "acquired" the Facility from AWG, and a simultaneous sublease under which the Plaintiffs leased the Facility back to AWG. The 1999 transaction also provides AWG with

-17-

Case No. 1:07-CV-857
Gwin, J.

an option to reacquire the Facility for a fixed purchase price in 2024.  Alternatively, the 1999

transaction requires AWG to enter into a service contract with the Plaintiffs in 2024 if the Plaintiffs

do not exercise the purchase option.  However, to choose the service contract instead of the purchase

option, the transaction strangely requires AWG, a lessee under the sublease and a customer under the

Service Contract, to arrange non-recourse financing for the Plaintiffs.  Unless AWG obtains such non-

recourse financing for the Plaintiff, the purchase option must be exercised and the circular flow of

moneys completed.

### A. The Transaction Structure at Closing

#### 1. The Head Lease

The Plaintiffs executed a Head Lease Agreement  ("Head Lease").  Under the terms of the

Head Lease, AWG "sold" the economic and tax ownership of the Facility to the Plaintiffs for 75 years

in exchange for a lump sum payment of $423 million, payable at closing via a wire transfer into

AWG's bank account ("the head lease rent").[8/]  [Joint Stip., Doc. 83-1 at ¶ 73-77.]  Section 9(k) of

the Head Lease states, "The Head Lessee [the Trust] and the Head Lessor [AWG] intend this Head

Lease to constitute an agreement for the sale of the Facility by the Head Lessor to the Head Lessee

on the Closing Date for U.S. federal income tax purposes."  [Joint Ex. 4, Doc. 157-2 at

IRS-ADM-002735; Angel Tr., Doc. 178-1 at 151.]  Under the terms of the Head Lease, the Trust

is entitled to any condemnation proceeds if the Facility is taken by eminent domain during the 75 year

period.  [Joint Ex. 4, Doc. 157-2 at IRS-ADM-002733.]

---

[8/] Despite the fact that the Head Lease has a term of 75 years, the Facility's estimated remaining useful life
was only valued at 46 years in 1999. [Joint Stip., Doc. 83-1 at ¶ 74.] The Head Lease also contains a provision stating
that if the actual economic useful life of the Facility is ever deemed to be longer than 75 years, then the term of the
Head Lease is automatically extended to be 125% of the new expected useful life of the Facility. *Id.* at ¶ 75; Joint Ex.
4, Doc. 157-2 at IRS-ADM-002730.

Case No. 1:07-CV-857
Gwin, J.

As will be discussed later, AWG and the Plaintiffs treated the Head Lease as a sale of the Facility from AWG to the Trust on the closing date under U.S. federal income tax law, but not under German tax law. AWG's lease of real property to the Plaintiffs was not recorded as is typically required under German title law. In its audited financial statements, AWG did not record any sale of the Facility and continues to deduct depreciation for tax purposes under German tax law.

### 2. The Leaseback ("Leaseback")

Along with the above-described Head Lease Agreement, at closing the parties simultaneously executed a Lease Agreement (the "Leaseback") in which the Trust "leased" the Facility back to AWG until January 1, 2024 (the "Initial Leaseback Period") in exchange for a series of annual rent payments. [Joint Stip., Doc. 83-1 at ¶ 82.] The Leaseback is a "triple net" lease, meaning that the lessee (AWG) must bear the costs of operating the Facility during the Leaseback Term, including taxes, insurance, and maintenance expenses. *Id.* at ¶ 85. The Leaseback states, "It is the intent of the parties hereto that this Lease is a true lease, and that the Lessor [the Trust] is the owner and lessor and the Lessee [AWG] is the lessee of the Facility for all U.S. Federal, state and local income tax purposes." [Joint Ex. 6, Doc. 158-1 at IRS-ADM-002809.]

Under the Leaseback, AWG is entitled to the sole possession and operation of the Facility during the Leaseback Term if it satisfies certain obligations under the Leaseback. [Joint Stip., Doc. 83-1 at ¶¶ 86, 87.] AWG must pay all costs for the use and maintenance of the Facility during the Leaseback term, and AWG is also entitled to keep all profits generated from the Facility during the Leaseback. *Id.* at ¶¶ 89, 90. The Leaseback requires that AWG operate, maintain, and repair the Facility in accordance with certain standards set forth in the Leaseback. *Id.* at ¶ 88. The Leaseback establishes annual reporting requirements, including certifications of AWG's compliance with

-19-

Case No. 1:07-CV-857
Gwin, J.

maintenance and repair obligations, environmental reporting obligations, financial reporting obligations, insurance requirements, and other Leaseback obligations.  [Joint Ex. 2, Doc. 156 at IRS-ADM-002300-05.]  AWG has provided this information to the Trust each year since 1999.  [Angel Tr., Doc. 178-1 at 158-59.]  Under the Leaseback, AWG also is required to maintain and return the Facility in specified good condition. The return conditions are detailed in the Leaseback, including fourteen engineering performance tests that the Facility must pass at the end of the Leaseback.  [Joint Ex. 2 (Participation Agreement), Doc. 156 at  IRS-ADM-002245-48; Angel Tr., Doc. 178-1 at 153-55.]

### B. Cash Flows at Closing

Under the terms of the Participation Agreement, AWG "receives" the $423 million lump sum "head lease payment" at closing.  To fund the closing, the Plaintiffs contributed a relatively small amount and borrowed the rest.  The Plaintiffs contributed $55.1 million in cash to the transaction with AWG.  The Plaintiffs borrowed $368 million from two German banks.  [Joint Ex. 8 (Loan and Security Agreement), Doc. 159-1; Joint Ex. 25 (Closing Funding Mem.), Doc. 164-2 at IRS-ADM-000510; Def. Graphic 1, Doc. 151-5.]  In reality, however, approximately $383 million of the $423 million is instantly transferred to other parties involved in the transaction.  AWG keeps only $28.5 million, or approximately 7% of the stated head lease payment, for itself.  [Joint Ex. 2 (Participation Agreement), Doc. 156; Joint Ex. 9 (Series A PUA), Doc. 159-2 at IRS-ADM-002973; Joint Ex. 10 (Nord LB PUA), Doc. 159-3 at IRS-ADM-002999; Joint Ex. 15 (PUA), Doc. 160-5 at IRS-ADM-003166;  Joint Ex. 25 (Closing Funding Mem.), Doc. 164-2, at IRS-ADM-00503-10.]  The remaining $26.5 million of the cash that the Plaintiffs paid at closing goes to AIG Matched Funding, a subsidiary of American International Group ("AIG"), in the form of a "Payment

Case No. 1:07-CV-857
Gwin, J.

Undertaking Agreement Fee" (the "Equity PUA"). [Keener Tr., Doc. 178-1 at 341-42; Joint Ex. 15 (PUA), Doc. 160-5 at IRS-ADM-003166; Joint Ex. 25 (Closing Funding Mem.), Doc. 164-2, at IRS-ADM-00503-10.]   This $26.5 million payment to AIG serves as an investment that, over the initial 24 year sublease term, grows to an amount that is sufficient to permit AWG to repurchase the plant if it chooses to exercise its option in 2024.

Key and PNC each provided equity contributions of $27.6 million to the Trust to fund the $28.5 million payment to AWG and to fund the $26.5 investment with AIG. In addition to the $55 million equity investment, the Plaintiffs also paid approximately $4.9 million to the entities, including lawyers, consultants, and arrangers, that helped to set up the deal with AWG. [Def. Graphic 1, Doc. 151-5.]

After contributing the $55.1 million, the Plaintiffs obtained the remaining 87% of the purchase price, or $368 million, through long-term, non-recourse loans from two banks in Germany. [Joint Stip., Doc. 83-1 at ¶ 78; Joint Ex. 2 (Participation Agreement), Doc. 156 at IRS-ADM-002090; Joint Ex. 8 (Loan and Security Agreement), Doc. 159-1; Joint Ex. 25, Doc. 164-2 at IRS-ADM-000510 (Closing Funding Mem.); Def. Graphic 1, Doc. 151-5.] Norddeutsche Landesbank loaned the Trust $331.1 million (the "Series A loan") and Landesbank Baden-Wurttenburg loaned them $36.8 million (the "Series B loan"). [Joint Ex. 25, Doc. 164-2 at IRS-ADM-000510 (Closing Funding Mem.); Def. Graphic 1, Doc. 151-5.] The Series A loan is equal to 90% of the loan proceeds, and the Series B loan constitutes the remaining 10%.  The Loan Agreement amortizes principal ratably so that the Series A and Series B loans are, at all times, in a 90/10 ratio. [Joint Ex. 8, Doc. 159-1 at IRS-ADM-002962-67.] As stated, the Plaintiffs borrowed these funds on a non-recourse basis, that is as debts whose satisfaction may be obtained on default only out of the particular collateral given

-21-

Case No. 1:07-CV-857
Gwin, J.

and not out of the Plaintiffs' other assets.

The Loan Agreement establishes the terms and conditions of the Series A and Series B Loans. [Joint Ex. 8 (Loan Agreement), Doc. 159-1.] Both loans have a term of 34 years and bear an annual interest rate of 7.28%. *Id.* at IRS-ADM-002912; Joint Ex. 2, Doc. 156 at IRS-ADM-002229-33. The borrower Trust's interest in the Facility secures the loans by a collateral assignment of the Trust's rights under the Lease, Site Lease, Site Leaseback, Assumption Agreement, and Facility Support Agreement. [Joint Ex. 8 (Loan Agreement), Doc. 159-1 at IRS-ADM-002907-09.] As non-recourse loans, the Plaintiffs would not be obligated if, for any reason, some of the monies to pay the note were not available.

The Series A Loan is not subordinated to the Series B Loan. The loans are *pari passu*, meaning that they are secured by the same collateral (i.e. the Facility) on a ratable 90/10 basis in the event of default, for example, for every dollar of available collateral, the Series A Lender is entitled to recover 90 cents. [Joint Ex. 8, Doc. 159-1 at IRS-ADM-02922-23; Angel Tr., Doc. 178-1 at 166-69.]

Under its agreement with the Plaintiffs, AWG was required to put the $368 million obtained from the Series A and Series B loans into two Payment Undertaking Accounts (the "Debt PUAs"). These Debt PUAs act as defeasance accounts, which means that they are created to pay AWG's obligations under the sublease and to apply those payments to Plaintiffs' debts that are incurred under the transactions. At closing, AWG purchased the Series A, Series B, and AIG PUAs as required by the agreement. [Joint Stip., Doc. 83-1 at ¶ 72.]

The Debt PUAs make payments to the German banks, and neither AWG nor any of its creditors can access the funds until 2024. The money in the Debt PUAs is held by an affiliate of

-22-

Case No. 1:07-CV-857
Gwin, J.

Norddeutsche Landesbank and purportedly is used to pay AWG's "rent" under the Leaseback and the Plaintiffs' debts under the loans. The rent payments under the Leaseback exactly match, in both amount and timing, the principal and interest payments due on the Plaintiffs' non-recourse loans.[9/] [Lys Tr., Doc. 178-1 at 880; Keener Tr., Doc. 178-1 at 342; Meilman Tr., Doc. 178-1 at 535-36; Def. Graphic 2, Doc. 151-6; Joint Ex. 6 (Lease Agreement), Doc. 158-1 at IRS-ADM-002818; Joint Ex. 8 (Loan and Security Agreement), Doc. 159-1 at IRS-ADM-002962, 2967.] The only exception to this perfectly off-setting payment schedule is a $1.2 million payment to be made from the Equity PUA to PNC on March 7, 2000. [Joint Ex. 15 (PUA), Doc. 160-5 at IRS-ADM-003183.]

By purchasing the PUAs, AWG did not legally discharge any of its payment obligations to the Trust.  [Joint Ex. 9 (Series A PUA), Doc. 159-2 at IRS-ADM-002974-75; Joint Ex. 10, Doc. 159-3 at IRS-ADM-003000-01; Joint Ex. 15 (PUA), Doc. 160-5 at IRS-ADM-003167-68.]  By the terms of the PUAs, AWG remained the primary obligor in respect of all rent owed under the Leaseback. If the PUA German banks go bankrupt and do not timely pay AWG's rent obligations to the Trust, AWG remains liable to the Trust for such amounts and would be in default under the terms of the Leaseback. After AWG purchased the PUAs, AWG's obligations to pay rent and the Trust's obligations to pay debt costs remained in full force and effect.  However, risk of the PUA banks going bankrupt seems exceedingly small.

The Series A PUA is pledged as collateral for repayment of the Loans, except in the event of default.   [Joint Ex. 8, Doc. 159-1 at IRS-ADM-002908.]  The PUA funds belong to AWG during the Leaseback term but the payment undertaking agreements restrict the funds to being used to make

_____

[9/]  In 1999, AWG's home currency was the Deutschmark.  All amounts payable under the Leaseback, including rent, Termination Value, and the Fixed Purchase Option price of $521 million (if exercised), are required to be paid by wire transfer in U.S. dollars. [Joint Ex. 6, Doc. 158-1 at IRS-ADM-002775-76.]

Case No. 1:07-CV-857
Gwin, J.

payments required by the Leaseback.  If, in 2024 at the end of the Leaseback, AWG does not exercise its option to repurchase the Facility, the balance of the funds will be paid out to AWG. [Angel Tr., Doc. 178-1 at 182.]

AWG may arrange for a refinancing of the Series A and Series B Loans on a non-defeased basis.  [Joint Ex. 2, Doc. 156 at IRS-ADM-002156-60; Meilman Tr., Doc. 178-1 at 529-32.]  This refinancing would terminate the related PUAs and release the PUA funds for the benefit of AWG. [Joint Ex. 9, Doc. 159-2 at IRS-ADM-002972-74; Joint Ex. 10, Doc. 159-3 at IRS-ADM-02998-3000.]  Any refinancing, however, would require AWG to pay a "Make Whole Amount" to the German banks.  The "Make Whole Amount" includes both outstanding principal and lost future interest, discounted at the then-prevailing United States Treasury rate.  By requiring that all interest be paid, and by then discounting that interest to the current United States Treasury rate, the agreement makes refinancing highly unlikely.  Typically, refinancing would occur when interest rates fall.  But the make-whole provision requires that all interest that would have otherwise been paid continue to be paid, and then discounts such obligation only by the current, presumptively lower rate.  In effect, the make-whole provision penalizes refinancing.  This make-whole provision makes it very unlikely that AWG would choose to refinance.

In sum, the cash flows resulting from the AWG transaction at closing, ignoring any intermediate payments, may be described as follows:

| Source of Funds | | Receivers of Funds | |
|---|---|---|---|
| German Banks | $367.9 million | German Banks (for Debt PUAs) | $ 367.9 million |
| Plaintiffs | $59.9 million | AIG (for Equity PUA) | $ 26.5 million |
| | | AWG | $ 28.6 million |
| | | Professional Service Fees | $ 4.8 million |
| *Total:* | *$427.8 million* | *Total:* | *$427.8 million* |

-24-

Case No. 1:07-CV-857
Gwin, J.

[Govt. Post-Trial Prop. Findings of Fact, Doc. 121 at 13; Joint Ex. 25 (Closing Funding Mem.), Doc. 164-2 at IRS-ADM-00503-10; Def. Ex. VVVVV (AWG Transaction Expense Detail).]

As described, AWG's Leaseback requires AWG to pay "rent"during the initial Leaseback term.  In reality, however, those rent payments are made by the two German banks under the PUAs and AWG does not use its operating funds to pay this rent.  The rent thus is essentially paid by the German banks to the German banks as payments on the Plaintiff's loan obligations.  The Debt PUAs therefore simultaneously satisfy both AWG's rent payments and the Plaintiffs' debt payments.  Due to these off-setting payment plans, no actual cash flows occur between AWG and the Plaintiffs during the 24 years of the Initial Leaseback Period, except for the previously mentioned $1.2 million payment to PNC from the Equity PUA on March 7, 2000. [Angel Tr., Doc. 178-1 at 228-30; Keener Tr., Doc. 178-1 at 349-50; Lys Tr., Doc. 178-1 at 879-81; Def. Graphic 2, Doc. 151-6.]

*C. AWG's "Options" in 2024*

Under the 1999 transaction documents, AWG will have two options when the Initial Leaseback Period ends in 2024.

*1. The Fixed Purchase Option*

In 2024, AWG can exercise a "Fixed Purchase Option" to regain the Plaintiffs' interest in the Facility for $521 million.  If AWG exercises the Fixed Purchase Option, the funds in the Debt PUAs will be released to the lenders and will be sufficient to satisfy the $521 million purchase cost.  In 2024, the balances in the Debt PUAs will exactly match the outstanding loan balance of $383 million.  All of the proceeds of the loans, therefore, will return directly to the lenders.  Neither AWG nor the Plaintiffs have to provide any cash to repay these loans.  [Angel Tr., Doc. 178-1 at 244-45; Joint Ex. 6 (Lease Agreement), Doc. 158-1 at IRS-ADM-002808; Joint Ex. 8 (Loan and Security Agreement),

Case No. 1:07-CV-857
Gwin, J.

Doc. 159-1 at IRS-ADM-002910).]  In effect, the German banks lent money to the Trust, the Trust paid AWG who was required to place the proceeds into the PUAs with the German banks, and the PUAs will then have sufficient balances after making rent payments to repurchase the Facility with the balances in the PUAs in 2024.

The $521 million Fixed Purchase Option has two components.  First, the $383 million in the Debt PUAs will go towards paying off the remaining loans owed to the German banks.  Second, the remaining $138 million in funds that will have accrued by 2024 in the Equity PUA will go to the Plaintiffs. [Lys Tr., Doc. 178-1 at 884-85; Def. Graphic 2, Doc. 151-6; Def. Graphic 3, Doc. 151-7; Joint Ex. 6 (Lease Agreement), Doc. 158-1 at IRS-ADM-002807-09.]  This $138 million represents the Plaintiffs' "return" on its equity "investment" in the AWG transaction if AWG exercises the 2024 purchase option.  Each of the Plaintiffs banks will therefore receive approximately $39.1 million above their initial equity investments.  [Supp. Joint Stip., Doc. 105.]  The Plaintiffs, therefore, will obtain an  internal rate of return on the AWG transaction of approximately 3.5% if the 2024 purchase option is exercised. [Pl. Ex. 113, Doc. 141-2; Angel Tr., Doc. 178-1 at 90-91; Graves Tr., Doc. 178-1 at 798-801.]  Under the Fixed Purchase Option, the $55.1 million "equity" investment that the Plaintiffs made in 1999 thus is returned to the Plaintiffs with a guaranteed, albeit low, pre-tax rate of return. [Lys Tr., Doc. 178-1 at 883; Joint Ex. 15, Doc. 160-5 at IRS-ADM-003170;  Def. Graphic 2, Doc. 151-6; Def. Graphic 3, Doc. 151-7.]

As will be discussed later in this opinion, the Court finds that it is very likely that AWG will exercise the Fixed Purchase Option in 2024.  In theory, however, AWG also has the option to enter into a Service Contract in 2024, which the Court will now describe.

*2. The Service Contract Option*

Case No. 1:07-CV-857
Gwin, J.

If AWG does not exercise the Fixed Purchase Option ("FPO"), AWG and the Trust, or its designee, are obligated to enter into a waste disposal service contract ("Service Contract") at the end of the Leaseback Term. Under that Service Contract, AWG agrees to purchase solid waste disposal services from a third-party provider, chosen by the Plaintiffs, from January 1, 2024 until September 23, 2036. [Joint Stip., Doc. 83-1 at ¶¶ 96, 97; Joint Ex. 2, Doc. 156 at IRS-ADM-002149; Joint Ex. 13, Doc. 160-3 at IRS-ADM-003094-3100.]  In order to enter into the Service Contract, however, AWG must first arrange for a non-recourse refinancing of the entire $383 million in non-recourse debt that will still be outstanding in 2024. Under the terms of the Service Contract, any refinanced debt cannot include a defeasance provision.  [Joint Ex. 2, Doc. 156 at IRS-ADM-002149-50.]

As will be discussed later in this opinion, the Court finds the allocation of the obligation to obtain refinancing upon AWG difficult to explain if the 1999 transaction had intended to sell the Facility to the Trust.  Under this provision, if AWG chooses to actually receive the monies from the 1999 sale, it need enter an expensive twelve-year service contract that will significantly raise the tipping fees AWG charges its municipal owners.  Further, even though the Trust is said to be the "owner" of the Facility, AWG is strangely saddled with the requirement to obtain non-recourse financing.

Assuming that AWG is able to secure such non-recourse refinancing, AWG then can enter the Service Contract in 2024.  Under the Service Contract, AWG will engage the Trust to provide solid waste disposal services for twelve years, until 2036.  During the Service Contract, AWG must pay a periodic fee (the "Service Fee") to the Trust or its designee.  The Service Fee is the sum of a "Capacity Charge", an operations and maintenance charge (the "O&M Charge"), and a charge for all solid waste delivered to the Facility in excess of a set, baseline amount (the "Excess Tonnage

-27-

Case No. 1:07-CV-857
Gwin, J.

Charge"); minus credits to AWG in respect of service fees realized by the Trust or its designee from the use of the Facility to serve third party customers.  [Joint Stip., Doc. 83-1 at ¶ 103.]

As indicated, the Service Contract requires AWG to pay Capacity Charges.  The Capacity Charge includes 'Debt Portion' payments that are sufficient to totally pay the principal and interest on the new non-recourse loan. [Joint Stip., Doc. 83-1 at ¶ 104; Joint Ex. 13, Doc. 160-3 at IRS-ADM-003080-81.]  In effect, under the Service Contract AWG must pay all borrowing costs associated with the non-recourse loan. In addition to paying all of the Trust's debt costs as part of its Capacity Charges, AWG must also pay all the operation and maintenance costs together with amounts necessary to fund a modest reserve for working capital. [Joint Stip., Doc. 83-1 at ¶ 105.] Beyond paying all debt costs and operating and maintenance costs, the Service Contract requires payment of an Excess Tonnage Charge, that is $40 per ton of solid waste delivered by, or on behalf of, AWG to the Facility in excess of 200,000 tons of waste per year. [Joint Ex. 13, Doc. 160-3 at IRS-ADM-003085; Angel Tr., Doc. 178-1 at 213; Graves Tr., Doc. 178-1 at  779.]  This Excess Tonnage Charge is a relatively low charge for quantities of more than 200,000 tons per year to the Facility.

Under the Service Contract, AWG retains the right to charge "tipping fees" to its customers for the disposal of solid waste, but the third-party service provider has the right to any revenue gained from the sale of electricity and steam heat created by the Facility. [Joint Stip., Doc. 83-1 at ¶¶ 103-05; Joint Ex. 2, Doc. 156 at IRS-ADM-002148-53 (Participation Agreement); Joint Ex. 13 (Service Contract), Doc. 160-3 at IRS-ADM-003080, 3082, 3105.]

The Service Fees are not to be paid on a "hell or high water" basis. [Joint Stip., Doc. 83-1 at ¶ 102.] This means that, under the Service Contract, AWG is required to pay Service Fees to the

Case No. 1:07-CV-857
Gwin, J.

Trust only to the extent that the Trust or its designee actually performs the obligations required of them under the Service Contract. If a disruption in service occurs that stops the incineration of waste at the Facility, then AWG is not required to pay and it can terminate the Service Contract or pursue other legal remedies. [Angel Tr., Doc. 178-1 at 208-16; Joint Ex. 13, Doc. 160-3 at IRS-ADM-003105-06, 003114.]  However, the Service Contract also requires AWG to reimburse the Plaintiffs for the cost of insurance, including business interruption and environmental insurance.

If AWG exercises the Service Contract option, then it also obtains a second option to repurchase the Facility.  In 2036, at the end of the Service Contract, AWG may terminate the Head Lease by giving the Plaintiffs an amount equal to the fair market value of the Facility ("the second purchase option").  [Joint Stip., Doc. 83-1 at ¶ 98.]  If, however, AWG does not terminate the Head Lease at the conclusion of the Service Contract, then the Plaintiffs will have effective ownership and control of the Facility for the remaining 38 years of the Head Lease and AWG will retain only bare title to the Facility.  [Joint Ex. 13 (Service Contract), Doc. 160-3 at IRS-ADM-003102.]

*D. German Tax Law Treatment of the AWG Transaction*

Under German tax law, the AWG transaction is not a sale of ownership in the Facility.  The Plaintiffs did not take legal title to the Facility. [Angel Tr., Doc. 178-1 at 257; Heisse Tr., Doc. 178-1 at 1023-24; Joint Ex. 28 (German Tax Ruling Req.), Doc. 164-5 at CLIF-005512.]  During the Initial Leaseback Period, AWG operates the Facility in largely the same manner and with the same freedoms as it did prior to entering into the Participation Agreement with the Plaintiffs.  Under the terms of the Participation Agreement, AWG is guaranteed the right to "quiet enjoyment" of the plant throughout the Initial Leaseback Period.  Additionally, the contract provides that the Plaintiffs are only allowed to inspect the Facility on one single calendar day each year. [Joint Ex. 6 (Lease Agreement), Doc.

-29-

Case No. 1:07-CV-857
Gwin, J.

158-1 at IRS-ADM-002778, 002796.] AWG does not use its own operating funds to pay rent during the Initial Leaseback Period due to the requirement that rent payments be made out of the PUA accounts that AWG funded at closing.   Lys Tr., Doc. 178-1 at 874; Joint Ex. 46 (PNC Purpose/Transaction Summary), Doc. 166-5.]

Further, AWG continues to carry many burdens of ownership that it held prior to 1999.  For example, AWG must maintain insurance on the Facility, must operate the Facility in compliance with German law, must maintain the Facility with its own funds, must make capital improvements to the Facility at its own expense, and is permitted to take depreciation deductions on the plant under German tax law.  The Plaintiffs' own engineering expert specifically testified that AWG will not need make any changes to its maintenance procedures for the Facility during the Initial  Leaseback Period. [Gonzalez Tr., Doc. 178-1 at 385-90; Joint Ex. 6 (Lease Agreement), Doc. 158-1 at IRS-ADM-002781-92.]   Additionally, during the Initial Leaseback Period, AWG remains solely responsible for any environmental liabilities incurred by the Facility because it remains the legal owner and operator of the Facility under German law.[10/]  [Angel Tr., Doc. 178-1 at 227; Heisse Tr., Doc. 178-1 at 1024; Pl. Ex. 81 (Asset Management Eval.), Doc. 137-2 at KSP0169558-59; Joint Ex. 46 (PNC Purpose/Transaction Summary), Doc. 166-5 at IRS-ADM-E0213.]

Thus, under German law, AWG has not represented the transaction with the Plaintiffs to be a "sale" of its ownership or interest in the Facility.  In fact, when AWG asked for a binding advanced German tax ruling on the consequences of its transaction with the Plaintiffs, AWG stated that it

---

[10/] If the AWG transaction was treated as a sale under German law, there would have been significant tax, regulatory, and legal consequences.  For example, the Plaintiffs would have incurred substantial potential liability and regulatory obligation under German law. [Heisse Tr., Doc. 178-1 at 1024; Jacob Tr., Doc. 178-1 at 713; Schweiss Tr., Doc. 178-1 at 1059-60.]

Case No. 1:07-CV-857
Gwin, J.

would maintain "economic ownership" of the plant for at least the first 25 years, and perhaps for the

entire transaction if the Fixed Purchase Option was exercised in 2024.   In fact, AWG represented

to the German tax authorities:

> [T]he head lease and the sublease are entered into simultaneously, so that possession, use, and the obligations will at no time – not even for one legal second – be transferred to the U.S. Trust, if [AWG] exercises the [Fixed Purchase Option].

[Joint Ex. 28 (Adv. Tax Ruling Req.), Doc. 164-5 at CLIF-005512.]  AWG continues to list the plant

as an asset on its financial statements and tax balance sheets.  AWG still claims and receives

depreciation deductions for the Facility under both German corporate and trade income taxes.  The

Plaintiffs are aware of this German tax treatment. [Angel Tr., Doc. 178-1 at 252; Jacob Tr., Doc.

178-1 at 741-42; Schweiss Tr., Doc. 178-1 at 1061.]

### IV. Legal Standard

In this action brought under 26 U.S.C. § 6226(a)(2), the Plaintiffs ask the Court to determine:

(i) whether the IRS erroneously adjusted certain partnership items on AWG Trust's tax returns for

1999, 2000, 2001, 2002, and 2003 (the "Taxable Years") that relate to the 1999 SILO transaction

entered into by the Trust; (ii) whether the IRS properly asserted that any underpayments of tax

resulting from these adjustments are subject to accuracy-related penalties under 26 U.S.C. § 6662;

and (iii) whether amounts deposited by Plaintiff KSP with the Secretary of Treasury, pursuant to 26

U.S.C. § 6226(e)(1), should be refunded with interest.  [Complaint, Doc. 1.]

In such actions, Section 6226(f) of the Internal Revenue Code of 1986 establishes that the

Court should "determine all partnership items of the partnership for the partnership taxable year to

which the notice of final partnership administrative adjustment relates, the proper allocation of such

items among the partners, and the applicability of any penalty, addition to tax, or additional amount

Case No. 1:07-CV-857
Gwin, J.

which relates to an adjustment to a partnership item." 26 U.S.C. § 6226(f).  The Court must conduct a de novo review of the adjustments made by the IRS in the FPAA.  *See Jade Trading, LLC v. United States,* 2007 WL 4553043, at **32 (Fed. Cl. 2007).  The Plaintiffs bear the burden of proving the correct amount of their tax liability.  *See id.* at **35; *Dow Chem Co. v. United States,* 435 F.3d 594, 599 (6th Cir. 2006) (citing *INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 84 (1992) (stating that an "income tax deduction is a matter of legislative grace and . . . the burden of clearly showing the right to the claimed deduction is on the taxpayer").

## V. Discussion

### A. General Principles of Federal Tax Law

As the Fourth Circuit recently noted, a taxpayer may attempt to reduce his tax liability by any means available under the law, but a taxpayer may not "claim tax benefits that Congress did not intend to confer by setting up a sham transaction lacking any legitimate business purpose, or by affixing labels to its transactions that do not accurately reflect their true nature."  *BB&T Corp. v. United States,* 523 F.3d 461, 471 (4th Cir. 2008).  Similarly, the Sixth Circuit has held:

> Because even the most patriotic citizens do not have a duty to increase [their] taxes, it is entirely legal and legitimate to minimize taxes through permissible means.  But if a transaction or entity has no valid, non-tax business purpose, nominally uses another person or entity as a conduit through which to pass title, or br[ings] about no real change in the economic relation of the [taxpayers] to the income in question, the Commissioner has the authority to find that the transaction or entity lacks economic substance and disregard it for tax purposes.

*Richardson v. Comm'r,* 509 F.3d 736, 741 (6th Cir. 2007) (internal quotation marks omitted).

In order to determine whether a taxpayer is entitled to claimed tax deductions, therefore, the Court must decide whether the underlying transaction had genuine economic substance apart from tax benefits.  If the Court finds that the transaction does have economic substance aside from tax

-32-

Case No. 1:07-CV-857
Gwin, J.

benefits, then the Court must also decide if the substance of the transaction is consistent with its stated form.  The Fourth Circuit accurately describes this two-part analysis as the "economic substance"and the "substance over form" tests.  *BB&T Corp.,* 523 F.3d at 471-72.

Under the economic substance doctrine, the Court must evaluate whether the transaction has true economic merit apart from any claimed tax benefits.  In making this determination, the Sixth Circuit notes that "even if a transaction is in 'formal compliance with Code provisions,' a deduction will be disallowed if the transaction is an economic sham." *Dow Chem. Co. v. United States,* 435 F.3d 594, 599 (6th Cir. 2006) (citing *Am. Elec. Power Co.  v. United States,* 326 F.3d 737, 741 (6th Cir. 2003), *cert. denied,* 540 U.S. 1104 (2004)).  Accordingly, the Sixth Circuit explains that the appropriate standard in evaluating whether a transaction is a sham is "whether the transaction has any practicable economic effects other than the creation of income tax losses." *Dow Chem. Co.,* 435 F.3d at 599 (citing *Rose v. Comm'r,* 868 F.2d 851, 853 (6th Cir. 1989)).  If the Court determines that the transaction has economic substance apart from asserted tax benefits, then the Court must decide "whether the taxpayer was motivated by profit to participate in the transaction." *Dow Chem. Co.,* 435 F.3d at 599 (quoting *Illes v. Comm'r,* 982 F.2d 163, 165 (6th Cir. 1992), *cert. denied,* 507 U.S. 984 (1993)).  If the Court finds that the challenged transaction lacks substance and is an "economic sham," then the transaction must be disallowed for federal tax purposes.  *See Dow Chem Co.,* 435 F.3d at 599.  *See also Rose,* 868 F.2d at 853 (stating that the "court will not inquire into whether a transaction's primary objective was for the production of income or to make a profit, until it determines that the transaction is bona fide and not a sham").

If the Court determines under the "economic substance" test that the transaction has objective economic substance and that the taxpayer was subjectively motivated by the possibility of profit to

Case No. 1:07-CV-857
Gwin, J.

participate in the transaction, then the Court must turn to the "substance over form" test.  The

substance, not the stated form, of a transaction determines its treatment for federal income tax

purposes.  *See* *Gregory v. Helvering,* 293 U.S. 465, 470 (1935); *BB&T Corp.,* 523 F.3d at 471-72;

*Richardson,* 509 F.3d at 740 (stating that in deciding whether to attribute income to a taxpayer, "the

Code elevates substance over form, asking not what the surface of a transaction suggests but what

the economic realities of the transaction show"); *Mitchell v. Comm'r,* 428 F.2d 259, 263 (6th Cir.

1970) (in evaluating tax deductions, "forms and labels must yield to reality").  Courts do not regard

"the simple expedient of drawing up papers" as a controlling factor in evaluating a financial

transaction for tax purposes where the objective economic realities of the transaction are not reflected

in the form under which the transaction is apparently structured.  *Frank Lyon Co. v. United States,*

435 U.S. 561, 573 (1978) (quoting *Comm'r v. Tower,* 327 U.S. 280, 291 (1946)).

        A court should respect the form of a transaction where it accurately reflects the underlying

rights and responsibilities held and allocated between parties.  If, however, the substance and form

of a transaction do not comport, then the substance of the transaction controls for purposes of U.S.

federal tax law.  *See* *Nebraska Dept. of Revenue v. Loewenstein,* 513 U.S. 123 (1994).  *See also*

*Union Planters Nat. Bank of Memphis v. United States,* 426 F.2d 115, 118 (6th Cir. 1970) ("[i]n

cases where the legal characterization of economic facts is decisive, the principle is well established

that the tax consequences should be determined by the economic substance of the transaction, not

the labels put on it for property law (or tax avoidance) purposes"). *See also* *Comm'r v. Duberstein,*

363 U.S. 278, 286 (1960).  In assessing whether the form of the transaction accurately captures the

substance, the court should consider the totality of the circumstances under which the transaction

arose. *See, e.g., Comm'r v. Culbertson,* 337 U.S. 733, 742 (1949); *Smith v. Comm'r,* 937 F.2d 1089,

-34-

Case No. 1:07-CV-857
Gwin, J.

1099 (6th Cir. 1991); *TIFD III-E, Inc. v. United States,* 459 F.3d 220, 231 (2nd Cir. 2006).

In this case, the Plaintiffs present three primary arguments regarding their asserted tax positions for the Taxable Years.  First, the Plaintiffs claim that they are entitled to the deductions for depreciation and amortization of transaction costs, saying that the Trust became the owner of the Facility on December 7, 1999 for purposes of U.S. federal income tax law. Second, the Plaintiffs say that they are entitled to deduct interest expenses that they incurred for the 1999 Series A and Series B Loans that the Trust entered into with the German Banks.  Finally, the Plaintiffs say that the IRS erroneously asserted accuracy-related penalties against them for the Taxable Years' returns.

The Court will evaluate each asserted tax deduction in turn.

### B. Depreciation and Amortization Deductions: The Economic Substance of the Transaction

This Court concludes that, while the AWG SILO transaction does have some economic substance apart from the tax benefits, the transaction's stated form as a "sale" is not consistent with its economic reality.  Because the Court finds that the Trust never actually became the owner of the Facility for purposes of U.S. federal tax law, the Court concludes that the Trust is not entitled to the depreciation or amortization deductions claimed on its tax returns for 1999, 2000, 2001, 2002, and 2003 ("the Taxable Years").  After discussing relevant case law on the issue, the Court will then analyze the AWG transaction under both the "economic substance" and the "substance over form" tests.

### 1. Applicable Case Law: The Fourth Circuit's *BB&T* Decision

There is a surprising lack of case law on the issue of the tax treatment to be given a sale-in/lease-out ("SILO") transaction or its closely related kin, the lease-in/lease-out ("LILO") transaction.  The Sixth Circuit Court of Appeals has not directly addressed the question.  In fact, the

Case No. 1:07-CV-857
Gwin, J.

only relevant litigation involving a relatively similar set of facts was recently decided by the Fourth

Circuit in *BB&T Corp. v. United States,* 523 F.3d 461, 465 (4th Cir. 2008).

In sum, *BB&T* involved a lease-in/lease-out ("LILO") transaction in which Sodra, a paper mill

company in Sweden, purportedly transferred a leasehold interest in paper processing equipment (the

"Equipment") to BB&T, a U.S. taxpayer.  The Equipment was then simultaneously leased back to

Sodra, and Sodra's lease payments were secured through Debt and Equity PUAs. At the end of the

initial lease period, Sodra will hold a pre-financed option to reacquire the Equipment at a fixed

purchase price.

A more detailed review of the facts in *BB&T* is instructive in comparing that case to this

present litigation.  On June 30, 1997, Sodra and BB&T, through a Trust, entered into a 36-year lease

(the "Head Lease") with BB&T purportedly acquired a leasehold interest in the Equipment.  BB&T

then immediately leased the interest in the Equipment back to Sodra for 15.5 years (the "Lease").

*BB&T Corp. v. United States,* 2007 WL 37798, at *1 (M.D. N.C. 2007).  At the end of this 15.5 year

Lease, Sodra was given an option to reacquire the Equipment and to terminate the Head Lease for

a pre-set price.

Under the Head Lease, BB&T agreed to make two rent payments to Sodra: an $86.2 million

Initial Head Lease Payment that was due at closing, and a $557.8 million Deferred Head Lease

Payment that is due in 2038, five years after the Head Lease period ends.  *Id.* at *2.  This Deferred

Head Lease Payment would obviously not be made if Sodra elects to exercise the 2013 option to

repurchase the Head Lease and the equipment.  To fund the 1997 $86.2 million payment to Sodra,

BB&T contributed $18.2 million of its own funds and borrowed $68 million in the form of a

non-recourse loan from a Swedish bank.

-36-

Case No. 1:07-CV-857
Gwin, J.

At closing, the agreement with BB&T, required Sodra to place the $86.2 million in trust accounts that were committed to paying Sodra's lease payments to BB&T under the sublease. Of the $86.2 million that BB&T paid Sodra for the Head Lease Payment, $80 million was used to fund the PUAs and the remaining $6.2 million was transferred to Sodra's account at the Swedish bank as an "incentive" for doing the transaction.  *Id.*

Also under the terms of the participation agreement, Sodra must make annual rent payments to BB&T, and these rent payments are identical to BB&T's scheduled loan payments to the Swedish banks until 2013.  The Debt PUA payments therefore satisfy both Sodra's rent payments and BB&T's loan obligations exactly in amount and timing during the initial lease period.  *Id.*

In 2013, Sodra has an option to elect a Fixed Purchase Option, to reacquire the Equipment for a pre-set price of approximately $46.9 million that is fully funded by the Debt and Equity PUAs. *BB&T,* 2007 WL at *3.  If Sodra declines the option in 2013, however, then BB&T can either require Sodra to renew the lease for 13.3 more years (the "Sublease Renewal"), enter into a lease with a third party (the "Replacement Sublease"), or take possession of the Equipment for itself (the "Return Option").  If Sodra does not elect the FPO option and BB&T does not require it to renew the lease, then Sodra is entitled to the approximately $12 million in the Equity PUA.  *Id.*

In 2004, BB&T filed a complaint in the U.S. District Court for the Middle District of North Carolina, seeking a refund of taxes that it claims to have overpaid.  BB&T alleged that it was entitled to tax deductions for rent and interest expenses for the above-described transaction that the IRS disallowed.  The district court granted summary judgment in favor of the Government. *BB&T Corp. v. United States,* 2007 WL 37798, at *12 (M.D. N.C. 2007).  The district court concluded that BB&T was not entitled to take deductions for rent because BB&T had not acquired sufficient

-37-

Case No. 1:07-CV-857
Gwin, J.

ownership interest in the Head Lease. *Id.* at *8. The district court further concluded that the transaction merely created a cycle of off-setting obligations between BB&T and Sodra that, in reality, only required BB&T to expend transaction costs. *Id.* at *9-10. Finally, the court found that BB&T was not entitled to interest deductions on the grounds that BB&T had not acquired genuine indebtedness because it was "clear that the loan transaction is only a circular transfer of funds in which the [Swedish bank] loan is paid from the proceeds of the loan itself." *Id.* at *11.

BB&T appealed the district court's decision to the Fourth Circuit Court of Appeals. The Fourth Circuit received amicus briefing, including a brief submitted on behalf of a trade association that Key and PNC affiliates are members. Chief Judge Williams wrote the opinion for the court. Former Chief Judge Wilkinson concurred. In a unanimous decision, the Fourth Circuit affirmed the district court in all respects. *BB&T Corp. v. United States,* 523 F.3d 461 (4th Cir. 2008).

The Fourth Circuit first concluded that BB&T is not entitled to rent deductions because it did not acquire a genuine property interest in the Equipment. *Id.* at 472-75. The court found that BB&T failed to carry its burden of showing that it retained "significant and genuine attributes of the traditional lessor [owner] status" under the LILO transaction with Sodra. *Id.* at 472 (citing *Frank Lyon Co.,* 435 U.S. at 584). The court noted that every right and duty acquired by BB&T under the Head Lease was instantly returned to Sodra under the sub-lease during the initial term. *Id.* at 473. Further, the court concluded that, even though the transaction appears to involve the transfer of millions of dollars in rental payments during this initial period, the only cash that ever flowed between the parties was the approximately $6.2 million "incentive" payment that BB&T paid to Sodra at closing. *Id.* The Fourth Circuit further decided that the pre-funded fixed purchase option that Sodra could exercise in 2013 gave Sodra the power to "unwind the transaction without ever losing

-38-

Case No. 1:07-CV-857
Gwin, J.

dominion and control over the Equipment or having surrendered any of its own funds to BB&T, and

has no economic incentive to do otherwise." *Id.*  Finally, the court noted that the structure of the

LILO transaction effectively protects BB&T from any risk of loss of its initial equity investment.  The

Fourth Circuit ultimately concluded, "In sum, the transaction does not allocate BB&T and Sodra's

rights, obligations, and risks in a manner that resembles a traditional lease relationship." *Id.* at 473.

The Fourth Circuit further found that BB&T is not entitled to deduct interest paid on the loan

obtained from the Swedish bank because the underlying loan did not qualify as genuine indebtedness.

*BB&T Corp. v. United States,* 523 F.3d 461, 475-77 (4th Cir. 2008).  The court noted that Sodra has

no economic incentive in 2013 to decline the fixed purchase option and the exercise of the fixed

purchase option would eliminate any obligation on BB&T's part to make further payment on the loan.

*Id.* at 476.  The court concluded, "A party simply does not incur genuine indebtedness by taking

money out of a bank and then immediately returning it to the issuing bank. This principle holds true

even if the bank accepts the bookkeeping responsibility of repaying itself out of the loan proceeds for

the duration of the loan." *Id.* at 477.

The Plaintiffs urge this Court to distinguish the *BB&T* case from this present litigation.  First,

the Plaintiffs note that the *BB&T* case involved a LILO transaction, while this case involves a SILO

transaction.  Second, the Plaintiffs say that the cases are materially different because the Fixed

Purchase Option in this case does not represent the only economically feasible option for AWG,

whereas the Fourth Circuit concluded that the FPO was the only economically viable choice for

Sodra.  The Plaintiffs argue that economic ownership of the Facility will certainly transfer if AWG

exercises the Service Contract option in 2024. Further, the Plaintiffs argue that, unlike the BB&T

transaction, the AWG transaction does not eliminate all risk of economic loss to the Trust.  The

-39-

Case No. 1:07-CV-857
Gwin, J.

Plaintiffs say that the Service Contract option in this case has no "hell or high water" guaranteed return, so there is a substantial risk of loss for the Trust because it may lose its whole investment if the Facility is damaged or destroyed.

Facts and contract provisions drive any determination regarding whether a transaction sufficiently transfers an ownership interest. Each transaction need be judged on its own conditions. This Court finds that both the facts and legal issues presented by the *BB&T* case and this present litigation are similar in many regards. First, the structure of the transactions in both cases are remarkably alike. Both included long-term head leases and simultaneous sub-leases back. In this case, the head lease was sufficiently long to qualify as a sale for tax purposes. Both cases involve reciprocal "leases" that leave the original owner in substantially uninterrupted control of the asset through at least the initial lease period. In both cases, the subleases returned nearly all the rights and obligations obtained by the United States taxpayer under the head lease.

At the end of the initial sublease period, both Sodra and AWG own an option to repurchase their assets for a fixed price, and this option is fully pre-funded. In the *BB&T* case, the Fourth Circuit found the exercise of the purchase option was the near-certain result. Here, the option terms and background differ from the *BB&T* conditions and terms. But after examining the conditions and terms of the AWG option, the Court finds it extremely likely that AWG will exercise the option to repurchase the Facility because it will not be able to obtain the $383 million non-recourse loan that is required before the Service Contract option may be exercised in 2024. Although not determinative, the Court also finds it very unlikely that AWG exercise the Service Contract option because of political considerations that would flow from that decision.

Having concluded that the precedent set by the Fourth Circuit in *BB&T* is relevant and

-40-

Case No. 1:07-CV-857
Gwin, J.

instructive, although certainly not binding on this Court, the Court will now proceed to analyze the

AWG transaction under both the "economic substance" and the "substance over form" doctrines.

### 2. The Economic Substance of the AWG Transaction

The Sixth Circuit has held that the "proper standard in determining if a transaction is a sham

is whether the transaction has any practicable economic effects other than the creation of income tax

losses. A taxpayer's subjective business purpose and the transaction's objective economic substance

may be relevant to this inquiry." *Rose, 868 F.2d at 853* (internal citations omitted). The Court

therefore first considers whether the transaction has any genuine economic effects other than the

creation of tax benefits. If the Court finds some economic effects, then the Court evaluates whether

the Plaintiffs were truly motivated by profit to participate in the transaction. *See Dow Chem. Co.,*

*435 F.3d at 599*. In making this determination, the Court looks to the pre-tax profitability of the

AWG transaction. *See Am. Electric Power Co. v. United States, 326 F.3d 737, 743-44 (6th Cir.*

*2003)* (stating that "the point of the analysis is to remove from consideration the challenged

deduction, and evaluate the transaction on its merits, to see if it makes sense economically or is mere

tax arbitrage") (internal quotations omitted).

A sale-leaseback transaction may have economic substance if an objective assessment at the

beginning of the transaction indicates that the taxpayer has a reasonable possibility of generating a

pre-tax profit. *See, e.g., Levy v. Comm'r, 91 T.C. 838, 854 (Tax Ct. 1988)*; *Torres v. Comm'r, 88*

*T.C. 702, 718-19 (Tax Ct.1987)*; *Rice's Toyota World, Inc. v. Comm'r, 752 F.2d 89, 94 (4th Cir.*

*1985)*. The relevant inquiry for the Court is not whether the taxpayer's predictions regarding the pre-

tax profits are ultimately proven true, but rather whether the projections of cash flow and residual

value are reasonable at the time at which the taxpayer enters into the transaction. *See, e.g., Levy, 91*

-41-

Case No. 1:07-CV-857
Gwin, J.

T.C. at 858; *Torres,* 88 T.C. at 719.  The taxpayer generally must only show a reasonably expected, minimal pre-tax profit in order to prove that a transaction has economic substance and is not required to show that its transaction will yield a higher pre-tax return than all other possible investment opportunities.

In this case, at closing, the Plaintiffs had an initial outlay of $55 million dollars, excluding transaction costs.  During the Initial Leaseback Period, the only money that the Plaintiffs receive is the payment of $1.2 million to PNC in 2000.  If AWG exercises the Fixed Purchase Option in 2024, Key and PNC will each receive slightly over $39 million or a total of $78 million on their 24-year investment of $55 million. [Supp. Joint Stip., Doc. 105 at ¶¶ 113, 114.]

The internal rate of return serves as one industry standard for measuring pre-tax profitability. David Angel testified that the internal rate of return "is a way of calculating the pre-tax cash flows in the transaction." [Angel Tr., Doc. 178-1 at 87.] On average, Key and PNC typically receive internal rates of return between 2.5% and 3.5% on their leveraged lease transactions. [Pl. Ex. 171, Doc. 148-2; Angel Tr., Doc. 178-1 at 87-93.]  In comparison, the Plaintiffs will obtain an internal rate of return on the AWG transaction of approximately 3.4% if the 2024 purchase option is exercised. That return is consistent with the internal rate of return that banks generally receive from such deals. [Pl. Ex. 113, Doc. 141-2; Angel Tr., Doc. 178-1 at 90-91; Graves Tr., Doc. 178-1 at 798-801.]

The Government's expert, Thomas Lys, similarly testified that the Trust could reasonably expect to earn a pre-tax return of more than 3% during the Initial Leaseback period because the Plaintiffs will collectively gain approximately $80 million more than they spend between 1999 and 2023. [Lys Tr., Doc. 178-1 at 916.]  In the unlikely event that AWG exercises the Service Contract option, then the Trust's pre-tax return may exceed 5-8% depending on the business generated by the

-42-

Case No. 1:07-CV-857
Gwin, J.

Facility under the Service Contract.  *Id.* at 916-17.

After examining the totality of the circumstances that existed in 1999, the Court concludes that the Plaintiffs could have reasonably expected to make a small, but guaranteed, pre-tax profit that is sufficient to show that the transaction had some "practicable economic effects other than the creation of income tax losses."  *Rose,* 868 F.2d at 853.

Having concluded that the AWG transaction was not an economic sham, the Court must now consider whether the partners engaged in the transaction "for the primary purpose of making a profit."  *Bryant v. Comm'r,* 928 F.2d 745, 749 (6th Cir. 1991) (citing *Rose,* 868 F.2d at 853).  In evaluating whether the Trust entered into the AWG transaction with the primary goal of making a profit, the Court notes that even "a small chance of making a large profit can support a profit motive."  *Bryant,* 928 F.3d at 750.

The Court is convinced that the Plaintiffs were substantially motivated to enter into the AWG transaction by the tremendous tax benefits that they could generate by claiming ownership of the Facility.  The Court finds, however, that the Plaintiffs did in fact have a "small chance of making a large profit" in the highly unlikely event that AWG exercises the Service Contract option in 2024. As previously discussed, the Plaintiffs could have reasonably estimated that they would achieve an internal rate of return of more than 5-8% under the Service Contract.  In 1999, the Plaintiffs knew that changes in German law supporting waste-to-energy incineration plants, together with the ability to increase tipping fee rates under the Service Contract, supported their belief that they could generate significant profit should AWG enter into the Service Contract in 2024.

As will be discussed, the Plaintiffs included requirements in the 1999 Transaction that make a decision by AWG to enter the service contract near impossible.  Likely, these requirements were

-43-

Case No. 1:07-CV-857
Gwin, J.

intentionally inserted to force the 2024 exercise of the purchase option.  The Court will return to a discussion of these issues.  However, absent these disqualifying conditions, there is sufficient evidence to support the existence of a profit motive.

Because the Court does not find that the AWG transaction is a complete economic sham, the Court now turns to the "substance over form" analysis to evaluate whether the Plaintiffs are entitled to the depreciation and expenses amortization deductions that they seek as alleged "owners" of the Facility.

### 3. The Form of the AWG Transaction

The Plaintiffs argue that they became the owners of the Facility when the AWG transaction closed on December 7, 1999.  Accordingly, the Plaintiffs argue that, as owners of the asset, they are entitled to claim deductions for depreciation and amortization of transaction costs. The Government challenges this position and asserts that the Trust never acquired true ownership of the Facility and that the purported structure of the AWG sale-leaseback transaction does not comport with its true nature as a tax-avoidance financing scheme.

In order for the Plaintiffs to prevail on their claim that they are entitled to take depreciation and amortization deductions, they must prove that they both obtained and kept "significant and genuine" characteristics of ownership of the Facility.  *See Frank Lyon,* 435 U.S. at 584.  Such genuine attributes of ownership are generally found only where the alleged owner bears both the burdens and enjoys the benefits of asset ownership. *See Coleman v. Comm'r,* 16 F.3d 821, 826 (7th Cir. 1994).  If the partners possess the "benefits and burdens" of ownership, then the Court must respect the form of the AWG sale-leaseback transaction and cannot re-characterize it as a financing arrangement or as the purchase of a future interest.  *Frank Lyon,* 435 U.S. at 569, 583-84.  The

-44-

Case No. 1:07-CV-857
Gwin, J.

Plaintiffs, therefore, must establish that the Head Lease is, in reality, a true sale by AWG to the Trust and that the Trust acquired the significant and genuine attributes of traditional owner status. *See id. at 584.*

For the following reasons, the Court concludes that the AWG transaction is not properly characterized as a transfer of a depreciable ownership interest in the Facility to the Plaintiffs because: (i) no substantive benefits or burdens of ownership are transferred between the parties during the Initial Leaseback Period; (ii) no significant cash flows between the parties exist during the Initial Leaseback Period; (iii) the AWG transaction creates little, if any, risk for the Plaintiffs throughout the Head Lease; and (iv), most importantly, it is nearly certain that AWG will exercise the Fixed Purchase Option in 2024, thus ensuring that the Plaintiffs never actually acquire economic ownership of the Facility. In sum, the Court concludes that the Trust did not become the owner of the Facility at closing in 1999 and it is highly likely that the Trust never will acquire such ownership under the terms of the AWG sale-leaseback transaction.

*i. No Benefits or Burdens of Ownership Exchanged Between the Parties*

The Plaintiffs have failed to show that they enjoy the benefits or carry the burdens of owning a depreciable interest in the Facility. First, nearly every right and duty that the Trust received under the terms of the Head Lease was contemporaneously returned to AWG after the execution of the Leaseback for the 24-year Initial Leaseback period. Under the terms of the Leaseback, between 1999 to 2024, AWG keeps the same benefits and burdens of ownership that it has held since the Facility became operational in 1976. These rights and duties remain unchanged for AWG, despite its apparent "sale" of the Facility to the Trust and the Trust's simultaneous "lease" of the Facility back to AWG.

-45-

Case No. 1:07-CV-857
Gwin, J.

The Plaintiffs and AWG structured the 1999 transaction intending that it not be a sale under German law.  The Plaintiffs did not take legal title of the Facility.  AWG receives the right to "quiet enjoyment" of the Facility and Plaintiffs are only permitted to inspect the Facility on one calendar day each year.  Under the contract, AWG must maintain the Facility and make capital improvements to the Facility at its own expense.  Under its sublease, AWG may not sublet the Facility and can only assign its interest in the Facility with the Trust's consent.  Additionally, AWG has not treated the 1999 Transaction as a "sale" of the Facility.  In its audited financial statements, AWG continues to record the Facility as an asset on its balance sheet.

Under German law, the right to take depreciation follows the legal title unless someone else has the right to exclude the legal title holder during the tax useful life of the facility.  AWG takes depreciation on the Facility for German tax purposes.  In addition to maintaining the rights and benefits of economic ownership of the Facility under German law, AWG remains solely responsible for environmental liabilities related to the Facility.  Finally, AWG did not meet any of the regulatory requirements it would have needed to satisfy if it sold the Facility.

Under the terms of the AWG transaction, the Trust obtained the right to physically inspect the Facility on one day each year and the right to condemnation proceeds in the unlikely event that the Facility is taken by condemnation during the Initial Leaseback period. Apart from these rights, AWG retained all important ownership interests. Because the transaction also included guarantees by the municipalities and regional German governments, the risk of condemnation was extremely minimal.  Under German law, municipalities must dispose of waste and after 2005 such disposal must be done using incineration.  Against this backdrop, the Plaintiff offers no explanation why German officials would institute condemnation proceedings.

Case No. 1:07-CV-857
Gwin, J.

AWG, therefore, retains nearly all attributes of ownership, and the Plaintiffs acquire few such rights or burdens of ownership, during the initial term to 2024. AWG retains legal title to the Facility, possesses the Facility, maintains the Facility, pays all taxes and all costs on the Facility, operates the Facility, and improves the Facility. AWG remains responsible for maintaining insurance coverage, including paying for property damage and environmental liability insurance. AWG continues to retain all profits acquired from tipping fees, as well as the sale of electricity and steam heat, generated by the Facility. Simply described, the Plaintiffs enjoyed almost none of the attributes of ownership during the sublease term to 2024.

The record reflects that both the Plaintiffs and AWG structured the deal in this manner to avoid the transfer of any substantive rights or liabilities associated with ownership to the Trust and to ensure that AWG would continue to reap the tax benefits of ownership under German law. AWG itself accurately summarized the relationship between the parties during the Initial Leaseback Period when it informed the German tax authorities of the following:

> [P]ossession, use, and the obligations will at no time – not even for one legal second – be transferred to the U.S. Trust, if [AWG] exercises the FPO. By entering into the sublease, [AWG] will – if the transaction is consummated as agreed – obtain the incontestable right to use the [Facility] over the duration of the sublease term . . .

[Joint Ex. 28 (Adv. Tax Ruling Req.), Doc. 164-5 at CLIF-005512.]

The Court concludes that the substantive benefits and burdens traditionally associated with asset ownership were not transferred from AWG to the Plaintiffs during the initial sublease leaseback period to 2024.

*ii. No Cash Flows Between the Parties*

Second, despite the fact that the structure of the transaction purportedly results in the

-47-

Case No. 1:07-CV-857
Gwin, J.

exchange of hundreds of millions of dollars in purchase payments and subsequent rent payments

between the Trust and AWG, the only money that is ever actually exchanged from December 7, 1999

until January 1, 2024 is the $28.5 million received by AWG at closing and the $1.2 million payment

to be made from the Equity PUA to PNC on March 7, 2000.   [Joint Ex. 46 (PNC

Purpose/Transaction Summary), Doc. 166-5 at IRS-ADME0206; Joint Ex. 15 (PUA), Doc. 160-5

at IRS-ADM-003183; Joint Ex. 2 (Participation Agreement), Doc. 156; Joint Ex. 9 (Series A PUA),

Doc. 159-2 at IRS-ADM-002973;  Joint Ex. 10 (Nord LB PUA), Doc. 159-3 at IRS-ADM-002999;

Joint Ex. 25 (Closing Funding Mem.), Doc. 164-2 at IRS-ADM-00503-10.] With the exception of

the $1.2 million payment to PNC in 2000, the rent and debt payment schedules throughout the Initial

Leaseback Period are identical in both amount and timing.  These perfectly off-setting, circular

payments from and then back to the German banks strongly indicate that the AWG transaction has

little substantive business purpose other than generating tax benefits for the Plaintiffs between 1999

and 2024.

AWG has therefore not only continued to use, maintain, and operate the Facility in the exact

same way as it did before the AWG transaction, but it also has been able to do so without actually

paying any rent to the Trust out of its own pockets.

*iii. Minimal Risk to the Plaintiffs Under the AWG Transaction*

Third, the structure of the AWG transaction effectively protects the Plaintiffs from any

possible risk of financial loss, including the loss of its initial $55 million equity investment.  As the

Government's expert, Morris Shinderman, testified at trial, the AWG transaction does not carry any

of the substantive credit, residual value, or remarketing risks typically experienced by a lessor in a

-48-

Case No. 1:07-CV-857
Gwin, J.

leveraged lease.[11/]

      The transaction does not carry any substantive credit risk for the Plaintiffs.  AWG's purported rent payments were guaranteed by the German banks through the creation of the Debt PUAs and thus the likelihood of any payment default is highly improbable.[12/]  Further, as mentioned above, the Fixed Purchase Option ensures that the Plaintiffs will receive a small, but guaranteed, return on their 1999 equity investment.  Additionally, the transaction has a guaranty from the municipal members of AWG, backed by the German federal government.  Even in the unlikely event that AWG were to go bankrupt during the pendency of the relationship, the Plaintiffs are guaranteed a small positive rate of return because the Participation Agreement requires a letter of credit providing credit protection for a specified "termination value." This letter of credit serves as an investment protection, backing up the defeasance accounts and ensuring that the Plaintiffs would be made whole if AWG prematurely terminated the contract.

      Based on the letter of credit and PUAs, PNC classified the credit risk of the AWG transaction as a "1" on a scale of 1 to 6, with 1 being the lowest possible credit risk to PNC. [Keener Tr., Doc. 178-1 at 355-59; Joint Ex. 46 (PNC Purpose/Trans. Summ.), Doc. 166-5 at IRS-ADM-E0214; Joint Ex. 43 (PNC Risk Rating Grid), Doc. 166-2 at IRS-ADM-E0140.]  Further, even if there was a default that triggered a termination payment, the Plaintiffs would demand payment from AWG and could liquidate the collateral in the PUAs to meet their debt obligations to the German banks. [Angel

---

     [11/] Shinderman testified, in relevant part, at trial: "[I]n my judgment, the credit risk has been mitigated by the defeasance.  In my judgment, the remarketing risk at the end of the lease term has been mitigated by the need to enter into the purchase option or into the service contract. . . The residual value risk has also been taken care of by either the purchase option or the service contract.  The residual value risk in my judgment doesn't exist at the end of the lease term.  [Shinderman Tr., Doc. 178-1 at 1115.]

     [12/] Key knows of no PUA providers that have ever gone bankrupt.  [Angel Tr., Doc. 178-1 at 221; Meilman Tr., Doc. 178-1 at 526; Shinderman Tr., Doc. 178-1 at 1115-16.]

Case No. 1:07-CV-857
Gwin, J.

Tr., Doc. 178-1 at 166, 234-35; Shinderman Tr., Doc. 178-1 at 1115-16; Joint Ex. 16 (Letter of Credit), Doc. 161-1; Joint Ex. 12 (Guaranty Agreement), Doc. 160-12; Joint Ex. 46 (PNC Purpose/Transaction Summary), Doc. 166-5 at IRS-ADM-E0208, 214; Pl. Ex. 80 (Final Key Credit Package), Doc. 137-1 at KSP0169525-169532.]

The Plaintiffs suggest that they bear remarketing risks.  This would be true if it were likely that, in 2024, AWG would choose the service contract rather than the purchase option.  However, the Plaintiffs do not carry any substantive remarketing risk under the AWG transaction because, in 2024, AWG will  almost certainly reacquire the Facility by exercising the Fixed Purchase Option.

The Plaintiffs also do not experience any residual value risk under the AWG transaction.  When AWG exercises the Fixed Purchase Option in 2024, AWG will reacquire ownership of the Facility and the Plaintiffs will assume no residual risk.  Even in the highly unlikely event that AWG exercises the Service Contract option in 2024, the Plaintiffs are partially insulated from any residual value risk because they will receive an almost guaranteed return on their $55.1 million equity investment through the capacity charges that they will gain under the Service Contract.  Under their agreements, the capacity charges need be sufficient to retire all obligations under the substitute loan. The record shows that PNC knew that any possible residual risk would be mitigated by the capacity charges under the Service Contract.  [Keener Tr., Doc. 178-1 at 351-53; Shinderman Tr., Doc. 178-1 at 1115, 1117; Def. Ex. DDDDDD (PNC Leasing Presentation), Doc. 151-4 at PNC0005857.]

The fact that the Plaintiffs experience little, if any, substantive risk from the AWG transaction undermines their claim that they acquired a depreciable interest in the Facility on December 7, 1999. *See, e.g., Kwiat v. Comm'r,* 1992 WL 178603, at *6 (T.C. 1992); *TIFD III-E, Inc.,* 459 F.3d at 236-37.

Case No. 1:07-CV-857
Gwin, J.

### iv. The Fixed Purchase Option Will Be Exercised

Most importantly, in 2024, AWG has the ability to reacquire the Facility under the Fixed Purchase Option without ever having lost control or use of the Facility and without being required to expend any of its own money for the purchase. The Court finds that it is highly likely that AWG will exercise this Fixed Purchase Option in 2024, and that the parties intended this result when they closed the AWG deal on December 7, 1999. It is nearly certain that AWG will exercise the Fixed Purchase Option in 2024 because AWG will be financially unable to exercise the Service Contract option and, moreover, AWG will have little economic or political incentive to give up control of the Facility to the Trust under the Service Contract.

### a) The Fixed Purchase Option is the Only Economically Feasible Choice for AWG

First, the Court finds that it will not be economically feasible for AWG to exercise the Service Contract option in 2024 because it will not be able to secure the non-recourse financing that it is required to obtain as a condition precedent to its ability to enter into the Service Contract. In order to enter into the Service Contract, AWG must first arrange for a non-recourse refinancing of the entire $383 million in non-recourse debt that will still be outstanding in 2024. AWG cannot defease the obligations under the refinanced loan. [Joint Ex. 2, Doc. 156 at IRS-ADM-002149-50.]

The requirement that AWG, and not the Trust, must obtain non-recourse refinancing to avoid exercising the fixed purchase option contrasts with the Plaintiffs' argument that they intended to purchase the Facility with the 1999 transaction. According to the Plaintiffs, if AWG does not exercise the purchase option in 2024, the Trust would simply continue its ownership of the Facility and AWG would become a purchaser of services under the Service Contract. The 1999 transaction then requires the purchaser of services, AWG, to obtain a $383 million non-recourse loan for the

-51-

Case No. 1:07-CV-857
Gwin, J.

claimed owner of the Facility, the Trust.

The Plaintiff gives no plausible explanation why the purchaser of services, and not the claimed owner of the Facility, should face the burden of obtaining financing if it declines to exercise the Fixed Purchase Option. The Court surmises that the Plaintiffs likely included this refinancing provision in order to effectively force AWG into exercising the Fixed Purchase Option. The Transaction requirement that puts the burden upon AWG to obtain non-recourse financing if it elects the Service Contract in 2024 seems significantly inconsistent with the Plaintiffs' purported ownership of the Facility. This obligation is the functional equivalent to a requirement that a tenant under a lease be required to obtain refinancing for a landlord as a condition to renewing the lease.

Apart from the strangeness of requiring a non-owner to obtain difficult financing before that non-owner is permitted to enter a contract that is very favorable to the claimed owner, the re-financing seems impossible. In major part, lenders look to the value of collateral in deciding whether to offer non-recourse financing. Thomas Lys, an accounting professor from the Kellogg School of Management at Northwestern University, testified persuasively that AWG will be compelled to exercise the Fixed Purchase Option in 2024 because it will be unable to obtain the required non-recourse refinancing of the $383 million loan balance. The Plaintiff's appraiser, Deloitte, estimates that the Facility will be worth $390 million in 2024. Lys testified that, under Deloitte's own projections, AWG would be requesting a non-recourse loan with a loan-to-value ratio of over 98%.

If non-recourse financing could be obtained, a provision in the Service Contract requires AWG to make an initial $50 million payment. The true amount of the non-recourse loan required to enter the Service Contract, therefore, would be $333 million. Even with this payment, however, the loan-to-value ratio of the non-recourse loan that AWG is required to obtain would be in the range

-52-

Case No. 1:07-CV-857
Gwin, J.

of 85%, significantly above what could be obtained.

Because the non-recourse loan cannot be legally or economically defeased under the Participation Agreement, any lender would need look to the value of the Facility for repayment in the event of default. Lys testified that it would be practically impossible for AWG to obtain non-recourse financing with such a high loan-to-value ratio. He testified that a 2005 survey of German lending "shows that loan-to-value ratios in Germany range up to 67 percent. But understand, the 67 percent is for perfect asset that has a very high debt capacity." [Lys Tr., Doc. 178-1 at 903.] It is unlikely that the AWG Facility could even support a 67 percent loan-to-value ratio. The AWG Facility is "illiquid, unique and has no alternative uses." *Id.* at 902.

Without defeasance or recourse, the Court finds that AWG would not be able to obtain the requisite non-recourse refinancing. The Court therefore concludes that AWG will be compelled to exercise the Fixed Purchase Option in 2024 and that this ultimate outcome was known by the parties to the AWG transaction in 1999.

To rebut this, the Plaintiffs say that other Participation Agreement provisions would cause lenders to support a higher loan-to-value ratio. The Plaintiffs argue that the collateral available to a lender in this scenario would include more than just the value of the Facility. They claim that AWG would in fact be able to obtain the requisite non-recourse refinancing in 2024 "based on the expected value of the Facility, the substantial collateral package available at that time, and the short average life of the refinanced debt. The collateral package includes the Trust's interest in the Service Fees, which alone will be sufficient to service the debt on the new loans. The collateral package also includes guarantees by the bankruptcy-remote German Cities." [Pl. Post-Trial Prop. Conc. of Law, Doc. 118 at 81.] This Court disagrees.

-53-

Case No. 1:07-CV-857
Gwin, J.

The Court has already addressed the fact that the expected value of the Facility, under Deloitte's own projections, will be insufficient for AWG to secure non-recourse financing at a remotely reasonable loan-to-value ratio.  Further, the Court notes that the Service Fees under the Service Contract are not to be paid on a "hell or high water" basis. [Joint Stip., Doc. 83-1 at ¶ 102.] This means that, under the Service Contract option, AWG is required to pay Service Fees to the Trust only to the extent that the Trust actually performs the obligations required of it under the Service Contract. If a disruption in service occurs such that AWG's solid waste does not get incinerated by the Facility, then AWG is not required to pay the fees.  [Angel Tr., Doc. 178-1 at 208-16; Joint Ex. 13, Doc. 160-3 at IRS-ADM-003105-06, 003114.]  Lys logically testified that a lender must evaluate whether to extend non-recourse financing based on an assumption of default by the borrower, which in this case means an assumption that the Facility is no longer operable.  In such a case, AWG would not be required to pay Service Fees to the Trust and such fees would not be included in the estimated value of collateral for a lender considering whether to lend AWG a non-recourse loan in 2024.

Finally, the Court finds that it is highly unlikely that AWG's municipal shareholders would provide a guarantee of AWG's obligations under the Service Contract to pay Capacity Charges and Service Fees.  AWG's procurement of this guarantee is a condition precedent to their ability to enter into the Service Contract and the guarantee must be approved by the county of Dusseldorf. Dr. Matthias Heisse testified at trial that an "obstacle" to entering into the Service Contract would be convincing the German cities of Wuppertal and Remscheid to extend such a guarantee. [Heisse Tr., Doc. 178-1 at 1031.] Heisse testified that, while the municipalities signed the original guarantee in 1999 because the defeasance accounts protected it from the risk of serious financial loss, the 2024 guarantee would be a much more risky, controversial political and economic choice for the German

Case No. 1:07-CV-857
Gwin, J.

cities.  Heisse testified:

> A: [I]f you look at the service contract situation, there will be no money in the defeasance account so it will be a real guarantee guaranteeing the service charges and the capacity charges.  So this might be a different situation.
>
> Q:  But are such guarantees, do they happen often?
>
> A:  Not too often, because the municipalities are limited in their possibility of giving guarantees, and that is in the municipal code.  And they have only very limited permission.  And in this case, they have to not only report it to the authority, but they also need the consent.  And this is to prevent municipalities from going into financial risks, obviously.

[Heisse Tr., Doc. 178-1 at 1042-43.]

The Plaintiffs have not presented sufficient evidence of any incentive that exists for the German municipalities to extend such a high-risk guarantee to AWG in 2024, particularly since such a financial guarantee would be undertaken in order to secure an otherwise politically unpopular decision.

As a result, the Court concludes that a lender would only consider the value of the Facility in estimating the collateral available to it in case of default and, based on the analysis presented above, any reasonable lender would be unwilling to lend on a non-recourse basis the amount of funds that AWG would need to enter into the Service Contract.  The Court therefore concludes that the Fixed Purchase Option is the only viable choice for AWG in 2024.

### b) The Fixed Purchase Option is the Economically Dominant Option for AWG

Second, the Court finds that, even if AWG were able to obtain the required refinancing, the Service Contract option is not an economically desirable option for AWG.  The Plaintiffs argue that AWG will be economically better off under the Service Contract option than under the Fixed Purchase option because, under the Service Contract, in 2024, AWG will directly receive the $521

-55-

Case No. 1:07-CV-857
Gwin, J.

million cash balance from the PUAs.  This Court disagrees.  At the outset, the Court notes that under

the Service Contract, AWG will be immediately required to pay $50 million in capacity charges in

2024, reducing the actual amount of cash that AWG would receive in 2024 under the Service

Contract to approximately $471 million.

The 1999 Deloitte report that supported the argument that AWG would likely enter the

Service Contract relies upon unsupported assumptions.  If the Service Contract is chosen, Deloitte

says AWG could deduct capacity and other charges and applies a 40.85% marginal tax rate.  This

assumption was obviously wrong and significantly overstates the expenses deductible under the

Service Contract.[13]  The Deloitte report accompanies this error with the inconsistent assumption that

the $521 million received from the PUAs would not be taxable in 2024.  Obviously, if the $521

million were taxable at 25% it would reduce the after-tax return from entering the Service Contract

by over $130 million.

In 1999, AWG did not recognize a sale of the Facility under German law and has not

recognized any PUA assets on its balance sheet.  If AWG exercises the Fixed Purchase Option, it is

unlikely that any tax would be imposed. Since AWG is the current economic owner of the Facility

under German law, its reacquisition of the Facility will not be treated as a taxable event.  On the other

---

[13] Plaintiff's German tax law expert, Werner Jacob testified:

Q.    And I would like to direct your attention to 1999 and what you knew in 1999 about
      corporate  taxes and what the parties to this transaction therefore would know.

A.    Yes. I think in 1999, too, there were good reasons to believe that the tax would not be 25
      percent. . . They [corporate tax rates] went down in consecutive steps until in 1999 it was
      announced that tax would be lowered to -- tax rate to 25 percent, and at the time being
      we're at 15 percent.

[Jacob Tr., Doc. 178-1 at 731-32.]

Case No. 1:07-CV-857
Gwin, J.

hand, it is probable that AWG's receipt of the $521 million in cash under the Service Contract option would be recognized as a taxable event in 2024.

Recognizing that no one can predict what the exact German tax rate will be in 2024, Lys utilized a cost benefit analysis to examine AWG's choice in 2024 between the Fixed Purchase and Service Contract options using a variety of different tax rates and concluded that, in all remotely likely scenarios, the FPO will be the economically preferable choice for AWG. Most important to this finding, Lys disregarded Deloitte's unsupported assumption that AWG could deduct $298.7 million from its taxes by using a 40.85 percent tax rate against the $731.2 million in capacity charges that it will pay to the Plaintiff Trust over the 12-year life of the Service Contract. When adjusted to actual or reasonable tax rates, the Service Contract becomes much less economically viable. In general, the fixed price option is more desirable whenever the tax rate is less than 29%. [Def. Gr. 5, Doc. 151-9; Lys. Tr., Doc. 178-1 at 898.]

Even setting aside the German tax consequences of AWG's decision to enter into the Service Contract in 2024, the Court concludes that the Service Contract will be less economically desirable than the Fixed Purchase Option to AWG. Under the Service Contract, AWG must pay "Capacity Charges" to the Plaintiffs. Deloitte, the Plaintiffs' own appraisers, estimated that over the 12-year Service Contract, AWG will incur additional capacity charges of DM 1.61 billion, or $851.9 million, on top of the operating and maintenance expenses that AWG will also need to pay under the Service Contract. [Pl. Ex. 119 (Appraisal), Doc. 142 at PNC0005175-5177.] Under the Service Contract, AWG will need pay this amount out of their operating funds. The Capacity Charges alone cost AWG $380 million more than the $471 million in cash that it would receive in 2024 under the Service Contract option. In 2024, AWG Directors must therefore choose whether it is better to receive $471

-57-

Case No. 1:07-CV-857
Gwin, J.

million less any amount paid for taxes when the receipt of that money is conditioned upon their

agreement to pay back $851.9 million over twelve years.

No evidence identifies what benefit would accompany the 2024 receipt of monies when

accompanied by the obligation to pay so much more during the Service Contract.  In other words,

nothing explains what benefit would flow to AWG from receiving the $521 million attached to an

obligation to pay $851.9 million over twelve years.

Although neither this Court nor the parties can predict the future, there is sufficient evidence

in the record to strongly suggest that AWG will exercise the Fixed Purchase Option.  We know that

if the fair market value of the Facility in 2024 is less than anticipated, AWG will be more likely to

enter into the Service Contract rather than pay the overpriced Fixed Purchase Option amount.   But

if the value of the Facility has declined significantly below the option price, AWG will almost certainly

be unable to obtain the non-recourse refinancing that is a condition precedent to its ability to enter

into the Service Contract.  If, on the other hand, the fair market value of the Facility in 2024 is greater

than anticipated, then AWG will have an economic incentive to repurchase the Facility for the fixed

purchase price instead of absorbing all the financing costs created by the Service Contract and

waiting until 2036 to reacquire the Facility at fair market value.  In sum, AWG will therefore be

unable to enter into the Service Contract option when it is desirable to exercise the Service Contact

option, and will be unwilling to enter into the Service Contract option when it is feasible to exercise

the Service Contract option.

Third, in addition to the lack of financial incentives for AWG to exercise the Service Contract

option, the Court finds that AWG's decision to enter into the Service Contract would also be

politically unpopular.  In 2024, the German bureaucrats and politicians who control AWG's decision

Case No. 1:07-CV-857
Gwin, J.

will likely choose the Fixed Purchase Option.  If the German politicians exercise the Service Contract

option in 2024, they will essentially be turning over control of the plant to an independent third party

service provider that will be chosen by the U.S. Trust.  Under the terms of the Service Contract,

AWG will become a mere customer of the Facility, instead of the owner, and will be required to pay

very significantly increased Capacity Charges together with operation and maintenance costs.  AWG

will likely need to substantially increase the tipping fees that it charges to the voters who elect the

politicians that comprise AWG and to its neighbors for the disposal of their solid waste.

The Plaintiffs say that the German politicians who control the municipalities that own AWG

would have an incentive to enter into the Service Contract because they would receive a "free" $521

million in cash in 2024 that they could use for any purpose.  The Court has already explained that

AWG will not actually receive this sum because AWG is required to repay $50 million immediately

and will also likely be expected to pay significant taxes on this $471 million.  Further, the amount of

cash received in 2024 will likely be overshadowed by the costs and expenses incurred by AWG under

the Service Contract.  Even assuming that AWG receives a significant amount of "free" cash in 2024,

however, the Court concludes that the Service Contract option will likely be politically unpopular.


For all of these reasons, the Court finds that AWG will exercise the Fixed Purchase Option

in 2024.  Further, the Court finds that the Plaintiffs were virtually certain of this outcome when they

closed the AWG transaction on December 7, 1999.

### v. The Substance, Not the Form, of the AWG Transaction Must Control

In sum, the AWG transaction does not allocate the rights, responsibilities, and risks between

AWG and the Plaintiffs in a way that resembles a traditional sale.  Further, as in the *BB&T* case, the

-59-

Case No. 1:07-CV-857
Gwin, J.

Plaintiffs here have "failed to show any 'business or regulatory realities' that 'compelled or encouraged' the structure of the transaction at issue here, nor has it established that its [SILO] is 'imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached.'" *BB&T Corp. v. United States,* 523 F.3d 461, 473 (4th Cir. 2008) (internal citations omitted).

Accordingly, this Court concludes that, in reality, the AWG transaction is a financing arrangement designed in significant measure to increase tax deductions available to the Plaintiffs. The AWG transaction was is not a genuine sale and leaseback.  Essentially all that the Trust did was to pay AWG a $28.5 million accommodation fee to sign paperwork meeting the formal requirements of a sale and leaseback and to arrange a circular and largely meaningless flow of cash from and then back to Norddeutsche Landesbank and Landesbank Baden-Wurttenburg.  AWG, meanwhile, continues to have undisturbed and uninterrupted possession and control of the Facility, continues to claim the tax benefits of ownership of the Facility under German law, and has no economic or political motivation to give up control of the plant to the Plaintiffs at any time.  Because the Plaintiffs never became the true owners of the Facility, they are not entitled to deductions for the depreciation or amortization of expenses associated with the asset.

### C. Entitlement to Interest Deductions: The Genuineness of the Underlying Debt

The Plaintiffs also argue that they are entitled to deduct interest paid or accrued on the 1999 Series A and Series B Loans from their reported taxable income on their returns for the Taxable Years under 26 U.S.C. § 163(a). The Government opposes this asserted tax position and contends that the loans at issue are not genuine debts because they lack a business purpose other than the creation of tax benefits and they consist solely of "loop debt" in which the loan proceeds are used

Case No. 1:07-CV-857
Gwin, J.

solely for the purpose of paying the purported debt.

26 U.S.C. § 163(a) provides that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." 26 U.S.C. § 163(a).  The Supreme Court has generally defined "interest" as "compensation for the use or forbearance of money."  *See, e.g., Comm'r v. Nat'l Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 145 (1974) (internal citation omitted).  In order for a taxpayer to take such a deduction, however, the underlying debt on which the interest is paid must be genuine.  *Bridges v. Comm'r,* 325 F.2d 180, 184 (4th Cir. 1963).  *See also Goldstein v. Comm'r,* 364 F.2d 734, 742 (2nd Cir. 1966), *cert. denied,* 385 U.S. 1005 (1967) (holding "Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction").  In deciding whether economic advances made to a corporation are true debt, courts must consider "whether the objective facts establish an intention to create an unconditional obligation to repay the advances." *Indmar Products Co. v. Comm'r,* 444 F.3d 771, 776 (6th Cir. 2006) (citing *Roth Steel Tube Co. v. Comm'r,* 800 F.2d 625, 630 (6th Cir. 1986).

> The Sixth Circuit has embraced the Second Circuit's definition of "debt" for tax purposes as:
>
> [A]n unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof.  While some variation from this formula is not fatal to the taxpayer's effort to have the advance treated as a debt for tax purposes, . . . too great a variation will of course preclude such treatment. The question becomes, then, what is "too great a variation"?

*Indmar Products,* 444 F.3d at 776 (citing *Gilbert v. Comm'r,* 248 F.2d 399, 402-03 (2nd Cir. 1957) (internal quotation marks omitted).[14]

---

[14] This Court recognizes that non-recourse debt may be considered genuine indebtedness for tax purposes if
(continued...)

-61-

Case No. 1:07-CV-857
Gwin, J.

In *Roth Steel*, the Sixth Circuit established several non-exhaustive factors to consider in

evaluating whether an economic advance constitutes debt or equity.  These factors include:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the
> presence or absence of a fixed maturity date and schedule of payments; (3) the
> presence or absence of a fixed rate of interest and interest payments; (4) the source
> of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of
> interest between the creditor and the stockholder; (7) the security, if any, for the
> advances; (8) the corporation's ability to obtain financing from outside lending
> institutions; (9) the extent to which the advances were subordinated to the claims of
> outside creditors; (10) the extent to which the advances were used to acquire capital
> assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Indmar Products,* 444 F.3d at 777 (citing *Roth Steel,* 800 F.2d at 630).  In considering the *Roth Steel*

factors, the Sixth Circuit has explained that "[n]o single factor is controlling; the weight to be given

a factor (if any) necessarily depends on the particular circumstances of each case." *Indmar Products,*

444 F.3d at 777.

The Plaintiffs say that they are entitled to tax deductions for the interest paid on the Series

A and Series B Loans because the non-recourse loans constitute genuine indebtedness for federal tax

purposes.  The Plaintiffs argue that Deloitte appraised the fair market value of the Facility in 1999

at $423 million and that this fair market value of the asset serving as collateral exceeds the total

amount of debt, which was approximately $368 million, in 1999.  The Plaintiffs also say that the fair

market value of the Facility will likely exceed the amount of the debt at all times during the duration

of the loan.

------

[14]/(...continued)
it meets the other generally accepted criteria for genuine debt.  *See Crane v. Comm'r,* 331 U.S. 1 (1947).  Several
Circuit courts and IRS regulations indicate that non-recourse debt may be respected as true indebtedness if, at the time
that the economic advance is made to the taxpayer, the fair market value of the asset securing the loan exceeds the
amount of the debt.  *See Odend'hal v. Comm'r,* 748 F.2d 908 (4th Cir. 1984); *Estate of Franklin v. Comm'r,* 544 F.2d
1045 (9th Cir. 1976); *Pleasant Summit Land Corp. v. Comm'r,* 863 F.2d 263 (3rd Cir. 1988); *Gibson Products Co.
v. United States,* 637 F.2d 1041 (5th Cir. 1981); Rev. Rul. 77-110, 1977-1 C.B. 58; Rev. Rul. 78-29, 1978-1 C.B. 62.

Case No. 1:07-CV-857
Gwin, J.

The Court agrees with the Plaintiffs that the fair market value of the Facility will likely exceed the amount of the outstanding debt during the initial sublease period, but finds that this issue is not dispositive in its consideration of whether the Series A and B Loans were genuine debts.  The Court has already concluded that the Plaintiffs did not purchase economic ownership of the Facility in 1999, and the Court finds that the Plaintiffs' emphasis on the relationship between fair market value of the asset and the amount of debt incurred focuses too narrowly on whether the German banks' initial decision to lend the Plaintiffs money was rational.  Rather, the real issue that the Court must examine is whether the Plaintiffs' obligation on the debt was genuine.

As to this dispositive issue, the Plaintiffs assert that the debt that they allegedly incurred under the Series A and Series B loans constitutes genuine indebtedness under the Sixth Circuit's *Roth Steel* test because (1) the Series A and B Loans are evidenced by debt instruments, the Loan Certificates, and were issued in registered form; (2) the Series A and B Loans have a fixed maturity date and a specified principal amortization schedule; (3) the Loans are governed by a specified, fixed interest rate; and (4) the Loans are not subordinated to the claims of outside creditors.  The Court agrees that the Series A and B Loans satisfy these four factors under the *Roth Steel* analysis.

The Court finds, however, that the *Roth Steel* factors are inconclusive in determining whether the Series A and B Loans constitute genuine indebtedness for federal tax purposes.  Some of the *Roth Steel* factors are entirely inapplicable to the present case due to the sale-leaseback nature of the transaction.  Others weigh heavily against a determination that the Loans constitute true debt.  For example, the Sixth Circuit has instructed courts to look to the source of repayment as an important consideration in evaluating whether an advance constitutes a debt for tax purposes.  *Indmar Products,* *444 F.3d at 777*.  This factor weighs heavily against judicial treatment of the Series A and B Loans

-63-

Case No. 1:07-CV-857
Gwin, J.

as genuine debt.

The source of repayments on the Series A and B Loans are the proceeds of the Series A and B Loans themselves.  The entire AWG transaction is structured to ensure that the Debt PUAs, fully funded by the proceeds of the Loans, are used to repay the Loans.  In *Indmar Products*, the Sixth Circuit explained that "[r]epayment can generally come from 'only four possible sources . . .: (1) liquidation of assets, (2) profits from the business, (3) cash flow, and (4) refinancing with another lender.'" *Id.* at 781 (citing *Bordo Products Co. v. United States,* 476 F.2d 1312, 1326 (Ct. Cl. 1973)).  In this case, however, the true source of repayment of the Loans *are* the Loans.  The Plaintiffs' own assets, profits, and cash flow have no bearing on the repayment of the Loans.  At closing, the Plaintiffs did not need to provide any funds for repayment of the Loans and, during the entire initial lease period, every single one of their principal and loan payments will be made from the Debt PUA accounts and will require no additional expenditure.[15/]

Even in the highly unlikely event of default by the Debt PUAs, the Plaintiffs will still not be obligated to use their own funds to repay the Series A and Series B Loans.  In the event of default, the Series B Loan is extinguished by a matching deposit and AWG will become the holder of the Series A Loan Certificates. [Joint Ex. 2, Doc. 156 at IRS-ADM-002148.]  If AWG becomes the holder of the Series A Loan Certificates, AWG cannot set off rent payable by it under the Leaseback

---

[15/] The Court notes that while the terms of the Participation Agreement give AWG the basic right to seek undefeased refinancing of the Series A and B Loans during the initial lease period, the Plaintiffs indisputably have the right to veto any attempted refinancing by claiming that the terms would in some way be less favorable to them.  In fact, the Participation Agreement contains seventeen conditions precedent that AWG must satisfy in order to exercise its right to refinance. [Joint Ex. 2, Doc. 156 at IRS-ADM-002157-60.]  Further, even in the highly unlikely event that AWG could satisfy all of these conditions, AWG would still be required to pay a prohibitively costly "Make Whole Amount" to the German banks on the date of refinancing that would include any outstanding principal and the German banks' entire expected return from the Loans, discounted at the then-current U.S. Treasury rate. *See* Joint Ex. 8, Doc. 159-1 at IRS-ADM-002918; Shinderman Tr., Doc. 178-1 at 1119; Angel Tr., Doc. 178-1 at 1174-75.

Case No. 1:07-CV-857
Gwin, J.

against debt service owed to it on the Series A Loan. *Id.*  Should the PUAs go bankrupt, therefore, the Series A Loan will remain in existence, but the borrower will no longer be the Trust; rather, the burden of repayment will be carried solely by AWG.  In such a situation, AWG would remain liable to the Plaintiffs for amounts owed as "rent" during the initial sublease period. [Joint. Ex. 9 (Series A PUA), Doc. 159-2 at IRS-ADM-002974-75; Joint Ex. 10 (Nord LB PUA), Doc. 159-3 at IRS-ADM-003000-01.]

In considering the totality of the circumstances and issues presented by this uniquely structured SILO transaction, the Court concludes that several other factors should be considered in evaluating whether the Series A and B Loans constitute genuine indebtedness.  First, the Court notes that the funds acquired through the Series A and B Loan were contractually dedicated to one purpose: paying off the Series A and B Loans.  In reality, the German banks "loaned" the Plaintiffs money on a non-recourse basis.  The Plaintiffs then immediately gave these funds to AWG at closing as the "price" of the Head Lease.  AWG then "paid" the German banks as consideration for their undertaking of AWG's "rent" obligations under the PUAs.  All of these transactions occurred instantaneously and, therefore even if this Court were to accept the form of the structure, the cash flows were circular and the funds never truly left the hands of the German banks.

Moreover, as the Court has already concluded that the Plaintiffs did not become the economic owners of the Facility in 1999 for federal tax purposes, the Plaintiffs did not use the loans to acquire ownership of a capital asset.  By the terms of the Participation Agreement, the funds in the PUAs are committed to the payment of the off-setting "rent" and "loan" payments during the initial sublease period.  The circular cash flows of the AWG transaction mean that neither the Plaintiffs nor AWG will ever be able to use the Series A and B Loan funds to invest in the Facility or to engage in any

Case No. 1:07-CV-857
Gwin, J.

other economically productive endeavor.  The loans at issue lack any substantive business purpose other than creating this "loop debt" between the Plaintiffs, AWG, and the German banks to generate tax benefits for the Plaintiffs.

The structure and intended use of the Series A and B Loans in this case is remarkably similar to the loan at issue in the *BB&T* case.  In *BB&T*, the taxpayer argued that it was entitled to interest deductions for the loan it acquired from a Swedish bank (the "HBU Loan") because, under the terms of its Loan and Security Agreement, BB&T has a legal obligation to repay the loan.  The Fourth Circuit strongly disagreed.

First, the court remarked that "it is difficult to see how the 'interest' BB&T paid could represent 'compensation for the use or forbearance of money.'" *BB&T Corp.,* 523 F.3d at 476.  As in our case, the funds that the Swedish bank "loaned" the taxpayer were immediately returned to it at closing and placed into a Debt PUA account that was untouchable by the taxpayer.  Second, the Fourth Circuit noted that the fact that BB&T signed loan documents was insufficient to prove that the underlying debt was truly genuine because the court must consider the economic realities and true substance, not form, of the transaction.  *Id.*

The Fourth Circuit concluded that the HBU loan did not constitute genuine indebtedness for federal tax purposes.  The court explained that BB&T, in reality, incurred no obligation to repay the HBU loan because the source of repayment under the terms of the transaction was the Debt PUA account, fully funded by the proceeds of the HBU loan itself.  The Fourth Circuit reached this conclusion even in light of a provision in the BB&T transaction documents that BB&T would need make the final loan payment if Sodra were to exercise the Replacement Lease option or the Return option in 2013.  *Id.*  The AWG transaction contains no such provision personally obligating the Trust

-66-

Case No. 1:07-CV-857
Gwin, J.

to make any future payment on behalf of AWG.

> Finally, the Fourth Circuit concluded:
>
> A party simply does not incur genuine indebtedness by taking money out of a bank and then immediately returning it to the issuing bank.  This principle holds true even if the bank accepts the bookkeeping responsibility of repaying itself out of the loan proceeds for the duration of the loan.  *See Bridges v. Comm'r*, 39 T.C. 1064, 1077, *aff'd* 325 F.3d 180 (4th Cir. 1963) (concluding that a transaction "merely provided the 'facade' of a loan," as "there was no reason to think that [the taxpayer] . . . would have been called upon to pay the note out of his own funds or to put up additional collateral").

*BB&T Corp.,* 523 F.3d at 477.

This Court agrees with the Fourth Circuit's analysis in *BB&T* and concludes that the Plaintiffs are not entitled to deductions under § 163(a) for interest paid or accrued on the Series A and B Loans.  The underlying loans do not constitute genuine indebtedness because the Plaintiffs, at no point in time, will be required to use their own funds to repay the debt to the German banks.  Rather, the Plaintiffs craftily structured an entirely self-sustaining transaction in which the Series A and B Loans' proceeds would be used to pay for the Series A and B Loans' debt.  In the highly unlikely event that the Debt PUA accounts would go bankrupt before the balance of the Loans had been paid off, the Plaintiffs structured the transaction to ensure that AWG would be the only party to pay for such an unexpected wrinkle in the transaction.  The Plaintiffs never, at any point in time or under any circumstances, will actually be required to expend one dollar towards the repayment of the Series A and Series B Loans.

In light of such a transaction so clearly designed to generate tax deductions and without any other business purpose, the Court denies the Plaintiffs' claim that they are entitled to tax deductions for interest allegedly paid or accrued on the loop debt created by the Series A and B Loans.

-67-

Case No. 1:07-CV-857
Gwin, J.

### D. The Government's Imposition of Accuracy-Related Penalties

In this TEFRA partnership proceeding, the Court considers the applicability of accuracy-related penalties that have been asserted by the IRS against the Plaintiffs.  26 U.S.C. §§ 6221, 6226(f).  The Government bears the burden of production on the issue of the applicability of penalties, but the Plaintiffs carry the ultimate burden of proof in challenging such penalties.  *Pahl v. Comm'r,* 150 F.3d 1124, 1131 (9th Cir. 1998).

In this case, the IRS asserted that a penalty for substantial understatement of tax attributable to the Trust's treatment of the AWG transaction was proper under § 6662. An understatement of income tax, which is generally considered the difference between the amount of tax reported by a taxpayer on a return and the accurate amount of tax actually due, is "substantial" if it exceeds the greater of (1) 10% of the tax that should have been shown on the return, or (2) $5,000 (or in the case of corporations, $10,000).  26 U.S.C. § 6662(d)(1).  In determining whether an understatement exists, the Court must engage in a purely computational analysis.  26 U.S.C. § 6662(a) establishes accuracy-related penalties for such substantial understatements of tax in "an amount equal to 20 percent of the portion of the underpayment to which this section applies."  26 U.S.C. § 6662(a).

The amount of an understatement, however, must be reduced by any part of it that is attributable to the taxpayer's good faith reliance on substantial authority for such treatment. § 6664(c)(1) provides, "No penalty shall be imposed under section 6662 or 6663 with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  26 U.S.C. § 6664(c)(1).

In this case, even though 26 U.S.C. § 6221 provides that the applicability of any accuracy-related penalty shall be determined at the partnership level, the Plaintiffs say that the computation of

-68-

Case No. 1:07-CV-857
Gwin, J.

any "substantial understatement" of tax liability for purposes of the accuracy-related penalty under

§ 6662 must be done at the partner-specific level. The Plaintiffs say that certain defenses to tax-

related penalties, such as the reasonable cause defense, rely upon the acts of the individual partners

and are not partnership items within the scope of this case. The Plaintiffs conclude that any such

partner-level defenses may only be raised in a separate refund action under Treas. Reg. §§ 301.6221-

1(c), (d).

The U.S. Court of Federal Claims recently addressed the issue of whether the reasonable

cause defense to the imposition of accuracy-related penalties may be properly asserted at the

partnership-level in a TEFRA proceeding. *Jade Trading, LLC v. United States,* 80 Fed. Cl. 11 (Fed.

Cl. 2007). In that case, the court explained that partner-level defenses to any accuracy-related

penalty relating to the adjustment of a partnership item cannot be litigated at the partnership level.

*Id.* at *59. To this effect, Treasury Regulation § 301.6221-1(d) provides:

> Partner-level defenses to any penalty . . . that relates to an adjustment to a partnership
> item may not be asserted in the partnership-level proceeding, but may be asserted
> through separate refund actions following assessment and payment. . . . Partner-level
> defenses are limited to those that are personal to the partner or are dependent upon
> the partner's separate return, and cannot be determined at the partnership level.
> Examples of these determinations are . . . section 6664(c)(1) (reasonable cause
> exception) . . .

Treas. Reg. §§ 301.6221-1(d).

The Treasury regulation thus establishes that the reasonable cause defense is an example of

a partner-level defense against accuracy-related penalties that should be asserted in a later partner-

level refund suit, not in the TEFRA proceeding itself. Despite the seemingly conflicting statutory

language of § 6444, which prohibits the application of penalties where a taxpayer has reasonable

cause for his understatement, and § 6221, which provides that the "applicability of penalties" relating

-69-

Case No. 1:07-CV-857
Gwin, J.

to "partnership items" shall be decided at the partnership-level, the *Jade Trading* court concluded that

individual partners should reserve their reasonable cause defenses for subsequent partner-specific

proceedings. *Jade Trading*, 80 Fed. Cl. at *59.  This Court agrees.

The Court acknowledges that this administrative procedure may be "burdensome" to the

taxpayer-partners as the partners must pay any asserted accuracy-related penalty at the conclusion

of the TEFRA partnership proceeding without having first asserted their defenses.  *Id.*  In reaching

this conclusion and upholding the validity of the Treasury regulation, however, the Court of Federal

Claims explained:

> The regulation does not deprive a taxpayer from ever being able to show reasonable
> cause- it merely delays the adjudication of that defense until the partner-level
> proceeding, recognizing that the reasonable cause defense may differ from partner to
> partner depending upon individual circumstances.  The individual partners may still
> avail themselves of section 6664's protection and defeat the penalties if they can show
> the requisite reasonable cause and good faith. This is consistent with TEFRA's
> purpose of litigating all common partnership items at the partnership-level and
> deferring the unique individual defenses to the partner-level proceeding.

*Jade Trading*, 80 Fed. Cl. at *59-60.  *See also* *Stobie Creek Investments, LLC v. United States*, 2008

WL 852821, at *2008-1154 (Fed. Cl. 2008) (reemphasizing the "two-tiered structure" of TEFRA

proceedings). The Treasury regulations, therefore, "do not allow for binding determinations of

partner-level defenses until they are presented at the partner level."  *Id.*

Here, the Court concludes that the Trust has not presented a partnership-level reasonable

cause defense. The Trust took an "all-or-nothing" stance at trial regarding the propriety of its tax

treatment of the AWG sale-leaseback transaction and did not present any evidence in support of a

reasonable cause defense on behalf of the Trust.  Because the Trust has not carried its burden of

proving a defense, the Court must therefore sustain the applicability of the accuracy-related penalties

Case No. 1:07-CV-857
Gwin, J.

to the partnership's tax returns.

The individual partners, however, may each be able to prove a reasonable cause defense in a subsequent partner-level refund action under Treas. Reg. §§ 301.6221-1(d). Nothing in the Court's opinion should be construed to foreclose such a possibility for the individual Plaintiffs.

### E. Original Issue Discount (OID)

In its Final Partnership Administrative Adjustment ("FPAA"), the IRS concluded that the Plaintiffs had failed to report original issue discount ("OID") income in the amount of $12,167,086 for the Taxable Years. In their post-trial findings of fact and conclusions of law, the Plaintiffs vaguely argue that the OID income was improperly asserted in this case and that, even if some OID income should have been imposed, the IRS grossly overstated the amount.

Original issue discount "results when a [debt instrument] is issued for less than its face value. The discount, which compensates for a stated interest rate that the market deems too low, equals the difference between a [debt instrument]'s face amount (stated principal amount) and the proceeds, prior to issuance expenses, received by the issuer." *Matter of Pengo Industries, Inc.,* 962 F.2d 543, 546 (5th Cir. 1992) (citing *LTV Corp. v. Valley Fidelity Bank & Trust Co. (In re Chateaugay Corp.),* 961 F.2d 378, 380 (2nd Cir. 1992)).   A debt instrument typically has original issue discount interest when the instrument is issued to a taxpayer "for a price that is less than its stated redemption price at maturity. OID is the difference between the stated redemption price at maturity and the issue price." IRS Publication 550, *Investment Income* (2007), http://www.irs.gov/publications/p550/ch01.html#d0e2840.  OID, therefore, is a type of interest and must generally be included in a taxpayer's reported income as it accrues over the duration of the debt instrument. *Id.*

Case No. 1:07-CV-857
Gwin, J.

In this case, original issue discount income only will arise if the underlying SILO transaction is re-characterized as a "loan" from the Trust to AWG.  In support of this position, the Government says that the Equity PUA is, in reality, a debt owed by AWG to the Plaintiffs because it represents an "unconditional obligation that Plaintiffs will receive a sum certain (i.e., the return that the Equity PUA guarantees to provide in 2024)." [Govt. Rebuttal Br., Doc. 123 at 6, n.5.]  The Government says that the Plaintiffs will collect that fixed amount directly from AIG if the Fixed Purchase Option is exercised in 2024, or out of the equity portion of the Capacity Charges if the Service Contract option is exercised.  In the FPAA, the Government thus allocated the Plaintiffs' resulting OID income, which is the difference between the Plaintiffs' original "equity" investment and the amount that is payable by AWG under the Service Contract, annually over the 24-year duration of the Equity PUA under 26 U.S.C. §§1271, 1272.

In their post-trial briefs, the Plaintiffs vaguely challenge this conclusion and assert that, because the underlying SILO transaction was not a "debt" owed by AWG to the Trust, the application of any original issue discount income to the Plaintiffs is improper.  Alternatively, the Plaintiffs say that, if the Court determines that the imposition of OID income is valid, the amount of income asserted by the IRS in the FPAA is overstated.

The Court, however, finds that the Plaintiffs have waived their argument with respect to their challenge of the original issue discount income.  The Plaintiffs bear the burden of proving the correct amount of their tax liability.  *See Dow Chem Co. v. United States,* 435 F.3d at 599 (citing *INDOPCO, Inc. v. Comm'r,* 503 U.S. 79, 84 (1992)).  The Plaintiffs briefly mentioned the OID income issue in their complaint, but then failed to raise or discuss the issue in their pre-trial briefs or proposed findings of fact and conclusions of law. The Plaintiffs offered no evidence and presented no testimony

-72-

Case No. 1:07-CV-857
Gwin, J.

at trial regarding the issue of OID income.  The Plaintiffs did not argue the merits of the issue in their

post-trial briefs. The record before this Court is substantively insufficient with respect to the OID

income question.  As the Government correctly notes, the Plaintiffs' vague attempt to briefly litigate

the issue in their post-trial findings of fact and conclusions of law is insufficient to meet their burden

of proving the correct amount of tax liability.

The Court therefore sustains the IRS's determination that the Trust should have reported

additional original issue discount income on their tax returns for the Taxable Years.

### VI. Conclusion

For the reasons stated above, the Court **SUSTAINS** the IRS's determination that the

Plaintiffs' asserted tax benefits relating to the AWG transaction are improper.  The Court therefore

**DENIES** the Plaintiffs' claimed depreciation deductions under 26 U.S.C. § 168, interest expense

deductions under § 163(a), and amortization of transaction costs deductions.  The Court also

**SUSTAINS** the IRS's imposition of accuracy-related penalties at the partnership level for substantial

understatement of tax liability under 26 U.S.C. § 6662(a).

IT IS SO ORDERED.


Dated: May 28, 2008                              s/          *James S. Gwin*
                                                 JAMES S. GWIN
                                                 UNITED STATES DISTRICT JUDGE